**2014-1074, -1129**

# United States Court of Appeals
# for the Federal Circuit

———————•———————

TAKEDA PHARMACEUTICAL CO., LTD.,
TAKEDA PHARMACEUTICALS AMERICA, INC,
TAKEDA PHARMACEUTICALS LLC, and
TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.,

*Plaintiffs – Cross-Appellants,*

*v.*

TWI PHARMACEUTICALS, INC.,

*Defendant – Appellant.*

*Appeal from the United States District Court for the Northern District of California in case no. 11-CV-01609, Magistrate Judge Joseph C. Spero.*

## BRIEF OF THE DEFENDANT-APPELLANT
## TWI PHARMACEUTICALS, INC.

DON J. MIZERK
STEVEN E. FELDMAN
DANIEL R. CHERRY
JOHN A. SHOLAR, JR.
HUSCH BLACKWELL LLP
120 South Riverside Plaza • 22nd Floor
Chicago, Illinois 60606
(312) 655–1500

*Attorneys for Defendant-Appellant
TWi Pharmaceuticals, Inc.*

APRIL 21, 2014

# CERTIFICATE OF INTEREST

Pursuant to FED. CIR. R. 47.4, counsel for Appellant TWi Pharmaceuticals, Inc. certifies the following:

**1.     The full name of every party represented by me is:**

TWi Pharmaceuticals, Inc.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

The party named in the caption is the real party in interest.

**3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by me are:**

TWi Pharmaceuticals, Inc. is a publicly held stock company of Taiwan with no parent corporation.  Although no longer a wholly owned subsidiary, TWi Pharmaceuticals Holdings, Inc. has a financial interest in TWi Pharmaceuticals, Inc.  No publicly held corporation owns more than ten (10) percent of TWi Pharmaceuticals, Inc. or TWi Pharmaceuticals Holdings, Inc.

**4.  The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:**

Don. J. Mizerk, Steven E. Feldman, Daniel R. Cherry, and John A. Sholar, all of Husch Blackwell LLP Chicago, Illinois.


/s/ Don J. Mizerk_____
an Attorney for Defendant-Appellant
**TWi Pharmaceuticals, Inc.**


 April 21, 2014____
Date

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF RELATED CASES .................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 2

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE .............................................................. 4

   1.  The proceedings below. ............................................................. 4

   2.  The '282 patent claims amorphous dexlansoprazole and amorphous salts of dexlansoprazole. ................................................................ 5

   3.  The '282 patent is not listed in the Orange Book. ....................... 6

   4.  Amorphous dexlansoprazole and amorphous salts of dexlansoprazole are disclosed in the prior art. ................................ 7

   5.  Amorphous salts of dexlansoprazole are not described in the text of the patent. ................................................................................ 9

SUMMARY OF ARGUMENT ............................................................ 11

STANDARDS OF REVIEW ............................................................... 15

ARGUMENT ..................................................................................... 18

   I.  No basis exists for asserting infringement of the '282 patent under § 271(e)(2)(A) because it was never listed in the FDA Orange Book. ......... 18

   II.  The claims are anticipated when the term "amorphous compound" is correctly construed and not improperly limited to solid compounds. ........ 19

      A.  The claim language. ...................................................... 20

B.  The specification. ................................................................. 21

C.  The prosecution history. ....................................................... 23

D.  The extrinsic evidence. ......................................................... 28

E.  Because an "amorphous compound" includes nonsolids, the claims are invalid in view of Larsson and Von Unge. ..................... 32

III. Whether or not limited to solids, the asserted claims are invalid because they are not supported by an adequate written description of amorphous salts. ........................................................................... 33

IV. Even if limited to solid compounds, the claims are invalid because solid amorphous dexlansoprazole and solid amorphous dexlansoprazole salts are not patentable over the prior art. ........................ 37

A.  Barberich anticipates solid amorphous salts of dexlansoprazole. ................................................................. 39

B.  Barberich anticipates amorphous solid dexlansoprazole. ................ 42

    1.  The University of Wisconsin's lab work demonstrates that the person of ordinary skill would have been able to make amorphous solid dexlansoprazole without undue experimentation. .................................................. 42

        a.  The selection, and gradient addition, of the solvents. .................................................... 46

        b.  Dropwise addition of the CHP oxidant. ...................... 47

        c.  Doing the isolation procedure more than three times. .......................................................... 48

        d.  Not using an achiral HPLC test for chemical purity. .......................................................... 50

    2.  Expert testimony established that the person of ordinary skill would have been able to make solid amorphous dexlansoprazole from an oil without undue experimentation. .................................................. 51

3.     The District Court erroneously analyzed the *Wands* factors. .................................................................. 54

      a.     The amount of direction or guidance presented. ......... 54

      b.     The presence or absence of working examples. .......... 55

      c.     The nature of the invention and the relative skill in the art. .................................................................... 55

      d.     State of the prior art. .................................................... 56

      e.     The predictability or unpredictability of the art. ......... 56

      f.     Breadth of the claim. ................................................... 57

      g.     The quantity of experimentation needed. .................... 58

      h.     Enablement is the only conclusion support by a proper analysis of the *Wands* factors. .......................... 58

C.     The claims are invalid for obviousness. ........................................... 59

CONCLUSION .................................................................................... 62

ADDENDUM

    November 1, 2013 Final Judgment as to TWi Pharmaceuticals (Doc. No. 335) ......................................................... A1-A4

    October 17, 2013 Findings of Fact & Conclusions of Law (Doc. No. 330) .................................................................... A5-A131

    April 8, 2013 Summary Judgment Order (Doc. No. 235) ........... A132-A184

    April 11, 2012 Claim Construction Order (Doc. No. 81) ........... A185-A255

    Patent at Issue, U.S. 7,737,282 (TX1055) .................................. A256-A265

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page*

## CASES

*Abbott Labs. v. Sandoz, Inc.*,
  486 F. Supp. 2d 767 (N.D. Ill. 2007)............................................................. 52

*Alcon Research Ltd. v. Barr Labs., Inc.*,
  Nos. 2012-1340, -1341, slip op. (Fed. Cir. Mar. 18, 2014)...................... 18

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ........................................................... 38, 59

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  457 F.3d 1293 (Fed. Cir. 2006) .................................................................. 38

*Ancora Techs., Inc. v. Apple, Inc.*,
  744 F.3d 732 (Fed. Cir. 2014) ........................................................... 23, 32

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
  726 F.3d 1296 (Fed. Cir. 2013) ......................................................... 20, 23

*Ariad Pharms., Inc. v. Eli Lilly and Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ............................... 12, 16, 33, 35

*AstraZeneca Pharms, LP v. Apotex Corp.*,
  669 F.3d 1370 (Fed. Cir. 2012) ......................................................... 18, 19

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
  750 F.2d 1569 (Fed. Cir. 1984) .................................................................. 58

*Atlas Powder Co. v. Ireco Inc.*,
  190 F.3d 1342 (Fed. Cir. 1999) ......................................................... 16, 40

*Aventis Pharma S.A. v. Hospira, Inc.*,
  675 F.3d 1324 (Fed. Cir. 2012) ..................................................... 20, 23, 32

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
  676 F.3d 1316 (Fed. Cir. 2012) .................................................................. 19

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
    922 F.2d 792 (Fed. Cir. 1990) ................................................................. 30

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ................................................. 39, 41, 57

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*,
    69 F.3d 1130 (Fed. Cir. 1995) ................................................................. 15

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .................................................................................. 52

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ........................................................ 23, 31

*Cephalon, Inc. v. Watson Pharms., Inc.*,
    707 F.3d 1330 (Fed. Cir. 2013) ............................................................. 42

*DeGeorge v. Bernier*,
    768 F.2d 1318 (Fed. Cir. 1985) ............................................................. 50

*Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research*,
    346 F.3d 1051 (Fed. Cir. 2003) ............................................................. 17

*Glaxo Operations UK Ltd. v. Quigg*,
    894 F.2d 392 (Fed. Cir. 1990) ............................................................... 33

*Goeddel v. Sugano*,
    617 F.3d 1350 (Fed. Cir. 2010) ........................................................ 35, 36

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011)............. 20, 23

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
    545 F.3d 1312 (Fed. Cir. 2008) ............................................................. 38

*In re Angstadt*,
    537 F.2d 498 (CCPA 1976) ................................................................... 57

*In re Antor Media Corp.*,
    689 F.3d 1282 (Fed. Cir. 2012) ................................................ 38, 55, 56, 57

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir. 2002) .................................................. 40

*In re Donohue*,
766 F.2d 531 (Fed. Cir. 1985) ................................. 39, 41, 55, 57

*In re Epstein*,
32 F.3d 1559 (Fed. Cir. 1994) ........................................... 13, 40

*In re Gay*,
309 F.2d 769 (CCPA 1962) .............................................. 46

*In re Hanford Nuclear Reservation Litig.*,
534 F.3d 986 (9th Cir. 2008) ......................................... 53

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009) ........................................... 61

*In re Lamberti*,
545 F.2d 747 (CCPA 1976) .......................................... 44, 58

*In re Michalek*,
162 F.2d 229 (CCPA 1947) .......................................... 44

*In re Omeprazole Patent Litig.*,
483 F.3d 1364 (Fed. Cir. 2007) ...................................... 23, 39

*In re Paulsen*,
30 F.3d 1475 (Fed. Cir. 1994) ...................................... 40

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) ............................... passim

*Inverness Med. Switz., GmbH v. Warner Lambert Co.*,
309 F.3d 1373 (Fed. Cir. 2002) ...................................... 31

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) .................................... 53

*Jepson v. Coleman*,
314 F.2d 533 (CCPA 1963) ........................................ 35, 37

*Johns Hopkins Univ. v. CellPro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998) ................................................................ 54

*Kao Corp. v. Unilever United States, Inc.*,
    441 F.3d 963, 967 (Fed. Cir. 2006) ....................................................... 33

*Kennecott Corp. v. Kyocera Int.'l, Inc.*,
    835 F.2d 1419 (Fed. Cir. 1987) ............................................................. 37

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) .................................................................................. 60

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ............................................................... 23

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    No. 2012-1014, slip op. (Fed. Cir. Feb. 21, 2014) (en banc) .................... 15

*Lindemann Maschinenfrabrik GmbH v. Am. Hoist and Derrick Co.*,
    730 F.2d 1452 (Fed. Cir. 1984) ............................................................. 38

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) ....................................................... passim

*Lupin Ltd. v. Abbott Labs.*,
    491 F.Supp. 2d 563 (E.D. Va. 2007) ..................................................... 52

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996) ........... 30

*Martek Biosciences Corp. v. Nutinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ............................................................. 27

*Martin v. Mayer*,
    823 F.2d 500 (Fed. Cir. 1987) ....................................................... 35, 37

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) .............................................. 14, 17, 60

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S.Ct. 2238 (2011) ............................................................................ 16

*Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*,
   686 F.3d 1348 (Fed. Cir. 2012) ................................................. 18

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
   424 F.3d 1347 (Fed. Cir. 2005) ............................................. 15, 17

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ................................................. 61

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................... passim

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ................................. 12, 35, 36, 37

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001) ................................................. 32

*Saffran v. Johnson & Johnson*,
   No. 2:07-CV-451, 2011 WL 1299607 (E.D. Tex. Mar. 31, 2011)............. 52

*Schering Corp. v. Geneva Pharms., Inc.*,
   339 F.3d 1373 (Fed. Cir. 2003) (same) ................................... 40, 54, 56, 57

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005) ................................................. 39

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
   511 F.3d 1186 (Fed. Cir. 2008) ......................................... 17, 40

*Takeda Pharma. Co. v. Zydus Pharmas, USA, Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014) ................................................. 54

*Tempo Lighting, Inc. v. Tivoli, LLC*,
   742 F.3d 973, (Fed. Cir. 2014) ......................................... 25, 28

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002) ................................................. 31

*Therma-Tru Corp. v. Peachtree Doors Inc.*,
   44 F.3d 988 (Fed. Cir. 1995) ................................................. 37

*Thorner v. Sony Computer Entmt. Am., LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .......................................................... 23, 32

*Titanium Metals Corp. v. Banner*,
    778 F.2d 775 (Fed. Cir. 1985) ................................................................... 40

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948) ................................................................................... 15

*Vederi, LLC v. Google, Inc.*,
    Nos. 2013-1057, -1296, slip op. (Fed. Cir. Mar. 14, 2014)........................ 28

*Wood v. Dalton*,
    855 F.Supp.2d 494 (D.Md. 2012)............................................................... 49

## STATUTES

21 U.S.C. § 355 ..................................................................................... 18, 19

28 U.S.C. § 1295 .......................................................................................... 2

35 U.S.C. § 112 .......................................................................................... 11

35 U.S.C. § 271 .................................................................................. passim

## RULES

FED. R. CIV. P. 52 ........................................................................................ 16

## OTHER AUTHORITIES

9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 52.31[4] (3d
    ed. 2013) ................................................................................................... 15

http://dictionary.reference.com/browse/couple ...................................... 49

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from this same civil action in the lower court was previously before this or any other Court of Appeals.

In an Order dated February 27, 2014 (Doc. No. 26), this case was made a companion case to:

- *Takeda Pharmaceutical Co., Ltd., et al., v. Handa Pharmaceuticals*, LLC, et al., Nos. 14-1079, -1134.

- *Takeda Pharmaceutical Co., Ltd., et al. v. Impax Laboratories, Inc.*, Nos. 2014-1107, -1132.

That order set a uniform briefing schedule for the cases and assigned them to the same merits panel for oral argument.

No other cases are known to counsel to be pending in this Court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

As explained below in Section I of the Argument, there is no subject matter jurisdiction to adjudicate infringement or validity of U.S. Patent No. 7,737,282 under 35 U.S.C. § 271(e)(2)(A) because that patent has never been listed in the FDA Orange Book.

The District Court correctly rejected Declaratory Judgment Act jurisdiction over the infringement claim under 35 U.S.C. § 271(a).  (A104-A107.)

After a bench trial on the issue of validity, the District Court entered a final judgment and a permanent injunction on November 1, 2013.  (A1-A3.)  The notice of appeal was timely filed on November 5, 2013.  (A315; A318.)  This Court has appellate jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

Can an infringement action under 35 U.S.C. § 271(e)(2)(A) be maintained when the patent-in-suit is not listed in the FDA Orange Book?

Did the District Court misconstrue the claim term "amorphous compound" by limiting it to include only *solids*?

Are the asserted claims invalid because the written description contains no explicit or inherent disclosure of *amorphous salts* of dexlansoprazole?

Are the asserted claims invalid for anticipation by the prior art?

Are the asserted claims invalid for obviousness in view of the prior art?

## STATEMENT OF THE CASE

**1.    The proceedings below.**

Takeda[1] sued TWi[2] alleging infringement of U.S. Patent No. 7,737,282 ("the '282 patent"), as well as U.S. Patent Nos. 7,790,755 ("the '755 patent"), 6,462,058 ("the '058 patent"), 6,664,276 ("the '276 patent"), 6,939,971 ("the '971 patent") and 7,285,668 ("the '668 patent") under 35 U.S.C. §§ 271(a) and 271(e)(2)(A) based on TWi's filing of Abbreviated New Drug Application ("ANDA") No. 202-666 seeking approval to sell generic dexlansoprazole products.  (A9; A12.)

By consent, the case was reassigned to Magistrate Judge Honorable Joseph C. Spero.  (A276.)

Just prior to initial expert disclosures, Takeda conceded that TWi did not infringe the '058, '276, '971 and '668 patents, and final judgment in TWi's favor was entered with respect to those patents.  (A133 n.2.)

At summary judgment the District Court found that TWi did not infringe the '755 patent, but did infringe claims 1-2 of the '282 patent.  (A10.)

---

[1] Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals North America, Inc.
[2] TWi Pharmaceuticals, Inc.

After a bench trial, the District Court declined declaratory judgment jurisdiction over Takeda's § 271(a) claim and rejected TWi's invalidity defenses to the '282 patent. (A128 ¶ 459.)

The District Court entered final judgment against TWi with respect to the '282 patent under Takeda's § 271 (e)(2)(A) claim and in TWi's favor with respect to the '755 patent. (A1-A3.) TWi timely appealed. (A315; A318.)

## 2. The '282 patent claims amorphous dexlansoprazole and amorphous salts of dexlansoprazole.

Lansoprazole is a drug long known to be effective as a gastric acid secretion inhibitor useful in treating ulcers. (A17 ¶ 39; A9366; A9521.)

Enantiomers are the non-superimposable mirror images of a given compound, just as a person's left and right hands are non-superimposable images of each other. (A16 ¶ 32.) Enantiomers are designated by their handedness as right (R) or left (S). (*Id.*) Dexlansoprazole is the R-enantiomer of lansoprazole. (A17 ¶ 38.)

Crystals are solids in which the atoms (or molecules) are arranged in a periodic repeating pattern that extends in three dimensions. (A12 ¶ 12.) Amorphous compounds lack such long range order. (*Id.*) Some solids and all liquids are amorphous. (*Id.*; A223; A226; A2291.)

The '282 patent is entitled "Benzimidazole Compound Crystal" and states repeatedly that the "present invention" is a "crystal." (A256; A259 at 4:9; A264

– 5 –

at 14:51.)  It is the latest patent to issue from a series of continuation applications claiming priority to a Japanese filing date of June 17, 1999.  (A17 ¶ 40; A24 ¶ 72; A256.)  The earlier patents in the series claim *crystalline* dexlansoprazole.  (A17 ¶ 37.)  As a result of claims first presented ten years later in 2009, the '282 patent claims *amorphous* dexlansoprazole.  (*Id.*; A265; A8873 (pp. 126-127); A9857-A9859.)  Takeda asserted Claims 1 and 2 against TWi.  (A2.)

- **Claim 1** claims "an amorphous compound of [dexlansoprazole] or a salt thereof."  (A265.)

- **Claim 2** claims a "pharmaceutical composition comprising the amorphous compound according to claim 1 and a pharmaceutically acceptable excipient, carrier or diluent."  (A265.)

Unless invalidated sooner, the '282 patent expires June 15, 2020.  (A2.)

### 3.    The '282 patent is not listed in the Orange Book.

Takeda's Dexilant product contains crystalline, not amorphous, dexlansoprazole.  (A2226.)  Accordingly, the '282 patent is not and cannot be listed in the FDA Orange Book.  (A133.)  The District Court held that Orange Book listing is not a prerequisite to the maintenance of an action under § 271(e)(2)(A).  (A170.)

**4.     Amorphous dexlansoprazole and amorphous salts of dexlansoprazole are disclosed in the prior art.**

Amorphous dexlansoprazole is disclosed in the Larsson, Von Unge, and Barberich prior art references.  (A46 ¶ 178; A47 ¶ 179; A175.)

In the District Court, Takeda opposed invalidity based on Larsson and Von Unge by arguing that the '282 patent's claimed "amorphous compound" should be construed to cover only a *solid* compound, so as to distinguish the claims from the pure dexlansoprazole disclosed in Larsson and Von Unge in an *oil*.  (A144-A146.)  The evidence showed that:

- The claim language makes no reference to the amorphous compound being a solid.  (A265.)

- The specification never describes its amorphous compounds as solids. (A256-A264.)

- The specification never attributes any importance to whether the amorphous compound is a solid or nonsolid.  (*Id.*)

- During prosecution Takeda did not distinguish the prior art on the ground that the claimed amorphous compounds are solids.  (A10084-A10086.)

- Takeda's own expert conceded that the plain and ordinary meaning of the term "amorphous compound" includes both solids and nonsolids.  (A1985.)

Nevertheless, the District Court limited the claims to solids. (A27 ¶ 91; A229-A233.)

Takeda's response to invalidity based on Barberich, which discloses *solid* amorphous dexlansoprazole and salts thereof (A9523-A9524 at [0031]-[0035]), was to argue that Barberich was not enabled. (A145.) The evidence showed that:

- The '282 patent has no better disclosure than Barberich of how to make an amorphous salt of dexlansoprazole. (A8874 (p. 130); A9096 (p. 571).)

- In another patent Takeda stated that amorphous solid salts of dexlansoprazole can be made according to the methods disclosed in the WO 94/27988 prior art reference. (A10955 at 4:5-7; A11075.)

- The lab at the University of Wisconsin was able to make solid amorphous dexlansoprazole by following prior art techniques. (A8999-A9006 (pp. 359-385); A11015-A11025.)

- Alternative prior art techniques were available for making solid amorphous dexlansoprazole. (A9092-A9094 (pp. 554-564).)

Nevertheless, the District Court held that the prior art was not sufficiently enabling. (A123 ¶ 436; A127 ¶ 452.)

The District Court found that the person of ordinary skill in the art would have been motivated to make the claimed compound. (A100-A102 ¶¶ 375-379; A127 ¶ 453.) No objective indicia of nonobviousness were found by the District

Court.  (A91-A102; A127-A128.)  The '282 patent is itself dependent on the prior art for instruction on how to make the claimed amorphous salts of dexlansoprazole.  (A8874 (p. 130) ("[T]here's no description of how to make an amorphous salt anywhere in the '282 patent.") (Inventor Kamiyama).)  Nevertheless, the Court rejected TWi's obviousness defense on the ground that the skilled person would have lacked a reasonable expectation of success.  (A127 ¶ 453.)

**5.    Amorphous salts of dexlansoprazole are not described in the text of the patent.**

The claims to amorphous dexlansoprazole and amorphous dexlansoprazole salts were first presented in the last of the series of continuation applications, years after patents had issued from earlier applications in that series.  (A256; A9857-A9859; A8873 (pp. 126-127); A9347; A9355; A11106.)   The written description common to all these applications does not contain an explicit description of amorphous salts.  (A146 ("Takeda does not dispute that there is no explicit description in the '282 Patent of the amorphous salt of Claim 1 or its use in a pharmaceutical compound….").)   Instead, the written description includes salts of dexlansoprazole in its definition of the "*crystal* of the present invention."  (A259 at 3:38-40 (emphasis added).)  The written description nowhere contradicts this definition of the salts as crystalline.

Prior to the filing of their first patent application, the inventors had not actually made any salts of dexlansoprazole. (A8873 (p. 127).) Later, they made some salts, including an amorphous magnesium salt of dexlansoprazole. (A8874 (p. 130).) A magnesium salt of dexlansoprazole is on the laundry list of salts listed in the written description, but it is not identified in the written description as being amorphous. (A258 at 2:5.) There is no evidence that a magnesium salt of dexlansoprazole will inevitably be amorphous rather than crystalline.

At one point, Takeda's own expert testified that the ordinarily skilled person would not have regarded the inventors as being in possession of amorphous salts of dexlansoprazole. (A9315 (p. 1049); A9319-A9320 (pp. 1068-1070); A9320 (p. 1071-1072).) Nevertheless, the District Court held that there was an adequate written description because "a person of skill in the art would know how to derive a salt of amorphous dexlansoprazole." (A176.)

## **SUMMARY OF ARGUMENT**

Takeda's § 271(e)(2)(A) action cannot be maintained because the '282 patent was never Orange Book listed. The artificial infringement cause of action under § 271(e)(2)(A) is part of a statutory scheme keyed to listing patents in the Orange Book and does not support a cause of action for an unlisted patent.

The District Court misconstrued the claim term "amorphous compound." Nothing in the claim language limits it to solids. Nowhere in the specification are the amorphous compounds characterized as solids. Nor does the specification attribute any importance to whether the amorphous compound is a solid or not. Never during prosecution were the claimed amorphous compounds distinguished from the prior art on the ground that they are solids. Takeda's own expert conceded that the plain and ordinary meaning of "amorphous compound" includes *non*solids. (A1985.) In sum, there is no reason to limit the claims to solids.

When the claims are correctly construed to encompass any amorphous compound of dexlansoprazole, they are invalid in view of the Larsson and Von Unge references that each disclose dexlansoprazole in an oil. (A43 ¶¶ 167-168; A46 ¶¶ 177-178; A48 ¶ 185.)

Irrespective of the District Court's erroneous claim construction, the asserted claims are invalid under 35 U.S.C. § 112 because there is no written

– 11 –

description of the claimed amorphous salts either as a solid or in a liquid. The District Court misunderstood the requirement for a written description when it relied on the skilled person's ability to make the claimed amorphous salt of dexlansoprazole. (A176.) The test is not whether the skilled person might have been able to do what is claimed, but rather whether the patent's written description necessarily discloses it. *E.g., Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1348 (Fed. Cir. 2010) (en banc). It is undisputed that there is no *explicit* description in the '282 patent of the claimed amorphous salt of dexlansoprazole. (A146.) Nor is there an *implicit* description because the record does not demonstrate the salts listed in the patent are inherently and necessarily amorphous. *E.g., PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306-07 (Fed. Cir. 2008).

Even under the District Court's erroneous claim construction, the claims are invalid in view of Barberich's disclosure of *solid* amorphous dexlansoprazole and salts thereof. (A47 ¶ 179; A123 ¶ 436; A175; A9523-A9524 at [0031]-[0035].) The District Court was wrong in its determination that Barberich was not enabled.

First, as Inventor Kamiyama admitted, there is no description of how to make an amorphous salt anywhere in the patent (A8874 (p. 130)), and so the '282 patent is itself dependent on prior art know-how for making the claimed

amorphous salts. If the '282 patent is enabled, then so too is the prior art Barberich reference. *E.g., In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994).

Second, in its later '182 patent, Takeda relied on the WO 94/27988 prior art reference to enable its disclosure of amorphous salts of dexlansoprazole. (A8874 (p. 130); A10955 at 4:5-7; A11075.) The District Court never explained why the methods of WO 94/27988 are not likewise sufficient to enable Barberich's disclosure of amorphous salts of dexlansoprazole.

Third, the University of Wisconsin lab made solid amorphous dexlansoprazole using the procedure described in Example 22 of the prior art Larsson reference, making only adjustments that were available to the skilled person in 1999. (A8999-A9006 (pp. 359-385); A11015-A11025.)

Fourth, as an alternative approach, the skilled person in 1999 could have used the prior art trituration procedure to extract solid amorphous dexlansoprazole from the oil reported in Larsson's Example 22. (A9092-A9094 (pp. 554-564).)

Even were it not enabled, the Barberich reference still supports the District Court's finding that the person of ordinary skill would have been motivated to make solid amorphous dexlansoprazole and its salts. (A100-A102 ¶¶ 375-379; A127 ¶ 453.) Because the prior art provides as much instruction as the '282 patent does about how to make the amorphous salts of dexlansoprazole, the

asserted claims would have been obvious to the person of ordinary skill in the art. *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1373-75 (Fed. Cir. 2005).  No objective indicia of nonobvious were found by the District Court or even argued by Takeda.

## STANDARDS OF REVIEW

A district court's decision following a bench trial is reviewed for errors of law and clearly erroneous findings of fact. *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1352 (Fed. Cir. 2005). A finding of fact is clearly erroneous when, despite some supporting evidence, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Novo Nordisk*, 424 F.3d at 1353. "[T]he reviewing court may discard a finding even if supported by substantial evidence when the clear weight of the evidence suggests that the finding is incorrect." 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 52.31[4] at 52-65 to 52-66 (3d ed. 2013) (footnote omitted).

An issue of statutory construction is a question of law that is reviewed *de novo*. *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1134 (Fed. Cir. 1995).

Claim construction is reviewed *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, No. 2012-1014, slip op. 7, 26 (Fed. Cir. Feb. 21, 2014) (en banc).

– 15 –

Because by statute patents are presumed valid, TWi had the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242 (2011).

Determination of compliance with the written description requirement is a question of fact. *Ariad,* 598 F.3d at 1351. Normally, the District Court's findings of fact are subject to review under FED. R. CIV. P. 52(a)(6)'s clearly erroneous standard, but here, despite having conducted a bench trial on the issue, the Court incorrectly treated the written description issue as disposed of on summary judgment. (A102 ¶ 382 ("The Court expressly rejected the second argument at summary judgment, holding that the disclosure of the '282 Patent 'shows that the inventors were in possession of the claimed salt of dexlansoprazole.' TWi Summary Judgment Order [D.N. 235] at 45. The Court declines to revisit that ruling.").) Summary judgment rulings are reviewed *de novo, Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed. Cir. 1997), and that standard of review should be applied here.

Anticipation is a question of fact reviewed under the clearly erroneous standard. *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999). What a prior art reference discloses is a factual determination that is reviewed under the clearly erroneous standard; however, whether a prior art reference is enabling is a question of law based on underlying factual findings. *SRI Int'l, Inc.*

*v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008); *Novo Nordisk*, 424 F.3d at 1355. Whether a prior art reference teaches one of ordinary skill how to make the claimed invention without undue experimentation is a question of law based on underlying factual inquiries that are reviewed for clear error. *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research*, 346 F.3d 1051, 1054 (Fed. Cir. 2003).

Obviousness is a question of law, reviewed *de novo,* based upon underlying factual questions that are reviewed for clear error. *Merck*, 395 F.3d at 1369 (Fed. Cir. 2005).

**ARGUMENT**

## I.   No basis exists for asserting infringement of the '282 patent under § 271(e)(2)(A) because it was never listed in the FDA Orange Book.

The '282 patent was never listed in the FDA Orange Book.  (A133.)  The District Court held that Orange Book listing is not required for a 35 U.S.C. § 271(e)(2)(A) infringement action.  (A166-A170.)

The Orange Book listing of a patent is a requirement of any action under § 271(e)(2)(A).   In addressing jurisdiction under § 271(e)(2)(A), this Court recognized that the patentee asserted "that the Appellees' ANDA filings infringed its *listed* patents under § 271(e)(2), and [that] *nothing more was required* to establish the district court's subject matter jurisdiction."  *AstraZeneca Pharms, LP v. Apotex Corp.*, 669 F.3d 1370, 1377 (Fed. Cir. 2012) (emphasis added).  The question of the propriety of asserting unlisted patents was recently identified by this Court in *Alcon Research Ltd. v. Barr Labs., Inc.*, Nos. 2012-1340, -1341, slip op. 4 n.2 (Fed. Cir. Mar. 18, 2014).

Unlike the more broadly written "safe harbor" of § 271(e)(1), the artificial act of infringement created by § 271(e)(2)(A) pertains to the filing of an ANDA under Hatch-Waxman Act § 505, 21 U.S.C. § 355 (j), for "a drug claimed in a patent or the use of which is claimed in a patent."  *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 686 F.3d 1348, 1354-1355 (Fed. Cir. 2012).  In order to be consistent with the Hatch-Waxman statutory scheme, the patent referenced in

§ 271(e)(2)(A) must be one that the NDA holder has identified pursuant to 21 U.S.C. § 355 (b)(1). *Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1318 (Fed. Cir. 2012) (NDA holder must "identify every patent that claims the drug or a use of the drug that could reasonably be asserted in an infringement action."). The patents that the NDA holder identifies are listed by FDA in the Orange Book. *Id.* Each such listed patent must be addressed in an ANDA with a certification under 21 U.S.C. § 355(j)(2)(A)(vii) or a statement under § 355(j)(2)(A)(viii). *Id.* at 1318-19. The ANDA submission is what triggers a § 271(e)(2)(A) cause of action. *AstraZeneca*, 669 F.3d at 1377. Unlisted patents are not part of this process and, therefore, cannot be asserted under § 271(e)(2)(A).

Takeda's § 271(e)(2)(A) infringement claim based on the unlisted '282 patent should be dismissed either for lack of jurisdiction or on the merits for failure to state a claim.

## II. The claims are anticipated when the term "amorphous compound" is correctly construed and not improperly limited to solid compounds.

Inventor Kamiyama admitted that the prior art discloses amorphous dexlansoprazole. (A8876 (p. 138).) For example, the Larsson and Von Unge prior art references each disclose dexlansoprazole in an oil. (A43 ¶¶ 167-168; A46 ¶¶ 177-178; A48 ¶ 185.) Under the correct claim construction, which

encompasses amorphous dexlansoprazole in any form, both claims at issue are anticipated, or rendered obvious, by Larsson and Von Unge.[3]

Takeda's response was to argue that the claim term "amorphous compound" should to be limited to solids. (A144-A146; A8876 (p. 138).) The District Court sided with Takeda and erroneously limited the claims to solids. (A220-A233.)

## A.     The claim language.

The claim language sets forth the limits of the patent grant. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 1323 (Fed. Cir. 2005) (en banc).

Here, the claim language makes no reference to the compound being a solid.  If the claims had been intended to be limited to solids, one would expect them to say so.  *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013) ("Had the applicant wanted to limit the claim to [certain nucleic acids], it easily could have done so…."); *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (The patentee "could  have included such a limitation in the claim but notably did not."); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ) ("Had the inventors intended this limitation,

---

[3] Takeda did not contest that Larsson discloses the "pharmaceutical composition" element of Claim 2.  (A144 n.12.)  While Von Unge does not expressly recite Claim 2's pharmaceutical composition with an excipient, carrier or diluent, that is the obvious use of the dexlansoprazole it discloses, particularly in view of Larsson and Barberich.  (A9523 at [0030]; A9837 at 34:33-34.)

they could have drafted the claims to expressly include it."), *aff'd*, 131 S. Ct. 2238 (2011).  The inventors could have used the term "amorphous solid" (A1999-A2000) — but they didn't.

### B.    The specification.

The written description preceding the claims provides the context for the language used in the claims.  *Phillips*, 415 F.3d at 1313, 1315, 1320-21.

The written description of the '282 patent uniformly states that the "present invention" is a "crystal" of dexlansoprazole.  (A258 at 1:14, 1:39-64; A259 at 4:9, 4:19; A260 at 5:65, 6:9, 6:45, 6:65-66; A264 at 14:51, 14:59, 14:61, 14:65.)  Crystals are solids in which the atoms (or molecules) are arranged in a periodic repeating pattern that extends in three dimensions.  (A12 ¶ 12.)

By contrast, "amorphous" substances have no long range order.  (A12 ¶ 12.)  The claim term "amorphous compound" is never used in the written description.  (A229.)  The term "amorphous substance" is used, but not until over halfway through the specification where, in Reference Examples 1 and 2, it is used to describe the substance obtained from two processes.[4]  (A261 at 8:2, 8:3, 8:6, 8:28-29.)  Examples 1, 2, and 3 use these "amorphous" forms in processes for making the crystalline form.  (A263 at 11:10, 11:63, 12:60.)  The

---

[4] The '282 patent has four "Reference Example[s]" (A261 at 7:51, 8:9, 8:30, 8:59), three "Example[s]" (A263 at 11:3, 11:56, 12:54), and two "Experimental Example[s]" (A264 at 13:26, 14:1).

"amorphous" dexlansoprazole obtained in Reference Example 1 is discussed near the end of the specification in Experimental Example 2. (A264 at 14:4, 14:30, 14:38, 14:42, 14:46.) It states that the amorphous form is inferior to the crystalline. (*Id.* at 14:44-46 ("[T]he crystal of R(+)-lansoprazole is more stable and more preferable for use as a pharmaceutical etc. than the amorphous form.").)

Thus, the word "amorphous" is used in the '282 patent merely to distinguish from a crystalline substance. Some solids and all liquids are amorphous. (A12 ¶ 12; A223; A226; A2291.) The patent nowhere attributes any importance to whether the amorphous substance is a solid or a liquid.

The patent never identifies any of its amorphous compounds as being a solid. (A1991.) The District Court, nevertheless, found that the skilled reader would infer that the amorphous substances reported in Reference Examples 1 and 2 are solids. (A231.) Calling it "a close call," the Court justified this finding on the insubstantial ground that those examples do not say that they are liquids. (*Id.*)[5] Even if these examples were referring to solids, that would not limit the claims to solid amorphous compounds. *Phillips*, 415 F.3d at 1323 (warning "to avoid the danger of reading limitations from the specification into the claim" and "against confining the claim to those embodiments" described in the

---

[5] The instructions to "evaporate to dryness" in those examples do not require the product to be a solid — several prior art references report obtaining a liquid after evaporating to dryness. (A225; A231; A2139 at 46:44-45; A2161 at 25:23-24.)

specification).   Rather, the patent's failure to attribute any importance to the amorphous substance being a solid indicates indifference to what physical state it is in.   Without some more palpable expression of an intent to limit the claims, there is no reason to read the specification as limiting the invention to amorphous solids.  *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 734 (Fed. Cir. 2014) (clear intention to limit claim scope required); *Aria*, 726 F.3d at 1301 (same); *Aventis*, 675 F.3d at 1330 (same); *Thorner v. Sony Computer Entmt. Am., LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012); *i4i*, 598 F.3d at 842-43 (same); *In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1372 (Fed. Cir. 2007) (same); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906, 913 (Fed. Cir. 2004) (same); *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) (same).

## C.    The prosecution history.

The prosecution history may provide evidence of how the Patent Office and the applicant understood the claim language.  *Phillips*, 415 F.3d at 1317.

The only examiner's rejection during prosecution of the '282 patent was for unpatentability over the Robinson reference.  (A10062-A10066.)   In response, the applicants distinguished Robinson on the ground that it discloses the racemate and not the R-isomer of lansoprazole. (A10084.)  They further explained:

> **By using the amorphous compound** of claim 8 **to obtain a crystal R-isomer of lansoprazole**, the pharmaceutical composition

> including the crystal R-isomer would exhibit excellent properties
> such as higher Cmax (maximum blood concentration) and greater
> AUC (area under the concentration-time curve) than those of the
> composition including the racemate, ….

(A10084 (emphasis added).)   Two things are noteworthy about this passage. First, there is no discussion of whether the amorphous compound is a solid. Second, the amorphous compound is not regarded as the final product, but rather as something used to obtain the crystalline R-isomer that is then used in the pharmaceutical compound.  It is hard to imagine why the physical state (solid or liquid or whatever) of the amorphous compound would be of any importance given that it is the subsequently formed crystal that is actually used in the pharmaceutical composition.  The quoted passage certainly assigns no importance to the physical state of the amorphous compound.   The examiner thereafter allowed the application without any further rejection or comment.  (A100890-A100894.)

Relying on the prosecution histories of earlier patents that claim crystalline dexlansoprazole, and saying "that claims should be construed to preserve their validity," the District Court found support for its solid-only claim construction in the fact that, absent such construction, the claims would be invalid in view of the Larsson and Von Unge prior art references.  (A232-A233.)   The notion that claims are to be construed to preserve their validity is circular in its logic and of

limited utility. *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014) ("[T]he Board properly avoided the circularity inherent in any attempt to construe claims with an eye to preserving their validity, a doctrine of 'limited utility.'") (quoting *Phillips*, 415 F.3d at 1328). If carried to its logical extreme, that approach would dictate that no patent claims would ever be invalidated in view of prior art (or at least prior art cited during prosecution) because the claims would, instead, be construed to avoid that prior art.

As explained in *Phillips*, "[t]he applicability of the doctrine [that claims should be construed, if possible, to sustain their validity] in a particular case therefore depends on the strength of the inference that the PTO would have recognized that one claim interpretation would render the claim invalid, and that the PTO would not have issued the patent assuming that to be the proper construction of the term." 415 F.3d at 1328. Here, the record does not provide this predicate for relying on the doctrine.

The District Court cited the Reasons For Allowance in the prosecution history of the '058 patent as "indicat[ing] that examiner was aware that Von Unge and Larsson related to oils." (A233.) Those statements were made by an examiner, Jane T. Fan, different from the examiner, D. Margaret Seaman, who examined the '282 patent. (A233; A9347; A256; A10066.) The Court also cited arguments made in the prosecution history of the '276 patent as indicating that the

– 25 –

examiner was aware that Von Unge related to an oil, not a solid. (A233.) Again, that examination was conducted by Examiner Fan, not Examiner Seaman. (A9355.) Accordingly, these citations provide no support for the proposition that Examiner Seaman, who examined the '282 patent, had any belief, one way or the other, about whether either Larsson or Von Unge involved an oil rather than solid. What the other examiner in the earlier applications may have thought is irrelevant because she was not examining claims that recited an "amorphous compound." (A9354; A9362-A9363; A8873 (pp. 126-127).)

Although Larsson (WO 96/02535) and Von Unge (WO 97/02261) are both listed as "References Cited" (A256), Examiner Seaman never discussed them. In her only rejection, Examiner Seaman relied on the Robinson reference, not Larsson or Von Unge. (A10064-A10066.) As pointed out in applicants' response, the Robinson reference does not disclose the claimed R-isomer of lansoprazole, but only the racemate. (A10084.) By contrast, Larsson and Von Unge each disclose the R-isomer. (A42-A46.) Examiner Seaman would have cited either or both of them instead of, or in addition to, the Robinson reference, if she had fully appreciated them. There is no basis for believing that Examiner Seaman had any belief, one way or the other, about whether the claims had to be limited to solids in order to distinguish from Larsson and Von Unge.

A portion of the earlier '276 patent's file history demonstrates what the applicants thought "amorphous" meant. Takeda distinguished the crystal claims then at issue from the Sukenik reference by commenting that Sukenik "provides an example wherein a benzenesulfute is indefinitely stable in *solution* (*amorphous* form), but is much less stable as a solid." (A2304 (emphasis added).) Thus, while in the Patent Office, the applicants had no trouble applying the term "amorphous" to a nonsolid, which is strong evidence that the same term includes nonsolids when later used in the claims. *Martek Biosciences Corp. v. Nutinova, Inc.*, 579 F.3d 1363, 1377 (Fed. Cir. 2009) (During prosecution, "the applicant used the term 'non-chloride sodium salt' in a manner broad enough to encompass NaOH."). The applicants' own broader use of the term "amorphous" during prosecution belies Takeda's subsequent litigation-induced attempt to confine the term to solids.

The District Court relied on Takeda's commentary about Sukenik to reject Takeda's argument that the amorphous substance of Reference Example 1 in the '282 patent must be solid because in Experimental Example 2 it is compared to a solid material, *i.e.*, that the comparison purportedly had to be "like to like." (A231-A232.) The Court also relied on Takeda's Sukenik commentary in rejecting "Takeda's more general argument that because the '282 patent addresses crystalline materials, a person skilled in the art would understand that the claimed

'amorphous compound' must be the counterpart to the crystalline material and therefore also a solid." (A232 n.11.)

The District Court regarded Takeda's Sukenik commentary to be "entirely consistent with Dr. Myerson's opinion that when an amorphous substance is something *other* than a solid, that is, a liquid or gas, it is expressly identified as such." (A232 (court's italics); A1991.) Dr. Myerson's opinions fall under the heading of "extrinsic" evidence, which is discussed next.

### D. The extrinsic evidence.

"In claim construction, this court gives primacy to the language of the claims, followed by the specification." *Tempo Lighting*, 742 F.3d at 977. "Additionally, the prosecution history, while not literally within the patent document, serves as intrinsic evidence for the purposes of claim construction." *Id.* "After considering these three sources of intrinsic evidence, a court may also seek guidance from extrinsic evidence." *Vederi, LLC v. Google, Inc.*, Nos. 2013-1057, -1296, slip op. 9 (Fed. Cir. Mar. 14, 2014). "However, extrinsic evidence may be less reliable than the intrinsic evidence." *Id.* In *Phillips* this Court explained five reasons why extrinsic evidence is less reliable than intrinsic evidence. 415 F.3d at 1318-19. For example, "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of

litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* at 1318.

Takeda's expert Dr. Myerson conceded that the plain and ordinary meaning of the term "amorphous compound" encompasses both solids and nonsolids, but then he looked to the specification for a way to narrow the claim to solids only.

> Q.    But according to the plain and ordinary meaning of the term "amorphous compound," a person of ordinary skill in the art would understand that that could be referring to a solid or nonsolid compound, correct?
>
> A.    If one interpreted "amorphous compound" without reference to the specification at all, okay, in a vacuum, that's correct. But one of ordinary skill would read the specification and interpret the term in light of the specification.

(A1985; A1989 (same).)  Dr. Myerson acknowledged that the patent does not expressly redefine the term.  (A1981-A1982; A1984.)  His view was that the skilled reader of the '282 patent would eschew the broad plain and ordinary meaning of "amorphous compound" in favor of one limited to solids because she would surmise that the amorphous substances in two of the examples in the specification were solids, even though the specification does not say they are solids.  (A782 ¶ 83; A1985; A1988-A1991.)[6]  As discussed above in Section II.B, under this Court's precedents the claims cannot be limited unless the

---

[6] The District Court had no difficulty rejecting another rationalization offered by Dr. Myerson.  (A231-A232 (rejecting the "like to like" argument); A782-A783 ¶¶ 84-85.)

specification is more emphatic than that. Furthermore, expert testimony about how a claim term is to be construed in view of the specification "amounts to no more than a legal opinion, not fact evidence." *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed. Cir. 1990); *accord*, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

Dr. Myerson also opined that when one refers to "amorphous" compounds, they are normally solids, unless expressly identified as liquids. (A1991.) That ignores instances where an author does not bother to state whether an amorphous compound is a liquid or solid because its physical state does not affect the point the author is making. As explained above in Section II.B, in the '282 patent the physical state of the amorphous substance does not matter because the term "amorphous" is used in the patent specification merely to distinguish from the crystalline state, and no importance is attributed to whether the "amorphous" substance is a solid or a liquid. The claimed "amorphous compound" can be either a solid or liquid because the '282 patent is indifferent to which it is.

The District Court read the extrinsic evidence as providing two ordinary and accustomed meanings of the word "amorphous," one that includes liquids, while the other is limited to solids. (A230.) That is a false dichotomy. In the extrinsic evidence the word "amorphous" always refers to a lack of long range

order, *i.e.*, being noncrystalline. (*E.g.*, A12 ¶ 12 ("no long range order"); A2291 ("Noncrystalline"); A2297 ("Noncrystalline"); A2650 ("Non-crystalline" and "no regular order"); A2654 ("lack of long-range order"); A902 ("The three-dimensional long-range order that normally exists in a crystalline material does not exist in the amorphous state…."); A922 ("Amorphous materials do not possess the long-range translational order (periodicity) characteristic of a crystal. The terms amorphous and non-crystalline are synonymous…."); A963 (lack of "long-range ordering"); A1001 ("long range order is absent"); A1034 ("do not have a periodical three-dimensional pattern"); A1117 ("lacks a regular, long-range pattern"); A1121 ("noncrystalline"). Some solids and all liquids lack such long range order, *i.e.,* are not crystalline. (A12 ¶ 12; A223; A226; A2291.) Accordingly, the use in the extrinsic evidence of the term "amorphous" is consistent with including liquids in the category of amorphous compounds.

Even if it were true that there were two competing definitions of "amorphous" in this art, the District Court was wrong when it thought that it had to pick between them. (A230.) If both definitions are consistent with the intrinsic evidence, then the claim term is to be construed to encompass both. *Phillips*, 415 F.3d at 1319; *Brookhill-Wilk 1*, 334 F.3d at 1300; *Inverness Med. Switz., GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1378-82 (Fed. Cir. 2002); *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002);

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343-48 (Fed. Cir. 2001). As explained above, the intrinsic evidence is consistent with an "amorphous" compound being either a solid or a liquid.

### E. Because an "amorphous compound" includes nonsolids, the claims are invalid in view of Larsson and Von Unge.

The claim says merely "amorphous compound" with no language saying that it must be a solid. (A263) Takeda's own expert conceded that the plain and ordinary meaning of the term "amorphous compound" includes nonsolids. (A1985.) Nowhere did "the patentee explicitly redefine[] the term or disavow[] its full scope" as would be required to narrow the term from its ordinary meaning. *Thorner*, 669 F.3d at 1367; *accord*, *Ancora*, slip op. p. 5 ("A claim term should be given its ordinary meaning in the pertinent context, unless the patentee has made clear its adoption of a different definition or otherwise disclaimed that meaning."); *Aventis*, 675 F.3d at 1330 (explaining "the stringent standard for narrowing a claim term beyond its plain and ordinary meaning"). Accordingly, the correct construction of "amorphous compound" is not limited to a solid. Under this correct construction, the claims are invalid in view of Larsson and Von Unge, which each disclose amorphous dexlansoprazole in an oil. (A43 ¶¶ 167-168; A46 ¶¶ 177-178; A48 ¶ 185.)

**III. Whether or not limited to solids, the asserted claims are invalid because they are not supported by an adequate written description of amorphous salts.**

The claims at issue include within their coverage amorphous salts of dexlansoprazole. (A265 at 15:1-8; A9314 (p. 1046).) A compound and a salt of that compound are distinct chemical entities. *Kao Corp. v. Unilever United States, Inc.*, 441 F.3d 963, 967, 974 (Fed. Cir. 2006). A salt of a compound is formed when a hydrogen atom is replaced, typically by a metal ion. (A9314 (pp. 1046-1047).) *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 393 n.3 (Fed. Cir. 1990). While the '282 patent refers to salts of dexlansoprazole, there is no written description of the claimed *amorphous* salts of dexlansoprazole.[7] The solid/nonsolid claim construction dispute discussed above does not affect this written description issue; there is no written description of an amorphous salt in any form, solid or otherwise.

The test is whether the written description "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F3d at 1351. At one point, Takeda's own expert

---

[7] Here, the claims are not self-supporting. Takeda's claims to amorphous salts first appeared in an amendment filed in 2009 in the last of a series of continuation applications, years after patents had issued from earlier applications in that series. (A256; A9857-A9859; A8873 (pp. 126-127); A9347 (issued 2002); A9355 (issued 2003); A11106 (issued 2005).) Those earlier patents are invalidating prior art against the '282 patent unless the written description carried over into the '282 patent describes the later claimed invention. *Lockwood*, 107 F.3d at 1569.

testified that the ordinarily skilled person would not understand that the inventors had been in possession of an amorphous salt. (A9315 (p. 1049) (The "ordinarily skilled person would not understand that inventors had been in possession of a salt; but rather, of the amorphous solid."); A9319-A9320 (pp. 1068-1070); A9320 (pp. 1071-1072).)

In its Trial Opinion the District Court dismissed TWi's written description defense on the ground that it had been disposed of at summary judgment. (A102 ¶ 382.) However, that summary judgment ruling was a denial of TWi's motion for invalidity, not a grant of summary judgment motion of validity, there having been no such motion. (A133; A176.) Nevertheless, so far as the District Court was concerned, this was a matter handled by summary judgment. Accordingly, there are no findings of fact with respect to this issue to be reviewed under FED. R. CIV. PRO. 52(a)(6)'s clearly erroneous standard. The matter is, therefore, a summary judgment ruling subject to *de novo* review. *Lockwood*, 107 F.3d at 1569.

The District Court's analysis was legally flawed. The Court reasoned that TWi was not entitled to summary judgment on its written description defense "because it is undisputed that a person of skill in the art would know how to

derive a salt of amorphous dexlansoprazole." (A176.)[8]  In relying on the skilled person's ability to make an amorphous salt to make up for the absence of any reference to an amorphous salt in the written description, the District Court did exactly what this Court's precedents forbid.  "It is 'not a question of whether one skilled in the art *might* be able to construct the patentee's device from teachings of the disclosure….  Rather, it is a question whether the application necessarily discloses the particular device.'"  *Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987), quoting *Jepson v. Coleman*, 314 F.2d 533, 536 (CCPA 1963) (court's italics); *accord, Goeddel v. Sugano*, 617 F.3d 1350, 1355 (Fed. Cir. 2010); *Ariad*, 598 F.3d at 1348; *PowerOasis, Inc.* 522 F.3d at 1306; *Lockwood*, 107 F.3d at 1572.

In the written description of the '282 patent, the salts of dexlansoprazole are said to be crystalline. (A259 at 3:38-41 (defining the "crystal of the present invention" as including salts of dexlansoprazole).)  The amorphous compounds discussed later in the specification are dexlansoprazole *per se*, not salts of dexlansoprazole.  (A261 at 8:2-6, 8:28-29; A263 at 11:10, 11:63, 12:60; A264 at 14:4, 14:30-47.)  Nowhere does the written description state that any salt of

---

[8] That prior art knowledge renders the claims invalid in view of the prior art.  See Section IV below.

dexlansoprazole is amorphous. Takeda did not dispute the absence of an explicit description in the '282 patent of the claimed amorphous salts. (A146.)

Nor is there an implicit disclosure of amorphous salts of dexlansoprazole. That is not surprising given that, when the inventors filed their original patent application, they had not yet made any dexlansoprazole salts, much less amorphous salts. (A8873 (p. 127).) Later, they made a magnesium salt of dexlansoprazole that was an amorphous solid. (A8874 (p. 130); A10962 at 17:15-19, 17:42-44.) But that does not demonstrate that every time one makes a magnesium salt of dexlansoprazole that it will always be amorphous. The same compound can sometimes be amorphous, sometimes crystalline. (A8911 (p. 175); A8913 (p. 184).) The patent's definition (A259 at 3:38-41) of the "crystal of the present invention" as dexlansoprazole "or a salt thereof" indicates that the enumerated salts, such as the magnesium salt, can be crystalline, and nothing in the patent suggests otherwise. Therefore, the mere listing in the written description of a magnesium salt (A258 at 2:5) does not constitute an implicit description of an amorphous salt because the record does not contain the required showing that, contrary to what the patent teaches, a magnesium salt of dexlansoprazole is inherently and necessarily amorphous. *Goeddel*, 617 F.3d at 1355 ("necessarily"); *PowerOasis*, 522 F.3d at 1306 ("necessarily" and "inherently"); *Lockwood*, 107 F.3d at 1572 ("necessarily"); *Therma-Tru Corp. v.*

*Peachtree Doors Inc.*, 44 F.3d 988, 992 (Fed. Cir. 1995) ("inherently and necessarily"); *Kennecott Corp. v. Kyocera Int.'l, Inc.*, 835 F.2d 1419, 1422-23 (Fed. Cir. 1987) ("inherent" and "necessary"); *Martin*, 823 F.2d at 505 ("necessarily"); *Jepson*, 314 F.2d at 536 ("necessarily"). Because Takeda's claims need adequate written description in Takeda's earlier filed applications (see footnote 7 above), Takeda had the burden of proof on this issue. *PowerOasis*, 522 F.3d at 1305.

If it were true that there never could be a *non*amorphous magnesium salt of dexlansoprazole, then the claims would be anticipated by Barberich. *See* Section IV.A below. But as the record stands, the '282 patent is invalid for absence of a written description of the claimed amorphous salts of dexlansoprazole.

## IV. Even if limited to solid compounds, the claims are invalid because solid amorphous dexlansoprazole and solid amorphous dexlansoprazole salts are not patentable over the prior art.

Even if limited to solids, the claims are invalid in view of the disclosure of solid amorphous dexlansoprazole and salts thereof in the prior art Barberich reference. (A47 ¶ 179; A9523-A9524 [0031]-[0035].)[9] The District Court, however, rejected invalidity based on Barberich on the ground that Barberich lacked an enabling disclosure. (A123 ¶ 436-A128 ¶ 455.)

_____

[9] Claim 2's recitation of a pharmaceutical composition with an excipient, carrier or diluent provides no distinction from Barberich. (A123 ¶ 437; A144 n.12; A9315 (p. 1052); A9522 at [0017]; A9523 at [0030].)

A prior art reference is presumed to be enabled. *In re Antor Media Corp.*, 689 F.3d 1282, 1287-89 (Fed. Cir. 2012); *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1316 (Fed. Cir. 2008); *Amgen Inc. v. Hoechst Marion Roussel, Inc. ("Amgen III")*, 457 F.3d 1293, 1307 (Fed. Cir. 2006); *Amgen Inc. v. Hoechst Marion Roussel, Inc. ("Amgen II")*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). The burden of proof is on the patentee to overcome that presumption. *Antor*, 1287-1289; *Impax*, 545 F.3d at 1316; *Amgen III*, 457 F.3d at 1305, 1307; *Amgen II*, 314 F.3d at 1355-56. Initially, in its summary judgment ruling, the District Court correctly held that the patentee Takeda had the burden of proving nonenablement of a prior reference by a preponderance of the evidence, relying on *Antor*, *Amgen III*, and *Amgen II*. (A161-A163.) The Court fell into error when it changed its mind and held in its trial opinion that TWi had the burden by clear and convincing evidence, relying on pre-*Antor* district court opinions. (A110-A112.)

Under any burden of proof standard, the District Court erred in rejecting TWi's invalidity defense based on the Barberich reference, because the evidence shows that the person of ordinary skill in the art could have made what is disclosed in the anticipatory reference, which is all that is required for enablement of a prior art reference. *Lindemann Maschinenfrabrik GmbH v. Am. Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed. Cir. 1984); *In re Donohue*, 766 F.2d 531,

533 (Fed. Cir. 1985).   Additional prior art references can be used to prove

enablement of an anticipatory prior art reference without changing the basis for

invalidity from § 102 anticipation to § 103 obviousness.   *Bristol-Myers Squibb*

*Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001); *Donohue*,

766 F.3d at 534.

### A.    Barberich anticipates solid amorphous salts of dexlansoprazole.

If, despite what is explained above in Section III, one assumes that the '282

patent's listing of salts of dexlansoprazole provides a sufficient written

description for the amorphous salts in the asserted claims, then the claims are

invalid in view of the prior art Barberich reference that also lists salts of

dexlansoprazole.    (A9523 at [0031]-[0033]; *see also* A9096 (p. 571) (no

substantive difference between disclosures of salts in the '282 patent and

Barberich).)  For example, if one assumes that the disclosure of a magnesium salt

of dexlansoprazole is a sufficient inherent disclosure of an amorphous solid salt

of dexlansoprazole to support the claims of the '282 patent, then the listing in

Barberich (A9523 at [0031]-[0032]) of the magnesium salt of dexlansoprazole is

also a sufficient inherent disclosure in the prior art to anticipate those claims.

*Omeprazole Patent Litig.*, 483 F.3d at 1372-73 (claims anticipated by inherent

disclosure in prior art); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d

1331, 1334 (Fed. Cir. 2005) (same); *Schering Corp. v. Geneva Pharms., Inc.*, 339

F.3d 1373, 1377-80 (Fed. Cir. 2003) (same); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349-52 (Fed. Cir. 2002) (same); *Atlas Powder,* 190 F.3d at 1347-50 (same).

In addition, the prior art Barberich reference cannot fail to be enabled without the '282 patent itself also being nonenabled.  The District Court found that "the specification of the '282 Patent does not include a description of how to make an amorphous salt."  (A26 ¶ 89; *see also* A8874 (p. 130) ("[T]here's no description of how to make an amorphous salt anywhere in the '282 patent.") (Inventor Kamiyama).)  Thus, the '282 patent is itself dependent on prior art knowledge of how to make the claimed salt.  If the written description in the specification of the '282 patent is enabling, then the like description in the prior art reference is likewise enabled.  *SRI Int'l, Inc.*, 511 F.3d at 1193-94; *Epstein*, 32 F.3d at 1568 ; *In re Paulsen*, 30 F.3d 1475, 1481 n.9 (Fed. Cir. 1994); *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781 (Fed. Cir. 1985).

The record establishes that the person of ordinary skill had the ability to make Barberich's salts of dexlansoprazole.  Takeda's own later '182 patent says that one can make its dexlansoprazole salts, which includes an amorphous solid magnesium salt, using methods disclosed in WO 94/27988 (A11075), which is prior art to the '282 patent.  (A8874 (p. 132); A10955 at 4:5-7 ("The salt of the present invention can be prepared by per se known methods, for example, the

methods described in WO 94/27988…."); A10962 at 17:15-19 (amorphous magnesium salt), 17:42-44 (same).)[10]

Despite TWi's reliance on WO 94/27988's disclosure of how to make salts (A8332 ¶¶ 267-268; A8435), the District Court failed to include that prior art reference in its discussion of the crucial "state of the prior art" factor from *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). (A80 ¶ 305; A110 ¶ 401; A124 ¶ 442.) Instead, the Court focused its attention on whether the skilled person would have been able to obtain Barberich's amorphous compound from Larsson's oil. (A127 ¶ 452.) Section IV.B below discusses the Court's erroneous evaluation of the alternative path that involves using Larsson's method. The relevant point here, however, is that irrespective of the Larsson controversy there is unrefuted evidence that the skilled person had the ability to make solid amorphous dexlansoprazole salts by the prior art methods described in WO 94/27988. (A10955 at 4:5-7.) Takeda's admission (which was not denied, much less refuted) in its '182 patent of the sufficiency of WO 94/27988's prior art methods

---

[10] The application for the '182 patent (A10949) was filed after the filing date of the '282 patent (A256), and so a mere statement that one can use methods known as of the filing date of the later '182 patent might not be sufficient to demonstrate enablement as of the filing date of the earlier '282 patent. *Bristol-Meyers*, 246 F.3d at 1379. But here Takeda went further and said that the methods described in WO 94/27988 — which is prior art as to the earlier '282 patent — can be used to prepare salts of dexlansoprazole. Additional prior art references, like WO 94/27988, can be used to prove enablement of an anticipatory reference. *Id.*; *Donohue*, 766 F.3d at 534.

– 41 –

disposes of any need to discuss the other *Wands* factors. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) (The *Wands* factors "while illustrative are not mandatory.").

### B. Barberich anticipates amorphous solid dexlansoprazole.

The Barberich reference also discloses solid amorphous dexlansoprazole without the additions needed to turn it into a salt. (A47 ¶ 179; A123 ¶ 436; A175; A9523-A9524 at [0032]-[0035].) The District Court, however, erroneously concluded that Barberich was not an anticipation because it lacked an enabling disclosure of how to make the solid amorphous dexlansoprazole it discloses. (A123 ¶ 436-A127 ¶ 452.)

#### 1. The University of Wisconsin's lab work demonstrates that the person of ordinary skill would have been able to make amorphous solid dexlansoprazole without undue experimentation.

As instruction for how to make its solid amorphous dexlansoprazole, Barberich incorporated by reference Larsson. (A9522 at [0013].) Under TWi's expert Dr. Elder's direction, Larsson's Example 22 was performed in a lab at the University of Wisconsin ("UW"). (A8999 (p. 357).) Amorphous solid dexlansoprazole with low optical purity was obtained in a first run. (A11017-A11018; A9002-A9003 (pp. 370-373); A9118 (p. 659).) The procedure was then slightly modified to take advantage of the well-known prior art technique of dropwise addition of the oxidant. (A11017-A11018; A9004 (p. 377).) In the

second run, amorphous solid dexlansoprazole with high optical purity was obtained. (A11017-A11018; A9005 (p. 383).)

The UW lab work demonstrates that a skilled person using prior art techniques could obtain an amorphous solid of dexlansoprazole without undue experimentation. (A11017-A11018; A8999 (p. 358).) That should have been the end of the matter, but the District Court got side tracked by the fact that the UW lab got a solid instead of the oil reported by Larsson. (A78-A90; A125 ¶ 446-A126 ¶ 450.) That is beside the point. The relevant legal question was not whether one could get Larsson's oil, but whether prior art techniques could be used to produce amorphous solid dexlansoprazole without undue experimentation, which is what the UW lab work demonstrated.

The District Court also criticized alleged differences between Larsson's Example 22 and the UW lab's work. (A85-A86 at ¶¶ 323-24.) As discussed in detail below, none of these criticisms hold water. Taken together, they demonstrate that the District Court was slavishly requiring an exact duplication of Larsson's Example 22, but that is not the test.

> [I]t must be said that in a [prior art] patent it is to be presumed that a process, if used by one skilled in the art, will produce the product alleged by the patentee and such presumption is not overcome by a mere showing that it is possible to operate within the disclosure without obtaining the alleged product. **Skilled workers would as a matter of course**, in our opinion, if they do not immediately obtain desired results, **make certain experiments and adaptations**….

*In re Michalek*, 162 F.2d 229, 231-232 (CCPA 1947) (emphasis added); *accord, In re Lamberti*, 545 F.2d 747, 750 n.2 (CCPA 1976) ("[T]here is no showing that one of ordinary skill in the art, making adaptations within the skill of the art, could not have successfully carried out each process.").

Larsson's Example 22 has three steps. (A9001 (p. 364).) The first step is the synthesis of the dexlansoprazole. (*Id.*) Once that step is completed, one has all the dexlansoprazole one is going to get. (A9307 (p. 1017); A9312 (pp. 1037-1038).) The second step, called the workup procedure, is about removing chemical impurities. (A9001 (p. 364); A9001 (p. 367); A9307 (pp. 1017-1018).) The second step workup procedure in Larsson's Example 22 yielded a compound of dexlansoprazole having an "enantiomeric excess (e.e.) of 46%." (A9001-A9002 (pp. 367-368); A9397-A9398.)[11] The third step is isolation of the dexlansoprazole from the racemate lansoprazole. (A9001 (p. 364).) Using the third step's isolation procedure one time "afforded an oil with enhanced optical purity." (A9398; A9002 (pp. 368-370).) Repeating this isolation procedure "a

---

[11] "'Enantiomeric excess' or 'e.e.' is a measure of the optical purity of enantiomer. The optical purity of an R-enantiomer is obtained by subtracting the amount of S-enantiomer in a given compound from the amount of R-enantiomer in that compound." (A17 ¶ 36.) For example, an e.e. of 95% means there is 97.5% of the desired enantiomer and 2.5% of the other enantiomer. (A9841 at 4:60-63.)

couple of times" produced an oil with an optical purity of 99.6% e.e. (A9398; A9002 (p. 370).)

On its first run, the UW lab "opted for as strict [an] interpretation of the Larsson procedure as possible." (A11017.) In this first run, the second step workup procedure yielded solid dexlansoprazole with a 6% e.e. (A9003 (p. 372); A11018.) The UW lab did not perform the third step isolation procedure on this product. (*Id.*)

Instead, the UW lab "explored the effect of a slow addition of the oxidant to augment the selectivity" while "keeping all other conditions the same." (A11018; *see also* A9003 (p. 373) ("optimize it slightly to enhance the EE.").) Accordingly, during the workup procedure in their second run the oxidant, cumene hydroperoxide ("CHP"), was added "slowly to the reaction mixture at room temperature over a period of 30 minutes" instead of all at once ("in one portion") as had been done in the first run. (A11017-A11018); *see also* A9004 (p. 377) ("the only change").) This yielded a 56% e.e. (at this point, Larsson's Example 22 reported 46% e.e.). (A9004 (pp. 378-379); A9398; A11018.) The UW lab then subjected the product of this workup procedure to the isolation procedure that was repeated for a total of five or six times. (A9004 (p. 379); A9009 (p. 398); A11022; A11051.) This yielded a 97.8% e.e. (at this point,

Larsson's Example 22 reported 99.6% e.e.).  (A9004 (p. 379); A9005 (p. 383); A9398; A11018.)

The District Court made several criticisms of the UW lab's work.

### a.    The selection, and gradient addition, of the solvents.

The District Court criticized the UW lab's selection of solvents used in the workup procedure and their administration by a "gradient" method.  (A87 ¶ 329-A88 ¶ 331.)  Larsson's Example 22 did not specify any particular solvents for the workup procedure, nor whether or not a gradient method was used.  (A9008 (p. 394); A9379-A9398; A9829.)    Omission of those details indicates their noncriticality.  *In re Gay*, 309 F.2d 769, 774 (CCPA 1962). Takeda's expert Dr. Atwood agreed that "if the manner in which those steps were carried out was significant," one would "expect the inventors of Larsson to have been more specific about what choices ought to be made." (A9308 (p. 1021).)  Indeed, Dr. Atwood conceded that one of his own patents does not state what solvents to use in such a process.  (A9308 (pp. 1022-1023).)

Larsson's Example 22 left it to the skilled reader to choose the solvents and how to administer them.  The UW lab made choices consistent with the state of the art in 1999.  The UW lab chose to use a combination of hexane and ethyl acetate.   (A11022.)    On  cross-examination,  Dr. Atwood  conceded  that  a combination hexane and ethyl acetate was a choice available in 1999.  (A9308

(pp. 1021-1022).)  The UW lab added these solvents using a "gradient" method that started with twice as much ethyl acetate as hexane and ended up with all ethyl acetate.  (A11022.)  Dr. Elder testified that the UW lab's procedure was typical for the art in 1999.  (A9003 (p. 372); A9008 (p. 395)).)  Dr. Atwood conceded on cross-examination that the use of a gradient was an option in 1999.  (A9307 (p. 1019).)

### b.    Dropwise addition of the CHP oxidant.

The District Court also criticized the dropwise addition of the CHP oxidant in the UW lab's second run as an inappropriate departure from Larsson's Example 22.  (A87 ¶ 328.)  Larsson Example 22 merely says that "1.1 ml (6.0 mmol) of [CHP] (80%) were added."  (A9829 at 18:17-18).  It does not say whether it was added all at once or over a period of time.  Choosing the simplest option, the UW lab added it all at once in their first run.  (A11017 ("in one portion").)  When they got only 6% e.e., they looked for a variation that would optimize the process to enhance the e.e.  (A11018; 9003 (p. 373).)  There were two options:  (1) reducing the temperature or (2) adding the oxidizing agent more slowly.  (A9004 (p. 376); A11018.)  Changing the temperature was not selected because Larsson's Example 22 specified room temperature.  (A9004 (p. 376).)  That left the option of slower addition of oxidizing agent while maintaining room temperature.  (A9004 (pp. 376-377); A11018.)  Dr. Elder testified that the skilled

person in 1999 would have concluded that slow addition of the oxidant was necessary.  (A9004 (p. 377).)

The District Court found that lowering the temperature was not "an appropriate departure from the specific teachings of [Larsson's] Example 22." (A87 ¶ 328.)  The Court then went astray by saying that slowing the rate of oxidant addition was also not an appropriate departure simply because it is an "alternative" to lowering the temperature.  (A87 ¶ 328.)  The District Court reasoned that "[b]ecause both changes are ways of accomplishing the same purpose," the option of adding the oxidating agent slowly must be "akin to lowering the temperature."  (A84 ¶ 321.)  The Court regarded them as "interchangeable."  (*Id.*)  That is contradicted by the undisputed evidence.  While the two options shared the purpose of improving e.e., they did so in different ways.  The first would have changed the temperature, while the second did not. The UW labs chose to slowly add the oxidant while not changing the temperature for the very purpose of staying consonant with the room temperature recitation in Larsson's Example 22.  (A9004 (pp. 376-377); A11018.)

c.      **Doing the isolation procedure more than three times.**

In addition, the District Court criticized the UW lab's second run's use of "five or six rounds" of the isolation procedure "instead of three rounds described

in Larsson." (A88 ¶ 332.)[12] Larsson's Example 22 does not say *three* rounds; it says that the isolation procedure was performed and then repeated "a couple of times." (A9398.) Both the District Court and Dr. Atwood assumed that "a couple of times" more means exactly two times more. (A88 ¶ 332; A9308-A9309 (pp. 1024-1025); A9312 (p. 1038).) But the phrase "a couple of times" does not mean precisely two. *See, e.g.,* http://dictionary.reference.com/browse/couple (last visited Apr. 15, 2014) (defining "a couple of" to mean "more than two, but not many, of; a small number of; a few"); *Wood v. Dalton*, 855 F.Supp.2d 494, 504 n.31 (D.Md. 2012) ("a small but inexact number"). Dr. Elder testified that Larsson's use of the phrase "a couple of times" meant that "a skilled artisan would repeat it a sufficient number of times to get the EE that you desire; and, so, in this case it took us five, which would be in line with a couple." (A9006 (p.385).)

Dr. Atwood did not take issue with how the isolation procedure was performed, only with the number of times it was performed. (A9309 (p. 1025).) Although the UW lab used the isolation procedure more than three times, their report for the second run states that they obtained 91.2% e.e. after the third

---

[12] The final UW lab report states five times. (A11022.) Takeda argued that an entry in the lab notebook meant six times. (A9235 (p. 920); A9309 (p. 1025); A11051.) Whether it was five or six times does not affect the legal import of the work done.

repetition of the isolation procedure. (A9235 (p. 920); A11023.)[13]  That is sufficient for the asserted claims of the '282 patent because they contain no optical purity limitations. (A265; A9315 (p. 1052).)  *See DeGeorge v. Bernier*, 768 F.2d 1318, 1323-24 (Fed. Cir. 1985) (reversing nonenablement holding under improper narrow construction, holding that enablement was established under proper broad construction).  In other words, even assuming *arguendo* that the isolation procedure had to be done exactly three times, the UW lab's second run was successful upon doing the procedure three times.  The would-be controversy over doing it more than three times is legally a red herring.

### d.    Not using an achiral HPLC test for chemical purity.

The District Court further criticized the UW lab's second run for failure to use an achiral HPLC test for chemical purity. (A89 ¶¶ 336-337; A126 ¶ 449.)  Dr. Atwood admitted on cross-examination that the "achiral analysis is not a step in the reaction" and, in particular, that "it's not a step in removing the impurities." (A9308 (p. 1024).)  It is merely a test to see if there are impurities. (*Id.*)  The UW lab used NMR to confirm the lack of impurities. (A9005 (pp. 381-382); A11019.)  Dr. Atwood criticized the NMR test for being able to test down to only 1 percent impurity. (A9235 (p. 921).)  But the asserted claims of the '282 patent

---

[13] The prior art Larsson and Von Unge references regarded even lower e.e. measurements as sufficient for their inventions. (A9822 at 4:25-28 (>85-90%); A9825 at 9:40-51 (78%); A9828 at 15:17 (87%); A9842 at 6:48 (88.7%).)

do not specify any particular degree of chemical purity much less a method to test for it. (A265; A9315 (p. 1052).)   The would-be controversy over the type of chemical purity testing is just another red herring.

> **2.     Expert testimony established that the person of ordinary skill would have been able to make solid amorphous dexlansoprazole from an oil without undue experimentation.**

Even if, as the District Court insisted, one must start with Larsson's oil and then turn it into a solid, TWi's expert Dr. Rogers explained how to do that.   The third and final step of Larsson's process is the isolation procedure for separating the R(+) isomer from racemic lansoprazole and that involves dissolving the lansoprazole in the solvent acetonitrile.   (A9034 (p. 496); 9106-A9107 (pp. 613-615).)   There is residual solvent left in Larsson's oil — remove enough of that solvent and one gets a solid.   (A9092-A9094 (pp. 554-564); A9118 (p. 661).)   The problem was so common that there were various prior art techniques for dealing with it, including one called "trituration" that was so basic as to be taught to undergraduates.   (A9092-A9094 (pp. 555-564); A9648 at A9651.)

Takeda's expert Dr. Atwood acknowledged that trituration was a common technique (A9236 (p. 925)), but attacked the use of trituration here on the ground that it was not suitable for dealing with very pure samples, citing Larsson Example 22's measurement of 99.9% chemical purity.   (A9236 (pp. 925-926).)   However, Larsson's measurement of 99.9% chemical purity was made *before* the

addition of the acetonitrile used in the isolation procedure. (A9829 at 18:26-33.) It is this after-added acetonitrile that would be the thing removed by trituration to produce the solid. (A9092 (p. 555).)

Dr. Atwood urged the theory that the oil obtained in Larsson's Example 22 did not have residual solvent left in it, but rather was pure dexlansoprazole that just happened to be a liquid. (A9316 (p. 1054).) In other words, per Dr. Atwood, pure amorphous dexlansoprazole at room temperature could be either a solid or liquid. (*Id.*) Dr. Atwood admitted that he could cite no authority for his view. (A9316 (pp. 1054-1055).) Nor could he explain the chemistry or physics of such a theory. (A9316 (pp. 1055-1056).)

This is not the first time that Dr. Atwood has expressed unsupported opinions in patent litigation. *Saffran v. Johnson & Johnson*, No. 2:07-CV-451, 2011 WL 1299607, at *5 (E.D. Tex. Mar. 31, 2011); *Lupin Ltd. v. Abbott Labs.*, 491 F.Supp.2d 563, 569 (E.D. Va. 2007); *Abbott Labs. v. Sandoz, Inc.*, 486 F.Supp.2d 767, 776 (N.D. Ill. 2007).

While normally the District Court may choose between competing experts' explanations, it is reversible error to rely on expert testimony that lacks a sound basis. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or

otherwise render the opinion unreasonable, it cannot support a jury's verdict."). For example, in *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005), this Court held that a speculative expert opinion failed to preclude summary judgment. *Id.* ("Nowhere did Falkinham explain why the PowerScript RT would only create small sized fragments with its RNase H activity, nor reference any theory explaining—or evidence confirming—this behavior.") Likewise, here Dr. Atwood could provide no basis for his theory.

The baselessness of Dr. Atwood's theory is demonstrated by the testimony of another Takeda expert, Dr. Myerson, who testified at his deposition that dexlansoprazole could not be a liquid at room temperature because its melting point is significantly above room temperature, that there was solvent left in Larsson's Example 22, and that if that solvent were removed, one would obtain solid amorphous dexlansoprazole. (A7471.73-A7471.74 (pp. 133-135); A7480-A7481.) Even though this testimony had already been made of record in connection with infringement (A5360-A5361; A5375-A5376 (pp. 133-135)), the District Court erroneously excluded it from the validity trial on the ground that Dr. Myerson had been offered by Takeda as an expert for the issues of claim construction and infringement, but not validity. (A8003; A8795; A8831-A8836; A8838.) *See In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (improper to preclude defendant's use of plaintiff's expert's testimony

on some topics when plaintiff offers that expert's testimony on other topics). The underlying science is the same whether the legal issue is claim construction, infringement, or validity.

### 3. The District Court erroneously analyzed the *Wands* factors.

With the foregoing in mind, we can now turn to the District Court's analysis of several *Wands* factors.

#### a. The amount of direction or guidance presented.

The District Court stated that "[t]he Barberich specification provides no direction or guidance as to how to convert the oil in Larsson into a solid." (A78 ¶ 297.) The District Court misjudged this *Wands* factor. What is relevant is the making of *any* solid amorphous dexlansoprazole covered by the asserted claims of the '282 patent-in-suit, and it suffices to make it by *any* means, whether or not from an oil. *Takeda Pharma. Co. v. Zydus Pharmas, USA, Inc.*, 743 F.3d 1359, 1369 (Fed. Cir. 2014); *Schering Corp.*, 339 F.3d at 1381; *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998). As discussed above in Section IV.B.1, Barberich incorporates Larsson by reference and Larsson's Example 22 provides detailed guidance that permitted the UW lab to produce solid amorphous dexlansoprazole on the second try without having to extract it from an oil. Even if one were required to produce solid amorphous

dexlansoprazole from an oil, the prior art provided techniques, such as trituration, for doing so. *See* Section IV.B.2 above.

### b. The presence or absence of working examples.

The District Court pointed out that Barberich contains only prophetic examples. (A79 ¶ 301; A124 ¶ 440.) However, Larsson's Example 22 is a working example. (A9829 at 18:5-35; A9309-9310 (pp. 1026-1030).) Furthermore, enablement does not require that the prior art include working examples. *Antor*, 689 F.3d at 1290. The absence of working examples carries little or no weight. *Donohue*, 766 F.2d at 533 ("[T]he fact that the author of a publication did not attempt to make his disclosed invention does not indicate one way or the other whether the publication would have been enabling.").

### c. The nature of the invention and the relative skill in the art.

No one disputes the District Court's finding the level of ordinary skill for the '282 patent "is a bachelor's degree in chemistry, chemical engineering, or related disciplines, with a minimum of three years of experience in the pharmaceutical industry related to organic synthesis, API (active pharmaceutical ingredient) manufacturing, crystallization or detection and/or evaluation of solid-state forms, or an advance degree in chemistry, chemical engineering, or related disciplines, with less or no industry experience." (A91-A92 ¶ 345.) In its *Wands* factors analysis, the District Court states that "[t]he level of skill of the person of

– 55 –

ordinary skill in the art of the Barberich invention is very similar to the level of skill of a person of ordinary skill in the art of the Takeda patents, discussed above, but the focus of such a person would be on formulation because Barberich is a formulation patent." (A80 ¶ 304.) The Court's comment erroneously imagines there are two relevant levels of skill, but there is only one. The relevant question is enablement of what is claimed in the '282 patent-in-suit, not of what is claimed in the prior art Barberich reference. *Antor,* 689 F.3d at 1290; *Schering*, 339 F.3d at 1381. Accordingly, the relevant level of skill relates to the invention claimed in the '282 patent-in-suit.

### d. State of the prior art.

The District Court cites Larsson, Von Unge, and Barberich in its discussion of the state of the art. (A80 ¶ 305.) The art additionally includes other references, such as the student guide that discusses the trituration technique for obtaining a solid from an oil. *See* Section IV.B.2 above.

### e. The predictability or unpredictability of the art.

Relying on Takeda's expert's testimony and assorted case law, the District Court found that the art was unpredictable because "[o]rganic chemistry is an experimental source, meaning that one cannot predict the outcome of an experiment without carrying out the experiment (such as crystallization or synthesis) in the laboratory." (A80 ¶ 307; A124-125 ¶ 443.) Just because one

has to go to the lab and do the experiment, does not mean there can be no enablement.    Enablement of prior art references occurs even in so-called unpredictable arts.  *E.g., Bristol-Myers*, 246 F.3d at 1371, 1379-80 (anticancer agent); *Donohue*, 766 F.2d at 531, 533 (organic compound).

The doctrine of undue experimentation is particularly relevant in dealing with so-called unpredictable arts.  *In re Angstadt*, 537 F.2d 498, 503 (CCPA 1976) ("[T]he term 'experimentation' implies that the success of particular activity is uncertain.").    In considering a question of undue experimentation, "[t]he key word is 'undue,' not 'experimentation.'"  *Id.* at 504; *accord, Wands*, 858 F.2d at 737.  At least "some" experimentation is permitted and sometimes "a considerable amount of experimentation is permissible."  *Id*.  Saying that the claimed invention involves a so-called unpredictable art merely asks the undue experimentation question; it does not answer it.

### f.    Breadth of the claim.

The District Court comments on the breadth of Barberich's claims.  (A81 ¶ 311; A125 ¶ 444.)  However, the relevant question is whether the prior art enables the asserted claims of the '282 patent-in-suit.  *Antor*, 689 F.3d at 1290; *Schering*, 339 F.3d at 1381.    As discussed above in Section IV.B.1.c and IV.B.1.d, the asserted claims contain no limitations concerning optical or chemical purity.

### g. The quantity of experimentation needed.

The District Court's criticisms of the UW lab's work are discussed at length in Section IV.B.1 above. The bottom line is that the UW lab got solid amorphous dexlansoprazole on the second try, having made "adaptations within the skill of the art." *Lamberti*, 545 F.2d at 750 n.2. That is not undue experimentation. To require success on the first try would be to improperly exclude all experimentation. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) ("That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, must not be unduly extensive.").

### h. Enablement is the only conclusion support by a proper analysis of the *Wands* factors.

The UW lab's success on the second try demonstrates that no undue experimentation was needed to make solid amorphous dexlansoprazole. Furthermore, the only expert testimony entitled to consideration proves that solid amorphous dexlansoprazole can be made by triturating dexlansoprazole from an oil. Properly understood, none of the *Wands* factors undermine the presumption that Barberich was enabled. The only legal conclusion supported by the record is that the prior art was enabled.

## C.    The claims are invalid for obviousness.

"Enablement of the prior art is not a requirement to prove invalidity under § 103." *Amgen II.*, 314 F.3d at 1357.   In an obviousness analysis, even a nonenabling reference qualifies as prior art and may be used for whatever is disclosed therein.   *Id.*   Therefore, even if Barberich were not enabling, its disclosure of solid amorphous dexlansoprazole supports the District Court's finding that "a person of ordinary skill in the art would have been motivated to obtain an amorphous solid form of dexlansoprazole."  (A100-101 ¶ 375; A127 ¶ 453; *see also* A101-102 ¶ 378 (finding additional prior art motivations for making amorphous solid dexlansoprazole).)

The District Court erred, however, in finding that the skilled person would not have had a reasonable expectation of success.  (A127 ¶ 453.)  Barberich's disclosure of amorphous solid dexlansoprazole and its salts shows that at least some prior art workers, namely, Barberich and his coinventors, were of the view that such compounds could be obtained successfully.  Neither the District Court nor Takeda cited any prior art stating that such compounds could not be obtained. Furthermore, as explained above in Sections IV.A and IV.B, prior art techniques were in fact sufficient to produce amorphous solid dexlansoprazole and salts thereof, either directly or from an oil.  Takeda itself stated in its later '182 patent that the prior art methods disclosed in WO 94/27988 can be used to prepare

amorphous solid salts of dexlansoprazole. (A10955 at 4:5-7; A10962 at 17:15-19, 42-44.)

Tellingly, the '282 patent itself has no description of how to make the amorphous salts of dexlansoprazole it claims. (A26 ¶ 89; A8874 (p. 130).) It if were true that prior to the '282 patent the skilled person would have lacked a reasonable expectation of being able to make an amorphous salt of dexlansoprazole, she would have no more confidence afterwards because the '282 patent provides no additional instructions. Takeda's situation is like the losing patentee's in *Merck v. Teva*, where the patent-in-suit taught no more than the prior art taught about how to overcome the drug's adverse GI effects. 395 F.3d at 1373-75. Likewise, here the '282 patent teaches no more (in fact, less) than the prior art teaches about how to make the claimed amorphous salts of dexlansoprazole.

The nonobviousness requirement assures that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). Here, there is no innovation at all. The patent specification touts the alleged advantages of the *crystalline* form, but that cannot impart patentability to the claimed *amorphous* compounds. The only even arguable written description for the claimed amorphous salts of dexlansoprazole is the mere listing in the '282 patent of salts such as the

magnesium salt, but the prior art Barberich reference likewise lists salts, including the magnesium salt.  *See* Section IV.A above.  No innovation there.  The '282 patent has no description of how to make the claimed amorphous salts.  (A26 ¶ 89; A8874 (p. 130).)  That means the '282 patent must itself rely on the prior art know-how for how to make the claimed salts.  No innovation there either.  Takeda has not identified, and cannot identify, how its claimed amorphous salts of dexlansoprazole constitute any innovation at all over the prior art.

As for the District Court's reliance (A124-125 ¶ 443) on organic chemistry being "unpredictable," this Court has admonished that "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (rejecting "a rule of law equating unpredictability to patentability"); *accord*, *In re Kubin*, 561 F.3d 1351, 1360 (Fed. Cir. 2009) ("This court also declines to cabin *KSR* to the 'predictable arts' (as opposed to the 'unpredictable art' of biotechnology).").

The District Court found no objective indicia (a/k/a secondary considerations) of nonobviousness.  (A91-A102; A127-A128.)  Takeda proved none because there are none.  There is no commercial success; Takeda sells the crystalline form, not the amorphous.  (A2226.)  The claimed invention provides no solution for a long felt, unsolved need or unexpectedly superior result; the

specification criticizes the amorphous form, rather than praise it.  (A264 at 14:44-46.)

In view of all the evidence, the asserted claims are invalid for obviousness.

## CONCLUSION

The District Court's decision should be reversed.  Takeda's claim for infringement of the '282 patent should be dismissed either for lack of subject matter jurisdiction or for failure to state a § 271(e)(2)(A) claim and for invalidity for lack of written description and for unpatentability over the prior art.

Respectfully Submitted,


Date:  April 21, 2014            /s/ Don J. Mizerk
                               Don J. Mizerk
                               Steven E. Feldman
                               Daniel R. Cherry
                               John A. Sholar, Jr.
                               **HUSCH BLACKWELL LLP**
                               120 South Riverside Plaza • 22nd Floor
                               Chicago, Illinois 60606
                               (312) 655-1500

                               Attorneys for Defendant-Appellant
                               **TWi Pharmaceuticals, Inc.**

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

*Page(s)*

November 1, 2013 Final Judgment as to TWi
Pharmaceuticals (Doc. No. 335) ..................................................................... A1-A4

October 17, 2013 Findings of Fact & Conclusions
of Law (Doc. No. 330) ............................................................................. A5-A131

April 8, 2013 Summary Judgment Order (Doc. No. 235) ..................... A132-A184

April 11, 2012 Claim Construction Order (Doc. No. 81) ...................... A185-A255

Patent at Issue, U.S. 7,737,282 (TX1055) ........................................... A256-A265

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAKEDA PHARMACEUTICAL CO., LTD., TAKEDA PHARMACEUTICALS NORTH AMERICA, INC., TAKEDA PHARMACEUTICALS LLC, AND TAKEDA PHARMACEUTICALS AMERICA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TWI PHARMACEUTICALS, INC., <br><br> Defendant. | Case No. 3:11-cv-01609 JCS <br><br> **[PROPOSED] FINAL JUDGMENT AS TO TWI PHARMACEUTICALS, INC.** <br><br> Judge: Hon. Joseph C. Spero <br> Courtroom G, 15th Floor <br><br> Related Cases: 3:11-cv-00840 (JCS) <br> 3:11-cv-01610 (JCS) |

CASE NO. 3:11-cv-1609 JCS

[PROPOSED] FINAL JUDGMENT AS TO TWI

A1

1   This action having come before the Court for a bench trial from June 5 to June 12, 2013;

2   the issues having been heard and a decision having been rendered:

3   **IT IS HEREBY ORDERED AND ADJUDGED** this 1st day of November , 2013, for

4   the reasons set forth in the Court's Findings of Fact and Conclusions of Law [D.N. 330] dated

5   October 17, 2013, that Judgment shall be entered in favor of Plaintiffs Takeda Pharmaceuticals

6   Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and

7   Takeda Pharmaceuticals America, Inc. (collectively, "Takeda"), and against Defendant TWi

8   Pharmaceuticals, Inc. ("TWi"), on Takeda's claim that TWi's proposed products described in

9   Abbreviated New Drug Application ("ANDA") No. 202-666 infringe asserted claims 1 and 2 of

10  U.S. Patent No. 7,737,282 ("the '282 Patent") pursuant to 35 U.S.C. § 271(e)(2); and it is further,

11  **ORDERED AND ADJUDGED** that the asserted claims of the '282 Patent are valid and

12  enforceable, and that Judgment shall be entered in favor of Takeda and against TWi on all

13  counterclaims and defenses alleging noninfringement, invalidity, or unenforceability of the '282

14  Patent; and it is further,

15  **ORDERED AND ADJUDGED** that the Court declines to exercise jurisdiction of

16  Takeda's declaratory judgment claim against TWi pursuant to 35 U.S.C. § 271(a); and it is further,

17  **ORDERED AND ADJUDGED**, pursuant to the Court's Order Re Summary Judgment

18  [D.N. 235] dated April 8, 2013, that Judgment shall be entered in favor of TWi and against Takeda

19  on Takeda's claim that TWi's proposed products described in ANDA No. 202-666 infringe

20  asserted claims 2 and 4 of U.S. Patent No. 7,790,755 ("the '755 Patent"); and it is further,

21  **ORDERED AND ADJUDGED** that Judgment shall be entered in favor of TWi and

22  against Takeda on TWi's counterclaim alleging noninfringement of asserted claims 2 and 4 of the

23  '755 patent, and that all counterclaims and defenses alleging invalidity and unenforceability of the

24  '755 Patent are moot; and it is further,

25  **ORDERED** that, pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval

26  by the United States Food and Drug Administration of TWi's proposed products described in

27  ANDA No. 202-666 shall be a date that is not earlier than the date of expiration of the '282 Patent

28  (currently, June 15, 2020); and it is further,

A2

1       **ORDERED** that, pursuant to Civil L.R. 54-1, costs shall be awarded to Takeda. JCS

2

3       DATED: _____11/01_____, 2013

4                                               THE HONORABLE _____ SPERO

5                                               United St

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A3

1                                          Presented by,

2    DATED:  October 25, 2013               MUNGER, TOLLES & OLSON LLP

3

4
                                           By:  _____/s/ Heather E. Takahashi_____
5                                               JEFFREY I. WEINBERGER (SBN 056214)
                                                *jeffrey.weinberger@mto.com*
6                                               TED G. DANE (SBN 143195)
                                                *ted.dane@mto.com*
7                                               HEATHER E. TAKAHASHI (SBN 245845)
                                                *heather.takahashi@mto.com*
8                                               RYAN N. HAGGLUND (*pro hac vice*)
                                                *ryan.hagglund@mto.com*
9                                               MUNGER, TOLLES & OLSON LLP
                                                355 South Grand Avenue, 35th Floor
10                                              Los Angeles, CA 90071-1560
                                                Telephone: (213) 683-9100
11                                              Facsimile: (213) 687-3702

12                                              TINA W. ARROYO (State Bar No. 272757)
                                                *tina.arroyo@mto.com*
13                                              MUNGER, TOLLES & OLSON LLP
                                                560 Mission Street
14                                              San Francisco, California 94105-2907
                                                Telephone:    (415) 512-4000
15                                              Facsimile:    (415) 512-4077

16                                          Attorneys for Plaintiffs
                                           TAKEDA PHARMACEUTICAL CO., LTD.,
17                                         TAKEDA PHARMACEUTICALS NORTH
                                           AMERICA, INC., TAKEDA PHARMACEUTICALS
18                                         LLC, AND TAKEDA PHARMACEUTICALS
                                           AMERICA, INC.
19   21943711

20

21

22

23

24

25

26

27

28
                                           3                       CASE NO. 3:11-cv-1609 JCS
                                    [PROPOSED] FINAL JUDGMENT AS TO TWI

A4

FILED

OCT 17 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAKEDA PHARMACEUTICAL CO., LTD, et al., | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiffs, | **FILED UNDER SEAL** |
| v. | |
| HANDA PHARMACEUTICALS, LLC, AND PAR PHARMACEUTICALS, | Case No. C-11-00840 JCS |
| Defendants. | |
| TAKEDA PHARMACEUTICAL CO., LTD, et al., | |
| Plaintiffs, | |
| v. | |
| TWI PHARMACEUTICALS, INC., | Case No. C-11-01609 JCS |
| Defendant. | |
| TAKEDA PHARMACEUTICAL CO., LTD, et al., | |
| Plaintiffs, | |
| v. | |
| IMPAX LABORATORIES, INC., | Case No. C-11-01610 JCS |
| Defendant. | |

United States District Court
Northern District of California

A5

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1
II. FINDINGS OF FACT ................................................................................................. 3
   A.  The Parties ............................................................................................................. 3
   B.  Background of Technology .................................................................................... 4
      1.  Crystals ........................................................................................................... 4
      2.  X-Ray Powder Diffraction Analysis ............................................................... 5
      3.  Polymorphs, Solvates and Hydrates ............................................................... 6
      4.  Crystallization and the Formation of Polymorphs .......................................... 6
      5.  Column Chromatography ................................................................................. 8
      6.  Enantiomers and Racemates ............................................................................ 8
      7.  Takeda's Inventions ........................................................................................ 9
         a.  Crystalline Dexlansoprazole .................................................................... 9
            i.   Example 1 ........................................................................................ 10
            ii.  Example 3 ........................................................................................ 11
            iii. Example 2 ........................................................................................ 11
            iv.  Reference Example 4 ....................................................................... 13
            v.   Experimental Example 1 ................................................................. 15
         b.  Amorphous Dexlansoprazole ................................................................. 15
      8.  The Patents-in-Suit ....................................................................................... 16
         a.  The '058 Patent ...................................................................................... 16
         b.  The '276 Patent ...................................................................................... 17
         c.  The '971 Patent ...................................................................................... 17
         d.  The '282 Patent ...................................................................................... 18
   C.  Facts Regarding Infringement of '276 Patent by Handa ...................................... 19
      1.  Overview of Handa's ANDA Product ............................................................ 20
      2.  XRPD Analysis of the Active-Layered Spheres of Handa's ANDA Product ................. 22
      3.  Solvias Testing of Handa's Finished ANDA Product .................................... 24
      4.  Whether the Crystal Peaks at 6.4 and 10.0 Can Be Attributed to Any Excipient in Handa's ANDA Product ........................................................................................ 25
         a.  SDS and Sugar Spheres .......................................................................... 25
         b.  Mannitol ................................................................................................. 27
         c.  Other Excipients ..................................................................................... 27
      5.  Statements in Handa Documents Relating to Whether Dexlansoprazole in its Drug Product Crystallizes During the Manufacturing Process .......................................... 28
      6.  Failure of SSCI's Standard Polymorph Screen to Identify a Polymorph of Dexlansoprazole With Characteristic Peaks at 6.4 and 10.0 ........................................ 30
      7.  Whether the Peaks at 6.4 and 10.0 are More Likely than Not Attributable to Crystalline Dexlansoprazole .......................................................................................... 31
   D.  Findings of Fact Related to the Validity of the Crystal-Form Patents ('058, '276 and '971 Patents ................................................................................................................ 31
      1.  The Level of Ordinary Skill in the Art of the Crystal-Form Patents ............. 32
      2.  Whether Claims 1 and 3 of the '058 Patent are Obvious ............................... 32
         a.  Overview of the Prior Art ....................................................................... 32
         b.  Prior Art Cited by Impax for the Disclosure of Dexlansoprazole .......... 34
           vi. Larsson, Von Unge and Barberich ....................................................... 34
             a.   Larsson .......................................................................................... 34
             b.   Von Unge ....................................................................................... 37

i

       c.     Barberich ........................................................................... 39
     vii.  Katsuki, Tanaka, Borner, Erlandsson ......................................... 40
    c.   Prior Art Cited by Impax for Disclosure of Crystallization Methods ......... 41
      i.  Tietze, Vogel, Gordon ........................................................... 41
     ii.  Kato, Nohara, Kohl and Bohlin ............................................... 42
    d.   Whether a Person of Ordinary Skill in the Art Would have been Motivated to Obtain a Crystal of Dexlansoprazole ......................................................... 45
    e.   Whether a Person of Ordinary Skill in the Art Would Have a Reasonable Expectation of Success ..................................................................................... 46
      i.  Prior Art Disclosing Asymmetric Oxidation to Obtain Dexlansoprazole .............. 46
     ii.  Prior Art Disclosing HPLC to Obtain Dexlansoprazole ................................. 49
     iii.  Prior Art Disclosing Methods of Crystallization ...................................... 54
    f.   Whether the Anhydrous Form of Dexlansoprazole Could have Been Predicted ......... 63
  3.  Differences Between the Inventions of Claims 2 and 3 of the '276 Patent and the Prior Art ......................................................................................... 64
  4.  Differences Between the Inventions of Claims 6 and 7 of the '971 Patent and the Prior Art ......................................................................................... 65
E.  Findings of Fact Relating to Plaintiffs' Standing to Assert the '282 Patent ............... 66
F.  Findings of Fact Relating to Declaratory Judgment Jurisdiction ........................... 69
G.  Findings of Fact Related to the Validity of the '282 Patent ................................ 69
  1.  Anticipation ............................................................................... 70
    a.   Handa's and TWi's Contention that Barberich II Anticipates an Amorphous Compound of Dexlansoprazole ...................................................... 70
      i.  The Amount of Direction or Guidance Provided by the Specification ............... 70
     ii.  The Absence of Working Examples Set Forth in the Specification .................. 71
     iii.  The Nature of the Invention and the Relative Skill of a Person of Ordinary Skill in the Art ..................................................................................... 71
     iv.  The State of the Prior Art ..................................................... 72
     v.  Predictability or Unpredictability of the Art ................................... 72
     vi.  The Breadth of the Claim ...................................................... 73
     vii.  The Quantity of Experimentation Needed and the Experiments at the University of Wisconsin ...................................................................... 73
        a.   Dr. Elder's First Attempt to Replicate Example 22 of Larsson ......... 74
        b.   Dr. Elder's Second Attempt and the Dropwise Addition of CHP ........ 75
        c.   Other Departures from the Procedure in Example 22 of Larsson ........ 79
        d.   Dr. Elder did Not Obtain an Oil of Dexlansoprazole ..................... 80
    b.   Handa and TWi's Contention that Larsson and Barberich II Anticipate a Salt of an Amorphous Compound of Dexlansoprazole ......................................... 82
  2.  Obviousness ............................................................................... 83
    a.   The Level of Ordinary Skill in the Art of the '282 Patent ......................... 83
    b.   Handa and TWi's Contention that Claims 1 and 2 of the '282 Patent are Obvious over the Larsson, Von Unge, and Barberich II References in View of the Knowledge of One of Ordinary Skill in the Art ................................................... 84
    c.   Handa and TWi's Contention that Claim 1 of the '282 Patent is Obvious in View of Larsson, Von Unge, or Barberich II in Combination with Takechi, Brittain, and/or Bohlin ....................................................................................... 87
      i.  The Disclosure of Takechi ...................................................... 87
     ii.  The Disclosure of Brittain ...................................................... 89
     iii.  The Disclosure of Bohlin ....................................................... 90
    d.   Handa's and TWi's Contention that Claim 2 of the '282 Patent is Obvious over the

United States District Court
Northern District of California

ii

A7

Larsson and Von Unge References in Combination with Barberich II, the PDR Entry for Prevacid, and/or Katsuki ........................................................................... 91

    e.   Motivation to Obtain Dexlansoprazole as an Amorphous Solid ................................ 92

  3.  Handa's and TWi's Contention that the Claims of the '282 Patent are Invalid for Failure to Satisfy the Written Description Requirement ........................................ 94

III.  CONCLUSIONS OF LAW ........................................................................................................ 94

  A.  Constitutional Standing of the Takeda U.S. Entities ........................................................ 94

  B.  Declaratory Judgment Jurisdiction ..................................................................................... 96

  C.  Infringement of the '276 Patent ......................................................................................... 100

    1.  Legal Standard on Infringement ..................................................................................... 100

    2.  Analysis .......................................................................................................................... 100

  D.  Validity of Asserted Patents ............................................................................................... 101

    1.  Legal Standards ............................................................................................................. 101

      a.   Presumption of Validity ............................................................................................ 101

      b.   Anticipation ............................................................................................................... 101

      c.   Obviousness ............................................................................................................... 104

      d.   Written Description .................................................................................................... 107

    2.  Whether the Crystal Form Patents are Obvious ............................................................ 108

      a.   Claims 1 and 3 of the '058 Patent ............................................................................. 108

      b.   Claims 2 and 3 of the '276 Patent ............................................................................. 113

      c.   Claims 6 and 7 of the '971 Patent ............................................................................. 114

    3.  Whether Claims 1 and 2 of the '282 Patent are Anticipated ........................................ 115

      a.   Whether Barberich II Anticipates an Amorphous Compound of Dexlansoprazole .. 115

      b.   Whether Barberich II Anticipates an Amorphous Salt of Dexlansoprazole ............. 119

    4.  Whether Claims 1 and 2 of the '282 Patent are Obvious ............................................. 119

    5.  Whether Claims 1 and 2 of the '282 Patent Satisfy the Written Description Requirement ................................................................................................................... 120

IV.  CONCLUSION ........................................................................................................................ 120

A8

I. **INTRODUCTION**

Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc. (hereinafter referred to collectively as "Takeda") initiated this action under the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), 35 U.S.C. § 271(e)(2)(A), in response to the filing of Abbreviated New Drug Applications ("ANDA") by Handa Pharmaceuticals, LLC ("Handa"), Impax Laboratories, Inc. ("Impax"), and TWi Pharmaceuticals, Inc. ("TWi"). Takeda claims the proposed ANDA products infringe upon its existing patents. Takeda also asserts infringement under 35 U.S.C. §271(a) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, as to Defendant TWi only.

At the outset of the three related cases, Takeda asserted Defendants' ANDA products infringed the following patents: 1) U.S. Patent No. 6,462,058 ("the '058 Patent"); 2) U.S. Patent No. 6,664,276 ("the '276 Patent"); 3) U.S. Patent No. 6,939,971 ("the '971 Patent"); 4) U.S. Patent No. 7,737,282 ("the '282 Patent"); 5) U.S. Patent No. 7,285,668 ("the '668 Patent") and 6) U.S. Patent No. 7,790,755 ("the '755 Patent"). Defendants, in turn, asserted counterclaims seeking declaratory judgment of noninfringement and invalidity as to the asserted patents.

On April 11, 2012, the Court issued its Claim Construction Order construing disputed claim terms found in one or more of the asserted patents. *See* Claim Construction Order [Case No. 3:11-cv-840, D.N. 106]. The case was subsequently narrowed to eleven asserted claims from the '755, '282, '058, '276, and '971 Patents. In particular, Takeda asserted that: 1) the ANDA submitted by Defendants Handa and Par Pharmaceuticals infringes claims 2, 4, and 6 of the '755 Patent, claims 1 and 2 of the '282 Patent and claims 2 and 3 of the '276 Patent; 2) the ANDA submitted by Defendant TWi infringes claims 2 and 4 of the '755 Patent and claims 1 and 2 of the '282 Patent; and 3) the ANDA submitted by Impax infringes claims 2, 4 and 6 of the '755 Patent, claims 1 and 3 of the '058 Patent, claims 2 and 3 of the '276 Patent, and claims 6 and 7 of the '971 Patent.

Following briefing and submission of evidentiary material and argument, on April 8, 2013, the Court entered a summary judgment order in each of the three related cases. *See* Handa

United States District Court
Northern District of California

A9

Summary Judgment Order [Case No. 3:11-cv-840, D.N. 265] ("Handa Summary Judgment

Order"); TWi Summary Judgment Order [Case No. 3:11-cv-1609, D.N. 235] ("TWi Summary

Judgment Order"); Impax Summary Judgment Order [Case No. 3:11-cv-1610, D.N. 241] ("Impax

Summary Judgment Order"). The Court granted summary judgment of noninfringement of the

'755 Patent in favor of all Defendants. *See* Handa Summary Judgment Order at 49-51; TWi

Summary Judgment Order at 47-51; Impax Summary Judgment Order at 49-51. The Court granted

summary judgment of infringement of the '282 Patent by Handa and TWi and denied Handa and

TWi's motions as to invalidity of the '282 Patent on grounds of anticipation. *See* Handa Summary

Judgment Order at 39-48; TWi Summary Judgment Order at 39-45. The Court also granted

Takeda's motion for summary judgment of infringement of the '058, '276, and '971 Patents by

Impax and denied Impax's cross-motion as to noninfringement of claims 1 and 3 of the '058

Patent and claim 7 of the '971 Patent. *See* Impax Summary Judgment Order at 47-49. The Court

rejected Impax's claim that the '971 Patent lacks an adequate written description to support claims

6 and 7 of that patent. *Id.* The Court denied Handa's motion of noninfringement as to the '276

Patent, finding there to be a triable issue of fact. *See* Handa Summary Judgment Order at 48-49.

     The Court held a six-day bench trial beginning on June 5, 2013 and concluding on June 12,

2013. The issues that remained at trial were as follows: 1) does Handa's ANDA product infringe

the '276 Patent because it contains crystalline dexlansoprazole; 2) are claims 2 and 3 of the '276

Patent invalid because they are obvious in view of the prior art; 3) are claims 1 and 2 of the '282

Patent invalid on the basis that they are anticipated, obvious, or lack sufficient written description;

4) are claims 1 and 3 of the '058 Patent invalid because they are obvious; 5) are claims 6 and 7 of

the '971 Patent invalid because they are obvious; 6) do the Takeda entities in the United States –

Takeda Pharmaceuticals North America, Inc. (now Takeda Pharmaceuticals U.S.A., Inc.), Takeda

Pharmaceuticals LLC and Takeda Pharmaceuticals America, Inc. – have standing to assert

infringement of the '282 Patent against TWi; and 7) is there a real and immediate controversy

sufficient to establish jurisdiction under the Declaratory Judgment Act as to Takeda's

infringement claim under § 271(a), asserted against TWi. The parties filed post-trial briefs on

June 28, 2013.

United States District Court
Northern District of California

1    Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings

2    of fact and conclusions of law. [1]

3    **II.  FINDINGS OF FACT**

4        **A.  The Parties**

5    1.    Takeda Pharmaceutical Company Limited ("TPC") is a Japanese corporation with its

6    principal place of business at 1-1, Doshomachi 4-chome, Chuo-ku, Osaka, Japan.  TPC is the owner

7    of record and assignee of the '058, '276, '971 and '282 Patents.

8    2.    Takeda Pharmaceuticals North America, Inc. ("TPNA") is a Delaware corporation with its

9    principal place of business at One Takeda Parkway, Deerfield, IL 60015.  TPNA recently changed

10   its name to Takeda Pharmaceuticals U.S.A., Inc.  TPNA is the registered holder of approved New

11   Drug Application No. 22-287 for Dexilant.

12   3.    Takeda Pharmaceuticals LLC ("Takeda LLC") is a Delaware limited liability company,

13   having a principal place of business at One Takeda Parkway, Deerfield, IL 60015.

14   4.    Takeda Pharmaceuticals America, Inc. ("TPA") is a Delaware corporation, having a

15   principal place of business at One Takeda Parkway, Deerfield, IL 60015.

16   5.    Handa Pharmaceuticals, LLC is a limited liability company organized under the laws of

17   California with its principal place of business at 39465 Paseo Padre Parkway, Suite 2600,

18   Fremont, CA 94538.

19   6.    Par Pharmaceutical, Inc. is a corporation organized under the laws of Delaware with its

20   principal place of business at 300 Tice Boulevard, Woodcliff Lake, NJ 07677.

21   7.    Handa submitted ANDA No. 202-294 to the U.S. Food and Drug Administration ("FDA"),

22   seeking approval for the manufacture, use, or sale of 60-mg dexlansoprazole capsules.

23   Subsequently, Handa and Par entered into an exclusive acquisition and license agreement

24   concerning ANDA No. 202-294, effective March 12, 2012, and Par is now the owner of that

25   ANDA. [Joint Statement of Undisputed Facts for Takeda's Motion for Summary Judgment of

26

27   _____

28   [1] Any Findings of Fact that constitute Conclusions of Law shall be deemed to have been found by the Court as a matter of law. Conversely, any Conclusions of Law that constitute Findings of Fact shall be deemed to have been found by the Court as a matter of fact.

3

A11

United States District Court
Northern District of California

1    Infringement of the '282 Patent ("JSUF (Takeda Motion)") ¶¶ 5-6] Hereinafter, the Court refers

2    to Handa and Par collectively as "Handa."

3    8.    Defendant TWi Pharmaceuticals, Inc. is a corporation organized under the laws of Taiwan

4    with its principal place of business at 4Fl., No. 41, Lane 221, Kang Chien Rd., Nei Hu Dist., Tai

5    Pei 114 Taiwan. [Case No. 3:11-cv-1609, D.N. 22].

6    9.    TWi is the owner of ANDA No. 202-666, which has been submitted to the FDA and which

7    seeks approval to market dexlansoprazole delayed-release capsules in 30-mg and 60-mg dosage

8    forms.

9    10.    Defendant Impax Laboratories, Inc. is a corporation organized under the laws of Delaware

10   with its principal place of business at 30831 Huntwood Ave., Hayward, CA 94544. [Case No.

11   3:11-cv-1610, D.N. 14].

12   11.    Impax is the owner of ANDA No. 202-576, which has been submitted to the FDA and

13   which seeks approval for the manufacture, use, or sale of dexlansoprazole delayed-release

14   capsules in 30-mg and 60-mg dosage forms.

15   **B.    Background of Technology**

16          **1.    Crystals**

17   12.    Crystals are solids in which the atoms (or molecules) are arranged in a periodic repeating

18   pattern that extends in three dimensions. *See* Trial Transcript ("Trial Tr.") (Myerson Direct)

19   173:7-10. Solids that are not crystalline and have no long range order (meaning that their

20   constituent molecules are similarly oriented for no more than a few molecules) – such as glass –

21   are said to be amorphous. Amorphous solids are generally less chemically stable than crystalline

22   solids of the same compound. *See id.* (Myerson Direct) 175:7-21.

23   13.    The internal structure (called the crystal structure or crystalline lattice) of molecular

24   crystals is determined by the position of the molecules relative to each other and extending in

25   three dimensions. *See id.* (Myerson Direct) 173:7-18.

26   14.    A crystal lattice can be characterized in terms of three spatial dimensions – a, b, and c –

27   and three angles – alpha, beta, and gamma. These lengths and angles are known as lattice

28   parameters and a single cell constructed using these parameters is called the unit cell. The

4

1    dimensions of the unit cell of a crystal (making up a crystal's internal architecture) are unique and

2    can be used to distinguish one crystalline form of a molecule from another crystalline form of the

3    same molecule. *See id.* (Myerson Direct) 173:19-174:1; *id.* (Atwood Direct) 798:20-799:16.

**2.  X-Ray Powder Diffraction Analysis**

5    15.    X-ray diffraction is a technique used to identify crystals and to determine crystal structure.

6    Crystal structure can be determined using single crystal x-ray diffraction.  In this method a single

7    crystal with dimensions of at least 0.1 mm in all dimensions is prepared. This crystal is then

8    rotated and exposed to x-rays. The resulting data can be analyzed to determine lattice type, unit

9    cell dimensions and the location of each atom in the crystal relative to the other atoms, thus

10   enabling a three dimensional understanding of the crystal structure. *See* Trial Tr. (Myerson

11   Direct) 176:4-17.

12   16.    Another type of x-ray diffraction, known as x-ray powder diffraction ("XRPD"), is also

13   used to identify crystals.  XRPD analyzes a small amount of ground crystalline powder rather than

14   a single crystal and produces a pattern of peaks that acts as a signature or fingerprint for the

15   substance being analyzed. *See id.* (Myerson Direct) 176:18-178:3.

16   17.    In XRPD, a sample of the material of interest is first lightly ground into a fine powder.

17   XRPD relies on the fact that the array of tiny crystals in the powder sample, randomly arranged,

18   will present all possible lattice planes for reflection of an incident beam of x-rays. When x-rays are

19   directed at such a crystalline solid, an observable pattern is produced because the distances

20   between atoms in a crystal are of a length similar to the x-ray wavelength. The relationship

21   between the wavelength of the x-rays and the spacing between atoms in a crystal is known as

22   Bragg's law:  $n\lambda = 2d \sin \theta$, where $\lambda$ is the wavelength of the incident x-rays, d is the interplanar

23   spacing in the crystal and $\theta$ is the angle of incident x-rays on the crystal. *Id.*

24   18.    XRPD data is often reported in terms of d-spacings and Bragg angles (known as "$2\theta$" or

25   "two-theta" values) as well as relative intensities (which for any given peak is shown as a

26   percentage of the intensity of the maximum peak). The two-theta values are a function of the

27   wavelength of the x-rays used. The d-spacings are the distances between adjacent crystal planes in

28   the lattice.  Because these d-spacings are a property of the crystalline solid, unlike two-theta

United States District Court
Northern District of California

5

1    values they are invariant. For any x-ray wavelength, d-spacing data can be used to calculate two-

2    theta angles, and vice versa. *Id.* (Myerson Direct) 178:4-15.

3    19.    The x-ray pattern (particularly the location of the peaks) acts as a "fingerprint" for a given

4    crystal form of a particular compound and a selection of peaks from an XRPD pattern can be used

5    to identify a compound and its crystalline phase. *Id.* (Myerson Direct) 177:23-178:3.

6    20.    XRPD is commonly used to characterize the active ingredient in a drug product. *Id.*

7    (Myerson Direct) 185:2-5.

### 3. Polymorphs, Solvates and Hydrates

9    21.    It is possible for a given chemical compound to crystallize into more than one distinct

10   crystal structure. This ability is called polymorphism. Different polymorphs of the same

11   compound can be as different from one another in terms of their properties as different

12   compounds. Trial Tr. (Myerson Direct) 183:2-11.

13   22.    A solvate is a crystal in which solvent is part of the crystalline structure. A solvate in

14   which the solvent is water is usually referred to as a hydrate. *Id.* (Myerson Direct) 183: 13-17.

15   Approximately fifty percent of pharmaceutical compounds are either polymorphic or have solvates

16   or hydrates. *Id.* (Myerson Direct) 184: 5-9.

17   23.    Polymorphs may convert from one form to another during manufacture and storage.

18   Typically that conversion would be from a less stable form to a more stable form. At a given

19   temperature, for example, one polymorph is the thermodynamically stable form. This does not

20   mean that other polymorphs cannot exist under those conditions; it means only that one

21   polymorph is stable and any others present can convert to the stable polymorphic form. For

22   example, an amorphous form can convert to a crystalline form because an amorphous form is

23   generally less stable than a crystalline form. *See id.* (Myerson Direct) 184: 10-21.

### 4. Crystallization and the Formation of Polymorphs

25   24.    The process by which crystals are formed is called crystallization. Crystallization of

26   molecules has long been known, and crystallization of pharmaceutical compounds has been a

27   common practice in the pharmaceutical industry and in academic research laboratories for

28   decades. Trial Tr. (Genck Direct) 715:8-10; *id.* (Atwood Direct) 964:22-965:6. The general

United States District Court
Northern District of California

6

A14

United States District Court
Northern District of California

1  technique of crystallization is taught to undergraduate students as part of their training and is used

2  routinely by chemists in the preparation and purification of organic compounds. *Id.* (Atwood

3  Direct) 964:6-21.

4  25.     Many methods of crystallization exist. Crystallization from solution is a common

5  crystallization method in which a solid material (known as the solute) is first dissolved in a liquid

6  (known as the solvent). *Id.* (Atwood Direct) 934:15-936:9.

7  26.     Crystallization from solution is the result of three successive processes: (1) supersaturation

8  of the solution, which means that more than the thermodynamically stable amount of a compound

9  is in solution; (2) formation of crystal nuclei; and (3) crystal growth around the nuclei.

10  Supersaturation can be achieved by cooling the solution, evaporating the solvent, changing the pH

11  of the solution, or introducing a solvent into the solution in which the compound is less soluble, or

12  a combination of the foregoing. As a result of these steps, the solution becomes supersaturated.

13  *Id.* (Atwood Direct) 934:15-939:8.

14  27.     Supersaturation itself is insufficient to cause crystal formation; the crystal embryos must

15  form by collision of molecules of solute in the solution, or sometimes by addition of seed crystals.

16  If the molecules are not oriented properly so as to crystallize, or if the compound is a liquid at

17  room temperature, then supersaturation will not result in a crystal. *Id.* (Atwood Direct) 938:20-

18  939:8.

19  28.     Once a newly synthesized compound has been crystallized, subsequent crystallizations are

20  generally easier because of the presence of suitable seeds to serve as the site of nucleation. *Id.*

21  (Atwood Direct) 972:9-973:8; *Id.* (Genck Direct) 723:14-724:7. Seeding may be unintentional or

22  intentional. Intentional seeding involves adding small crystals or crystallites (small, often

23  microscopic crystals) to a supersaturated solution to encourage nucleation of the desired crystal,

24  thereby speeding up the crystallization process. *Id.* (Genck Direct) 723:15-724:1; *id.* (Atwood

25  Direct) 972:1-8. Unintentional seeding sometimes occurs in laboratories where compounds are

26  crystallized because the working atmosphere may become contaminated with seeds of the

27  particular material, which promotes subsequent crystallization. *Id.* (Atwood Direct) 972:13-973:9.

28  29.     Organic molecules are generally more difficult to crystallize because there are several

7

1   possible ways for the pendant groups on the outside of the molecule to arrange themselves in

2   three-dimensional space. *Id.* (Atwood Direct) 941:4-24.

### 5. Column Chromatography

4   30.     Chromatography is a technique designed to separate molecules in a sample. Column

5   chromatography is a technique that carries out this separation using a column that is packed with

6   some kind of solid matrix, such as silica-gel beads, that has an affinity for the compound of

7   interest. Trial Tr. (Atwood Direct) 952:24-955:20.

8   31.     This technique involves applying a mixture of the sample in solution to the top of the

9   column. Large amounts of a liquid solvent are then added, into which the sample dissolves. The

10   solvent containing the samples (called the mobile phase) then flows through the column, typically

11   under high pressure. Different types of molecules in the sample may interact with the silica-gel

12   matrix as they travel through the column, and if they do interact they will travel more slowly

13   through the column. Other molecules that do not interact with the matrix will travel through the

14   column more quickly. These different rates of travel allow the molecules to be separated, because

15   they emerge from the bottom of the column at different times. The separated materials that come

16   off the column will still be in the mobile phase (solvent). *See id.*

### 6. Enantiomers and Racemates

18   32.     "Enantiomers" are non-superimposable mirror images of a given compound, just

19   as a person's left and right hands are non-superimposable images of each other. They are

20   designated by their handedness as right (R) or left (S), or by the direction they rotate a plane of

21   polarized light. *See* Trial Tr. (Rogers Direct) 482:14-20.

22   33.     Substances that can rotate polarized light are said to be optically active because

23   they interact with light and can rotate plane-polarized light. *Id.* (Atwood Cross) 1057:19-20.

24   34.     Enantiomers that rotate plane-polarized light clockwise are said to be

25   dextrorotatory or (+). Those that rotate plane-polarized light counterclockwise are called

26   levorotatory or (–). *Id.* (Atwood Cross) 1057:19-20.

27   35.     Racemates are mixtures of both the R-enantiomer and the S-enantiomer; racemates can

28   be separated using various techniques, including chromatography. *Id.* (Rogers Direct) 482: 21-22.

8

United States District Court
Northern District of California

United States District Court
Northern District of California

36. "Enantiomeric excess" or "e.e." is a measure of the optical purity of an enantiomer. The optical purity of an R-enantiomer is obtained by subtracting the amount of S-enantiomer in a given compound from the amount of R-enantiomer in that compound. *Id.* (Kamiyama Direct) 86: 4 - 87: 3.

### 7. Takeda's Inventions

37. The patents-in-suit claim amorphous and crystalline forms of dexlansoprazole, a compound used to treat gastroesophageal reflux disease ("GERD"). The '282 Patent claims an amorphous form of dexlansoprazole (hereinafter, "Amorphous Form Patent"). The, '276, '058 and '971 Patents relate to crystalline forms of dexlansoprazole (hereinafter, "Crystal Form Patents").

38. Dexlansoprazole is a chemical compound known as (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole. It is the R-enantiomer of lansoprazole.

39. Lansoprazole is the active pharmaceutical ingredient ("API") in the drug Prevacid®, which Takeda began marketing in 1995. Lansoprazole is a racemic mixture of the enantiomers dexlansoprazole (the right, R+, or (+) enantiomer) and levolansoprazole (the left, S-, or (-) enantiomer). This means that lansoprazole contains 50% of each of the two enantiomers with alternating right-handed and left-handed molecules intermixed. *See* Trial Tr. (Atwood Direct) 968:17-18.

40. The Amorphous and Crystal-Form Patents grew out of the work of Takeda scientists Akira Fujishima, Isao Aoki, and Keiji Kamiyama, who sought to isolate stable solid forms of dexlansoprazole. These four patents are part of the same patent family and claim priority to a Japanese patent application filed June 17, 1999. TX 0001 ('058 Patent); TX 0002 ('276 Patent); TX 1054 ('971 Patent); TX 1055 ('282 Patent). All have essentially the same specification.

### a. Crystalline Dexlansoprazole

41. In May 1999, Dr. Kamiyama began working on the crystallization of the separate enantiomers of lansoprazole – the PPI used in Takeda's Prevacid® drug – in order to protect Takeda's market in the face of impending generic competition resulting from the expiration of

9

United States District Court
Northern District of California

1   Takeda's first patent for lansoprazole. Trial Tr. 82:20-25 (Kamiyama Direct); *id.* (Kamiyama

2   Cross) 122:6-24; TX 0306A-0036 (TAK-390MR2[2] New Employee Training) (goal of

3   crystallization of both enantiomers was given "top priority" in light of lansoprazole patent

4   expiration). Dr. Kamiyama began his efforts by obtaining samples of the amorphous solids of

5   (R+)-lansoprazole and (S-)-lansoprazole from Takeda's Production Technology Division. *See*

6   Trial Tr. (Kamiyama Direct) 85:3-86:3; TX 0306A-0036 (TAK-390MR New Employee Training,

7   describing research on TAK390).

8   42.     Dr. Kamiyama started with a little over a gram of dexlansoprazole, which he divided into

9   10 smaller samples of approximately 100 milligrams each in order to conduct crystallization

10  experiments. *See id.* (Kamiyama Direct) 85:3-86:3; TX 0306A-0037. Dr. Kamiyama did so

11  because he did not know if he would be successful in obtaining a crystal of dexlansoprazole and

12  wanted enough samples to allow him to conduct multiple crystallization experiments. Trial Tr.

13  (Kamiyama Direct) 85: 11-13; TX 0306A-0037.

14  43.     Dr. Kamiyama's first attempts to crystallize dexlansoprazole using solvents included an

15  attempt using ethyl acetate with hexane and an attempt using ethanol with hexane. These attempts

16  failed to produce crystals. *See* Trial Tr. (Kamiyama Direct) 88:11-23, 110:16-21. Dr. Kamiyama

17  also later failed to obtain dexlansoprazole crystals using tetrahydrofuran ("THF") and methanol as

18  solvents. *See id.* (Kamiyama Direct) 110:22-11:5.

19  44.     Dr. Kamiyama was able to crystallize dexlansoprazole after one or two days of

20  experiments. *Id.* (Kamiyama Cross) 115: 16-24. (Kamiyama Direct) 91:1-92:22.

21                          **i.      Example 1**

22  45.     Dr. Kamiyama's first successful crystallization is described in Example 1 of the

23  Amorphous and Crystal-Form Patents. Trial Tr. (Kamiyama Direct) 91:1-92:22. The method that

24  Dr. Kamiyama used to successfully crystallize dexlansoprazole involved several steps. First, he

25  dissolved a small amount of amorphous solid of (R+)-lansoprazole in acetonitrile. Next, he

26  gradually evaporated the solution at room temperature while blowing a nitrogen stream over the

27

28  _____

[2] Takeda refers to dexlansoprazole as TAK390. Trial Tr. (Kamiyama Direct) 138: 24-25.

10

United States District Court
Northern District of California

1  surface of the solution. *See* Trial Tr. (Kamiyama Direct) 87:14-88:6, 92:3-22; TX 0001-0006

2  ('058 Patent) at col.10, ll.25-42 (Example 1). The use of a nitrogen stream encouraged evaporation

3  of solvent and cooling of the solution, thereby promoting crystallization. Trial Tr. (Kamiyama

4  Direct) 89:8-16; *id.* (Genck Direct) 718:8-719:8 (blowing a nitrogen stream across the surface of

5  the solution leads to evaporation and cooling).

6  46.    After a crystal began to form, Dr. Kamiyama added diethyl ether to the solution and

7  stoppered the container at room temperature. *Id.* (Kamiyama Direct) 87:14-88:66, 92:3-22; TX

8  0001-0006 ('058 Patent) at col.10, ll.25-42 (Example 1). This method yielded a small quantity of

9  the anhydrous crystal of dexlansoprazole described in claim 1 of the '058 Patent (38 mg). *See* TX

10  0001-0006 ('058 Patent) at col.10, ll.25-42 (Example 1).

11                              **ii.    Example 3**

12  47.    Dr. Kamiyama attempted additional crystallization techniques to obtain crystals of

13  dexlansoprazole. *See* Trial Tr. (Kamiyama Direct) 96:14-19, 97:11-17. One of those techniques

14  resulted in the sesquihydrate (1.5 hydrate) crystal described in Example 3 of the '058 Patent. *See*

15  *id.* (Kamiyama Direct) 96:14-97:2. Dr. Kamiyama testified credibly that he did not expect to

16  obtain a sesquihydrate crystal. *Id.* (Kamiyama Direct) 97: 18-20.

17  48.    In Example 3, 100 mg of amorphous solid dexlansoprazole from Reference Example 1 was

18  dissolved in ethanol and water. TX 0001-0007 ('058 Patent) at col.12, ll.11-24. This failed to

19  result in crystallization. Trial Tr. (Kamiyama Direct) 97:14-98:3. A seed from the anhydrous

20  crystal disclosed in Example 1 of the '058 Patent was then placed in the solution, and the solution

21  was kept standing at room temperature for an hour. TX 0001-0007 ('058 Patent) at col.12, ll. 18-

22  20. This seeding caused crystallization to occur, although the crystal formed was different from

23  that of the seed crystal. *See id.* Precipitated crystals were collected by filtration, washed, and

24  dried to yield 96 mg of the sesquihydrate crystal of dexlansoprazole. *Id.* at col.12, ll. 20-24.

25  49.    X-ray powder diffraction data for the 1.5 hydrate crystal is shown in Table 3 of the '058

26  Patent. *Id.* at col.12, ll.29-44.

27                              **iii.    Example 2**

28  50.    Dr. Kamiyama later attempted to manufacture a greater quantity of the anhydrous crystal

of dexlansoprazole for use in an animal study described in Experimental Example 1 of the Crystal-

Form Patents as well as other experiments. *See* Trial Tr. (Kamiyama Direct) 100:23-101:17,

108:11-22.

51.     He succeeded by taking the approach described in Example 2 of the '058 Patent, using the

amorphous solid dexlansoprazole from Reference Example 2 as starting material. TX 0001 ('058

Patent) at TX 0001-0007, col.11, ll.11-43 (Example 2); *see also* Trial Tr. (Kamiyama Direct)

103:25-104:19. This crystallization experiment involved several steps. *Id.*

52.     In the first step, Dr. Kamiyama obtained a sesquihydrate crystal from the amorphous form

using the following procedure: First, 9.17 grams of the amorphous solid (98.3% e.e.) were

dissolved under heating in acetone and water. TX 0001 ('058 Patent) at TX 0001-0007, col.11,

ll.16-19. The resulting solution was kept standing at room temperature overnight. Then water

was added and the mixture was subjected to ultrasonication. *See id.* at col.11, ll.20-22. This

process resulted in a solid, which was collected by filtration, washed, and dried to yield 9.10

grams of the sesquihydrate crystal of dexlansoprazole. *See id.* at col.11, ll. 22-25; Trial Tr.

(Kamiyama Direct) 103:25-104:6, 104:20-25.

53.     In the second step, Dr. Kamiyama obtained an anhydrate crystal from the sesquihydrate

crystals using the following procedure: 9.00 grams of the sesquihydrate crystals were dissolved in

acetone and filtered.  TX 0001 ('058 Patent) at TX 0001-0007, col.11, ll.25-27. Diisopropylether

was added to the filtrate and a seed from the anhydrous crystal disclosed in Example 1 was added

to the mixture, which was kept standing at room temperature overnight. *Id.*, col.11, ll.27-29; Trial

Tr. (Kamiyama Direct) 105:12-19. The resulting crystals were collected, washed, and dried to

yield 7.85 grams of the anhydrous crystal of dexlansoprazole (optical purity 99.8% e.e.).  TX 0001

('058 Patent) at TX 0001-0007, col.11, ll.29-32; TX 0502 & TX 0502A (Kamiyama laboratory

notebook and partial English translation) at TX 0502-0013 & TX 0502A-0013; Trial Tr.

(Kamiyama Direct) 103:25-104:15, 105:1-5, 108:23-109:21.

54.     In the third step, Dr. Kamiyama obtained hydrate crystal from anhydrate crystal using the

following procedure: 7.80 grams of these anhydrous crystals were dissolved under heating in

acetone and water, and this solution was kept standing at room temperature for an hour. TX 0001

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1   ('058 Patent) at TX 0001-0007, col.11, ll.32-34. A precipitated solid was collected by filtration,

2   washed, and dried to yield 3.88 grams of the sesquihydrate crystal of dexlansoprazole. *Id.*, col.11,

3   ll.35-37; Trial Tr. (Kamiyama Direct) 103:25-104:15, 105:6-8. The optical purity of this

4   sesquihydrate crystal (99.8% e.e.) was higher than that of the anhydrate crystal in step 2 above.

5   *See* TX 0502 & TX 0502A (Kamiyama laboratory notebook and partial English translation) at TX

6   0502-0013 & TX 0502A-0013; Trial Tr. (Kamiyama Direct) 108:23-109:21.

7   55.     In the fourth and final step, Dr. Kamiyama obtained an anhydrate crystal from hydrate

8   crystal using the following procedure: the entire amount of sesquihydrate crystals obtained in step

9   3 above were dissolved under heating in acetone and diisopropyl ether, and the solution was kept

10  standing at room temperature for 30 minutes. TX 0001 ('058 Patent) at TX 0001-0007, col.11,

11  ll.37-40. Precipitated crystals were collected by filtration, washed, and dried to yield 3.40 grams

12  of the anhydrate crystal of dexlansoprazole (99.8% e.e.). *Id.*, col.11, 30-44; Trial Tr. (Kamiyama

13  Direct) 103:25-104:15, 105:9-11.

14  56.     Example 2 thus sets forth additional techniques for obtaining sesquihydrate and anhydrate

15  crystals of dexlansoprazole. Although only the second step involved the intentional use of a seed

16  crystal, the crystallization was performed in the same lab in which the sesquihydrate crystal was

17  first obtained in Example 3. Moreover, the second crystallization of the anhydrous crystal

18  occurred after one such crystallization had already been performed in Example 2. Accordingly, the

19  crystallizations described in Example 2 may have been facilitated by both intentional and

20  unintentional seeding.

21  57.     Table 2 reports the x-ray powder diffraction data for the resulting anhydrous crystal of

22  dexlansoprazole. The d-spacings listed in Table 2 correspond to the d-spacings listed in claim 1 of

23  the '058 Patent, and are reported as 11.68, 6.77, 5.84, 5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41 and

24  3.11 Angstrom. *See* TX 0001 ('058 Patent) at TX 0001-0007, col.11, tbl. 2, TX 0001-0008, col.14,

25  ll.25-30 (claim 1).

26                              **iv.    Reference Example 4**

27  58.     Reference Example 4 describes a series of experiments in which Takeda generated the

28  anhydrous crystal of dexlansoprazole described in Example 2 on a much larger production scale.

13

1    TX 0001-0005 to -0006 ('058 Patent), col.8, l.31 to col.10, l.23 (Reference Example 4.

2    59.    The first step was the asymmetric oxidation of 4.5 kilograms of lansoprazole derivative, 2-

3    [[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridyl]methyl]thio] benzimidazole. This reaction

4    resulted in dexlansoprazole in the reaction liquor, which was then crystallized and recrystallized

5    multiple times to improve its chemical and optical purity. TX0001-0005, col.8, ll.35-53.

6    60.    In step two, four solvents in succession were added to the organic layer resulting from the

7    asymmetric oxidation reaction to yield a highly pure crystal (100% e.e.) of dexlansoprazole with

8    d-spacings at 5.85, 4.70, 4.35, 3.66, and 3.48 Angstrom. TX 0001-0005 to -0006 ('058 Patent) at

9    col.8, l.53 to col.9, ll.8.

10    61.    In step three, the crystal obtained in step two was suspended in acetone and subjected to

11    additional steps that resulted in another highly pure crystal (100% e.e.) of dexlansoprazole with d-

12    spacings at 8.33, 6.63, 5.86, and 4.82 Angstrom. TX 0001-0006 ('058 Patent), col.9, ll.9-26.

13    62.    In step four, the crystal obtained in step three was dissolved in ethyl acetate and water and

14    a trace amount of insoluble material in the organic layer was removed. Triethylamine was added

15    to the remaining ethyl acetate-water mixture, and the mixture was concentrated under reduced

16    pressure. Methanol and aqueous ammonia and t-butyl ether were added at 50° C, and additional

17    separations were performed. These separations resulted in a concentrate that was dissolved in

18    acetone, concentrated, dissolved in more acetone, and then added drop by drop into a mixture of

19    acetone and water. This resulted in a highly pure crystal (100% e.e.) of dexlansoprazole with d-

20    spacings at 8.33, 6.63, 5.86, and 4.82 Angstrom. *Id.* at col.9, ll.27-65.

21    63.    In step five, the crystal obtained in step four was dissolved in ethyl acetate, and the water

22    layer was separated from the organic layer. The resulting organic layer was then concentrated

23    under reduced pressure, and ethyl acetate and activated charcoal were added. After stirring, the

24    activated charcoal was removed by filtration. The filtrate was concentrated under reduced pressure

25    and then heptane was added in a dropwise fashion (drop by drop) at 40° C. The resulting crystal

26    was separated and washed with ethyl acetate-heptane at 40° C. *Id.* at col.9, l.66 to col.10, l.12.

27    64.    This process yielded 3.4 kilograms of the same anhydrous crystal of dexlansoprazole

28    reported in Example 2, with d-spacings at 11.68, 6.77, 5.84, 5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41

United States District Court
Northern District of California

14

A22

and 3.11 Angstrom. The optical purity of the final crystal of Reference Example 4 had an optical purity of 100% e.e., compared to the optical purity of 99.8% e.e. for the anhydrous crystal of Example 2. *See id.* at col.10, ll.13-24; *see also id.* at col.11-12, tbl. 2.

### v. Experimental Example 1

65. Experimental Example 1, titled "Suppressive action on gastric mucosal injury due to stress of water immersion restraint in rat," TX 0001-0006 to -0007 ('058 Patent) at col.12, l.46 to col.13, l.16, describes the administration of dexlansoprazole to a treatment group of rats. Thirty minutes after the administration of dexlansoprazole, rats in treatment and control groups were subjected to a standard stress test in which they were partially immersed in water in a standing position for 5 hours. Following the stress test, the gastric mucosal injury to each rat's stomach was evaluated to determine the protective value of dexlansoprazole. *See id.*

66. This experiment demonstrated that dexlansoprazole is effective at inhibiting intragastric acid section. *See* TX 0001-0007 ('058 Patent) at Table 4 (showing 98% suppression of gastric mucosal injury in animals that received dexlansoprazole).

### b. Amorphous Dexlansoprazole

67. Reference Examples 1 and 2 of the '282 Patent describe two slightly different methods for synthesizing highly pure preparations of the amorphous solid of dexlansoprazole. TX 1055 ('282 Patent) at col.7, l.51 to col.8, l.7 (Reference Example 1); *id.*, col.8, ll.9-29 (Reference Example 2).

68. In Reference Example 1, chiral high pressure liquid chromatography ("HPLC") was used to separate 3.98 grams of racemic lansoprazole into its optically active isomers. *See* TX 1055-0006 ('282 Patent) at col.7, l.51 to col.8, l.7 (Reference Example 1). Racemic lansoprazole was dissolved in the mobile phase (solvent) and acetonitrile before separation by HPLC. *See id.* Fractions of the (R+)-enantiomer were collected from the chromatography column, the individual lots were combined and dissolved in ethanol, and filtered. *See id.*

69. To prevent decomposition of the filtrate that resulted from the chiral column chromatography and filtration process described in Reference Example 1, the Takeda inventors added hexane quickly to the material. *See* Trial Tr. (Atwood Direct) 961:3-14. This solution of hexane and dexlansoprazole was then evaporated to dryness to yield 1.6 grams of solid amorphous

15

United States District Court
Northern District of California

1  dexlansoprazole, with an e.e. of 97.6%. *See* TX 1055 ('282 Patent) at col.7, l.51 to col.8, l.7

2  (Reference Example 1).

3  70.  By repeating these steps, the Takeda inventors were able to obtain 1.37 grams of solid

4  amorphous dexlansoprazole with an optical purity greater than 99.9% e.e. TX 1055 ('282 Patent)

5  at col.7, l.51 to col.8, l.7 (Reference Example 1) ("1 shot: 20-25 mg" and reporting the separation

6  of 3.98 grams).

7  71.  In Reference Example 2, Takeda obtained a larger quantity (9.31 grams) of solid

8  amorphous form of dexlansoprazole. In this example, triethylamine, a base, was used instead of

9  hexane to stabilize the material. *Id.*, col.8, ll.9-29 (Reference Example 2); *cf. id.* (Kamiyama

10  Direct) 106:18-108:4; *see also* TX 0722-0002 (SSCI document entitled "Standard Polymorph

11  Screen") ("TAK-390 [dexlansoprazole] degraded in solution over time but was stabilized by

12  addition of triethylamine.").

13  **8.  The Patents-in-Suit**

14  72.  The four patents-in-suit are all part of the same patent family, with the same inventors and

15  essentially the same specifications. These patents claim priority to a Japanese patent application

16  filed June 17, 1999. *See* TX 0001 ('058 Patent); TX 0002 ('276 Patent); TX 1054 ('971 Patent);

17  TX 1055 ('282 Patent). All claim June 17, 1999 as their earliest priority date.

18  **a.  The '058 Patent**

19  73.  The '058 Patent issued on October 8, 2002.

20  74.  Claim 1 of the '058 Patent requires "[a] crystal of (R)-2-(((3-methyl-4-(2,2,2-

21  trifluoroethoxy)-2-pyridinyl)methyl)sulfinyl)-1H-benzimidazole wherein the x-ray powder

22  diffraction analysis pattern has characteristic peaks at interplanar spacings (d) of 11.68, 6.77, 5.84,

23  5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41 and 3.11 Angstrom." TX 0001-0008 ('058 Patent) at col.14,

24  ll. 25-30 (claim 1).

25  75.  The Court construed the disputed term "a crystal of" in claims 1 and 3 of the '058 Patent to

26  mean "regularly repeating pattern of molecules with long range order extending in three

27  dimensions." Similarly, the Court construed the disputed term "a crystalline compound of" in

28  claims 2 and 3 of the '276 Patent and claims 6 and 7 of the '971 Patent to mean "regularly

16

repeating pattern of molecules with long range order extending in three dimensions." Claim

Construction Order [D.N. 106], 3:11-cv-840, at 70.

76.     The Court also construed the disputed term "characteristic peaks at interplanar spacings

(d)" in claim 1 of the '058 Patent and claim 7 of the '971 Patent to mean "peaks in the x-ray

powder diffractogram of a crystal that uniquely identify that crystal, denoted by distances between

lattice planes in a crystal as measured by a diffraction experiment and defined by Bragg's law,

within normal experimental error of x-ray powder diffraction." *Id.*

77.     The two-theta values that correspond to the d-spacings given in claim 1 of the '058 Patent

for the anhydrous crystal are: 7.56, 13.06, 15.16, 15.44, 20.04, 21.72, 22.56, 22.82, 24.08. *See* TX

0001-0007 ('058 Patent) at col.11-12, tbl.2.

78.     Claim 3 of the '058 Patent depends from claim 1 and requires "[a] pharmaceutical

composition which comprises the crystal according to claim 1 and a pharmaceutically acceptable

excipient, carrier or diluent." TX 0001-0008 ('058 Patent) at col.14, 11.37-39 (claim 3).

### b. The '276 Patent

79.     The '276 Patent issued on December 16, 2003. TX0002 at 45.

80.     Claim 2 of the '276 Patent requires "[a] crystalline compound of (R)-2-[[[3-methyl-4-

(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1 H-benzimidazole." TX 0002-0008

('276Patent) at col.14, 11.59-61 (claim 2).

81.     Claim 3 of the '276 Patent requires "[a] pharmaceutical composition comprising: a

crystalline compound of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-

1 H-benzimidazole or a salt thereof; and a pharmaceutically acceptable excipient, carrier or

diluent." TX 0002-0008 ('276 Patent) at col.14, 11.62-67 (claim 3).

### c. The '971 Patent

82.     The '971 Patent issued on September 6, 2005. TX 1054.

83.     Claims 6 and 7 of the '971 Patent depend, directly or indirectly, from claim 5. Claim 5

requires "[a] method of treating reflux esophagitis in a mammal in need thereof which comprises

administering to said mammal an effective amount of a crystalline compound of (R)-2-(((3-

methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl)methyl)sulfinyl)-1H-benzimidazole or a salt thereof

17

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and a pharmaceutically acceptable excipient, carrier or diluent." *See* TX 1054 ('971 Patent) at col.

2  15, ll. 8-13 (claim 5).

3  84.     The Court construed the disputed term "effective amount" in claim 5 of the '971 Patent to

4  mean "an amount sufficient to help ameliorate or cure reflux esophagitis." Claim Construction

5  Order [D.N. 106], 3:11-cv-840, at 71.

6  85.     Takeda and Impax have further agreed that the term "reflux esophagitis" in claim 5 of the

7  '971 Patent means "inflammation or esophageal symptoms caused by gastroesophageal reflux

8  disease (GERD) of the erosive or non-erosive type." Stipulated Facts in Joint Proposed Final

9  Pretrial Order ("Stipulated Facts") [Case No. 3:11-cv-840, D.N. 277] ¶ 9.

10  86.     Claim 6 further specifies that "said crystalline compound is (R)-2-(((3-methyl-4-(2,2,2-

11  trifluoroethoxy)-2-pyridinyl)methyl)sulfinyl)-1H-benzimidazole." TX 1054 ('971 Patent) at col.

12  15, ll. 14-16 (claim 6).

13  87.     Claim 7 also depends from claim 5 and specifies that "said crystalline compound has an x-

14  ray powder diffraction analysis pattern with characteristic peaks at interplanar spacings (d) of

15  11.68, 6.77, 5.84, 5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41 and 3.11 Angstrom." *See* TX 1054 ('971

16  Patent), col. 15, ll. 17-21 (claim 7).

17  88.     The d-spacings listed in claim 7 are the same d-spacings listed in claim 1 of the '058

18  Patent. *See* TX 0001-008 ('058 Patent) at col.14, ll.25-30 (claim 1).

19          **d. The '282 Patent**

20  89.     The '282 Patent issued on June 15, 2010. TX 1055. It is the first patent in this family of

21  patents to claim an amorphous compound of dexlansoprazole (rather than a crystal form), or a

22  "salt thereof." TX1055-0001; TX1055 at 15:3-8; TX0305; Trial Tr. (Kamiyama Cross) 127:9-13.

23  Prior to 1999, Takeda had not made a salt of dexlansoprazole and the specification of the '282

24  Patent does not include a description of how to make an amorphous salt. Trial Tr. (Kamiyama

25  Cross) 127: 14-17, 130: 8-10.

26  90.     Claim 1 of the '282 Patent requires an "amorphous compound of (R)-2-[[[3-methyl-4-

27  (2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole." TX1055 ('282 Patent) at

28  col. 15, ll. 3-8 (claim 1).

18

United States District Court
Northern District of California

91. The Court has construed the term "amorphous compound" in claims 1 and 2 of the '282 Patent to mean "a non-crystalline solid that lacks the long-range order characteristic of a crystal." Claim Construction Order [D.N. 106], 3:11-cv-840, at 71.

92. Claim 2 of the '282 Patent, which depends from claim 1, requires a "pharmaceutical composition comprising the amorphous compound according to claim 1 and a pharmaceutically acceptable excipient, carrier or diluent." TX 1055-0010 ('282 Patent) at col. 15, ll. 6-8 (claim 2).

### C.  Facts Regarding Infringement of '276 Patent by Handa

93. As noted above, claim 2 of the '276 Patent requires a crystalline compound of dexlansoprazole; claim 3 of the '276 Patent requires a pharmaceutical composition comprising a crystalline compound of dexlansoprazole and a pharmaceutically acceptable excipient, carrier, or diluent. TX 0002-0008 at col.14, 11.59-67 ('276 Patent) at claims 2 and 3.

94. Handa currently is seeking approval to market a 60-mg dose of dexlansoprazole. *See* Stipulated Facts ¶ 3. This ANDA product is a pharmaceutical composition that contains at least one pharmaceutically acceptable excipient. *See id.* at ¶ 6.

95. Handa uses the amorphous form of dexlansoprazole in the manufacturing process for the ANDA product. Liu Dep. Tr. 55:20-56:5. Takeda contends that a portion of the amorphous solid of dexlansoprazole used to manufacture Handa's ANDA product converts to a crystalline form during the manufacturing process. Handa asserts that while it is possible one of the excipients used in the ANDA product converts to a crystalline form during the manufacturing process, there is no evidence that any of the dexlansoprazole converts to a crystalline form. Although the Court previously found that Handa's drug product contains amorphous dexlansoprazole, it left open the possibility that it may contain both amorphous and crystalline dexlansoprazole.

96. At trial, Takeda's expert Dr. Allan Myerson testified regarding infringement of the '276 Patent.

97. Handa's expert Dr. Robin Rogers testified regarding his opinion that Handa does not infringe the '276 Patent. Portions of the deposition of Dr. Bill Liu, Handa's chief executive officer and president, were played for the Court during trial and Dr. Liu also appeared in person to testify.

19

United States District Court
Northern District of California

1. **Overview of Handa's ANDA Product**

98.    Handa's ANDA product consists of two types of pellets, Pellet L and Pellet S. TX 390-0008 (ANDA excerpt). The enteric coatings used to coat these two types of pellets are soluble at different pH levels so that they will release the drug at different places in the gastrointestinal ("GI") tract. TX 0390-0008 (Excerpt of Handa ANDA). Otherwise, the L and S Pellets are largely the same. Both are made up of sugar spheres on which the dexlansoprazole drug substance and various excipients are layered to create enteric coated pellets, and the same active-layered spheres are used in both types of pellets. Trial Tr. (Myerson Direct) 189:10-25; *see* TX 390-0010 and -0011 (listing the components of Pellets L and Pellets S). The active-layered spheres are formed by spraying a dispersion, that is, a mixture in which some components are not dissolved, of the active ingredient and various excipients on to the sugar spheres. *See* Trial Tr. (Myerson Direct) 189:3-7, 197: 17-23; *see also* TX 0390-0021 to -0023 (overview of manufacturing process, describing the mixture as a "dispersion").

99.    The excipients in the active-layered spheres of Handa's drug product are:

- Sugar spheres, which "basically act as a carrier" or "solid support to spray [the] dispersion on." Trial Tr. (Myerson Direct) 190:14-191:18.

- Calcium hydroxide, which is an inorganic compound used as a stabilizer to maintain a basic pH environment for the active layer. Trial Tr. (Myerson Direct) 191:21-24; TX 0390-0009.

- Hydroxypropylcellulose ("HPC"), a polymer used as a binder, allowing the drug substance and excipients to adhere to the sugar sphere. Trial Tr. (Myerson Direct) 191:25-192:7; TX 0390-0009.

- The right-handed enantiomer of mannitol, known as D-mannitol. Trial Tr. (Myerson Direct) 208:21-210:1. Mannitol is an organic compound that is used as a filler. Trial Tr. (Myerson Direct) 192:8-11; TX 0390-0009.

- Sodium lauryl sulfate, also known as sodium dodecyl sulfate ("SLS" or "SDS"), a surfactant that stabilizes the drug coating dispersion during drug layering. Trial Tr. (Myerson Direct) 192:12-17; TX 0390-0009.

20

A28

100.   Acetone and water also are used as solvents in Handa's manufacturing process for the active-layered spheres. *See* Trial Tr. (Myerson Direct) 192:18-193:1.

101.   The manufacturing process for the active-layered spheres of Handa's drug product is set forth in detail in the manufacturing batch record for the active-layered spheres of the exhibit batch submitted by Handa to the FDA, Batch No. 1000540. *See* TX 1010 (Manufacturing Batch Record); Trial Tr. (Myerson Direct) 195:4-25; *see* Liu Dep. Tr. 68:25-71:14 (describing manufacturing process); Trial Tr. (Liu Cross) 314:13-16 (admitting that the manufacturing process for Batch No. 1000540 was the same manufacturing process as for Handa's final ANDA product); *id.* (Rogers Cross) 446:10-447:1.

102.   First, 35.0 kilograms of acetone and 0.395 kilograms of purified water were combined. *See* TX 1010-0003; Trial Tr. (Myerson Direct) 196:8-16. Next, calcium hydroxide was added to the acetone/water mixture. *See* TX 1010-0003. Calcium hydroxide is "pretty insoluble" in acetone and water, so adding the calcium hydroxide would have created a dispersion. *See* Trial Tr. (Myerson Cross) 249:9-250:17; *id.* (Myerson Direct) 196:17-23. Next, amorphous solid dexlansoprazole was dissolved into this mixture. *See* TX 1010-0004; Trial Tr. (Myerson Direct) 196:24-197:1. A small amount of SLS (0.547 kilograms) was then added to this mixture. *See id.* Next mannitol was added. Because mannitol is practically insoluble in acetone, and a relatively large amount of mannitol was added (8.225 kilograms), most if not all of the mannitol would not be dissolved. *See* Trial Tr. (Myerson Direct) 197:4-12; *id.* (Rogers Cross) 454:18-20; TX 1010-0005.

103.   In a separate container, 3.080 kilograms of HPC was added to another 31.0 kilograms of acetone. *See* Trial Tr. (Myerson Direct) 197:13-17; TX 1010-0005. This HPC/acetone mixture was then combined with the acetone-water mixture containing calcium hydroxide, dexlansoprazole, SLS, and mannitol. *See* Trial Tr. (Myerson Direct) 197:14-21; TX 1010-0005. At this point, 16 kilograms of acetone and 0.395 kilograms of water were present in the dispersion. *See* Trial Tr. (Myerson Direct) 198: 1-2. The final dispersion was sprayed onto sugar spheres and the product was dried at 70 degrees Celsius for one hour, thereby removing the acetone and water. *See* Trial Tr. (Myerson Direct) 198:3-9; TX 1010-0007.

21

A29

United States District Court
Northern District of California

### 2. XRPD Analysis of the Active-Layered Spheres of Handa's ANDA Product

104. Following the manufacture of Batch No. 1000540, Handa tried to determine whether the amorphous dexlansoprazole may have converted to a crystalline form during the manufacturing process. *See* Trial Tr. (Myerson Direct) 198:10-199:2; Trial Tr. (Rogers Cross) 447:2-10; *see* TX 1032A (Handa Sample Request Form).

105. Handa labeled a sample of the active-layered spheres from its exhibit batch (Batch No. 1000540) as sample "E64" and sent it to Zhejiang University for XRPD analysis. *See* Trial Tr. (Myerson Direct) 199:12-200:2; *id.* (Liu Direct) 292:15-20 (admitting that E64 corresponds to the exhibit batch for Handa's ANDA product); *see also* TX 1032A-0023 (describing analysis of sample E64, also referred to as the "Fourteenth sample submission"). Mr. Lui testified that this was the only exhibit batch and the one Handa relied on when it submitted its ANDA to the FDA. Trial Tr. (Liu Cross) 314:13-315:14.

106. Trial Exhibit 1032A is the English translation of the sample request form generated by Hangzhou Handa. Hangzhou Handa is a wholly-owned subsidiary of Handa and participated in the development of Handa's ANDA product. *See* Liu Dep. Tr. 175:7-16 (describing sample request form); *id.* 40:23-41:4 (describing relationship between Hangzhou Handa and Defendant Handa). The sample request form for E64 lists the same excipients used in Handa's manufacturing process, namely, HPC (code name F4), sucrose sphere (code name F5), calcium hydroxide (code name F8), mannitol (code name F17), and SLS (code name F19). *See* TX 1032A-0001, -0007, -0013, and -0019 (Hangzhou Handa's sample request form) (providing code names for excipients); *see also* Trial Tr. (Myerson Direct) 199:3-11.

107. According to Handa's sample request form, the purpose of the XRPD analysis of Batch No. 1000540 was to "[d]etermine whether the raw material drugs in the samples are amorphous or crystalline." TX 1032A-0023; Trial Tr. (Liu Cross) 317:12-16; Liu Dep. Tr. 181:9-14 (agreeing that it would be "fair to say that their objective was to characterize the drug substance in the sample"); Trial Tr. (Rogers Cross) 447:2-10 (agreeing that the purpose of this experiment was to determine whether the dexlansoprazole in the active-layered spheres was amorphous or crystalline). Dr. Liu, who testified that he designed the XRPD experiments, also testified at trial

22

United States District Court
Northern District of California

1    that Handa performed the XRPD analysis of Batch No. 1000540 to find out whether or not the

2    Handa product would infringe any Takeda patents, including the '276 Patent. Trial Tr. (Liu Cross)

3    326:5-10.

4    108.    At Handa's request, Zhejiang University also did XRPD analyses of the raw excipients

5    used in the manufacture of Handa's active-layered spheres. *See* Trial Tr. (Myerson Direct) 206:9-

6    210:1; Liu Dep. Tr. 175:3-10. Dr. Myerson confirmed that the x-ray patterns reported in Trial

7    Exhibit 0034 for the raw excipients correspond to the known crystal patterns for those excipients.

8    *See* Trial Tr. (Myerson Direct) 210:3-9. These x-ray patterns demonstrate that the sugar spheres,

9    SLS, calcium hydroxide, and mannitol are crystalline. Trial Tr. (Myerson Direct) 247:3-11; *see*

10   *also* TX 0034-0005 (XRPD for sugar spheres); TX 0034-0013 (XRPD for calcium hydroxide); TX

11   0034-0029 (XRPD for mannitol); TX0034-0033 (XRPD for SLS).  HPC is a mixture of crystalline

12   and amorphous regions, and its XRPD lacks sharp peaks. *See id.* (Myerson Direct) 208:6-16; *id.*

13   (Myerson Direct) 247:3-11; TX 0034-0004 (XRPD for HPC).

14   109.    After performing the XRPD analysis on the active-layered spheres of Handa's drug

15   product, Handa compared the crystal peaks in the x-ray patterns for these raw excipients against

16   the x-ray pattern for the active-layered spheres in its ANDA product, Batch No. 1000540. *See*

17   Trial Tr. (Myerson Direct) 205:19-206:8; *id.* (Rogers Cross) 449:2-10. This comparison or

18   "subtraction" of the peaks revealed that most of the peaks in the x-ray pattern for the active-

19   layered spheres in Handa's drug product correspond to excipients. Compare TX 1035-0002

20   (XRPD of sample E64) with TX 0034-0005 (XRPD for sugar spheres); TX 0034-0013 (XRPD for

21   calcium hydroxide); TX 0034-0029 (XRPD for mannitol); TX 0034-0033 (XRPD for SLS); *id.*

22   (Myerson Direct) 205:19-206:8; *id.* (Myerson Direct) 210:10-212:22.  However, two peaks, at 6.4

23   and 10.0 degrees two-theta, did not correspond to any known polymorphs of the excipients. *See*

24   Trial Tr. (Myerson Direct) 212:20-213:7; *see also* Trial Tr. (Liu Direct) 296:3-6 (testifying that

25   "those two [peaks] do[] not come from those single pure excipients"); *id.* (Rogers Cross) 451:3-16

26   (admitting that there are no peaks in the raw excipients that match the peaks at 6.4 and 10.0).

27   110.    Dr. Lui testified that he did not know whether the diffraction peaks at 6.4 and 10.00 were

28   attributable to the drug substance or the excipients.  This testimony was not credible.  Handa's

23

A31

United States District Court
Northern District of California

1   own contemporaneous documents show that Handa concluded, based on the XRPD analysis

2   conducted at Zhejiang University, that its ANDA product contained crystalline dexlansoprazole.

3   In particular, the results for the XPRD analysis for Batch No. 1000540 were described as follows:

4   "Samples are crystalline and the characteristic diffraction peaks are 6.4, 10.0 (2theta)." TX

5   1032A-0023.   Further, the stated goal of this analysis was to "[d]etermine whether the raw

6   material drugs in the samples are amorphous or crystalline."   TX 32A -0023.  In addition, Dr. Liu

7   admitted that, even though this result was originally reported by Zhejiang University, it was

8   incorporated into the Handa sample request form at Trial Exhibit 1032 (and TX 1032A) by an

9   employee of Hangzhou Handa. See Liu Dep. Tr. 175:12-16; Trial Tr. (Liu Redirect) 341:10-12.

10  Also, Enjun Fu, a formulation scientist at Hangzhou Handa, described the results of the XRPD

11  analysis on the active-layered spheres from the exhibit batch to Handa's Zack Shen, the general

12  manager of Hangzhou Handa. See TX 1035 (4/8/2010 email with XRPD chart) & TX 1035A

13  (English translation of email only); Trial Tr. (Liu Cross) 323:3-24. The cover email from Mr. Fu

14  uses the same language as that on the sample request form: "The samples are crystalline and their

15  characteristic diffraction peaks are 6.4, 10.0 (2 theta)." TX 1035A-0001; Trial Tr. (Liu Cross)

16  323:3-24.  It is significant that the diffractogram for the active-layered spheres shows

17  approximately fifty XRPD peaks, yet Handa described only the peaks at 6.4 and 10.0 degrees two-

18  theta as "characteristic," indicating these peaks characterized a crystal form of dexlansoprazole.

19  See TX 1035-0002 (XRPD of sample E64); TX 1035A-0001 (Mr. Fu's email).

20  111.   Dr. Myerson testified persuasively that the only purpose for performing XRPD analyses on

21  the pure excipients used in Handa's manufacturing process would be to eliminate them as the

22  source for the crystal peaks at 6.4 and 10.0 degrees in Handa's drug product. See Trial Tr.

23  (Myerson Direct) 201:24-202:12.

24  ### 3. Solvias Testing of Handa's Finished ANDA Product

25  112.   Takeda retained a laboratory, Solvias AG, to test Handa's ANDA product, and Solvias

26  confirmed that that product exhibits crystal peaks at 6.4 and 10.0 degrees two-theta. See TX 0129-

27  0014 (Solvias Report) ("Patent application WO2011/063150 of HANDA Pharmaceuticals

28  mentions two characteristic peaks at 6.4 and 10.0° in 2θ. Both peaks were found to be present in

24

the PXRD pattern of both dosage forms (samples PP443-K9 and PP443-K10).").

113.   Solvias also confirmed that the peaks at 6.4 and 10.0 degrees two-theta cannot be attributed to mannitol or the sugar spheres. *See* TX 0129-0015, fig. 5.2 (XRPD patterns of the granules in Handa's capsule, mannitol, and sucrose); Trial Tr. (Rogers Direct) 435:19-438:1.

### 4. Whether the Crystal Peaks at 6.4 and 10.0 Can Be Attributed to Any Excipient in Handa's ANDA Product

114.   Handa admits that the peaks at 6.4 and 10.0 degrees two-theta are in its finished ANDA product and that they cannot be attributed to any of the raw excipients used in the manufacture of the active-layered spheres of Handa's drug product. Trial Tr. (Rogers Direct) 422:23-423:6 ("[T]hey're reporting that they had those two peaks that were not attributable to the excipients in their original form, before processing."); Trial Tr. (Liu Direct) 296:3-6 (testifying that "those two [peaks] do[] not come from those single pure excipients"). In addition, Dr. Liu testified that he does not know the source of the peaks at 6.4 and 10.0. Trial Tr. (Liu Cross) 327:3-18; 338:22-339:11.

115.   Nonetheless, Handa contends the peaks at 6.4 and 10.0 degrees two-theta are attributable to polymorphs of the excipients. However, Dr. Rogers admitted that he did not know the details of the science behind the manufacturing process well enough to be able to say whether or not any of the excipients converted to any other polymorph during the manufacturing process that might explain the two peaks. Trial Tr. (Rogers Cross) 456:25-457:22; 458:25-459:13.

116.   The preponderance of the evidence showed that the peaks at 6.4 and 10.0 cannot be attributed to any of the excipients, and that they are attributable to a crystalline form of dexlansoprazole in Handa's drug product.

### a. SDS and Sugar Spheres

117.   Two of the excipients in Handa's active-layered spheres – SDS and the sucrose spheres – cannot be the source of the crystalline peaks in Handa's ANDA product, because Handa obtained these same peaks using a formulation that did not include these excipients. *See* TX 1031 (WO 2011/063150) ("the '150 patent application"). Example 1 of the '150 patent application , filed by Handa, describes a method for combining dexlansoprazole with the excipients calcium hydroxide,

25

A33

United States District Court
Northern District of California

1   mannitol, and HPC in acetone, applying this dispersion to a glass plate, and then drying the

2   mixture. *See* TX 1031-0030 to -0031 (Example 1); Trial Tr. (Myerson Direct) 214:23-215:16. Dr.

3   Liu testified that the formulation method set forth in Example 1 was only "slightly different" from

4   the manufacturing process used for Handa's active-layered spheres. *See* Liu Dep. Tr. 169:18-170:2

5   (noting that the only difference was that in Handa's manufacturing process the HPC is dissolved

6   separately in acetone then added to the dispersion with the other excipients); Trial Tr. (Liu Cross)

7   337:5-338:4. Dr. Myerson also noted that the experiment in Example 1 did not include water as in

8   the manufacturing process. However, Example 1 used the sesquihydrate form of dexlansoprazole,

9   which would have contributed the same ratio of water that was used to make the active-layered

10   spheres of the exhibit batch. *See* Trial Tr. (Myerson Direct) 215:17-216:10.

11   118.   Despite the fact that Handa did not use SDS or sugar spheres in this experiment, the

12   resulting solid exhibited crystal peaks at 6.4 and 10.0 degrees two-theta. *See* TX 1031-0031. As a

13   result, and as Dr. Rogers admitted at trial, the peaks at 6.4 and 10.0 degrees two-theta cannot be

14   attributed to SDS or the sucrose spheres. *See* Trial Tr. (Myerson Direct) 217:13-21; *id.* (Rogers

15   Cross) 461:8-11 ("I do think that's reasonable").

16   119.   Dr. Myerson also observed that, while the '150 application reports only seven crystal peaks

17   for the formulation described in Example 1, many more peaks must have been present because of

18   the presence of calcium hydroxide and mannitol in the formulation. See Trial Tr. (Myerson

19   Direct) 217:22-218:12. Thus, Handa must have once again compared the peaks in its formulation

20   to the known peaks for the raw excipients and concluded that the remaining peaks would be

21   associated with crystalline dexlansoprazole. This conclusion is corroborated by the following

22   admonition in the '150 application:

23         The x-ray diffraction patterns of formulations containing inactive
          ingredients, (i.e. excipients) requires careful analysis. The presence

24         of peaks relating to the inactive ingredients can be obscuring and an
          identification of the peaks relating to the inactive ingredients can be

25         helpful in analysis of the pattern. For analysis of the formulations
          containing inactive ingredients a set of x-ray diffraction pattern for

26         certain inactive ingredients were obtained.

27   TX 1031-0020 ('150 application) at [0055]; *see also* Trial Tr. (Myerson Direct) 218:16-219:4 ("I

28   think [this] paragraph implies that they took into account the peak[s] of the excipients when doing

their analysis").

### b. Mannitol

120.    The only polymorph of any excipient that Dr. Rogers identified as a potential source of the novel crystal peaks in Handa's drug product was delta mannitol. *See* Trial Tr. (Rogers Cross) 452:11-25.

121.    There are several known polymorphs of mannitol. *See* Trial Tr. (Myerson Direct) 222:5-9; *id.* (Rogers Direct) 425:9-10. Delta D-mannitol is a polymorph of D-mannitol. *Id.* (Myerson Direct) 209:9-210:1. Delta D-mannitol has a peak at about 10.0 degrees two-theta. *Id.* (Rogers Direct) 425:14- 26:1. Beta D-mannitol, another polymorph of D-mannitol, does not have a peak at 10.0 degrees two-theta. *Id.* (Myerson Direct) 208:7 - 209:13. Handa uses beta D-mannitol in its manufacturing process. *See id.*

122.    Further, Dr. Rogers admitted that delta D-mannitol could not be the source of the peak at 6.4 degrees two-theta and that he could provide no explanation for the peak at 6.4. *See* Trial Tr. (Rogers Cross) 452:25-453:6 (admitting that he said at his deposition that he has "no explanation for the distinctive peak at 6.4"). Dr. Rogers also admitted that he is not offering an opinion that delta D-mannitol is present in Handa's formulated product and that he had made no such determination. *See* Trial Tr. (Rogers Cross) 454:4-25.

123.    Accordingly, the Court finds that the mannitol in Handa's ANDA product is not the source of the peak at 6.4 degrees two-theta and is unlikely to be the source of the peak at 10.0 degrees two-theta.

### c. Other Excipients

124.    Dr. Myerson testified that, with the exception of mannitol, discussed above, no known polymorphs of any other excipient used by Handa have crystal peaks at 6.4 and 10.0 degrees two-theta. *See* Trial Tr. (Myerson Direct) 225:24-226:2. Dr. Rogers also testified that he could not explain how any of the excipients other than mannitol might change to another polymorphic form during the manufacturing process. *Id.* (Rogers Cross) 458:21-459:20.

125.    Because calcium hydroxide is an inorganic molecule, polymorphs of calcium hydroxide will not have "low-angle peaks" like those at 6.4 and 10.0 degrees two-theta. *See* Trial Tr.

27

United States District Court
Northern District of California

1  (Myerson Direct) 207:20-208:5; *id.* 226:3-8 (adding that "I'm not aware of calcium hydroxide

2  polymorphs"). In addition, there is no evidence that calcium hydroxide can form polymorphs such

3  as hydrates or acetone solvates with the acetone and water present during Handa's manufacturing

4  process. *See* Trial Tr. (Myerson Direct) 227:22-24. Because calcium hydroxide is "pretty

5  insoluble" in both acetone and water, it would be unlikely to form a new polymorph in the

6  acetone-water dispersion. *See id.* (Myerson Cross) 249:9-250:17; *id.* (Myerson Cross); *see also*

7  244:14-22 (testifying that if one of Handa's excipients does not dissolve then it will not change

8  polymorphic form).

9  126.    A polymorph of HPC, which is only semi-crystalline, would not demonstrate and could

10  not explain strong, sharp peaks at 6.4 and 10.0 degrees two-theta. *See* Trial Tr. (Myerson Direct)

11  226:9-10.

12  127.    Dr. Myerson also testified that there is no mechanism by which a co-crystal, meaning a

13  crystal composed of two molecules that combine to form a new molecule, could form from the

14  excipients in Handa's formulation. *See* Trial Tr. (Myerson Direct) 228:15-229:13; *id.* (Myerson

15  Cross) 252:6-253:4 (testifying that in order for an excipient to form a new crystalline complex, it

16  would need to be dissolved, but "the only things that are dissolved in that solution are HPC . . . ,

17  SDS, and very small amounts of calcium hydroxide [and] very small amounts of mannitol," so not

18  enough of any excipient is dissolved in water to form a crystalline complex). Furthermore, as

19  discussed above, the fact that the crystal peaks at 6.4 and 10.0 degrees are present in the

20  formulation in Example 1 of the '150 application, *see* TX 1031-0031, means that a complex with

21  SDS or the sugar spheres cannot be responsible for the peaks at 6.4 and 10.0 degrees.

22  128.    Accordingly, the Court finds that calcium hydroxide, HPC, and/or mannitol are not the

23  source of the peaks at 6.4 or 10.0 degrees two-theta.

24                   **5.  Statements in Handa Documents Relating to Whether Dexlansoprazole
                    in its Drug Product Crystallizes During the Manufacturing Process**

25

26  129.    Other Handa documents acknowledge that amorphous solid dexlansoprazole can

27  crystallize when it is placed in solution.

28  130.    For example, an experimental plan drawn up by Handa states that "[s]table anhydrous

<div align="center">28</div>

1  crystalline dexlansoprazole can be produced by recrystallization from amorphous dexlansoprazole

2  dissolved in acetone." TX 1030A-0001; *see also* Liu Dep. Tr. 163:12-24; *id.* 165:18-21; 166:2-4.

3  Dr. Liu testified at his deposition that amorphous dexlansoprazole "could result" in a crystal when

4  it is dissolved in acetone. *See* Liu Dep. Tr. 165:13-17. "The amorphous dexlansoprazole, after

5  dissolving in acetone, when you evaporate the acetone, it will become some type of crystals. It

6  may not be entirely A, the anhydrous dexlansoprazole. It could be some of the other — the other

7  forms. So that's what we find." Liu Dep. Tr. 166:6-24 (adding that Handa did not attempt to

8  characterize that crystal); *see also* Trial Tr. (Myerson Direct) 230:12-16 (testifying that the fact

9  that amorphous dexlansoprazole can crystallize from acetone supports his opinion that the peaks at

10  6.4 and 10.0 are attributable to the drug substance).

11  131.    Similarly, a Handa development document states: "When we dissolve amorphous

12  dexlansoprazole to acetone, disperse inactive ingredients to acetone, and coat them on the sucrose

13  spheres, the product is stabilized based on the Table 6 too. The reason is that amorphous

14  dexlansoprazole is transformed into crystal form when it is dissolved in acetone and sprayed onto

15  the sucrose spheres." TX 1028A-0007 to -0008 (spreadsheet). Dr. Myerson testified that, even

16  though the formulation described in this document did not contain water, the amount of water in

17  Handa's manufacturing process is so small that the absence of water would not change the fact

18  that a crystal is formed. *See* Trial Tr. (Myerson Direct) 231:1-16.

19  132.    Accordingly, Trial Exhibits 1030A and 1028A support the conclusion that during Handa's

20  manufacturing process amorphous dexlansoprazole can convert to a crystalline form of

21  dexlansoprazole. *Id.*

22  133.    In addition, Handa produced a spreadsheet that compares crystallinity data identified for

23  Handa's drug product with crystallinity data reported in two Takeda patents: U.S. Patent No.

24  6,462,058, which issued from the parent application for the '276 Patent, and EP1552833, a

25  European patent that describes a hemihydrate crystal of dexlansoprazole. *See* TX 1036A-0001.

26  The top 15 rows list the two-theta angles, d-spacings, and relative intensities from XRPD analysis

27  provided in the '276 Patent at Tables 2 and 3 for the anhydrate and sesquihydrate crystals of

28  dexlansoprazole, respectively. *Id.*; Trial Tr. (Myerson Direct) 219:5-221:12. Cell A29 states, "Our

United States District Court
Northern District of California

A37

1  Polymorph," and then lists four diffractogram peaks, including the peaks at 6.4 and 10.0 degrees

2  two-theta described above. *Id.*

3  134.   As discussed above, the term "polymorph" generally refers to crystalline forms of a

4  compound, particularly when used in conjunction with x-ray diffraction data. *Id.* This document

5  further evidences Handa's own belief that the dexlansoprazole drug substance in Handa's ANDA

6  product is crystalline, although with a different structure than the crystals specifically

7  characterized in the '276 Patent. *See* Trial Tr. (Myerson Direct) 221:5-12 ("[I]t appears that

8  whoever was the author of this document thought that they had a new crystalline polymorph of

9  dexlansoprazole.").

### 6. Failure of SSCI's Standard Polymorph Screen to Identify a Polymorph of Dexlansoprazole With Characteristic Peaks at 6.4 and 10.0

12  135.   To support its contention that the drug substance in the active-layered spheres of Handa's

13  ANDA product cannot be the source of the peaks at 6.4 and 10.0 degrees two-theta, Handa points

14  to the fact that SSCI, a contract laboratory retained by Takeda in connection with its New Drug

15  Application for Dexilant, did not identify a crystalline form with those peaks.

16  136.   In 2009, SSCI completed a "Standard Polymorph Screen" on dexlansoprazole, using the

17  anhydrous crystal of dexlansoprazole disclosed in the '276 Patent, referred to as "Form A," as a

18  starting point. Gushurst Dep. Tr.11 122:07-123:12. SSCI characterized several polymorphs of

19  dexlansoprazole, including several hydrates. *See, e.g.,* TX 0722-0002 (Standard Polymorph

20  Screen).

21  137.   The Standard Polymorph Screen conducted by SSCI was not intended to be exhaustive,

22  however. SSCI offers at least two types of polymorph screens: a standard screen that "is designed

23  to identify most of the solid forms of [a] drug substance," and a Super Screen, a more extensive

24  and expensive screen, that is intended to be comprehensive. *See* Trial Tr. (Rogers Cross) 465:11-

25  466:9; *id.* (Myerson Direct) 238:5-11. For dexlansoprazole, SSCI conducted only its standard

26  screen. *Id.* (Rogers Cross) 465:11-466:9.

27  138.   No polymorph screen can identify with certainty every possible polymorph. Trial Tr.

28  (Myerson Direct) 238:12-20 ("Those of us who are in this business know you can do an infinite

*(left margin)* United States District Court Northern District of California

1    number of experiments, and somebody might find a new polymorph of something 20 years after a

2    drug has been discovered or a molecule has been around."); *see id.* (Myerson Direct) 184:22-

3    185:1. In fact, SSCI failed to identify at least one other known form of dexlansoprazole called

4    Form X in its screen. *See* TX 0366-0002 (SSCI, Characterization Studies of Form X and Form A

5    of TAK-390 (Apr. 14, 2009)) ("A new TAK-390 form, form X has been discovered by Takeda.").

6    Takeda itself generated Form X by heating various different hydrated polymorphs of

7    dexlansoprazole, as well as amorphous dexlansoprazole. *See* TX 69x45-0005 (Manufacturing

8    Method and Analytical Data of Form X (TAP/Takeda CMC meeting in Osaka, March 12-13,

9    2008)); *see also* Trial Tr. (Rogers Direct) 433:13-19 (stating that Form X "was not obtained by

10   crystallization from solution," but rather was a "transformation of an amorphous form or of a

11   hydrated dexlansoprazole") (emphasis added). SSCI later determined that Form X is an

12   anhydrous crystal containing amorphous component. *See* TX 366-0008 to -0009; TX 69x45-0003.

13   139.    New polymorphs of drug substances may be discovered at any time. Trial Tr. (Myerson

14   Direct) 184:22-185:1 ("All you can say is that you have found a certain number of polymorphs,

15   but you never know if there's another one that exists"). Nonetheless, dexlansoprazole was first

16   crystallized fairly recently, in 1999. *See* Trial Tr. (Kamiyama Direct) 85:3-5. Form X was

17   discovered just five years ago, in 2008. *See* Trial Tr. (Myerson Direct) 186:20-187:12. In contrast,

18   the excipients in Handa's drug product have been studied for a long time. *See* Trial Tr. (Rogers

19   Cross) 467:14-468:1 ("I think most of them have been studied for a long time."). Therefore, the

20   Court finds that the peaks at 6.4 and 10.0 are attributable to a form of dexlansoprazole.

21                      **7.  Whether the Peaks at 6.4 and 10.0 are More Likely than Not
                            Attributable to Crystalline Dexlansoprazole**

22

23   140.    For the reasons stated above, the Court finds that the crystal peaks at 6.4 and 10.0 degrees

24   two-theta in the active-layered spheres of Handa's ANDA product are attributable to crystalline

25   dexlansoprazole in Handa's ANDA product.

26              **D.  Findings of Fact Related to the Validity of the Crystal-Form Patents ('058, '276
                    and '971 Patents**

27

28   141.    Impax contends the prior art renders obvious claims 1 and 3 of the '058 Patent and claims

31

*United States District Court
Northern District of California*

1  6 and 7 of the '971 Patent.

2  142.    Handa and Impax together contend that the prior art renders obvious claims 2 and 3 of the

3  '276 Patent.

4  143.    At trial, Defendants' expert Dr. Wayne Genck testified regarding his opinion that the

5  asserted claims of the Crystal-Form Patents are invalid.

6  144.    Takeda's expert Dr. Jerry Atwood testified regarding the validity of the asserted claims of

7  the Crystal-Form Patents.

8          **1.  The Level of Ordinary Skill in the Art of the Crystal-Form Patents**

9  145.    The parties' experts agreed as to the level of skill in the art of the Crystal-Form Patents.

10  These patents focus on organic chemistry, crystallization, and crystal forms. *See* Trial Tr. (Atwood

11  Direct) 901:23-902:13. The level of skill in the art of the invention of the Crystal-Form Patents is

12  either a Ph.D. in chemical engineering or related disciplines or a bachelor's degree in chemistry,

13  chemical engineering, or a related field and three to five years of experience in crystallization  and

14  characterization of crystals by routine methods such as x-ray diffraction analysis. *See* Trial Tr.

15  (Atwood direct) 942: 14-18; (Genck direct) 713: 14 - 714: 5.

16          **2.  Whether Claims 1 and 3 of the'058 Patent are Obvious**

17          **a.  Overview of the Prior Art**

18  146.    Impax divides the prior art that is the basis for its obviousness challenge into two broad

19  categories.  The first category discloses dexlansoprazole, either obtained via asymmetric synthesis

20  (as in Larsson and Von Unge), or separated from racemic lansoprazole via HPLC (as in Katsuki,

21  Tanaka and Borner).  The second category of references includes textbooks and manuals that teach

22  general methods of achieving crystallization, including Tietze, Vogel, and Gordon, and also

23  references disclosing methods for crystallizing structurally similar proton pump inhibitors

24  ("PPIs"), including Kato, Nohara, Kohl, and Bohlin. Trial Tr. (Genck Direct) 733: 2-734: 25,

25  735:22-736:20, 737:12-738:4, 836:11-24.

26  147.    Impax contends claims 1 and 3 of the'058 Patent are obvious based on Larsson, Von Unge

27  and Barberich in view of Kato, Nohara, Kohl, Bohlin, Tietze, Vogel, and Gordon.  It also asserts

28  claims 1 and 3 are obvious based on Katsuki, Tanaka, Borner and Erlandsson in view of Kato,

<div align="center">32</div>

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Nohara, Kohl, Bohlin, Tietze, Vogel and Gordon.

2    148.    "Larsson" refers to PCT Publication WO 96/02535 ("Larsson I") (TX 0070) and U.S.

3    Patent No. 5,948,789 ("Larsson II") (TX 0301)). The disclosures of Larsson I and Larsson II are

4    materially the same.

5    149.    "Von Unge" refers to PCT Publication WO 97/02261 ("Von Unge I") (TX 0071)) and U.S.

6    Patent No. 5,929,244 ("Von Unge II")  (TX 302)). The disclosures of Von Unge I and Von Unge

7    II are materially the same.

8    150.    "Barberich II" refers to U.S. Patent Application Publication No. 2003/0008903 (TX

9    0078).[3] The Barberich II reference claims priority to a provisional application filed January 30,

10   1998. *See* TX 0078-0001.

11   151.    "Kato" refers to PCT Publication WO 98/21201 ("Kato I") and U.S. Patent No. 6,002,011

12   ("Kato II"). *See* TX 87 (Kato I); TX 69x32 (Kato II). There is no material difference between the

13   disclosures of Kato I and Kato II.

14   152.    "Katsuki" refers to Hisakaza Katsuki et al., "Determination of R(+)-and S(-)- Lansoprazole

15   Using Chiral Stationary-Phase Liquid Chromatography and Their Enantioselective

16   Pharmacokinetics in Humans," Pharm. Res. 13(4):611-15, published in 1996 (TX0073).

17   153.    "Tanaka" refers to Makoto Tanaka, *et al*. "Direct HPLC Separation of Enantiomers of

18   Pantoprazole and Other Benzimidazole Sulfoxides Using Cellulose-Based Chiral Stationary

19   Phases in Reversed-Phase Mode," Chirality 7:612-15 (1995), published in 1995 (TX0069x48).

20   154.    "Borner" refers to K. Borner et al., "Separation of Lansoprazole Enantiomers in Human

21   Serum by HPLC," 47 Chromotgraphia 171 (1998), published in February, 1998 (TX0075).

22   155.    "Nohara" refers to U.S. Patent 4,628,098 (TX 0097), also assigned to Takeda.

23   156.    "Kohl" refers to German Patent Application Publication No. DE 403545 (TX 0086).

24   157.    "Bohlin" refers to PCT Publication WO 98/28294 (TX 0076).

25   158.    "Tietze" refers to Lutz-Friedjan Tietze and Theophil Eicher, *Reactions and Synthesis in*

26   *the Organic Chemistry Laboratory*, 24-25 (1989) (TX 0080).

27

28   ---

[3] Takeda does not concede that Barberich II is prior art to the '058 Patent.

33

United States District Court
Northern District of California

159.   "Vogel" refers to Arthur Israel Vogel, *Vogel's Textbook of Practical Organic Chemistry*, 135-43 (5th ed. 1989) (TX 0081).

160.   "Gordon" refers to Arnold Gordon & Richard Ford, The Chemist's Companion - A Handbook of Practical Data, Techniques, and References, 442-43 (1972) (TX 0082).

161.   Larsson I, Von Unge I, and Kato I were before the patent examiner during prosecution and appear on the face of the '058 Patent. See TX 0001 ('058 Patent), at TX0001-0001.

**b. Prior Art Cited by Impax for the Disclosure of Dexlansoprazole**

**vi.   Larsson, Von Unge and Barberich**

a. Larsson

162.   The goal of the Larsson inventors was to synthesize enantiomers of omeprazole and structurally related compounds for use in pharmaceutical products. *See* TX 0301 (Larsson II) at TX 0301-0002, col.1, ll.53-55.

163.   The Larsson inventors state that "[t]he best mode to carry out the present invention known at present is as described in Example 11." *Id.* at TX 0301-0012, col.21, ll.66-67. Example 11 describes the asymmetric oxidation of omeprazole to form (R+)-omeprazole, followed by the preparation of a sodium salt of (R+)-omeprazole and subsequent crystallization. This process resulted in a crystal of (R+)-omeprazole sodium with an optical purity of 99.6% e.e. *Id.* at TX 0301-0008, col.13, l.52 to col.13, l.14 (Example 11); *see also* TX 0301-0006, col.10, ll.28-33 (indicating that some of the crude products of the asymmetric oxidation reactions Larsson discloses can be crystallized). Accordingly, the preferred embodiment of the Larsson invention involves crystallization. This is consistent with the testimony at trial that crystal forms of compounds were preferred for use in pharmaceutical compositions such as those contemplated in Larsson. *See, e.g.*, Trial Tr. (Genck Direct) 773:5-15.

164.   The Larsson inventors describe the synthesis of enantiomers of omeprazole and several structurally related compounds using asymmetric oxidation: Compound (Ia) corresponds to omeprazole; Compound (Ib) corresponds to 5-fluoro-2-[[(4-cydopropylmethoxy-2-pyridinyl)methyl]sulphinyl]-1H-benzimidazole;  Compound (Ic) corresponds to 5-carbomethoxy-6-methyl-2-[[(3,4-dimethoxy-2-pyridinyl)methyl]sulphinyl]-1H-benzimidazole;

34

1   Compound (Id) corresponds to lansoprazole; Compound (Ie) corresponds to 5-difluoromethoxy-2-

2   [[(3,4-dimethoxy-2-pyridinyl)methyl]sulphinyl]-1H-benzimidazole; Compound (If) corresponds to

3   pariprazole; Compound (Ig) corresponds to leminoprazole; Compound (Ih) corresponds to 2-[(4-

4   methoxy-6,7,8,9-tetrahydro-5H-cyclohepta[b]pyridin-9-yl)sulphinyl]-1H-benzimidazole. *See* TX

5   0001 (Larsson II) at TX 0301-0004 to -0005, col.6, l.45 to col.7, l.58.

6   165.   Larsson also discloses the crystallization of several of these compounds and their salts. For

7   example, Larsson was able to crystallize enantiomers of omeprazole and compounds (Ib), (Ic), and

8   (Ie). *See, e.g., id.* at -0007 to -0011. Examples 4 and 9 ((S-)-omeprazole sodium); Examples 10

9   and 11 ((R+)-omeprazole sodium); Examples 12 and 15 (compound (+)-(Ib)); Examples 13 and 16

10  (compound (-)-(Ib)); Examples 18 and 19 (compound (-)-(Ic)); Example 20 (compound (+)-(Ic));

11  Example 23 (compound (-)-(Ie); and Example 24 (compound (+)-(Ie)).

12  166.   Larsson also reports isolating compounds (Ib), (Ic), and (Ih) as solids (not necessarily

13  crystals). *See id.* at Example 14 (compound (-)-(Ib)); Example 17 (compound (+)-(Ic)); Example

14  29 (compounds (-)-(Ih) and (+)-(Ih)).

15  167.   On the other hand, the Larsson inventors isolated certain sulfoxide compounds only as oils.

16  The sulfoxide compounds that were isolated only as oils include lansoprazole, pariprazole, and

17  leminoprazole. *See id.* at Example 21 ((S-)-lansoprazole); Example 22 ((R+)-lansoprazole);

18  Example 25 ((S-)-pariprazole); Example 26 ((R+)-pariprazole); Example 27 ((S-)-leminoprazole);

19  and Example 28 ((R+)-leminoprazole).

20  168.   Example 22 describes the synthesis and purification of dexlansoprazole, which resulted in

21  an oil. *See* TX 0301-0010 at col.18, ll.5-35 (Example 22); *see also* Trial. Tr. (Rogers Cross)

22  612:20-23; *id.* (Genck Direct) 735:1-5; *id.* (Atwood Direct) 906:18-21. 182. The first step in

23  Example 22 of Larsson is the asymmetric oxidation of a lansoprazole sulfide (2-[[[3-methyl-4-

24  (2,2,2-trifluoroethoxy)-2-pyridinyl]-methyl]thio]-1H-benzimidazole). *See* TX 0301 (Larsson II) at

25  TX 0301-0010, col.18, ll.10-26.

26  169.   The synthesis method described in Example 22 of Larsson consists of the following steps:

27  First, 2.1 grams of lansoprazole sulfide were dissolved in 50 ml of toluene, an organic solvent. *See*

28  *id.* ll.10-12. To this solution was added (i) water, (+)-diethyl L-tartarate, and titanium (IV)

35

United States District Court
Northern District of California

United States District Court
Northern District of California

1    isopropoxide; this mixture was stirred for 60 minutes at 50° C and then cooled to room

2    temperature. *See id.* ll. 12-16. Next, (ii) N,N-diisopropylethylamine and cumene hydroperoxide

3    were added. *See id.* ll. 16-18. The purpose of steps (i) and (ii) is to oxidize the sulfide to form a

4    sulfoxide, either lansoprazole or more preferably dexlansoprazole. Trial Tr. (Atwood direct) 915:

5    24 -916:2.

6    170.    This reaction was stirred for 16 hours at room temperature, and then toluene was added to

7    the solution. *See* TX 0301 (Larsson II) at TX 0301-0010, col.18, ll.19-22. Next, the solution was

8    extracted three times with an aqueous ammonia solution. *See id.* ll.22-24. Here, the compound of

9    interest (lansoprazole or its enantiomers) was extracted into the aqueous ammonia solution,

10   leaving behind the organic solvent (including toluene). *Cf. id.* ll. 22-26. The combined aqueous

11   layers were then neutralized by the addition of concentrated acetic acid. *Id.* ll.24-26.

12   171.    Next, the "workup procedure" employed extraction, evaporation, and flash

13   chromatography. *Id.* ll.26-27. These steps are taken to isolate the compound of interest. The first

14   of these three steps is extraction. The compound of interest would have been extracted into (i.e.,

15   separated from the remaining material and dissolved in) the solvent used here, although the

16   solvent that Larsson used is not specified. *See id.*; Trial Tr. (Rogers Cross) at 651:13-20; *id.*

17   (Elder Cross) 394:20-24. The second step is flash chromatography, which is a type of column

18   chromatography. *Cf.* Trial Tr. (Atwood Direct) at 915:23-916:8. The solvent system for the flash

19   chromatography used by Larsson is not disclosed in Example 22. TX 301 (Larsson II) at TX 0301-

20   0010, col.18, ll.26-27; Trial Tr. (Elder Cross) 394:20-24, 395:3-13; *see also id.* (Rogers Cross)

21   651:13-20 (indicating that Larsson did not specify a solvent for the purification step). These steps

22   resulted in 0.85 grams of a "residue" of dexlansoprazole with a chemical purity of 99.9% (achiral

23   analysis) and an enantiomeric excess of 46% (chiral analysis), meaning that a significant amount

24   of racemic lansoprazole was still present in the sample. *See, e.g.,* TX 0301 (Larsson II) at TX

25   0301-0010, col.18, ll.26-29; Trial Tr. (Rogers Cross) 613:6-614:1.

26   172.    This residue was dissolved in acetonitrile and a precipitate was removed by filtration. TX

27   0301 (Larsson II) at TX 0301-0010, col.18, ll.27-31. In the final step of the purification,

28   "[e]vaporation of the filtrate afforded an oil with enhanced optical purity. Repeating this

1    procedure a couple of times afforded 0.31 g (14%) of the desired compound as an oil with an

2    optical purity of 99.6% e.e." *Id.* at col.18, ll.30-35; *see also* Trial Tr. (Atwood Direct) 906:18-24

3    ("Larsson in Example 22 prepares an oil . . . which is highly chemically and optically pure."); *id.*

4    at 921:1-5 ("Larsson obtained, . . . after three extractions with acetonitrile, 99.6% EE.").

5    173.    Thus, although Larsson was able to obtain crystals of enantiomers of omeprazole and

6    compounds (Ib), (Ic), and (Ie) and solids of compounds (Ib), (Ic), and (Ih), the Court finds that

7    Larsson did not isolate any solid – crystalline or amorphous – of lansoprazole or its enantiomers.

8    *See, e.g.,* Trial Tr. (Atwood Direct), at 905:13-24, 906:18-21 (indicating that Larsson made a pure

9    dexlansoprazole oil but that solid dexlansoprazole had not been accomplished); *see also id.*

10   (Rogers Direct), at 500:17-19 (indicating that the dexlansoprazole isolated in Larsson is an oil); *id.*

11   (Genck Direct) 735:1-5 (same).

12   174.    Although Larsson contains some general language indicating that some of the crude

13   products of the asymmetric oxidation reactions it discloses can be crystallized, *see* TX 0301

14   (Larsson II) at TX 0301-0006, col.10, ll.28-33, the specific examples in Larsson demonstrate that

15   crystals will not always result.

16                          b.    Von Unge

17   175.    Von Unge does not disclose the asymmetric synthesis of enantiomers, but rather discloses

18   a process for improving the optical purity of enantiomerically enriched compounds (that is,

19   compounds that contains more of one enantiomer than the other), including enantiomers of the

20   following compounds: omeprazole (formula Ia); lansoprazole (formula Ib); pariprazole (formula

21   Ic); leminoprazole (formula Id), and the related compound 2-[(4-methoxy-6,7,8,9-tetrahydro-5H-

22   cydohepta[b]pyridin-9-yl)sulphinyl]-1H-benzimidazole(formula Ie). *See* TX 0302 (Von Unge II),

23   at TX 0302-0002 -0003, col.2, l.65-col.4, l.50; Trial Tr. (Atwood Direct), at 951:11-21.

24   176.    The processes disclosed in Von Unge involve dissolving the enantiomerically enriched

25   compound in an organic solvent referred to by Von Unge as the mother liquor.  TX 0302 (Von

26   Unge II) at TX 0302-0002 to -0003, col.2, l.65 to col.4, l.50.  Von Unge discloses that the racemic

27   compound will precipitate or crystallize from the mother liquor, leaving in solution an even

28   greater enantiomeric excess of the desired compound. *Id.*  Once the racemate has precipitated, the

37

1   solvent in the mother liquor is removed by evaporation. As a result, "[a] dramatic[] enhancement

2   of the enantiomeric excess of the (-)-enantiomer or the (+)-enantiomer of the present compounds

3   is obtained in the mother liquor (filtrate), even after only one racemate crystallisation." *Id.* at TX

4   0302-0003, col.4, ll.33-36.

5   177.    Von Unge, the sole inventor of the Von Unge reference, was a named inventor on the

6   Larsson patent. The Von Unge reference discloses several examples of the enantiomeric

7   enrichment of omeprazole and a few examples with other compounds including lansoprazole,

8   pariprazole, and leminoprazole. *See id.* at TX 0302-0003 to -0006. Example 12 discloses the

9   enantiomeric enrichment of (R+)-lansoprazole. The teachings of Von Unge with regard to

10  dexlansoprazole are for all relevant purposes identical to those of the Larsson reference. *See id.* at

11  TX 0302-0006, col.9, ll.20-31; Trial Tr. (Rogers Direct), at 600:1-5; *see also id.* (Genck Direct)

12  738:9-18. Example 12 is largely identical to Example 22 in Larsson. *See* Trial Tr. (Genck Cross)

13  838:1-18 (indicating that Von Unge Example 12 "describes, essentially, the same final steps as are

14  described in Example 22 of Larsson"); *id.* (Atwood Direct) 951:11-21 (indicating that "Von Unge

15  essentially describes the same acetonitrile steps as were disclosed in Example 22 of Larsson"); *see*

16  *also id.* (Rogers Direct) 600:6-17 (noting that Von Unge Example 12 is similar to Larsson

17  Example 22). As in Larsson, a small amount of (R+)-lansoprazole with an enantiomeric excess of

18  46% was dissolved in acetonitrile. *See* TX 0302 (Von Unge), at TX 0302-0006, col.9, ll.25-27;

19  Trial Tr. (Rogers Direct) 600:6-17. Racemic lansoprazole precipitated from the mother liquor. *See*

20  TX 0302 (Von Unge), at TX 0302-0006, col.9, ll.25-28; Trial Tr. (Rogers Direct) 600:6-17.

21  Again, as in Larsson, after the precipitate was removed by filtration, "[e]vaporation of the filtrate

22  [i.e., the mother liquor] afforded an oil with enhanced optical purity. Repeating this procedure a

23  couple of times afforded 0.31 g of the desired compound as an oil with an optical purity of 99.6%

24  e.e." *Id.* at col.9, ll.27-31; *see also* Trial Tr. (Rogers Direct) 600:6-17; *id.* (Atwood Direct) 921:1-5

25  ("Larsson obtained . . . after three extractions with acetonitrile 99.6% EE.").

26  178.    Thus, Von Unge, like Larsson, teaches the synthesis of (R+)-lansoprazole as an oil but not

27  a solid. *See, e.g.*, Trial Tr. (Genck Cross) at 838:14-18.

28

United States District Court
Northern District of California

38

c. Barberich

179.    The Barberich reference discloses solid pharmaceutical compositions of dexlansoprazole. For example, in the course of describing various pharmaceutical compositions with dexlansoprazole, Barberich states that "[c]ompressed tablets may be prepared by compressing in a suitable machine the active ingredient in a free-flowing form such as powder or granules." TX 0078 (Barberich II) at TX 0078-0005 [0035].

180.    Barberich further states that "the optically pure (+) isomer of lansoprazole is a superior agent for treating ulcers of the stomach, duodenum, and esophagus, gastroesophageal reflux diseases, Zollinger-Ellison Syndrome and other disorders, including those that would benefit from an inhibitory action on H+,K+-ATPase in that it provides this effective treatment while substantially reducing the adverse effects of racemic lansoprazole . . . ." *Id.* at TX 0078-0003 [0015].

181.    Despite Barberich's disclosure of solid pharmaceutical compositions of dexlansoprazole, nothing in Barberich teaches the skilled person how to synthesize any solid form of dexlansoprazole, let alone a crystal. *See, e.g.,* Trial Tr. (Atwood Direct) at 899:10-25 (stating that "[t]he Barberich reference really provides no guidance or direction in [] regard [to how one could make a solid form of dexlansoprazole."). None of the working examples discusses using a crystal of dexlansoprazole, and the word "crystal" does not appear in the Barberich reference.

182.    Barberich merely incorporates by reference the synthesis methods disclosed in the Larsson and Von Unge references (as well as another reference by Graham, which Defendants do not rely upon) in the following paragraph on page 2:

> Syntheses of R(+) lansoprazole and S(-) lansoprazole by asymmetric oxidation and by bioreduction are described in PCT applications WO 9602535 and 9617077, respectively, the disclosures of which are incorporated herein by reference. The enrichment of single enantiomers by crystallization of the racemate from non-racemic mixtures is described in PCT application WO 97/02261, the disclosure of which is also incorporated herein by reference.

TX 0078 (Barberich II) at TX 0078-0003 [0013]. As noted above, WO 96/02535 is Larsson I (TX 0070), and WO 97/02661 is Von Unge I (TX 0071).

183.    In his trial testimony, Dr. Genck opined that Barberich teaches that dexlansoprazole can be

39

United States District Court
Northern District of California

combined with pharmaceutically acceptable carriers and therapeutic ingredients and would be known to be superior to the (S-)-enantiomer for use in a pharmaceutical composition. *See* Trial Tr. (Genck Direct) 772:14-773:2; 786:7-787:7.

184.    Dr. Genck's opinion that Barberich teaches that the R enantiomer (dexlansoprazole) is superior to the S enantiomer of lansoprazole was undermined by evidence offered by Takeda that on the same day that the Barberich I application was filed, the inventors listed on the Barberich I and II references also filed an international patent application directed toward solid pharmaceutical compositions containing the (S-) enantiomer of dexlansoprazole. *See* WO 99/38512 (TX 0072) (hereinafter "Barberich S-Enantiomer Application") at TX 0072-0001. The Barberich S-Enantiomer Application indicates that the S enantiomer is a "superior agent" for treating the same symptoms. TX 0072 (Barberich S-Enantiomer Application) at TX 0072-008, l. 225 to TX 0072-009 l. 15. While the two applications cast doubt on Dr. Genck's testimony that Barberich taught that the R enantiomer was considered superior to the S enantiomer, a close reading of the two Barberich applications makes clear that there is, in fact, no real inconsistency between them. In fact, the cited passages do not compare the R and S isomers to each other but rather, both references compare the isolated lansoprazole isomer (whether R or S) to the racemic lansoprazole. In other words, the Barberich applicants apparently concluded that both the R enantiomer and the S enantiomer were superior for treating GERD as compared to racemic lansoprazole.

185.    To summarize, Larsson and Von Unge, the primary references relied on by Dr. Genck, disclose dexlansoprazole in oily form only. Barberich, which incorporates Larsson and Von Unge by reference, also does not teach a person of ordinary skill in the art how to make a crystalline form or any solid form of dexlansoprazole.

### vii.    Katsuki, Tanaka, Borner, Erlandsson

186.    The Katsuki, Tanaka and Borner references each disclose the separation of dexlansoprazole from racemic lansoprazole via High Pressure Liquid Chromatography ("HPLC"). Trial Tr. (Genck Direct) 742:5-745:15; *id.* (Atwood Cross) 983:13-15; TX0073 (Katsuki) at 612; TX0069x48 (Tanaka) at 615; TX0075 (Borner) at 174-75. Erlandsson discloses higher-capacity

40

1   chiral HPLC columns for separating greater quantities of enantiomers of proton pump inhibitors in

2   the same family of compounds as dexlansoprazole. *See, e.g.*, TX0069x49 (Erlandsson) at 307;

3   Trial Tr. (Genck Direct) 746:2-747:5. According to Erlandsson, the columns can be "easily and

4   inexpensively prepared using published methods." TX0069x49 (Erlandsson) at 307.

5                              **c. Prior Art Cited by Impax for Disclosure of Crystallization Methods**

6                                   **i.    Tietze, Vogel, Gordon**

7   187.    The Tietze, Vogel and Gordon references are textbooks and manuals from the 1970s and

8   1980s that disclose crystallization techniques and solvents known in the art, which both Drs.

9   Genck and Atwood agreed were familiar to persons of ordinary skill without the need to even

10  consult the textbooks. Trial Tr. (Genck Direct) 747:6-748:6; *id.* (Atwood Cross) 964:22-965:6,

11  986:20-987:1.

12  188.    For example, Tietze describes the slow cooling of a hot, saturated solution, as well as the

13  dropwise addition of an anti-solvent to a saturated solution of the compound at room temperature

14  to obtain crystals. Trial Tr. (Genck Direct) 748:13-749:16; TX0080 (Tietze) at 24.

15  189.    Tietze and Vogel also disclose techniques that should be attempted if crystallization does

16  not occur spontaneously, including seeding, scratching the flask with a glass rod, and cooling to

17  very cold temperatures and slowly warming the solution. TX0080 (Tietze) at 25; TX0081(Vogel)

18  at 141-42.

19  190.    Vogel also discloses particular methods to be used when inducing crystallization from the

20  oil form. TX0081 (Vogel) at 142; Trial Tr. (Genck Direct) 753:17-756:1.

21  191.    In addition, Tietze advises persons of ordinary skill that "[c]rystallization trials require

22  skill and patience. Several solvents should always be tried," and Vogel echoes this advice by

23  stating that "[t]he exercise of considerable patience is sometimes necessary so as to give the solute

24  every opportunity to crystalli[z]e." TX0080 (Tietze) at 25; TX0081 (Vogel) at 142; Trial Tr.

25  (Genck Direct) 750:17-751:22.

26  192.    The Gordon reference is a chemistry handbook from 1972 that discloses a list of common

27  solvents useful in obtaining crystals. TX0082 (Gordon) at 442-43; Trial Tr. (Genck Direct)

28  756:17-758:16.

United States District Court
Northern District of California

41

193.    Gordon discloses the combination of acetonitrile and diethyl ether (used in Example 1 of the '058 patent), acetone and water (used in Example 2 of the '058 patent), and heptane and ethyl acetate (used in Reference Example 4 of the '058 patent). *Id.* Tietze and Vogel disclose common crystallization solvents as well, including acetonitrile and diethyl ether (used in Example 1 of the '058 Patent) and acetone and water (used in Example 2 of the '058 Patent). TX0080 (Tietze) at 25; TX0081 (Vogel) at 137-38;  Trial Tr. (Genck Direct) 749:17-750:16, 752:4-753:16.

194.    Tietze and Vogel also contemplate that crystallization does not occur spontaneously, and that in such instances a crystal seed may be needed. *See* TX0080 (Tietze) at 25 ("a few crystals are saved from each crystallization for future use"); TX 0081 (Vogel) at 141 (describing how to gather seed crystals).

195.    Further, while Tietze, Vogel and Gordon list a number of known crystallization solvents, they also each acknowledge that crystallization can be difficult and unpredictable. *See, e.g.*, TX 0080 (Tietze) at 25 ("Crystallization trials require skill and patience.  Several solvents should always be tried."); TX0081 (Vogel) at 137 (listing generalizations to assist in the selection of a crystallization solvent, but noting that "numerous exceptions are known"); *id.* at 138 ("In practice the choice of a solvent for recrystallization must be determined experimentally if no information is already available."); TX00082 (Gordon) at TX 0082-0003 to TX 0082-0004 (listing common solvents for crystallization, but noting that, "[i]n choosing a second solvent for a mixture, trial and error are usually required").

196.    Dr. Genck testified that Tietze, Vogel and Gordon gave general guidance to one skilled in the art at the time of the invention as to how to perform crystallization. *See* Trial Tr. (Genck Direct) 747:6-13.  He also testified that some of the methods disclosed in Vogel for obtaining a crystal from an oil, such as scratching the inside of the vessel with a glass rod, seeding the solution, freezing a mixture, and adding solid carbon dioxide, might be used to crystallize dexlansoprazole, but he admitted that he was unaware of any attempts to do so.  Trial Tr. (Genck Cross) 841:22-843:2.

### ii.    Kato, Nohara, Kohl and Bohlin

197.    Kato describes methods for crystallizing racemic lansoprazole and a specific method that

42

United States District Court
Northern District of California

United States District Court
Northern District of California

1    produces solvent-free (i.e., anhydrous) crystals of racemic lansoprazole, but not its enantiomers.

2    *See also* Trial Tr. (Genck Direct) 774:6-775:1.

3    198.    Kato demonstrates the unpredictability of crystallization of related benzimidazole

4    compounds. Kato cites a prior art method for crystallizing racemic lansoprazole that resulted in a

5    lansoprazole crystal in monoethanolate monohydrate form (i.e., a solvate containing 1 molecule

6    each of ethanol and water). *See* TX 0069x32 (Kato II) at TX 0069x32-0003, col.1, ll.47-57; *see*

7    *also* Trial Tr. (Genck Cross) 860:3-17. This prior art method used ethanol and water as a solvent.

8    *See* TX 0069x32 (Kato II) at TX 0069x32-0003, col.1, ll.26-40, 47-57. This monoethanolate

9    monohydrate crystal decomposed easily during vacuum drying, particularly under heating. *See id.*

10    col.1, ll.47-57.

11    199.    Kato discloses that "suspending and stirring the [monoethanolate monohydrate] crystals

12    [of racemic lansoprazole] in warm water . . . unexpectedly causes a transformation of said solvate

13    crystals into substantially solvent-free [i.e., anhydrous] crystals." *Id.* col.2, ll.9-21; *see also id.*

14    (indicating that this desolvation occurred "to everybody's surprise"); *id.* at TX 0069x32-0007,

15    col.10, ll.7-31 (Example 1) (disclosing the preparation of substantially solvent-free racemic

16    lansoprazole crystals by suspending and stirring monoethanolate monohydrate lansoprazole

17    crystals (which were crystallized from ethanol and water, as described in a reference example) in

18    water)); Trial Tr. (Atwood Direct) 969:24-970:4, 970:14-18; *id.* (Genck Cross) 860:21-861:1.

19    Kato further notes that that "[t]he inventors further discovered to their own surprise that the

20    substantially solvent-free crystals of [racemic lansoprazole] . . . are remarkably stable as compared

21    with the conventional [] solvate and completely free from decomposition in the course of vacuum

22    drying." TX 0069x32 (Kato II) at TX 0069x32-0003, col.2, ll.21-26.

23    200.    Nohara (TX 0097) likewise describes only the crystallization of racemic compounds,

24    including the crystallization of racemic lansoprazole. *See* TX 0097 (Nohara); *see also* Trial Tr.

25    (Genck Cross) 847:7-16; *id.* (Atwood Direct) 966:17-967:1.

26    201.    Kohl (TX 0086) discloses a process for separating omeprazole, pantoprazole, and related

27    compounds into their enantiomers using highly-concentrated mineral acids. *See* TX 0086 (Kohl)

28    at TX0086-0007.

<div align="center">43</div>

202.    Examples 1 and 2 of Kohl together disclose the synthesis of crystals of (+)-pantoprazole

from a racemic pantoprazole salt. *See id.* at TX 0086-0006; *see also* Trial Tr. (Genck Direct)

761:9-762:13; *id.* (Genck Cross) 853:9-24. Example 1 discloses the synthesis of an intermediate

compound from racemic pantoprazole. *See* TX 0086 (Kohl) at TX 0086-0006; *see also* Trial. Tr.

(Genck Cross) 853:9-854:20. This intermediate, which Dr. Genck surmised to be a crystal, was

then used as the starting material in Example 2 for the synthesis of the enantiomer, (+)-

pantoprazole, as an oil using sulfuric ac*id. See id.*; Trial Tr. (Genck Cross) 854:3-25; *see* TX 0086

(Kohl) at TX 0086-0006; Trial Tr. (Genck Direct) 761:15-762:8. Subsequently, crystals were

formed from the oil by crystallization using diisopropyl ether as a solvent. *See* TX 0086 (Kohl) at

TX 0086-0006; Trial Tr. (Genck Direct) 761:15-762:8. Kohl does not disclose any measurement

of the optical purity of the resulting (+)-pantoprazole. *See* TX 0086 (Kohl) at TX 0086-0006.

203.    In Example 6, Kohl discloses the use of the procedure described in Example 2 to isolate

the (R+) enantiomer of omeprazole. *See* TX 0086 (Kohl) at TX 0086-0007; Trial Tr. (Genck

Cross) 855:22-866:17. However, in Example 6 the procedure described in Example 2, which was

reported to result in the synthesis of crystals of (+)-pantoprazole in that example, led to the

synthesis of (R+)-omeprazole as an amorphous solid, and produced no crystals of (R+)-

enantiomer. *See* TX 0086 (Kohl) at TX 0086-0007; Trial Tr. (Atwood Direct) 965:13-16 ("Kohl

obtains crystals of pantoprazole. And he tried to obtain crystals of R-omeprazole, but he failed to

do so."); *id.* (Genck Cross) 855:22-866:17.

204.    Bohlin (TX 0076) discloses the synthesis of S-omeprazole in three different forms,

obtained three different ways: an amorphous solid form, a partially crystalline/partially amorphous

form, and a fully crystalline form. *See* Trial Tr. (Atwood Direct) 965:22-966:12. The procedures

described in Bohlin are complicated and start from a sodium salt of S-omeprazole. *See id.* at

966:8-12. First, Bohlin discloses a method for preparing amorphous solid esomeprazole that

involves starting with a sodium salt of S-omeprazole and acid treatment followed by "evaporating

a solution of neutral S-omeprazole in one or more organic solvents to a highly concentrated

solution, adding a further solvent to the highly concentrated solution and evaporating further until

solid amorphous neutral S-omeprazole is formed." TX 0076 (Bohlin) at TX 0076-0006, ll.14-16;

44

United States District Court
Northern District of California

1    *id.* at TX 0076-0011, l.19 to TX 0076-0012, l.2 (Example 1). Bohlin then discloses "crystallization

2    from a solution of S-omeprazole in one or more organic solvents and optionally water," including

3    crystallization of S-omeprazole from amorphous solid (Examples 2-8) or partially crystalline

4    (Example 9) S-omeprazole using various solvents. *Id.* at TX 0076-0006, ll.18-19; *see id.* at TX

5    0076-0012 to TX 0076-0014 (Examples 2-9). Finally, Bohlin discloses "precipitation from a

6    solution of an alkaline salt of S-omeprazole in water and, optionally one or more organic solvents,

7    with a suitable acid" and the use of this technique to generate a partially crystalline form of S-

8    omeprazole. *Id.* at TX 0076-0006, ll.21-22; *see id.* at TX 0076-0014 to TX 0076-0015 (Examples

9    10-11).

10   205.    Bohlin does not disclose the preparation of a solid or crystal of any benzimidazole

11   compound other than S-omeprazole.

### d. Whether a Person of Ordinary Skill in the Art Would have been Motivated to Obtain a Crystal of Dexlansoprazole

14   206.    The evidence presented at trial supports the conclusion that a person of ordinary skill in the

15   art would have had a reason to attempt to obtain a crystal form of dexlansoprazole.

16   207.    First, a person of ordinary skill in the art would have been motivated to select

17   dexlansoprazole for use as a pharmaceutical. Trial Tr. (Genck Direct) 771:2-6; *id.* (Atwood

18   Cross) 1010:1-4.  As of June 1999, it was known that racemic lansoprazole was effective as an

19   inhibitor of gastric acid secretion, indicating to persons of ordinary skill in the art that its

20   enantiomers would likely have the same benefits. TX0070, Larsson I at 1; TX0071, Von Unge I at

21   1; Trial Tr. (Genck Direct) 771:13-772:19; *id.* (Rogers Direct) 596:6-19; *id.* (Atwood Cross)

22   1010:1-4. Moreover, Barberich had identified dexlansoprazole as having advantages over the

23   racemic lansoprazole for treating gastroesophageal reflux disease. TX0078, Barberich at [0015].

24   Indeed, Takeda's expert, Dr. Atwood, testified that "it was also known by June of 1999 that

25   dexlansoprazole was effective to treat GERD" and that although "[t]here was a little bit of

26   controversy with regard to the Barberich reference, as to whether R or S was more effective . . .

27   [his] understanding was that R was more effective." Trial Tr. (Atwood Cross) 985: 3-8. To the

28   extent there was any question as to whether the R or the S enantiomer was likely to be more

United States District Court
Northern District of California

1  effective, a person of ordinary skill would have understood that *both* would have advantages over

2  the racemic lansoprazole for the treatment of GERD.

3  208.   Second, it was known as of June 1999 that crystalline forms are preferred in the

4  pharmaceutical context because they are more stable, have a higher degree of purity, and are easier

5  to process into pharmaceutical compositions.   Trial Tr. (Genck Direct) 714:19-715:7, 804:7-11;

6  *id.*. (Rogers Cross) 700:9-13; *id.* (Atwood Direct) 896:16-22; TX0076 (Bohlin) at 2 (crystals are

7  preferred to oils).   Takeda's expert, Dr. Atwood, agreed that if a person of ordinary skill in the art

8  had an oil of dexlansoprazole (as disclosed by Larsson and Von Unge) and sought to use it as a

9  pharmaceutical, he or she would have been motivated to crystallize it.   Trial Tr. (Atwood Cross)

10  990:14-18.[4]

### e.   Whether a Person of Ordinary Skill in the Art Would Have a Reasonable Expectation of Success

13  209.   While a person of skill in the art would have had a reason to attempt to obtain any crystal

14  form of dexlansoprazole, the prior art would not have given rise to a reasonable expectation of

15  success as to that objective.

### i.   Prior Art Disclosing Asymmetric Oxidation to Obtain Dexlansoprazole

18  210.   A person of ordinary skill in the art would not have a reasonable expectation of success

19  that a crystal of dexlansoprazole could be obtained, or that the anhydrous crystal of claim 1 of the

20

---

21  [4] Dr. Genck testified further that a person of ordinary skill in the art would have been especially
motivated to make the anhydrous crystalline form of dexlansoprazole.  Trial Tr. (Genck Direct)
22  773:23-775:10.   The Court does not find Dr. Genck's testimony on this point persuasive.
Dr. Genck based his opinion on Kato, which teaches that the anhydrous crystalline form of the
23  racemic lansoprazole was remarkably stable as compared to its solvates, including hydrates.
TX0087, Kato at 3:22-27; Trial Tr. (Genck Direct) 774:12-775:3 ; *id.* (Atwood Cross) 992:2-6.
24  However, Dr. Genck provided no evidence or explanation to support his position that the stability
of a given crystal form of a racemic molecule is predictive of the stability of or the ability to
25  crystallize an enantiomer.  By his own admission, Dr. Genck is not a specialist in organic
chemistry or in the differences among the structures of benzimidazole compounds. See *id.* (Genck
26  Cross) 837:4-14. Dr. Atwood, who is an expert in organic chemistry as well as crystallization,
testified that the crystallization of a racemic compound is not predictive of and can be vastly
27  different from the crystallization of a specific enantiomer of that compound, as discussed further
below. Accordingly, the Court finds that the disclosures in Kato did not provide one of skill in the
28  art at the time of Takeda's invention with motivation to generate dexlansoprazole in anhydrous
crystal form.

46

'058 Patent could be obtained, based on Larsson or Von Unge. As set forth below, the Court finds that Larson and Von Unge sought to produce crystals of dexlansoprazole and that their failure to achieve this result would have demonstrated to a person of ordinary skill in the art the difficulty of crystallizing the dexlansoprazole molecule.

211. The Larsson inventors were scientists at Astra – the company that discovered omeprazole and esomeprazole – and were also responsible for the discovery that the large-scale synthesis of esomeprazole and related compounds could be achieved using asymmetric oxidation followed by crystallization, as described in the Larsson and Von Unge patents. *See* TX 0236 (Cotton); TX 0070 (Larsson I); TX 0301 (Larsson II); Trial Tr. (Atwood Direct) 944:20-945:5 ("[T]he emphasis in Larsson . . . . was to do the oxidation to get the enantioselective synthesis on an industrial scale, on a scale useful to industry . . . ."). The Larsson patent itself teaches the asymmetric synthesis of a large amount of an enantiomer of the salt of omeprazole using close to 7 pounds of oxidant. *See id.*; TX 0301 (Larsson II) at TX 0301-0008, col.13, l.51 to col.14, l.13 (Example 11). As Dr. Atwood testified, considerable skill and expertise is needed to perform such a reaction on such a large scale. *See* Trial Tr. (Atwood Direct) 945:6-946:14. Further, many of the inventors listed on Larsson I and Larsson II, especially Larsson, Von Unge, and Cotton, are named inventors on numerous patents and authors of numerous scientific publications. *See* Trial Tr. (Atwood Direct) 945:6-946:14. One skilled in the art reasonably would conclude from the fact that the Larsson inventors' stated goal was to synthesize large quantities of compounds for pharmaceutical compounds, *see* TX 0301 (Larsson II) at TX 0301-0002, col.1, ll.23-55, and the fact that they successfully synthesized other compounds as crystals, that Larsson and Von Unge sought to produce a crystal form of dexlansoprazole but failed.

212. Indeed, Larsson describes the synthesis of dexlansoprazole with high chemical purity (99.9% achiral analysis) and high optical purity (99.6% e.e.). After treating this residue with acetonitrile Larsson obtained only an oily form of dexlansoprazole. *See* TX 0301 (Larsson II) at TX 0301-0010, col.18, ll.30-35; *see also* Trial Tr. (Atwood Direct) 905:13-24, 906:18-21; *id.* (Rogers Direct) 500:17-19; *id.* (Genck Direct) 735:1-5. Repeating the procedure "a couple of times" did not even result in a solid form of dexlansoprazole, let alone a crystal. *See* TX 0301

47

United States District Court
Northern District of California

1    (Larsson II) at TX 0301-0010, col.18, ll.30-35. Furthermore, Dr. Atwood testified that the

2    technique used in Example 22 in Larsson, in particular the "[e]vaporation of the filtrate [which]

3    afforded an oil with enhanced optical purity," described in Example 22 at lines 31-33, was the

4    crystallization technique of crystallization by evaporation. As Larsson discloses, the solvent,

5    acetonitrile, was evaporated even though this crystallization technique was unsuccessful in

6    yielding crystals and resulted in an oil. *See* Trial Tr. (Atwood Direct) 947:15-949:8. Larsson thus

7    would have led a person skilled in the art to expect that using acetonitrile as a solvent (the solvent

8    that Dr. Kamiyama ultimately used together with diethyl ether, to successfully obtain crystalline

9    dexlansoprazole for the first time) was not likely to result in crystallization.

10   213.    Moreover, as acknowledged by Dr. Genck, Example 23 in Larsson discloses the synthesis

11   of crystals of an enantiomer of another benzimidazole compound using acetonitrile as a solvent.

12   *See* TX 0301 at TX 0301-0010, col.18, ll.37-67; Trial Tr. (Genck Cross) 836:22-24. Although the

13   two Examples do not describe the crystallization in exactly the same words, as Dr. Atwood

14   testified, one skilled in the art would understand that the same crystallization process was used in

15   Examples 22 and Example 23 – heating and then evaporating the solution containing the solvent

16   and compound of interest – but yielded completely different results. Trial Tr. (Atwood Direct)

17   947:17-949:8. Thus, the Court finds that Larsson discloses a failure to crystallize dexlansoprazole

18   using acetonitrile as a solvent and the successful crystallization of an enantiomer of another

19   benzimidazole compound using the same solvent. Therefore, the Court further finds that at the

20   time of the Takeda inventions, successful crystallization of benzimidazole compounds, such as

21   dexlansoprazole, from a given solvent, such as acetonitrile, was not predictable.

22   214.    Von Unge's goal was also to isolate enantiomers of omeprazole and related compounds for

23   use in pharmaceutical products. TX 0302 (Von Unge II) at TX 0302-0001, col.1, ll.24-67.

24   Nevertheless, Von Unge, like Larsson, was able to isolate the R- and S-enantiomers of

25   lansoprazole only as oils, despite repeating the acetonitrile procedure "a couple of times." *Id.* at

26   TX0302-0006, col.9, ll.9-19 (Example 11) ((S-)-lansoprazole); *id.* at TX 0302-0006, col.9, ll.20-

27   31 (Example 12) (dexlansoprazole); *see also* Trial Tr. (Genck Cross) 838:14-18. Moreover, in

28   Examples 11 and 12, it is the racemic compound that precipitates out of solution, not the desired

48

United States District Court
Northern District of California

1   enantiomers. TX 0302 (Von Unge II) at TX0302-0006, col.9, ll.9-19 (Example 11) ((S-)-

2   lansoprazole); *id.* at TX 0302-0006, col.9, ll.20-31 (Example 12) (dexlansoprazole).

3   215.   Although Impax's expert, Dr. Genck, testified at trial that neither Larsson nor Von Unge

4   (which, as noted above, have essentially the same disclosures relating to dexlansoprazole)

5   attempted to crystallize dexlansoprazole, this testimony was inconsistent with his deposition

6   testimony, which he reaffirmed at trial, that Von Unge was in fact "about crystallization" (as well

7   as enantiomeric enrichment) and that "[Von Unge] did one; one solvent; one attempt." Trial Tr.

8   (Genck Cross) 838:19-839:24. This supports the Court's finding that, as Dr. Atwood testified, both

9   Larsson and Von Unge represent unsuccessful efforts to crystallize dexlansoprazole using

10  acetonitrile as a solvent.

11  216.   Thus, although Larsson and Von Unge disclose dexlansoprazole in oily form, they support

12  the conclusion that a person of ordinary skill in the art would not have had a reasonable

13  expectation that dexlansoprazole could be crystallized based on the prior art of that time. As

14  Barberich merely incorporates Larsson and Von Unge, that prior art supports the same conclusion.

15              **ii.   Prior Art Disclosing HPLC to Obtain Dexlansoprazole**

16  217.   Similarly, a person of ordinary skill in the art would not have a reasonable expectation of

17  success that a crystal of dexlansoprazole could be obtained, or that the anhydrous crystal of claim

18  1 of the '058 Patent could be obtained, based on the prior art cited by Impax disclosing the

19  separation of lansoprazole enantiomers using HPLC.

20  218.   First, the person of ordinary skill in the art in 1999 would not understand from Katsuki,

21  Tanaka, and Erlandsson how to isolate dexlansoprazole, because none of these references

22  discloses the isolation of dexlansoprazole. *See* Trial Tr. (Atwood Direct) 962:1:5 (stating that

23  Katsuki and Tanaka do not "disclose isolating dexlansoprazole out from the solvent coming out of

24  the HPLC column"); *id.* (Genck Cross) 843:3-15 (indicating that Katsuki and Tanaka relate to

25  HPLC on lansoprazole but Erlandsson pertains to "omeprazole, a different compound"); *see also*

26  *id.* (Atwood Direct) 963:8-12 (indicating that Erlandsson discloses separation of enantiomers of

27  omeprazole); TX 0069x49 (Erlandsson) (disclosing enantiomeric separation of omeprazole but not

28  lansoprazole).   Likewise, none of these three references discusses or teaches crystallization. Trial

49

A57

Tr. (Atwood Direct) 961:21-25. Thus, none of these references would have suggested to a person

of ordinary skill in that art that HPLC could be used to make dexlansoprazole for crystallization.

219.    Further, the HPLC method disclosed by Katsuki does not include the additional steps that

would have to be taken to isolate dexlansoprazole for crystallization. Dr. Atwood explained in his

trial testimony that there are two ways to perform HPLC. *See id.* at (Atwood Direct) 955:21-966:8.

First, analytical HPLC, the technique used by Katsuki, is used to detect the mere presence of a

material, and is so sensitive that it can detect a few parts per million of the compound coming

through the column. *See id.* at 951:21-956:20. An analytical HPLC column, such as the one

Katsuki used, has a width about the size of a pen. *See id.* at 954:4-17. The interior containing the

matrix that has an affinity for the compound and delays its travel through the column is about four

millimeters in diameter, and the column is about a foot in length. *See id.* Thus, the section of

material is very thin. *See id.* The second type of HPLC is preparative HPLC, typically uses a

larger column, such as a column that is about one or two inches in diameter, and is "designed

specifically not for detecting the material, but for separating two or more materials, one from

another." *Id.* at 956:9-20.

220.    Katsuki says nothing about preserving the fractions containing the enantiomers for further

experiments. Dr. Atwood testified that he was unaware of any instances where analytical HPLC

was used to isolate solid compounds for the purposes of crystallization. He noted that it would be

difficult to obtain enough material for crystallization, as the solution containing the compound

eluted from the column contains a miniscule amount of the separated compound diluted within a

large volume of solvent. *See id.* at 956:21-957:5, 962:12-21. Given the dilute nature and small

amount of the dexlansoprazole obtained in the HPLC fractions in these references, they do not

disclose separation of dexlansoprazole in a form that would constitute an adequate starting

material for known crystallization methods.

221.    Thus, even if Katsuki disclosed the collection of the enantiomeric fractions, which, as

discussed above, it does not, (R+)-lansoprazole would be in solution at the end of the process, so

additional steps would be required to isolate dexlansoprazole from the solvent in order to prepare

crystalline forms of (R+)-lansoprazole. Katsuki, however, does not "disclose isolating

50

United States District Court
Northern District of California

1   dexlansoprazole from the solvent coming out of the HPLC column." Trial Tr. (Atwood Direct)

2   962:1-5; *see also id.* (Genck Cross) 844:4-6.

3   222.    The '058 Patent teaches that preparative HPLC can be used to isolate material that can be

4   used in crystallization. The'058 Patent discloses amorphous dexlansoprazole obtained from chiral

5   preparative HPLC as the starting material for the disclosed crystallization. *See* Trial. Tr. (Atwood

6   Direct) 967:6-16; TX 0001 ('058 Patent) at TX 0001-0005, col.7, ll.31-52 (Reference Example 1);

7   TX 0001-0006, col.8, ll.27-51 (Example 1). Based upon this fact, Dr. Genck opined that one

8   skilled in the art would also have been motivated to obtain dexlansoprazole as starting material for

9   crystallization using HPLC (either preparative HPLC, or, as Takeda did, multiple runs of

10  analytical HPLC). *See* Trial Tr. (Genck Direct) 741:11-743:11, 744:22-745:15.

11  223.    However, as noted above, Katsuki does not "disclose isolating dexlansoprazole from the

12  solvent coming out of the HPLC column." *Id.* (Atwood Direct) 962:1-5. Thus, one skilled in the

13  art would need to perform additional steps to isolate dexlansoprazole from the solvent and prepare

14  a material suitable for use in crystallization. Further, dexlansoprazole is unstable in solution and

15  decomposes. *See id.* (Kamiyama Direct) 105:20-107:12. The inventors of the '058 Patent

16  accordingly had to treat the dexlansoprazole material they obtained after HPLC separation to

17  prevent its decomposition. *See id.* (Atwood Direct) 961:3-7. They did so by adding hexane to the

18  material while it was being concentrated in solution after the HPLC separation in Reference

19  Example 1. *See id.* at 961:8-20; *see also* TX 0001 ('058 Patent) at TX 0001-0005, col.7, ll.31-52

20  (Reference Example 1) (indicating the addition of hexane). Dr. Atwood testified that the

21  prevention of decomposition of dexlansoprazole by the addition of hexane was unpredictable

22  before it was done by the inventors of the '058 Patent. *See* Trial Tr. (Atwood Direct) 961:12-18.

23  224.    Similarly, in Reference Example 2 in the '058 Patent, which also discloses the isolation of

24  dexlansoprazole by HPLC for use in crystallization experiments, the inventors also used

25  triethylamine to prevent decomposition of dexlansoprazole after HPLC in concentrated solution

26  *See* TX 0001 ('058 Patent) at TX 0001-0005, col.7, l. 54 to col.8, l.5 (Reference Example 2)

27  (disclosing the addition of triethylamine); TX-00001-0007, col.11, l.11 to col.12, l.27 (Examples 2

28  and 3) (disclosing the crystallization of the dexlansoprazole material described in Reference

51

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Example 2); cf. Trial. Tr. (Kamiyama Direct) 106:18-108:4 (indicating that triethylamine was

2    added to prevent degradation of dexlansoprazole in solution); TX 0722 (SSCI document entitled

3    "Standard Polymorph Screen") at TX 0722-0002 ("TAK-390 [dexlansoprazole] degraded in

4    solution over time but was stabilized by addition of triethylamine."). Because Katsuki was not

5    concerned with any post-HPLC processing of the dexlansoprazole he separated, he neither

6    mentioned the tendency of dexlansoprazole to decompose nor disclosed any steps necessary to

7    prevent such decomposition, which would have been a starting point if one wanted to undertake

8    further crystallization procedures.

9    225.    Furthermore, Katsuki does not report the enantiomeric purity of any of the peaks of (+)-

10    lansoprazole. *See, e.g.,* Trial Tr. (Atwood Direct) 962:18-21. Thus, one skilled in the art would not

11    know whether the fractions were of sufficient purity to provide adequate conditions for

12    crystallization of the enantiomer, given that, as discussed above, impurities can prevent

13    crystallization. *See id.* at 949:9-23; *cf. id.* at 962:22-963:7 (indicating that "before attempting to

14    crystallize something, one would want to know the level of impurity – the level of purity that one

15    had in the final product"). This is especially true given that Katsuki's starting material was blood

16    serum, which contained a huge array of biological impurities. *Cf. id.* at 962:22-963:7.

17    Accordingly, the Court rejects Dr. Genck's conclusion that one of ordinary skill in the art would

18    have had a reasonable expectation that the technique disclosed in Katsuki could be used

19    successfully to isolate dexlansoprazole for crystallization.

20    226.    Like Katsuki, Tanaka (TX 0069x48) discloses analytical HPLC to resolve the enantiomers

21    of lansoprazole. Trial Tr. (Atwood Direct) 955:21-956:8. The same conclusions discussed above

22    in the context of Katsuki, including those with respect to scale-up, also apply to Tanaka with the

23    exception that Tanaka did not involve lansoprazole derived from serum. Dr. Atwood testified that

24    dexlansoprazole obtained in Tanaka was a "very dilute solution," Trial Tr. (Atwood Direct)

25    962:15-17, and Tanaka also used a 4.6 millimeter column, *see* TX 0069x48 (Tanaka) at TX

26    0069x48-0003, Trial. Tr. (Genck Direct) 744:4-17, consistent with analytical HPLC. Also, like

27    Katsuki, Tanaka does not "disclose isolating dexlansoprazole out from the solvent coming out of

28    the HPLC column," Trial Tr. (Atwood Direct) 962:1-5; *id.* (Genck Cross) 844:4-6 (admitting that

United States District Court
Northern District of California

1    "in Tanaka, the separated enantiomers remain in solution"), or the collection of fractions. Nor

2    does Tanaka report the enantiomeric purity of any of the peaks of (+)-lansoprazole. *See, e.g.,* Trial

3    Tr. (Atwood Direct) 962:18-21. Indeed, Tanaka was not even able to identify which enantiomer

4    was coming off of the HPLC column. TX 0069x48 (Tanaka) at TX 0069x48-0005. Accordingly,

5    the Court finds that one of ordinary skill in the art would not have a reasonable expectation that

6    the disclosure in Tanaka would allow such a person to successfully prepare dexlansoprazole for a

7    crystallization attempt, for the same reasons the Court reached this conclusion with respect to the

8    Katsuki reference delineated above.

9    227.    Similarly, the Court finds that one skilled in the art would not read Erlandsson as teaching

10   a means to obtain dexlansoprazole in sufficient purity or amount to perform crystallization.

11   Erlandsson reports the separation of omeprazole into its enantiomers using a cellulose-based chiral

12   column. *See* TX 0069x49 (Erlandsson) at TX0069x49; *see also* Trial Tr. (Atwood Direct) 963:8-

13   12 (indicating that Erlandsson discloses separation of enantiomers of omeprazole). Erlandsson

14   does not describe the separation of lansoprazole at all. *See id.* (Genck Cross) 843:3-15 (indicating

15   that Katsuki and Tanaka relate to HPLC on lansoprazole but Erlandsson pertains to "omeprazole;

16   a different compound"). As Dr. Atwood testified, "the material Erlandsson's getting out after he

17   does chromatography is still quite impure." *Id.* at 963:20-25. The enantiomeric purity of the

18   fractions obtained by Erlandsson was 82% for (+)-omeprazole and 95.6% for (-)-omeprazole, less

19   than that of Larsson and Von Unge. TX 0069x49 (Erlandsson) at TX 0069x49-0014. Given that

20   Erlandsson teaches a technique that resulted in compounds of much lower purity than the

21   dexlansoprazole Larsson obtained in oil form, the Court agrees with Dr. Atwood's opinion that

22   one of ordinary skill in the art would not have concluded from Erlandsson that he or she could use

23   HPLC for purposes of obtaining a compound (e.g., dexlansoprazole) to be used in crystallization

24   experiments. *See id.* (Atwood Direct) 963:14-19.

25   228.    In sum, the HPLC references would not teach one skilled in the art how to make

26   dexlansoprazole for purposes of crystallization or give rise to a reasonable expectation of success

27   in doing so. Nothing in Katsuki, Tanaka or Erlandsson describes (i) concentrating the fractions of

28   dexlansoprazole from the chiral column so as to amass sufficient material to attempt

United States District Court
Northern District of California

1    crystallization, (ii) filtering the dexlansoprazole from the eluate, (iii) obtaining a substance of

2    sufficient purity to be an appropriate candidate for crystallization, or (iv) adding hexane or

3    triethylamine to the resulting filtrate to prevent decomposition. All of these steps were done in

4    preparing the material used in the successful crystallization of dexlansoprazole disclosed in the

5    '058 Patent. *See* TX 0001 ('058 Patent) at TX 0001-0005, col.7, ll.42-46 (Reference Example 1),

6    col.8, ll.9-29 (Reference Example 2).

7                        **iii.    Prior Art Disclosing Methods of Crystallization**

8    229.    Finally, the person of ordinary skill in the art in 1999 would not have had a reasonable

9    expectation of being able to crystallize dexlansoprazole, whether obtained through asymmetric

10   oxidation or by HPLC, using the general crystallization methods known in the art, such as those

11   described in Tietze, Vogel and Gordon, or the specific methods used for crystallizing other

12   benzimidazole compounds described in Kato, Nohara, Kohl and Bohlin. The Court finds that Dr.

13   Genck's opinions based the disclosure of potential solvents and techniques in these references are

14   not credible because they reflect an improper hindsight analysis.

15   230.    Tietze (TX 0080) and Vogel (TX 0081) describe several common crystallization

16   techniques, while Gordon (TX 0082) describes many common solvents used in crystallization. *See*

17   TX 0080 (Tietze); TX 0081 (Vogel); TX 0082 (Gordon). These references do not contain

18   examples of actual crystallizations of benzimidazole molecules, let alone dexlansoprazole.

19   Further, none of these references − or, for that matter, any of the references disclosing

20   crystallization of related compounds − discloses the use of a nitrogen stream during crystallization

21   like that used in the initial crystallization of dexlansoprazole disclosed in Example 1 of the '058

22   Patent. Accordingly, the particular method that resulted in crystalline dexlansoprazole is not

23   taught by any references upon which Dr. Genck relied.

24   231.    Tietze and Vogel also contemplate that crystallization does not occur spontaneously, and

25   that a crystal seed may be needed to bring about crystallization. *See* TX 80 (Tietze) at TX 0080-

26   0004 ("a few crystals are saved from each crystallization for future use"); TX 81 (Vogel) at TX

27   0081-0009 (describing how to gather seed crystals). In fact, as discussed above, Dr. Kamiyama

28   did use a crystal seed of the anhydrous crystal of dexlansoprazole from Example 1 of the '058

                                                    54

United States District Court
Northern District of California

1    Patent to encourage crystallization of the sesquihydrate crystals disclosed in Example 3 and Step 2

2    of Example 2 of the '058 Patent. However, a technique that employs a crystal seed presupposes

3    the existence of a suitable crystal for use in seeding. Here, the inventors necessarily had to obtain

4    the original dexlansoprazole crystal without benefit of any pre-existing crystals to use as a seed.

5    Indeed, as discussed above, Dr. Genck admitted that there were no dexlansoprazole seed crystals

6    available before the first crystallization of dexlansoprazole disclosed in the '058 Patent. *See* Trial

7    Tr. (Genck Cross) 808:14-18. The fact that crystallization sometimes requires the use of a crystal

8    seed to be performed successfully is further indicative of the unpredictable and uncertain nature of

9    crystallization.

10   232.    While the general crystallization references list a number of known crystallization

11   solvents, they also each acknowledge that crystallization can be difficult and unpredictable. *See,*

12   *e.g.,* TX 0080 (Tietze) at TX 0080-0004 ("Crystallization trials require skill and practice"); TX

13   0081 (Vogel) at TX 0081-0005 (listing generalizations to assist in the selection of a crystallization

14   solvent, but noting that "numerous exceptions are known"); *id.* at TX 0081-0006 ("In practice the

15   choice of solvent for recrystallization must be determined experimentally if no information is

16   already available"); TX 00082 (Gordon) at TX 0082-0003 to TX 0082-0004 (listing common

17   solvents for crystallization, but noting that, "[i]n choosing a second solvent for a mixture, trial and

18   error are usually required").

19   233.    The methods that Dr. Kamiyama unsuccessfully tried involved solvents mentioned in the

20   textbooks cited as prior art by Impax, namely, Tietze, Vogel and Gordon. *See* TX 0081 (Vogel) at

21   TX 0081-0004 to TX 0081-0005 (identifying THF, methanol, ethanol, ethyl acetate as solvents);

22   TX 0082 (Gordon) at TX 0082-0003 to TX 0082-0004 (identifying methanol, ethanol, ethyl

23   acetate, and hexane as solvents) ; *see also* TX 0080 (Tietze) at TX 0080-0003 to TX 0080-0004

24   (indicating the use of methanol as a solvent (in conjunction with another solvent) and hexane in

25   conjunction with other solvents). Moreover, as Dr. Genck admitted, developing a crystallization

26   method involves determining "what to do after the solvents are selected," including determining

27   the proportion of the solvents to be used, and the temperature conditions. Trial Tr. (Genck Cross)

28   819:25-820:8, 820:23-821:5. There are dozens, if not hundreds, of other possible methods and

United States District Court
Northern District of California

1  conditions disclosed in these references that one ordinarily skilled in the art potentially could have

2  used.

3  234.    The inherent unpredictability of crystallization is reflected in the fact that, as Dr. Genck

4  admitted, hundreds of patents have been issued on crystal forms of compounds. *See id.* (Genck

5  Cross) 830:5-15; *See* TX 00576 (J. Keith Guillory, "Generation of Polymorphs, Hydrates,

6  Solvates, and Amorphous Solids," in *Polymorphism in Pharmaceutical Solids* (Harry G. Brittain,

7  ed., 1999)) at 64 of 156 (as of 1990, "more than 350 patents on crystal forms granted on the basis

8  of an advantage in terms of stability, formulation, solubility, bioavailability, ease of purification,

9  preparation or synthesis, hygroscopicity, recovery, or prevention of precipitation.").

10  235.    Given the unpredictability of crystallization, absent impermissible hindsight, the lists of

11  potential solvents and solvent combinations set forth in Tietze, Vogel and Gordon would not

12  engender a reasonable expectation of success in any particular method, or in the ability generally

13  to obtain a dexlansoprazole crystal.

14  236.    A reference Dr. Genck relied on in his expert report, but about which he did not testify on

15  direct examination, emphasizes this point. In his expert report, Dr. Genck relied on a reference by

16  Fessenden (TX 0069x12) for common solvents used for crystallization. *See* Trial Tr. (Genck

17  Cross) 815:4-816. The Fessenden reference does not include acetonitrile, either in its table of the

18  13 most common crystallization solvents or its separate table of common solvent pairs. *See* TX

19  0069x12 (Fessenden) at TX 0069x12-0006; Trial Tr. (Genck Cross) 816:8-11, 816:22-817:4.

20  Fessenden also lists factors for choosing solvents, including whether the solvent reacts with the

21  compound to be crystallized and solubility of the compound in the solvent, which Dr. Genck

22  admitted would need to be determined through experimentation. *See* TX 0069x12 (Fessenden) at

23  TX 0069x12-0005 ("[u]nfortunately, the solubility of a compound in a solvent cannot be predicted

24  with accuracy"), *see also* Trial Tr. (Genck Cross) 817:5-818:12.

25  237.    Dr. Genck admitted that one would not have any reasonable expectation *a priori* that any

26  particular crystallization method would succeed. He agreed with the statement in Vogel that one

27  does not "know which solvent or combination of solvents is going to succeed in obtaining a

28  crystal" until one does crystallization experiments. Trial Tr. (Genck Cross) 818:17-819:16; *id.* at

56

818:13-16 (prior to the '058 Patent "there wasn't information known about which solvents could be used to crystallize dexlansoprazole."). Moreover, he admitted that he could not testify with respect to whether any of the solvent combinations disclosed in the Tietze reference would succeed in crystallizing dexlansoprazole without the teachings of the '058 Patent. *See id.* at 841:4-17. He further acknowledged that he would not have known what particular solvents would have worked with respect to crystallization of dexlansoprazole without performing the experiments. *Id.* at 821:6-19 ("[E]xperiments would be required" to determine this).

238. The Vogel, Gordon, and Fessenden references collectively disclose 36 individual solvents commonly used in crystallization by solution, twelve of which are disclosed in all three sources. Acetonitrile, the solvent Takeda first used to successfully obtain the anhydrous crystal, is not one of the twelve solvents listed by all three sources. Moreover, as both sides' experts testified at trial, crystallization often involves the use of solvent pairs. The total number of possible solvent pairs disclosed in Tietze, Gordon, and Fessenden is greater than 135. *See* TX 0080 (Tietze); TX 0082 (Gordon); TX 0069x12 (Fessenden). Moreover, crystallization from solution also requires selection of temperatures or pH conditions, as well as the ratios to be used of the two solvents. *See* Trial Tr. (Genck Cross) 819:9-821:5; cf. *id.* (Atwood Direct) 936:10-937:11. In light of Dr. Genck's acknowledgement that one would not know which particular solvents would work without actually trying them, the hundreds if not thousands of possibilities facing one skilled in the art prior to Takeda's invention demonstrate the unpredictable nature of the invention.

239. Moreover, as Dr. Atwood explained, "[t]hese references are generally focused on doing rather simple crystallizations; not difficult ones," and thus would not lead one of skill in the art to have a reasonable expectation of crystallizing dexlansoprazole, especially in light of Larsson's unsuccessful attempt at evaporation from acetonitrile. *Id.* at 964:22-965:6.

240. Dr. Atwood's opinion is borne out by his own experience. Dr. Atwood's level of skill is far greater than that of one of ordinary skill in the art, as he has performed approximately 10,000 crystallizations over a 50-year career as a chemist. *See id.* (Atwood Redirect) 1062:6-15. Nonetheless, Dr. Atwood testified that he has been unable to crystallize complex molecules, not dissimilar from dexlansoprazole, 20 to 25 percent of the time. *See id.* (Atwood Direct) 941:12-18

57

United States District Court
Northern District of California

1    (noting that when approaching a complex molecule that had not previously been crystallized, he

2    "would not have an expectation that [he] would be successful"); *see also id.* (Genck Cross)

3    796:21-24 ("[s]ometimes [] compounds cannot generate a crystal form.").

4    241.    In addition, as discussed above, Dr. Kamiyama, one of the inventors of the '282 Patent, in

5    fact attempted "textbook methods" of crystallization, using such solvents as ethanol with hexane,

6    ethyl acetate with hexane, THF, and methanol, but those methods failed to produce a crystal. *See*

7    Trial Tr. (Kamiyama Direct) 88:11-23, 110:16-111:5. He was successful in obtaining the original

8    crystal of dexlansoprazole by dissolving amorphous solid dexlansoprazole in acetonitrile, then

9    evaporating at room temperature in a nitrogen stream, and adding diethyl ether, a technique not

10   disclosed in any of the prior art cited by Defendants or Dr. Genck.

11   242.    Further, as discussed above, Dr. Kamiyama used a crystal seed of the anhydrous crystal of

12   dexlansoprazole from Example 1 of the '058 Patent to encourage crystallization of the

13   sesquihydrate crystals disclosed in Example 3 and Step 2 of Example 2 of the '058 Patent.

14   However, a technique that employs a crystal seed presupposes the existence of a suitable crystal

15   for use in seeding. Here, the inventors necessarily had to obtain the original dexlansoprazole

16   crystal without benefit of any pre-existing crystals to use as a seed. Indeed, as discussed above,

17   Dr. Genck admitted that there were no dexlansoprazole seed crystals available before the first

18   crystallization of dexlansoprazole disclosed in the'058 Patent. *See* Trial Tr. (Genck Cross)

19   808:14-18. The fact that crystallization sometimes requires the use of a crystal seed to be

20   performed successfully is further indicative of the unpredictable and uncertain nature of

21   crystallization.

22   243.    Although Reference Example 4 did not use seed crystals, the crystallization process

23   described in that Example to obtain the anhydrous crystal is extremely involved, involving five

24   different solvents and four separate crystallization steps, and would not have been an obvious

25   method for crystallizing dexlansoprazole at the time of the Takeda invention.

26   244.    Accordingly, the Court finds that whether a given solvent or solvent combination would

27   lead to the crystallization of dexlansoprazole, or whether dexlansoprazole could be crystallized at

28   all, was unpredictable and not something as to which one ordinarily skilled in the art would have

had a reasonable expectation of success at the time of Takeda's invention. Defendants' reliance on previous disclosures of solvents used for the crystallization of other compounds, including commonly used solvents, as evidence of a reasonable expectation of success in crystallizing dexlansoprazole constitutes the use of impermissible hindsight, since one of ordinary skill in the art would know or expect that crystallization of dexlansoprazole using acetonitrile and diethyl ether as well as the other solvents disclosed in the examples of the '058 Patent would be successful only with the benefit of the patent's own disclosure.

245.    The prior art disclosing crystallization of other PPIs, namely, Kato, Nohara, Kohl, and Bohlin, does not change the Court's conclusion that a person of ordinary skill in the art would not have had a reasonable expectation of success at the time of the invention.

246.    Kato illustrates that entirely different types of crystalline compounds are obtained depending on which crystallization methods are used. The surprising and unexpected nature of Kato's invention of the method of producing the anhydrous crystal resulted in his obtaining a patent even though crystalline lansoprazole was known at the time of his invention. This is consistent with Dr. Atwood's testimony that the outcome disclosed in Kato would not have been predicted and that Kato supported his opinion concerning the unpredictability of crystallization. *See* Trial Tr. (Atwood Direct) 971:11-16.

247.    A comparison of the results obtained for dexlansoprazole described in the '058 Patent with the disclosure in Kato with respect to racemic lansoprazole also supports this conclusion, and demonstrates the unpredictable nature of crystallization, even between racemates and enantiomers of the same compound. As discussed above, Kato discloses the synthesis of racemic lansoprazole in monoethanolate monohydrate crystalline form when it is crystallized from ethanol and water. *See, e.g.,* TX 0069x32, at TX 0069x32-0003, col.1, ll.26-40, 47-57; TX 0069x32-0007, col.9, l.46 to col.10, l.4 (Reference Example 6); *see also* Trial Tr. (Atwood Direct) 970:5-13. However, when the inventors of the '058 Patent attempted to crystallize dexlansoprazole using ethanol and water as the solvent, they were unable to obtain any crystals until they added a seed crystal. *See* Trial Tr. (Atwood Direct) 971:4-10; *id.* (Kamiyama Direct) 97:3-25. Dr. Kamiyama's laboratory notebook states that an oily phase precipitated as a result of the attempt to crystallize dexlansoprazole using

59

ethanol and water as the solvent without addition of a seed crystal. *See* TX 0502 and TX 0502A (Kamiyama Notebook) at TX 0502A-0009. Moreover, when the inventors of the '058 Patent used an anhydrous seed crystal in their crystallization of dexlansoprazole with ethanol and water, the result was a sesquihydrate crystal, see TX 0001 ('058 Patent) at TX 0001-0007, col.12, l.11-14 (Example 3); TX 0502A (Kamiyama Notebook) at TX 0502A-0009; Trial Tr. (Atwood Direct) 970:19-971:10; *id.* (Kamiyama Direct) 96:14-100:15. Thus, they obtained neither the monoethanolate monohydrate crystal disclosed in Kato using ethanol and water for racemic lansoprazole, nor the anhydrous crystal taught by Kato when the monoethanolate monohydrate crystal was suspended and stirred in water. As Dr. Kamiyama testified, no ethanol remained in the dexlansoprazole sesquihydrate crystal he obtained using ethanol and water as solvents. Trial Tr. (Kamiyama Direct) 100:7-15. Moreover, although Dr. Kamiyama used a seed crystal of anhydrous crystal, he unexpectedly obtained a sesquihydrate crystal from his crystallization of dexlansoprazole using ethanol and water. *See. id.* (Kamiyama Direct) 99:25-100:4 (indicating that Dr. Kamiyama expected to get an anhydrous crystal from this experiment).

248.    Nohara also would not have engendered a reasonable expectation of success as to the crystallization of dexlansoprazole.  As mentioned above, Dr. Atwood testified that the fact that racemic lansoprazole could be crystallized did not suggest that the R-enantiomer of lansoprazole could also be crystallized. *See* Trial Tr. (Atwood Direct) 967:11-25. Dr. Atwood explained:

> Racemic lansoprazole is a different entity from dexlansoprazole. Racemic omeprazole is a different entity from S-omeprazole. The process of crystallizing a racemate is generally relatively straightforward. A process of crystallizing an optically pure enantiomer is much more difficult. They're the same types of molecules, but they crystallize differently. They have to crystallize differently. And this means that they behave more like two separate entities.

*Id.* 967:25-968:9 (emphasis added); *see also id.* 967:11-969:12.

249.    Dr. Atwood testified that racemic compounds crystallize in what is called a "centric space group" whereas chirally pure enantiomers have to crystallize in one of the sixty-six acentric space groups. *Id.* (Atwood Direct) 968:10-16, 969:4-12. These represent different ways of packing the molecules in the crystals. *See id.* The racemic compound, containing molecules with both left- and

60

United States District Court
Northern District of California

1    right-handedness, can more easily pack together in a crystalline structure. *See id.*

2    250.    More crystalline structures thus are available for racemic compounds than for enantiomeric

3    compounds. *See* TX 0084 (Datta & Grant) at TX 0084-0004 ("[T]he overall crystal structure of an

4    enantiomer must be dissymmetric. Enantiomers can therefore crystallize in only 66 of the 230

5    space groups. . . . Racemic compounds, on the other hand, can crystallize in any of the 164 achiral

6    space groups."); *see also* Trial Tr. (Atwood Direct) 969:4-12 ("[A]n optically pure enantiomer

7    cannot crystallize in one of the centric space groups. It must crystalize in one of the 66 acentric

8    space groups."). These differences in crystal structure mean that racemic crystals and the related

9    enantiomeric crystals likely will crystallize under different conditions and have different physical

10    properties. *Cf.* Trial Tr. (Atwood Direct) 967:25-968:9 (indicating that enantiomers and racemic

11    compounds "crystallize differently" and "behave more like two separate entities").

12    251.    Dr. Genck admitted that a racemic compound "could very well be packed more densely"

13    than an enantiomer, *id.* (Genck Cross) 849:10-17, and that "given the difference in the crystal

14    structure of a racemic mixture from an enantiomer, the fact that the racemic mixture might

15    crystallize wouldn't necessarily mean that the enantiomer can also crystallize . . . ." *Id.* 848:25-

16    849:5.

17    252.    Dr. Genck's view that a person of ordinary skill would reasonably expect that

18    dexlansoprazole could be crystallized based on Kohl's disclosure of the crystallization of an

19    enantiomer of pantoprazole is similarly unpersuasive. *See* Trial Tr. (Genck Cross) 733:25-734:25,

20    761:11-763:15. Dr. Genck noted that Kohl lists several compounds that might be obtained using

21    the disclosed method, including dexlansoprazole. *See* TX 0086 (Kohl) at TX 0086-0006; Trial Tr.

22    (Genck Direct) 762:14-763:14. However, Kohl provides no working examples with

23    dexlansoprazole, or even racemic lansoprazole. *See* TX 0086 (Kohl). Kohl merely incudes a list of

24    compounds as "[p]articularly preferred compounds that can be prepared with the method

25    according to the invention," without mentioning whether they would form crystals or even solids.

26    TX 0086 (Kohl) at TX 0086-0006. Given that the list includes the (+)-enantiomer of omeprazole,

27    which Kohl was only able to obtain in amorphous solid form, Kohl would not suggest to one

28    skilled in the art that dexlansoprazole could be expected to be crystallized.

United States District Court
Northern District of California

253.    Although Dr. Genck testified that the invention described in Kohl resulted in a crystal, Trial Tr. (Genck Direct) 763:14-15, as noted above, and as Dr. Genck acknowledged, Kohl discloses successful crystallization of one benzimidazole enantiomer, (+) pantoprazole, and unsuccessful crystallization of another, (R+) omeprazole. *See id.* (Genck Cross) 856:18-20. Dr. Genck did not provide any explanation as to why one skilled in the art would find Kohl's teaching with regard to pantoprazole to be more relevant than its teaching regarding omeprazole. Thus, although Kohl might suggest that it could be possible to crystallize dexlansoprazole, it does not indicate that one would reasonably expect to be able to do so. Accordingly, the Court finds that Kohl demonstrates the unpredictability of crystallization of related benzimidazole compounds and supports the view that one of ordinary skill in the art would not have a reasonable expectation of success in crystallizing dexlansoprazole based on its disclosure. *See id.* (Atwood Direct) 965:17-21.

254.    Bohlin also would not have given rise to a reasonable expectation of success. The starting material for the experiments disclosed in Bohlin was an S-omeprazole salt. Neither Dr. Genck nor Defendants have identified any prior art disclosing a dexlansoprazole salt prior to the '058 Patent. Because Bohlin does not teach crystallization starting from a neutral S-omeprazole compound, one skilled in the art would not consider its teachings to disclose how to make a neutral crystalline form of dexlansoprazole.

255.    At trial, Dr. Genck pointed to Bohlin as a reference disclosing crystallization of a related compound, *see id.* (Genck Direct) 763:25-764:8, to support his opinion that crystallization of one compound provides one skilled in the art with a reasonable expectation of success in crystallizing another compound. *See id.* at 733:25-734:25. As reflected in the references cited above, however, including Larsson (which discloses crystals of enantiomers of benzimidazole compounds structurally related to omeprazole, including omeprazole salts, but only an oil of dexlansoprazole, *see* TX 0301 (Larsson II)) and Kohl (which discloses that amorphous or crystalline solids may result from the same crystallization procedures for related benzimidazole compounds), crystallization of enantiomers of related benzimidazole compounds is not predictive of whether a given enantiomer of a given benzimidazole compound can be crystallized. Thus, prior art

62

A70

crystallizations of enantiomers of other benzimidazole compounds would not have engendered a reasonable expectation of success prior to the '058 Patent that dexlansoprazole could be crystallized. Bohlin further confirms the unpredictability of crystallization, as the use of different methods with respect to isolation of S-omeprazole disclosed in Bohlin resulted in the formation of three different solid forms – amorphous solid, crystalline, and partially crystalline.

256.    The foregoing facts corroborate Dr. Atwood's opinion that crystallization of dexlansoprazole, including crystallization to obtain the anhydrous crystal described in claim 1 of the '058 Patent, would have been highly unpredictable to one skilled in the art at the time of the Takeda invention.

### f.    Whether the Anhydrous Form of Dexlansoprazole Could have Been Predicted

257.    The person of ordinary skill also would not have been able to predict, in view of the prior art, the anhydrous crystal with the characteristic d-spacings set forth in claim 1 of the '058 Patent because that crystal did not exist before Takeda made it and therefore, the particular d-spacings in claim 1 could not have been predicted.  Dr. Genck admitted that the d-spacings in claim 1 could not have been predicted before Takeda's invention and that understanding that it might be possible to crystallize a compound would not tell a person of ordinary skill in the art the structure of the crystal until it was actually made. *See* Trial Tr. (Genck Cross) 799:20-25, 800:17-21, 801:25-802:6.

258.    The anhydrous dexlansoprazole crystal has numerous properties that reflect its unique physical structure: a molecular weight of 369.36 g/mol, a melting point of 147.0-148.0 °C, a density of 1.452 g/cm$^3$, and a structure with the space group P2$_1$. *See* TX 0001-0006, col.10, l.53 to col.11, l.8, TX0001-0007, col.11, l.44; compare with the properties of the sesquihydrate dexlansoprazole crystal also disclosed in the '058 Patent, which has characteristic d-spacings of 3.00, 3.50, 4.49, 5.02, 5.65, 5.92, 6.61, 8.05, 8.87, 9.60, and 13.22 Angstroms and a melting point of 76.0-80.0 °C. *See* TX 0001-0007, col.12, ll.11-44; TX 0001-0008, col.14, ll.31-36. None of these properties would have been known or could have been predicted before Takeda's invention.

259.    Dr. Genck testified that because the anhydrous crystal of claim 1 is the only known stable

63

A71

United States District Court
Northern District of California

form of anhydrous dexlansoprazole resulting from crystallization from solvents, one necessarily

would have expected to obtain this crystal.  However, even if it became known *after* Takeda's

invention that the crystal described in claim 1 was the most stable anhydrous crystal, that does not

mean that this fact was known or knowable at the time of its invention.  Nor would the skilled

artisan have been able to predict which crystallization techniques would have resulted in the

anhydrous crystal of dexlansoprazole.

### 3. Differences Between the Inventions of Claims 2 and 3 of the '276 Patent and the Prior Art

260.    Handa and Impax also contend that claims 2 and 3 of the '276 Patent are obvious over the

prior art.

261.    As noted above, claim 2 of the '276 Patent requires a crystalline compound of

dexlansoprazole or a salt thereof, and claim 3 requires a pharmaceutical composition comprised of

the crystal according to claim 2 (or a salt thereof) and a pharmaceutically acceptable excipient,

carrier, or diluent. *See* TX 0002 ('276 Patent) at TX 0002-0008, col.14, ll.59-67. The claims of the

'276 patent thus cover different crystal forms of dexlansoprazole, including not only the

anhydrous crystal, but also, for example, the sesquihydrate crystal disclosed and described in

Example 3.

262.    Dr. Genck testified that the basis for his opinion that the asserted claims of the '276 Patent

are invalid is the same as his basis for his opinion that asserted claims of the '058 Patent are

invalid. *See* Trial. Tr. (Genck Direct) 788:9-17. This is consistent with the fact that Dr. Genck did

not offer any opinions that any crystals other than the anhydrous crystal described in claim 1 of the

'058 Patent, such as the sesquihydrate crystal, or the methods of making such crystals, would have

been obvious or predictable to one skilled in the art at the time of the Takeda invention. Instead,

all of the prior art-based-arguments presented by Dr. Genck and advanced by defendants are

equally applicable to the asserted claims of the '058 and '276 Patents. Therefore, the Court's

findings above with respect to the validity of the '058 Patent apply equally to the validity of the

'276 Patent.

263.    The '276 Patent discloses several crystals other than the anhydrous crystal, including the

1   sesquihydrate crystal made in Example 3, and various intermediate crystal forms described in

2   Reference Example 4. Prior to the work of the inventors of the '276 Patent, none of these crystals

3   of dexlansoprazole had been synthesized. Moreover, it is undisputed that none of the chemical

4   structure, d-spacings, or physical configuration of these crystal forms of dexlansoprazole could

5   have been predicted prior to Takeda's invention, and could only be known after the crystals had

6   been synthesized. *See* Trial Tr. (Atwood Direct) 975:8-16.

7   264.   Moreover, as discussed above in the context of the '058 Patent, the disclosures of the prior

8   art cited by Defendants and Dr. Genck would not have provided the person of ordinary skill with a

9   reasonable expectation of success in synthesizing a crystal from the oil disclosed in Larsson.

10  Rather, the person of ordinary skill would have understood, as set forth in Tietze and Vogel, that

11  crystallization is an unpredictable and experimental art. *See, e.g.,* TX 0080 (Tietze) at TX 0080-

12  0004; TX 0081 (Vogel) at TX 0081-0005.

13  265.   Because these prior art references did not teach the person of ordinary skill how to

14  crystallize dexlansoprazole, these references also did not teach the person of ordinary skill how to

15  formulate a pharmaceutical composition comprised of a crystalline compound of dexlansoprazole,

16  as required by claim 3 of the '276 Patent.

### 4. Differences Between the Inventions of Claims 6 and 7 of the '971 Patent and the Prior Art

19  266.   Asserted claims 6 and 7 of the '971 Patent depend directly or indirectly from claim 5,

20  which requires "[a] method of treating reflux esophagitis in a mammal in need thereof which

21  comprises administering to said mammal an effective amount of a crystalline compound of

22  [dexlansoprazole] or a salt thereof and a pharmaceutically acceptable excipient, carrier or diluent."

23  TX 1054 ('971 Patent) at TX 1054-0009, claim 5.

24  267.   Claim 7 further specifies that "said crystalline compound has an x-ray powder diffraction

25  analysis pattern with characteristic peaks at interplanar spacings (d) of 11.68, 6.77, 5.84, 5.73,

26  4.43, 4.09, 3.94, 3.89, 3.69, 3.41 and 3.11 Angstrom." *Id.* at claim 7.

27  268.   Claim 6 is thus directed to a pharmaceutical composition of a crystalline compound of

28  dexlansoprazole or a salt thereof, similar to claim 3 of the '276 Patent, while claim 7 specifies an

65

1  anhydrous crystalline compound of dexlansoprazole with the same d-spacings claimed in claim 3

2  of the '058 Patent.

3  269.    Impax contends that claims 6 and 7 of the '971 Patent are obvious for the same reasons

4  that the asserted claims of the '058 and '276 Patents are obvious.

5  270.    The Court makes the same findings of fact in connection with claim 6 of the '971 Patent

6  that it made above in connection with claim 3 of the '276 Patent. Similarly, the Court makes the

7  same findings of fact in connection with claim 7 of the '971 Patent that it made above in

8  connection with claim 3 of the '058 Patent.

9  271.    In addition, as discussed above, the person of ordinary skill would not have been able to

10  predict, in view of the prior art, the patented subject matter itself – namely, the anhydrous crystal

11  with the characteristic d-spacings set forth in claim 7 of the '971 Patent. Moreover, Impax has

12  presented no evidence that, prior to Takeda's invention, the skilled person would have known of

13  the existence of or expected to make a polymorph having the structural characteristics of this

14  crystal.

15  **E.  Findings of Fact Relating to Plaintiffs' Standing to Assert the '282 Patent**

16  272.    TWi contends Plaintiffs TPNA, Takeda LLC, and TPA (collectively, "the Takeda U.S.

17  entities") do not have standing to sue for infringement of the '282 Patent because: 1) a provision in

18  the relevant license agreement requiring TPNA to purchase its dexlansoprazole drug product from

19  TPC negates the grant of exclusive rights; and 2) the grant of an exclusive license in the field of

20  acid-related disorders was insufficient because the '282 Patent covers a compound and not a field

21  of use.

22  273.    The facts relevant to this standing issue are not in dispute and are set forth in a stipulation

23  served on TWi by Takeda on August 2, 2012. *See* TX 0244 (Stipulation Regarding Interests Held

24  by Plaintiffs in the Patents-in-Suit) ("Stipulation").

25  274.    As set forth in the Stipulation, Plaintiff TPC is the owner of record and assignee of the

26  asserted patents, including the '282 Patent. *See* TX 0244 at ¶ 1. In 2004, TPC (formerly known as

27  Takeda Chemical Industries, Ltd.) and TPNA (successor-in-interest to TAP Pharmaceutical

28  Products ("TAP")) signed a license agreement ("License Agreement") in which TPC granted an

66

United States District Court
Northern District of California

1    exclusive license under the patents-in-suit to sell dexlansoprazole drug products in the United

2    States for the treatment of acid related disorders. *See* TX 0221 (License Agreement); TX 0244 at

3    ¶¶ 1, 24-25.

4    275.    The rights of the other U.S. entities – TPA and Takeda LLC – are detailed in Trial Exhibit

5    244 and are derivative of the rights granted by TPC to TAP in the License Agreement. *See* TX

6    0244-0002- to -0007(Stipulation Regarding Interests Held by Plaintiffs in the Patents-in-Suit) at ¶¶

7    5-30. TWi's standing challenge is based only on the License Agreement between TPC and TAP;

8    TWi does not dispute that whatever rights were conveyed to TAP (and therefore to its successor-

9    in-interest, TPNA) under the License Agreement have also been conveyed to the other U.S.

10   entities.

11   276.    Section 2.1(a) of the License Agreement describes the license granted by TPC:

12           Licensor hereby grants to Licensee an Exclusive License in the Field
             under the Patent Rights and Technical Information (i) to offer for
13           sale and sell the Product in the Territory; (ii) to offer for sale and
             sell the Finished Compound to Repackagers in the Territory and (iii)
14           to sell the Product to Sub-licensees for their offer for sale and sales
             in Canada and Puerto Rico under Section 2.3. For such purposes,
15           Licensor also hereby grants to Licensee the right to import the
             Finished Compound from Licensor or Licensor's Designated
16           Manufacturer into the Territory and package or have packaged the
             Finished Compound in the Territory, and to package and have
17           packaged the Finished Compound into the Product outside the
             Territory and to import such Product into the Territory.
18

19   TX 0221-0004.

20   277.    "Field" is defined as "the cure, mitigation, control, treatment or prevention of any acid

21   related disorder." TX 0221-0002.

22   278.    "Product" is defined in the License Agreement as "the Finished Compound packaged for

23   commercial sale by itself or as a component of a Bundled Product." TX0221-0004.

24   279.    "Finished Compound" is defined as "the Compound in a dosage form that is suitable for

25   human use, such as a tablet or capsule, but which has not yet been placed into packaging for

26   commercial sale." TX 0221-0002.

27   280.    "Compound" is defined as "the compound that is identified by Licensor as TAK-390

28   [dexlansoprazole] and which has the chemical name and structure described in Exhibit A hereto,

67

United States District Court
Northern District of California

1  including its various salts, crystalline forms, hydrates and free forms." TX0221-0001.

2  281.  "Territory" means "(i) the United States and its territories and possessions, including

3  Puerto Rico, and (ii) Canada." TX 0221-0004, Section 1.22.

4  282.  The term "Exclusive License" is defined in the License Agreement as "a license under

5  which the Licensee's rights are sole and exclusive and operate to exclude all others, including the

6  Licensor [TPC]." TX 0221-0002, Section 1.7.

7  283.  The term "Patent Rights" is defined as follows:

8      "Patent Rights" means any United States or Canadian patents or
       patent applications currently existing or hereafter filed or acquired
9      by Licensor, or licensed to Licensor with the right to sublicense to
       Licensee, which relates to the Compound, Finished Compound,
10     and/or Product, including any addition, division, continuation,
       continuation-in-part, substitution, extension, renewal, reexamination
11     or reissue of any of the aforementioned patent applications or
       patents. Patent Rights shall include but not be limited to the patents
12     and patent applications listed in Exhibit B.

13  TX 0221-0003, Section 1.17; *see also* TX 0221-0018 TX 0221-0019 (Exhibit B).  Exhibit B

14  specifically lists U.S. Patent Application No. 09/674,624, the application to which the '282 Patent

15  claims priority.  TX 1055-0001 ('282 Patent).

16  284.  Section 2.1(b) of the License Agreement states, "Licensee shall not import into the

17  Territory or offer for sale or sell in the Territory the Compound or Finished Compound that is not

18  manufactured by Licensor or Licensor's Designated Manufacture and shall prohibit Sub-licensees

19  from doing so." *See* TX 0221-0004. Pursuant to Section 2.1(b), TPNA may not import or sell

20  dexlansoprazole drug product that is not manufactured by TPC.

21  285.  Although Section 2.1(b) limits the product that TPNA itself may import and sell under the

22  License Agreement, it does not limit TPNA's right to exclude others from importing or selling

23  dexlansoprazole drug products within the United States under Section 2.1(a).  Other provisions in

24  the License Agreement support this interpretation of Section 2.1(a) and (b). For example, Section

25  10.1 contemplates TPNA joining TPC as a plaintiff in patent infringement lawsuits. *See* TX 0221-

26  0011 ("Licensee shall join as a plaintiff if required to do so by law or by Licensor or may join as a

27  plaintiff if Licensee deems it necessary."). Other provisions contemplate that TPNA will file a

28  New Drug Application with the FDA and list TPC's patents in the Orange Book. *See* TX 0221-

68

United States District Court
Northern District of California

1    0007 (Section 5.2) and -0010 (Section 8.3).

2    286.    Viewed as a whole, the License Agreement between TPC and TPNA grants TPNA

3    exclusive rights to the patents covering dexlansoprazole so that TPNA may sell TPC's drug

4    products in the United States and exclude others from selling generic dexlansoprazole products

5    covered under the patents listed in Exhibit B to the License Agreement. The requirement that

6    TPNA purchase its dexlansoprazole drug products from TPC does not negate the grant of

7    exclusive rights in the license agreement.

8    287.    In addition, because only TPNA has the exclusive right under the '282 Patent to import

9    and sell dexlansoprazole drug products in the United States for the treatment of acid reflux

10   disease, *see* TX 0221-0004 (Section 2.1), TPNA can block TWi from obtaining a license from

11   TPC to practice the '282 Patent in connection with its ANDA products.

12        **F.  Findings of Fact Relating to Declaratory Judgment Jurisdiction**

13   288.    Count VII of Takeda's First Amended Complaint against TWi seeks a declaratory

14   judgment that the future "commercial manufacture, use, sale or offer for sale" of TWi's proposed

15   ANDA products "will constitute infringement" of the '282 Patent pursuant to 35 U.S.C. §§ 271(a),

16   (b), and/or (c). First Amended Complaint [Case No. 3:11-cv-1609, D.N. 19] at ¶ 61.

17   289.    TWi's Abbreviated New Drug Application No. 202-666 was filed on December 1, 2010,

18   was accepted for filing by the FDA on February 7, 2011, and remains pending before the FDA.

19   TX 1371 (Additional Stipulated Facts for Trial) at TX 1371-0002 ¶ 1.

20        **G.  Findings of Fact Related to the Validity of the '282 Patent**

21   290.    Handa and TWi contend prior art anticipates or renders obvious asserted claims 1 and 2 of

22   the '282 Patent. *See* Trial Tr. (Handa's Opening Statement) 33:25-34:4.

23   291.    Handa and TWi also contend the asserted claims of the '282 Patent are invalid for lack of

24   adequate written description because a person of ordinary skill would not have understood the

25   inventors to have had possession of an amorphous compound of dexlansoprazole or the

26   preparation of a "salt thereof." *Id.* (Handa's Opening Statement) at 38:14-39:13 (stating that

27   Handa's written description challenge is based on alleged absence of adequate disclosure of

28   amorphous compound of dexlansoprazole in '282 Patent); Handa, Par and TWi's Post-Trial Brief

69

A77

1    at 58-59 (arguing that claims 1 and 2 of '282 Patent are invalid because the specification does not

2    adequately disclose amorphous *salts* of dexlansoprazole).

3    292.    At trial, Defendants' expert Dr. Robin Rogers testified regarding his opinion that the

4    asserted claims of the '282 Patent are invalid. In his opinion, Dr. Rogers relied in part on the

5    experiments performed under the direction of Dr. Edmund Elder at the University of Wisconsin.

6    293.    Takeda's expert Dr. Jerry Atwood testified regarding the validity of the asserted claims of

7    the '282 Patent.

8        **1. Anticipation**

9            **a. Handa's and TWi's Contention that Barberich II Anticipates an
            Amorphous Compound of Dexlansoprazole**

10

11   294.    Handa and TWi contend that claims 1 and 2 of the '282 Patent are anticipated by Barberich

12   II.

13   295.    The Barberich II reference discloses solid pharmaceutical compositions of

14   dexlansoprazole. *See, e.g.,* TX 0078-0005 (Barberich II) at [0035] (teaching that "[c]ompressed

15   tablets may be prepared by compressing in a suitable machine the active ingredient in a free-

16   flowing form such as powder or granules").

17   296.    Despite Barberich's purported disclosure of solid pharmaceutical compositions of

18   dexlansoprazole, Defendants have not established by clear and convincing evidence that the

19   person of ordinary skill would have been able to make the amorphous solid of dexlansoprazole

20   described by Barberich without undue experimentation. Rather, the preponderance of the

21   evidence establishes that undue experimentation would have been required to make the amorphous

22   solid of dexlansoprazole described in Barberich.

23           **i. The Amount of Direction or Guidance Provided by the
            Specification**

24

25   297.    The Barberich specification provides no direction or guidance as to how to convert the oil

26   in Larsson into a solid. *See* Trial Tr. (Rogers Cross) 617:18-23; 666:17-667:13 (testifying that

27   "[t]here's no written statement" in Barberich II regarding how to change the oily form of

28   dexlansoprazole disclosed by Larsson and Von Unge into a solid).

70

A78

United States District Court
Northern District of California

United States District Court
Northern District of California

298.   Instead, Barberich incorporates by reference the synthesis methods disclosed in the

Larsson I (WO 96/02535) and Von Unge I (WO 97/02661) references, as stated above.

299.   As discussed above, Larsson and Von Unge disclose only the oily form of

dexlansoprazole. *See* Trial Tr. (Elder Direct) 383:19-21; *id.* (Elder Cross) 399:11-13 (testifying

that Larsson reported obtaining an oil of dexlansoprazole); Trial Tr. (Rogers Cross) 666:3-16

(testifying that Larsson and Von Unge disclose an oil of dexlansoprazole); *see also* TX 0301-0010

(Larsson II) at col.18, ll.32-35 ("Repeating this procedure a couple of times afforded 0.31 g (14%)

of the desired compound *as an oil* with an optical purity of 99.6% e.e.") (emphasis added); TX

0302-0006 (Von Unge II) at col.9, ll.29-31 ("Repeating this procedure a couple of times afforded

0.31 g of the desired compound *as an oil* with an optical purity of 99.6% e.e.") (emphasis added).

300.   The lack of direction or guidance in Barberich regarding how to convert the oil in Larsson

into a solid weighs against a finding that one skilled in the art could make the solid amorphous

compound of dexlansoprazole described by Barberich without undue experimentation.

### ii.   The Absence of Working Examples Set Forth in the Specification

301.   The Barberich specification does not contain any working examples regarding how to

synthesize solid dexlansoprazole. *See* Trial Tr. (Atwood Direct) 900:18-901:3. There is no

evidence that Barberich ever actually obtained the solid. *See id.*; *see also id.* (Rogers Cross)

617:18-23; 666:17-667:13 (testifying that "[t]here's no written statement" in Barberich II

regarding how to change the oily form of dexlansoprazole disclosed by Larsson and Von Unge

into a solid).

302.   The absence of any working examples of how to convert the oil in Larsson into a solid

weighs against a finding that one skilled in the art could make the solid amorphous compound of

dexlansoprazole described by Barberich without undue experimentation.

### iii.   The Nature of the Invention and the Relative Skill of a Person of Ordinary Skill in the Art

303.   The invention of Barberich II is a pharmaceutical formulation of dexlansoprazole. *See*

Trial Tr. (Atwood Direct) 901:8-12; *see also* TX 0078-0001 (Barberich II) ¶ [0002] ("This

71

United States District Court
Northern District of California

1    invention relates to compositions of matter containing lansoprazole. The invention also relates to

2    methods of treating and preventing ulcers, treating other conditions related to gastric

3    hypersecretion, and treating psoriasis.").

4    304.    The level of skill of the person of ordinary skill in the art of the Barberich invention is very

5    similar to the level of skill of a person of ordinary skill in the art of the Takeda patents, discussed

6    above, but the focus of such a person would be on formulation because Barberich is a

7    formulation patent. *See* Trial Tr. (Atwood Direct) 901:13-902:13.

8                           iv.    **The State of the Prior Art**

9    305.    As discussed above, the Larsson and Von Unge references are the closest prior art

10   references and are incorporated into Barberich. Neither Larsson nor Von Unge discloses the

11   synthesis of a solid form of dexlansoprazole. *See* Trial Tr. (Atwood Direct) 902:21-903:13

12   ("[d]exlansoprazole was known only as an oil"); *id.* (Rogers Cross) 617:18-23, 666:17-667:13

13   (testifying that "[t]here's no written statement" in Barberich II regarding how to change the oily

14   form of dexlansoprazole disclosed by Larsson and Von Unge into a solid).

15                          v.    **Predictability or Unpredictability of the Art**

16   306.    The art of pharmaceutical formulation, as described in the Barberich reference, was

17   relatively predictable at Barberich's priority date. *See* Trial Tr. (Atwood Direct) 903:20-25.

18   307.    On the other hand, the synthesis of solid dexlansoprazole, which falls within the field of

19   organic chemistry, was unpredictable. Organic chemistry is an experimental science, meaning that

20   one cannot predict the outcome of an experiment without actually carrying out the experiment

21   (such as a crystallization or synthesis) in the laboratory. *See* Trial Tr. (Atwood Direct) 903:20-

22   905:5 ("one has to go into the laboratory, one has to carry out the reactions, carry out the

23   crystallizations, carry out the solidification, and see what one gets. It's unpredictable, the

24   experimental aspect of chemistry"); cf. TX 0081-0005 (Vogel) (listing generalizations to assist in

25   the selection of a crystallization solvent, but noting that "numerous exceptions are known").

26   308.    The disclosure of Larsson supports Dr. Atwood's opinion that at the time of the invention,

27   the field of synthetic chemistry was unpredictable. Larsson was able to obtain enantiomeric solids

28   of omeprazole and compounds (Ib), (Ic), (Ie), and (Ih), but unable to obtain solid forms of

72

1    lansoprazole – even though Larsson performed the final purification step with acetonitrile at least

2    three times in the case of dexlansoprazole. Larsson was likewise unable to obtain solid forms of

3    the enantiomers of the related chemical compounds pariprazole and leminoprazole.

4    309.    Although Larsson reflects the state of the art in 1995 and Barberich II reflects the state of

5    the art in 1998, the parties agree that the state of the art with respect to techniques for obtaining

6    amorphous solids did not change between 1995 and 1998. Trial Tr. (Rogers Cross) 632: 16-22.

7    310.    The unpredictability of the art of organic chemistry weighs against a finding that one

8    skilled in the art could make the solid amorphous compound of dexlansoprazole described by

9    Barberich without undue experimentation.

10                                  **vi.    The Breadth of the Claim**

11   311.    Barberich states that its pharmaceutical formulations can take either solid or liquid form.

12   *See* TX 0078-0004 (Barberich II) at [0032] ("The compositions of the present invention include

13   suspensions, solutions, elixirs, or solid dosage forms."); *see also id.* at [0029], [0034]. The claims

14   of the Barberich reference also encompass both solid and liquid pharmaceutical formulations of

15   dexlansoprazole. *See id.* at p. 5 (Claims). Thus, despite Barberich's failure to disclose the

16   synthesis of solid dexlansoprazole, the person of ordinary skill could have used the oil of

17   dexlansoprazole disclosed in Larsson to make a liquid formulation of dexlansoprazole that would

18   have fallen within the scope of the Barberich claims. *See* TX 0078-0004 (Barberich II) at [0034]

19   ("Pharmaceutical compositions of the present invention suitable for oral administration may be

20   presented as . . . an oil-in-water emulsion, or a water-in-oil liquid emulsion."); Trial Tr. (Rogers

21   Cross) 618:22-619:6 ("I think if dexlansoprazole was an oil, then you could incorporate that into

22   an emulsion, along with whatever solvent was with it."); Trial Tr. (Atwood Direct) 905:6-24.

23                      **vii.    The Quantity of Experimentation Needed and the Experiments
                                  at the University of Wisconsin**

24

25   312.    The only evidence in the record of anyone attempting to make a solid form of

26   dexlansoprazole by following the teachings of Example 22 of Larsson is the work carried out

27   under the direction of Dr. Elder at the University of Wisconsin ("UW") in 2012, fourteen years

28   after Barberich was filed. *See* Trial Tr. (Elder Direct) 362:18-23 (testifying that he reviewed and

73

1  approved all of the work that Dr. Feltenberger or the UW lab performed); *id.* (Elder cross) 387:8-

2  389:8 (testifying that the UW experiments were carried out under his direction); *id.* (Rogers

3  Direct) 626:24-627:4 (testifying that Dr. Elder planned, designed, and oversaw the UW lab's

4  work). The UW lab attempted to repeat Example 22 of Larsson in two separate experiments,

5  referred to as ED-12 and ED-13. *See* TX 0733x03 (UW Report).

6  313.  Dr. Elder received a bachelor's degree in pharmacy in 1985 and a Ph.D. in pharmaceutical

7  sciences in 1989 from the Medical University of South Carolina. *See* TX 0733x01-0002 (Dr.

8  Elder's curriculum vitae). He then spent 16 years as a formulation scientist in the pharmaceutical

9  industry. *See* Trial Tr. (Elder Direct) 353:9-12. Since 2007, he has been the director of the Zeeh

10  Pharmaceutical Experiment Station at UW, which provides drug development services and

11  educational programming to researchers in academia and the pharmaceutical industry. *See*

12  TX0733x01-0002 (Dr. Elder's curriculum vitae); Trial Tr. (Elder Cross) 386:9-23.

13  314.  During his career, Dr. Elder has gained "extensive experience characterizing

14  pharmaceutical materials, including drugs, and formulating and testing pharmaceutical products."

15  Trial Tr. (Elder Cross) 386:13-16. Dr. Elder thus possesses greater than ordinary skill in the art of

16  the Barberich patent. *See* Trial Tr. (Rogers Cross) 627:1-14 (testifying that Dr. Elder's level of

17  skill is "a bit higher" than the threshold level of skill for one of ordinary skill); Trial Tr. (Elder

18  Cross) 386:24-387:7 (testifying that the person of ordinary skill in the art of the Larsson patent

19  "would have been exposed to asymmetric-oxidation-type reactions, but may not have actually

20  conducted them in a laboratory themselves.").

21                                      a.  Dr. Elder's First Attempt to Replicate Example 22 of Larsson

22  315.  Dr. Elder's first attempt to replicate Example 22 of Larsson was a "failure." Trial Tr.

23  (Atwood Direct) 908:9-12; *see also id.* (Rogers Cross) 628:7-19 (testifying that Dr. Elder's first

24  attempt did not "get the result that Larsson got"); *id.* (Rogers Cross) 658:24-660:18. Dr. Rogers

25  also testified that he is not relying on Dr. Elder's first attempt to replicate Example 22 of Larsson

26  for his opinion that Barberich anticipates the '282 Patent. *See id.* (Rogers Cross) 656:2-8.

27  316.  In this first attempt, referred to in the UW Report as "ED-12," the UW lab opted for a

28  "literal interpretation of Larsson." Trial Tr. (Rogers Direct) 513:3-10; *id.* (Elder Cross) 389:14-17

74

United States District Court
Northern District of California

1   (testifying that he "opted for as strict an interpretation of the Larsson procedure as possible"); TX

2   0733x03-0004 (UW Report) ("[F]or our first reaction we opted for as strict of interpretation of the

3   Larsson procedure as possible."). Each reagent, including the oxidant, 1.1 mL of cumene

4   hydroperoxide ("CHP"), was added "in one portion," or all at once. Trial Tr. (Elder Cross) 389:18-

5   21; TX 0733x03-0004 (UW Report).

6   317.    Instead of obtaining a residue with an enantiomeric excess ("e.e.") of 46% as did Larsson

7   after the asymmetric oxidation and extraction, evaporation, and flash chromatography steps, UW's

8   first attempt resulted in a solid of "nearly racemic" lansoprazole, with only a "slight preference"

9   (6% e.e.) for dexlansoprazole. TX 0733x03-0004-5 and -0008 (UW Report). Dr. Elder testified

10  that "an EE of 6 percent was not as good as [he] would have liked." Trial Tr. (Elder Cross) 391:8-

11  392:5. Moreover, it would have been difficult – and no attempt was made – to isolate the excess

12  dexlansoprazole from this mixture. *See* Trial Tr. (Rogers Cross) 658:16-19 ("[I]t would have been

13  difficult to isolate that 6 percent."); *id.* (Elder Direct) 373:5-13 ("we ended up with 1.6 grams of

14  material, which would represent dexlansoprazole and the racemate. So we would have to isolate

15  the dexlansoprazole portion of that. Since it was only a 6 percent enantiomeric excess, we would

16  have a very small yield if we were to go through and do additional isolation and, so, we decided

17  not to do that. There wouldn't have been enough to further characterize the material"); *id.*

18  (Atwood Direct) 908:3-8.

19  318.    In addition, there is no evidence regarding the chemical purity of the "nearly racemic"

20  solid obtained by the UW lab in this first attempt to replicate Example 22. *See* Trial Tr. (Rogers

21  Cross) 657:14-658:11. Therefore, the Court concludes that the results of the first attempt by the

22  UW lab to duplicate Example 22 of Larsson do not provide clear and convincing evidence that a

23  person of ordinary skill in the art would have been able to create an amorphous compound of

24  dexlansoprazole based on Larsson.

25            b.  Dr. Elder's Second Attempt and the Dropwise Addition of CHP

26  319.    In UW's second attempt to replicate Example 22 of Larsson, referred to in the UW Report

27  as "ED-13," the UW lab departed from the literal teachings of Example 22 by adding the oxidant

28  CHP drop-by-drop over a period of 60 minutes via syringe pump – a procedure that is not

75

United States District Court
Northern District of California

described in Example 22. *See* TX 0733x03-0005 and -0009 (UW Report); TX 0301-0010 (Larsson II) at Example 22, col.18, ll.17-18.

320.    Dr. Elder testified that he and Dr. Feltenberger determined that two factors could greatly enhance the enantioselectivity of this reaction: slow addition of the oxidant (CHP) and lower reaction temperature. The person of ordinary skill would have understood that these techniques were interchangeable, because these techniques were simply alternate ways of controlling the temperature of the oxidation reaction. *See* Trial Tr. (Elder Cross) 392:16-393:21 (testifying that these two factors would have had the same effect on the rate of reaction and either one would have worked to improve the enantioselectivity of the oxidation reaction); *see also id.* (Rogers Direct) 515:12-20 ("[O]ne of skill in the art in this area would know that the addition of the CHP too fast can affect the enantiomeric selectivity, particularly by causing a rise in temperature. And they would know that you would need to add it slowly, or control the addition."); *id.* (Rogers Direct) 515:21-25, 633:14-19 ("Well, the art at the time had taught that if you add this too fast, it could raise the temperature, and it could lead to a lower enantiomeric excess or selectivity.").

321.    Because these techniques were interchangeable, and Example 22 explicitly stated that the oxidation was performed at room temperature, Dr. Elder decided to improve the enantioselectivity of the reaction by slowing the addition of the oxidant using a syringe pump. Trial Tr. (Elder Cross) 392:16-393:21. Because both changes are ways of accomplishing the same purpose, Dr. Elder's modification was akin to lowering the temperature of the oxidation reaction.

322.    Although Dr. Elder initially testified based on the UW Report (TX 0733x03-0009) that the CHP was added over a period of 30 minutes, he admitted that he could not explain the phrase "in 60 min. addition time" in Dr. Deng's laboratory notebook. TX 0733x05-0003 (Deng's notebook); *id.* (Elder Cross) 394:10-19. The Court rejects Dr. Rogers' testimony that the phrase "60 min." in the notebook is illegible, and credits the notebook entry that the addition of cumene hydroperoxide occurred over 60 minutes, with the color changing to yellow after 30 minutes. Trial Tr. (Rogers Cross) 630:9-632:7; *id.* (Atwood Direct) 909:6-12 (testifying that UW "made the change so as to

United States District Court
Northern District of California

1    add this oxidizing agent over a period of 60 minutes rather than all at once").[5]

2    323.    Nothing in Larsson would have suggested to the person of ordinary skill in the art that 1.1

3    milliliters of oxidant – about one fifth of a teaspoon, Trial Tr. (Rogers Cross) 629:15-22 – should

4    have been added over 60 minutes. *See* Trial Tr. (Atwood Direct) 913:8-17; *id.* (Rogers Cross)

5    651:9-12 (testifying that he is "not aware of any example in Larsson where he indicates that the

6    oxidant was added at room temperature over a 60-minute time period"). Although Dr. Rogers

7    noted that a person of ordinary skill would have understood that the oxidant added in Larsson

8    Example 11 would need to be added over time, that Example involved 3.3 kilograms of oxidant,

9    which is a far greater amount than the amount added in Example 22. *See* Trial Tr. (Rogers Cross)

10   637:7-638:13; TX 0301-0008 (Larsson II) at Example 11, col.13, ll.64-66.

11   324.    Dr. Rogers's testimony to the contrary was not credible.  The prior art references relied

12   upon by Dr. Rogers do not support his opinion that one skilled in the art would know to add the

13   1.1 milliliters of oxidant in Example 22 over a period of 60 (or even 30) minutes. *See* Trial Tr.

14   (Rogers Cross) 639:17-647:17 (testimony regarding Trial Exhibits 146x23 (Zhao 1987), 146x18

15   (Zhao 1990), 146x16 (Diter 1994), 147 (Brunel 1995), and 146x17 (Bolm and Bienwald 1995)).

16   Dr. Rogers admitted that the sensitivity of the asymmetric oxidation reaction depends upon the

17   particular compounds and catalysts and other reagents that are used. *See* Trial Tr. (Rogers Cross)

18   633:20-634:12. One of Dr. Rogers's prior art references involved different catalysts, and thus

19   provided no guidance with regard to the enantioselectivity of an oxidation reaction using cumene

20   hydroperoxide. *See, e.g.,* Trial Tr. (Rogers Cross) 646:25-647:17 (TX 0146x17 (Bolm and

21   Bienwald 1995)). Other prior art references did not specify the rate of addition of the oxidant, *see,*

22   *e.g.,* Trial Tr. (Rogers Cross) 640:17-23 (TX 0146x23 (Zhao 1987)); *id.* (Rogers Cross) 643:11-14

23   (TX 0146x16 (Diter 1994)); *id.* (Rogers Cross) 649:7-18 (Rogers Cross) (TX 0146x22 (Ramón

24   2006)). The mere mention of dropwise addition of an oxidant is not the same as, and does not

25   provide support for, the extremely slow addition of less than a teaspoon of oxidant over an hour's

26   time. Further, none of the references relied upon by Dr. Rogers involves the synthesis of

27

28   _____
     [5] Even if the CHP was added over a 30 minute period, as stated in the UW report, the Court's
     conclusions would be the same.

United States District Court
Northern District of California

1  dexlansoprazole. *See* Trial Tr. (Atwood Direct) 909:13-910:1; *id.* (Rogers Cross) 634:19-23

2  (admitting that the sensitivity of the oxidation reaction could depend on the compound that is

3  being oxidized). Indeed, another reference around the time of the references on which Dr. Rogers

4  relied specified the *rapid* addition of cumene hydroperoxide. *See also id.* (Rogers Cross) 644:15-

5  23 (testifying that TX 0147 (Brunel 1995) specifies the "rapid addition" of cumene

6  hydroperoxide).

7  325.    Further, all of the oxidation experiments described in Dr. Rogers's prior art references

8  were carried out at or below minus 15 degrees Celsius (about five degrees Fahrenheit), much

9  lower than room temperature at which Example 22 was carried out. *Id.* (Atwood Direct) 910:13-

10 911:3; *id.* (Rogers Cross) 638:14-639:16. The fact that the oxidation reactions described in these

11 prior art references were carried out at low temperatures is significant because, as Dr. Rogers and

12 Dr. Elder testified, low temperatures and the slow addition of the oxidant were part of the pre-

13 Larsson teachings as to conditions that affected the enantioselectivity of the oxidation reaction.

14 *See id.* (Elder Cross) 392:16-393:21; *id.* (Rogers Direct) 515:12-20; *id.* (Rogers Direct) 515:21-25

15 ("Well, the art at the time had taught that if you add this too fast, it could raise the temperature,

16 and it could lead to a lower enantiomeric excess or selectivity.").

17 326.    However, by the time of Larsson, Larsson itself would have provided the most up-to-date

18 disclosure regarding how to add the oxidant in an asymmetric oxidation reaction for the person of

19 ordinary skill attempting to replicate Example 22 in 1998 (the priority date of the Barberich

20 reference) or 1999 (the priority date of the '282 Patent). *See* Trial Tr. (Atwood Direct) 911:4-14;

21 *cf.* Trial Tr. (Rogers Cross) 635:15-637:6. Larsson taught away from the references cited by Dr.

22 Rogers to the extent they taught the slow addition of the oxidant to control the temperature of the

23 reaction.

24 327.    The person of ordinary skill reviewing Larsson would not have concluded that the slow

25 addition of oxidant was necessary because Larsson teaches, in contrast to the prior art, that,

26 "[s]urprisingly, the process does not require a temperature below -20° C., as described by Kagan

27 and co-worker as essential for good enantioselectivity." TX 0301-0005, col.8, ll.44-47; *see* Trial

28 Tr. (Atwood Direct) 911:4-912:19; *id.* (Rogers Cross) 638:14-639:2, 651:3-8 ("[O]ne of

78

1    [Larsson's] big advances . . . was to be able to do this [oxidation reactions] at room temperature or

2    above."); *id.* (Rogers Cross) 650:10-16 (testifying that the ability to perform oxidation reactions at

3    room temperature "was one of the main things that Larsson was suggesting").

4    328.    Because slowing down the rate of oxidant addition is an alternative to simply lowering the

5    temperature of the reaction, the person of ordinary skill would conclude from this teaching in

6    Larsson that neither a low temperature nor the dropwise addition of 1.1 milliliters of oxidant over

7    60 minutes should affect enantioselectivity, or be an appropriate departure from the specific

8    teachings of Example 22. Trial Tr. (Atwood Direct) 911:4-913:7 ("One of ordinary skill would not

9    have done that because the key reference . . . is the Larsson patent; and Larsson is showing in the

10    patent that, unlike the prior art, it's possible to carry out these reactions at room temperature or

11    slightly above. . .").

12             c.    Other Departures from the Procedure in Example 22 of Larsson

13    329.    Dr. Elder engaged in further experimentation beyond the disclosure in Example 22 of

14    Larsson with respect to the solvents used for the extraction, evaporation, and flash

15    chromatography steps. *See* Trial Tr. (Atwood Direct) 913:18-22 (confirming that the extraction,

16    evaporation, and flash chromatography steps are sometimes referred to as "workup procedures").

17    Dr. Elder selected ethyl acetate for the extraction step. TX 0733x03-0009 (UW Report) ("the

18    workup procedure employed extraction by ethyl acetate"). For the flash chromatography step, he

19    chose to use a mixture of hexane and ethyl acetate in a gradient starting with a ratio of one part

20    hexane to two parts ethyl acetate and ending with 100% ethyl acetate. *Id.* ("the workup procedure

21    employed . . . silica gel flash column chromatography [gradient eluent: 1:2 hexane/EtOAc to

22    100% EtOAc]").

23    330.    Although one skilled in the art at the time of Larsson would have had prior publications

24    available to teach appropriate solvents for extraction or flash chromatography, the UW lab did not

25    use the solvent combinations taught by the art. None of the references relied upon by Dr. Rogers

26    to support the modifications to the protocol made by the UW lab describes a gradient elution

27    method, nor does Larsson teach that method. *See* Trial Tr. (Atwood Direct) 914:25-915:15; *id.*

28    (Elder Cross) 395:11-16 (discussing Larsson); *id.* (Elder Cross) 395:23-396:25 (admitting that the

United States District Court
Northern District of California

A87

Zhao reference (TX 0146x23) consulted by Dr. Elder during the UW experiments discloses

different solvents than those he used and does not describe the use of a gradient column); *id.*

(Rogers Cross) 652:18-653:1 (admitting that none of the prior art references on which Dr. Rogers

relied discloses ethyl acetate and hexane or ethyl acetate and hexane in a gradient for flash

chromatography).

331.    The selection of the particular solvents and the ratios for the gradient would not have been

a matter of routine experimentation for the person of ordinary skill implementing Example 22. *Id.*

(Atwood Direct) 915:16-916:8. The purpose of the flash column chromatography step is to

separate the different chemical entities present at the end of the oxidation reaction (namely,

sulfides, sulfoxides, and sulfones). Considerable experimentation would be required to determine

the solvent combination that would result in a good separation of these chemical entities. *Id.*

332.    Dr. Elder also departed from the procedure set forth in Example 22 of Larsson by

performing either five or six rounds of purification with acetonitrile instead of the three rounds

described in Larsson. *See* Trial Tr. (Atwood Direct) 916:9-15; TX 0733x05-0003 (showing six

acetonitrile steps: "first 50 mL[;] 2# 50 mL[;] 3# 30 mL[;] 5 mL[;] 5 mL[;] 5 mL"); *id.* (Elder

Cross) 398:5-9 (testifying that"[t]here did seem to be an extra entry" in Dr. Deng's notebook for a

sixth acetonitrile purification but that the UW report stating that the acetonitrile purification step

was performed five times was correct). Moreover, the enantiomeric purity at the end of the third

round, at 91.2% e.e., was significantly lower than the 99.6% e.e. disclosed in Larsson after three

rounds of purification with acetonitrile. *See* TX 0733x03-0010 (UW Report); TX 0301-0010

(Larsson) at Example 22, col.18, ll.33-35; Trial Tr. (Atwood Direct) 920:6-921:5.

333.    In fact, even after six rounds of purification with acetonitrile, the enantiomeric purity of

97.8% e.e. for the solid obtained by Dr. Elder was still less than the 99.6% e.e. for the oil obtained

by Larsson. *See* Trial Tr. (Atwood Direct) 920:21-921:5.

                 d.    Dr. Elder did Not Obtain an Oil of Dexlansoprazole

334.    Through these modifications and choices, Dr. Elder obtained a solid, not an oil,

immediately after the workup procedure. *See* Trial Tr. (Atwood Direct) 921:25-922:6 (testifying

that the various departures from Example 22 made by UW "certainly led to a different result

80

1   because the Wisconsin group got a solid and Larsson got an oil").

2   335.    In fact, Dr. Elder never obtained an oil of dexlansoprazole. *See* Trial Tr. (Rogers Cross)

3   654:5-18 (testifying that Dr. Elder obtained a solid before the acetonitrile step and never obtained

4   an oil); *id.* (Elder Direct) 399:14-23 (testifying that the UW lab did not obtain an oil). Because Dr.

5   Elder never obtained an oil of dexlansoprazole, UW's experiments are not a faithful re-working of

6   Larsson Example 22 but, rather, a departure from Larsson and, thus, fail to establish that the oil

7   obtained by Larsson could have been evaporated to dryness to obtain a solid. *Id.* (Atwood Direct)

8   922:7-13; *id.* (Rogers Cross) 654:16-656:1 (admitting that "the University of Wisconsin never

9   converted an oil into a solid," and that the UW experiment "is not an instance of someone

10  obtaining an oil, and simply doing more drying to remove the solvent").

11  336.    In addition, the "residue" obtained by Larsson following the workup procedures had a very

12  high chemical purity of 99.9%. *See* TX 0301-0010 (Larsson II) at Example 22, col.18, ll.26-29. In

13  contrast, the chemical purity of the "light, brown solid" obtained by Dr. Elder following the

14  workup procedures is unknown and unreported. Trial Tr. (Elder Cross) 400:14-17 ("We [did] not

15  do an achiral HPLC to determine that."); *id.* (Atwood Direct) 918:15-919:5; TX0733x03-0009

16  (UW Report). Moreover, the Nuclear Magnetic Resonance ("NMR") analysis performed by the

17  UW lab was not capable of establishing that the chemical purity of the UW solid was similar to

18  that of the oil obtained by Larsson. "At best NMR done properly can get down to 1 percent

19  impurity . . . . If not done exactly properly, it may – it may not show even that level of purity. So

20  NMR, it's not a technique of characterization to assign purity." Trial Tr. (Atwood Direct) 921:6-

21  24. In order to determine the chemical purity of the solid it obtained, the UW lab would have

22  needed to perform achiral HPLC, which it did not do. *Id.*

23  337.    Because nothing in the record establishes the chemical purity of the solid obtained by Dr.

24  Elder, it is impossible to know whether the UW lab faithfully replicated Example 22 of Larsson

25  even up to the workup stage of the Example. *See* Trial Tr. (Atwood Direct) 918:15-919:5.

26  338.    In summary, because Dr. Elder did not replicate Example 22 with sufficient fidelity to

27  obtain the oil Larsson describes and because the chemical purity of the solid that he did obtain is

28  unknown, his experiment does not indicate that one skilled in the art could have converted that oil

United States District Court
Northern District of California

81

A89

into an amorphous solid. Instead, with the benefit of hindsight knowledge that a solid amorphous dexlansoprazole compound could be obtained, Dr. Elder – a person of extraordinary skill in the art with more than a decade of subsequent knowledge regarding asymmetric oxidation reactions – conducted an experiment different than that described in Larsson and different from how the ordinarily skilled person in 1998 would have approached the Larsson reference.

339. For all of the above reasons, one skilled in the art would not have been able to make solid amorphous dexlansoprazole based on the disclosures of Barberich without considerable and undue experimentation.

### b. Handa and TWi's Contention that Larsson and Barberich II Anticipate a Salt of an Amorphous Compound of Dexlansoprazole

340. Handa and TWi also contend that Larsson and Barberich II anticipate a salt of an amorphous compound of dexlansoprazole. At trial, they did not present any testimony by their own experts in support of this assertion. Rather, they rely on the testimony of Dr. Kamiyama that as of June 1999 it was possible to make an amorphous salt of dexlansoprazole from an oil. Handa, Par and TWi's Post-Trial Brief at 42 (citing Trial Tr. (Kamiyama Cross) 131:12-18).

341. The disclosure of salts in Larsson and Barberich II cited by Handa and TWi is the same. In particular, Larsson refers to creation of salts using "conventional processes" and Barberich II incorporates Larsson's disclosure. *See* TX0070-0054 (Larsson I) ("and the obtained sulfoxide optionally is converted into a pharmaceutically acceptable salt by conventional processes"); TX0078-0003 (Barberich II) at [13] (incorporating disclosures of Larsson I as to "[s]yntheses of R(+) lansoprazole and S(-) lansoprazole by asymmetric oxidation and by bioreduction"); TX0301-0005 (Larsson II) at 7:59-61 ("The compounds defined by the above formulas . . . may be converted into pharmaceutically acceptable salts thereof by conventional methods"). Larsson and Barberich do not specifically address how these salts are made. Similarly, the '282 Patent does not describe how to make an amorphous salt. Trial Tr. (Kamiyama Direct) 130: 8-10. However, as noted above, Dr. Kamiyama testified that a person of skill in the art in 1999 would have known how to obtain a salt of dexlansoprazole starting with an oil.

342. Nonetheless, Dr. Kamiyama's testimony does not establish that a person of ordinary skill

82

United States District Court
Northern District of California

1  in the art in 1999 would have known how to obtain a solid amorphous dexlansoprazole salt based

2  on Larsson or Barberich II, as claimed in the '282 Patent. Testimony at trial established that a salt

3  obtained from an oil of dexlansoprazole may or may not be solid. *See* Trial Tr. (Rogers Cross)

4  678:12-18 (testifying that he has obtained salts as oils); TX 0700-0007 (U.S. Patent No.

5  7,271,182) at col.3, ll.31-33 (another patent listing Dr. Kamiyama as an inventor which

6  specifically states that the form of the dexlansoprazole salt of his invention was "not particularly

7  limited and may be an oil, a non-crystal, or a crystal"). Consequently, the disclosure of salts of

8  dexlansoprazole in Larsson and Barberich does not constitute clear and convincing evidence that it

9  was possible in June 1999 to make an amorphous solid salt of dexlansoprazole.

10  343.  Further, Dr. Kamiyama's testimony that in June 1999 it would be have been possible to

11  make an amorphous salt of dexlansoprazole from an oil of dexlansoprazole, *see* Trial Tr.

12  (Kamiyama Cross) 131:2-4, is consistent with this conclusion because he did not testify that the

13  resulting salt would necessarily have been a solid. Indeed, the evidence at trial established that a

14  salt obtained from an oil might itself be an oil, as discussed above. Dr. Kamiyama's testimony

15  was also consistent with the evidence presented at the summary judgment stage, demonstrating

16  that an amorphous salt in oil form might be obtained from a starting material that is an oil.

17  344.  For all of these reasons, Defendants have failed to establish by clear and convincing

18  evidence that Larsson and Barberich II anticipate a salt of an amorphous compound of

19  dexlansoprazole.

20  **2. Obviousness**

21  **a. The Level of Ordinary Skill in the Art of the '282 Patent**

22  345.  The '282 Patent is directed to the art of solid-state pharmaceutics, and in particular the

23  fields of chemistry, chemical engineering, or related disciplines. The Court finds that the level of

24  skill in the art of the invention of the '282 Patent is a bachelor's degree in chemistry, chemical

25  engineering, or related disciplines, with a minimum of three years of experience in the

26  pharmaceutical industry related to organic synthesis, API (active pharmaceutical ingredient)

27  manufacturing, crystallization or detection and/or evaluation of solid-state forms, or an advanced

28  degree in chemistry, chemical engineering, or related disciplines, with less or no industry

83

experience. *See* Trial Tr. (Atwood Direct) 902:3-7.

**b. Handa and TWi's Contention that Claims 1 and 2 of the '282 Patent are Obvious over the Larsson, Von Unge, and Barberich II References in View of the Knowledge of One of Ordinary Skill in the Art**

346.    Handa and TWi contend that it would have been obvious for one ordinarily skilled in the art in 1999 to evaporate the oil described in Larsson and Von Unge (and incorporated by reference in Barberich) using known techniques to obtain an amorphous solid.

347.    For the same reasons discussed above in connection with the Crystal-Form Patents, however, the person of ordinary skill in the art in 1999 would not have had a reasonable expectation that the oily form of dexlansoprazole described by the Larsson and Von Unge references could be evaporated to obtain an amorphous solid. To the contrary, the Larsson and Von Unge references demonstrate the difficulty of obtaining any solid forms of dexlansoprazole.

348.    As demonstrated by other experiments set forth in the Larsson and Von Unge references, the Larsson inventors possessed greater than ordinary skill in the art. *See* Trial Tr. (Atwood Direct) 945:6-946:14. One skilled in the art reasonably would infer from the fact that the Larsson inventors' stated goal was to synthesize large quantities of compounds for pharmaceutical compounds, and the fact that they successfully synthesized other compounds as crystals, that Larsson and Von Unge sought to produce a crystal form of dexlansoprazole but failed. In addition, the Larsson inventors were able to obtain enantiomeric crystals of omeprazole and compounds (Ib), (Ic), and (Ie), as well as solids of compounds (Ib), (Ic), and (Ih). Nevertheless, the Larsson inventors failed to obtain dexlansoprazole or (S-)-lansoprazole in a solid form.

349.    Moreover, the oil of dexlansoprazole obtained by Larsson before the acetonitrile purification steps had a high chemical purity (99.9% achiral analysis). *See* TX 0301-0010 (Larsson II) at col.18, ll.26-35. One of skill in the art would have understood that acetonitrile is toxic and must be removed before it can be used in a pharmaceutical composition. *Id.* (Rogers Cross) 670:11-22. Moreover, acetonitrile is a highly volatile solvent, which evaporates in a short time if merely left sitting in an open container. *Id.* (Rogers cross) 669:24-670:10; *id.* (Atwood direct)

84

A92

United States District Court
Northern District of California

United States District Court
Northern District of California

1    924:9-11 ("Acetonitrile is so volatile if we just took a small cap of acetonitrile and put it on the

2    bench top, within about ten minutes it's all gone. It evaporates."). As evidenced by the UW test,

3    the person of ordinary skill would have taken well-known steps to evaporate it, typically using a

4    rotary evaporator under a vacuum to remove the acetonitrile following the purification steps. Trial

5    Tr. (Rogers Cross) 669:1-670:10 (admitting that evaporating a solvent was a predictable process at

6    the time of the Larsson reference, that acetonitrile is highly volatile and would evaporate at room

7    temperature, and that the use of a rotary evaporator would have been known at the time of the

8    Barberich reference); *id.* (Atwood Direct) 923:9-924:25 ("[I]t's not possible in this evaporation

9    process to have acetonitrile trapped in the center of the oil in some fashion, because the oil is in

10   constant motion as a fluid . . . ."). Accordingly, the person of ordinary skill reviewing the Larsson

11   reference in 1999 would have concluded that the oil left after the acetonitrile steps did not contain

12   any significant amount of acetonitrile and also had a high chemical purity.

13   350.    For all of these reasons, the fact that Larsson had "a very pure sample" that nevertheless

14   persisted as an oil would have discouraged the person of ordinary skill from attempting to dry the

15   oil obtained by Larsson. *See id.* (Atwood Direct) 925:25-926:2.

16   351.    In light of the purity reported for the dexlansoprazole obtained in Example 22, the person

17   of ordinary skill also would not have understood that the oil of dexlansoprazole obtained by

18   Larsson could be obtained using trituration, the process of "removing [an] impurity from a sample

19   by treating it with a solvent." Trial Tr. (Atwood Direct) 925:1-12; *see id.* Trial Tr. (Rogers Cross)

20   670:23-672:1 ("I think from reading Example 22, if you were to obtain this exact oil, you

21   wouldn't necessarily know how to remove all the remaining solvent.").

22   352.    Further, the prior art references relied upon by Dr. Rogers for his opinion that trituration

23   could be used to convert Larsson's oily dexlansoprazole to an amorphous solid of dexlansoprazole

24   do not provide clear and convincing evidence that such a procedure would work. *See* TX 0146x15

25   (Zubrick); TX 0146x21 (Gadekar); TX 0146x20 (Castellano). Defendants offered no experimental

26   evidence in which they actually attempted to triturate dexlansoprazole in oily form to obtain a

27   solid. Moreover, the only reason for oiling out given in the Zubrick reference is that "the boiling

28   point of the recrystallization solvent is higher than the melting point of the compound," TX

85

1   0146x15-0003 (Zubrick), which Dr. Rogers has admitted does not apply to any lingering

2   acetonitrile solvent in dexlansoprazole because "the boiling point of the acetonitrile is pretty low,"

3   Trial Tr. (Rogers Cross) 672:17-673:2. Indeed, the Zubrick reference itself acknowledges that,

4   "[s]ometimes, once a solid oils out, it doesn't want to solidify at all . . . ." TX 146x15-0004

5   (Zubrick). In addition, the method that Zubrick describes for obtaining a solid requires first

6   obtaining crystals and then using those crystals as seeds to "[p]ossibly" solidify the remainder of

7   the oil; however, Dr. Rogers admitted at trial that dexlansoprazole will not form crystals using this

8   method. *Id.* (Rogers Cross) 675:13-676:9.

9   353.    The Gadekar reference, TX 0146x21-0006 (Example 1), does not assist because it

10  describes trituration of a completely different compound – 5-methyl-1-phenyl-2-(1H)-pyridone –

11  using petroleum ether, a solvent that is not included in any of Defendants' references as having

12  ever been used with dexlansoprazole. *See* Trial Tr. (Rogers Cross) 676:23-677:11. The Castellano

13  reference, TX 0146x20-0001, describes the trituration of an oily solid with methanol; however,

14  Dr. Kamiyama tried unsuccessfully to crystallize dexlansoprazole from methanol, *see* Trial Tr.

15  (Kamiyama Direct) 110:22-111:3, indicating that methanol likely would not have worked as a

16  trituration solvent for the dexlansoprazole oil obtained by Larsson.

17  354.    Most fundamentally, trituration is a technique designed to remove an impurity. Trituration

18  does not work where, as in Larsson, the sample is very pure. *Id.* (Atwood Direct) 926:3-12.

19  355.    Thus, one of ordinary skill in the art at the time of the '282 Patent would have concluded

20  from the fact that Example 22 discloses the synthesis and production of an oil rather than a solid

21  of dexlansoprazole "either the dexlansoprazole is, in fact, a liquid at room temperature, or that it's

22  going to be very, very difficult to convert it to a solid form." Trial Tr. (Atwood Direct) 926:13-22;

23  *cf. id.* (Rogers Cross) 678:9-679:2 ("I understand that some compounds in all chemistry can exist

24  at room temperature as a liquid. If the viscosity is high enough, somebody could call it an oil.").

25  356.    Further, the inventors of the '282 Patent "added hexane quickly" to prevent the

26  decomposition of the dexlansoprazole in concentrated fractions recovered from the chiral column

27  used for the separation of lansoprazole into its enantiomers in Reference Example 1. *See* Trial Tr.

28  (Atwood Direct) 961:1-18. That hexane could stabilize dexlansoprazole to prevent decomposition

1    was "completely unpredictable" at the time the '282 Patent was filed in June 1999. *Id.* (Atwood

2    Direct) 961:1-18. Similarly, in Reference Example 2, triethylamine was used to prevent

3    composition of the concentrated dexlansoprazole solution. Cf. *id.* (Kamiyama Direct) 106:18-

4    108:4; *see* also TX 0722-0002 (SSCI document entitled "Standard Polymorph Screen") ("TAK-

5    390 [dexlansoprazole] degraded in solution over time but was stabilized by addition of

6    triethylamine.").

7    357.    For these reasons, the person of ordinary skill in the art would not have had a

8    reasonable expectation that the oily form of dexlansoprazole disclosed by Larsson and Von Unge

9    could be completely evaporated to an amorphous solid.

10
11    **c.  Handa and TWi's Contention that Claim 1 of the '282 Patent is Obvious in View of Larsson, Von Unge, or Barberich II in Combination with Takechi, Brittain, and/or Bohlin**

12    358.    Handa and TWi further contend that asserted claim 1 of the '282 Patent is obvious in view

13    of Larsson, Von Unge, or Barberich II in combination with Takechi, Brittain, and/or Bohlin.[6]  The

14    Larsson, Von Unge, Barberich, and Bohlin references are discussed above in connection with

15    Defendants' validity challenges to the Crystal-Form Patents.

16    359.    "Takechi," TX 0388, refers to U.S. Patent No. 5,536,735.

17    360.    "Brittain," TX 0387, refers to J. Keith Guillory, "Generation of Polymorphs, Hydrates,

18    Solvates, and Amorphous Solids," in *Polymorphism in Pharmaceutical Solids* (Harry G. Brittain,

19    ed., 1999).

20    **i.    The Disclosure of Takechi**

21    361.    The Takechi reference discloses pharmaceutical compositions comprised of a

22    benzimidazole compound, such as racemic lansoprazole, and a stabilizing excipient such as

23    nicotinamide or benzamide. *See* TX 0388-0002 (Takechi) at col.1, ll.50-67. The pharmaceutical

24    compositions disclosed in Takechi may be solid or liqu*id. See id.* at TX 0388-0008, claim 8

25

26    ――――――――――――――
[6] Dr. Rogers further testified that Borner, TX 0075-0001, demonstrates that the compound
27    dexlansoprazole was known at the priority date of the '282 Patent and could be separated using
chromatography. See Trial Tr. (Rogers Direct) 581:9-582:1. However, nothing in Borner (or any
28    other prior art reference) discloses dexlansoprazole as a solid. See TX 0075; Trial Tr. (Atwood
Direct) at 1057:16-1058:10.

United States District Court
Northern District of California

87

United States District Court
Northern District of California

1   (lyophilizate) and claim 9 (aqueous solution). Takechi discloses that "[t]he solid composition may,

2   for example, be a solid preparation obtainable by freeze-drying or spray-drying the above aqueous

3   solution . . . . The preferred solid preparation is a lyophilizate." TX 0388-0005 (Takechi) at col.7,

4   l.56 to col.8, l.3. A lyophilizate is the product of freeze-drying, a dehydration process used to

5   preserve a chemically unstable material. *See* Trial Tr. (Atwood Direct) 929:1-15.

6   Lyophilization typically is used to remove solvents by vaporization. *See id.* (Rogers cross) 683:19-

7   22; TX 0387-0005 to -0007 (Brittain).

8   362.   Examples 4, 5, and 6 of Takechi specifically disclose lyophilized preparations of racemic

9   lansoprazole with nicotinamide and with various other excipients such as sodium hydroxide

10  (Examples 4, 5, and 6), Pluronic F68 (Examples 4 and 6), and citric acid, disodium

11  hydrogenphosphate, sodium hydrogen carbonate, and mannitol (all included in Example 6). *See*

12  TX 0388-0007 (Takechi) at col.12. For instance, in Example 4, lansoprazole, nicotinamide, and

13  Pluronic F68 (a polymer) "were blended in powdery form and, then, dissolved in" sodium

14  hydroxide. This solution was then filtered and distributed in small portions into vials, where it was

15  then lyophilized (freeze-dried).

16  363.   The racemic lansoprazole used by Takechi as starting material is in solid form. *See* Trial

17  Tr. (Atwood Direct) 929:23-930:3; *see also* TX 0388-0007 (Takechi) at col.12 (stating in each of

18  Examples 3, 4, 5, and 6 that the starting material included three kilograms of lansoprazole).

19  However, Takechi does not disclose whether the lyophilized preparations of racemic lansoprazole

20  that he obtains are amorphous or crystalline. Trial Tr. (Atwood Direct) 929:16-22; *id.* (Rogers

21  Cross) 686:1-4. Further, Takechi does not teach any method of freeze-drying without first

22  combining the racemic lansoprazole with nicotinamide or other excipients, suggesting that such

23  preparations were either not attempted or were not stable. *See id.* (Rogers Cross) 684:25-686:5.

24  364.   One would not obtain the same form of lyophilizate if the starting material was an oil

25  rather than a solid. Trial Tr. (Atwood Direct) 930:4-14 ("[I]f we're starting with instead of solid

26  dexlansoprazole, an oil of lansoprazole, then we're going to have an oil left at the end of the

27  process."). The person of ordinary skill also would have understood that lyophilization is designed

28  to remove solvent, and that it would not work to form an amorphous solid where the starting

88

material is a very pure oil, as was the case with the oil of dexlansoprazole described in Example 22 of Larsson.

365.   The person of ordinary skill in 1999 thus would not have known from Takechi how to lyophilize the oily form of dexlansoprazole disclosed in Larsson and Von Unge to obtain an amorphous solid.

### ii.   The Disclosure of Brittain

366.   The Brittain publication describes general methods for synthesizing amorphous solids. Trial Tr. (Atwood Direct) 928:11-19. Brittain does not describe any methods for obtaining an amorphous solid from an oil. *Id.* (Atwood Direct) 927:16-22 ("There is no teaching in Brittain that one starts with a liquid, an oil, and renders that amorphous."). Rather, Brittain discloses methods that "avoid the thermodynamically preferred crystallization process" or that "disrupt[] an existing crystal structure" – the implication being that these are methods that a person of ordinary skill would turn to when the crystalline form is known to be available and an amorphous solid is desired. *See* TX 0387-0004 (Brittain).

367.   Thus, for example, Brittain discloses techniques that are commonly used to obtain an amorphous solid after the compound of interest has already been crystallized, including:  (1) Solidification of the melt, in which an amorphous solid is "created by rapidly *cooling a liquid* so that crystallization nuclei can neither be created nor grow sufficiently" (TX 0387-0004 (Brittain). at TX 0387-0004) (emphasis added); (2) Spray-drying, in which the compound of interest is added to a *solvent or slurry [i.e., a watery mixture of insoluble solid material],* which is then atomized (reduced to minute particles or a fine spray), and then "dried in the airstream in seconds owing to the high surface area in contact with the drying gas" (*id.* at TX 0387-0005) (emphasis added); (3) Lyophilization, "a particularly useful technique in the case of compounds that are susceptible to decomposition in the presence of moisture but that are more stable as dry solids. . . . [L]yophilization also can be employed to *convert crystalline materials into their amorphous counterparts. . . .* [R]apid freezing is employed so as to avoid the crystallization process." (*id.* at TX 0387-0005-7) (emphasis added); (4) Removal of solvent from a *crystalline* solvate or hydrate (*id.* at TX 0387-0007) (emphasis added); and (5) *Precipitation* from solution, in which "the level

89

1  of supersaturation is carefully controlled . . . to avoid crystallization . . . ." (*id.* at TX 0387-0009)

2  (emphasis added). The last of these methods, precipitation, was used by Larsson and Von Unge,

3  but resulted in an oil and not a solid. Other techniques disclosed in Brittain require solid starting

4  material. The first method, solidification of the melt, consists of heating a solid material above its

5  melting point, then rapidly cooling the resulting liquid so that it forms an amorphous compound

6  before crystallization can occur. However, no evidence was presented at trial of this method ever

7  being attempted to obtain an amorphous solid of dexlansoprazole, or even any related compound.

8  Spray-drying and lyophilization (freeze-drying) work by removing solvent from the compound of

9  interest in order to render it an amorphous solid. *See* Trial Tr. (Rogers Cross) 680:22-25 (spray-

10  drying); *id.* 683:19-22 (lyophilization). Thus, they are simply alternatives to evaporation, the

11  technique attempted unsuccessfully by Larsson to obtain a solid. As discussed above, acetonitrile

12  is a highly volatile solvent that evaporates at room temperature that would already have been

13  removed from the dexlansoprazole Larsson synthesized in Example 22 through normal

14  evaporation methods. Accordingly, as Dr. Atwood testified, using Larsson's oil for spray-drying

15  would result in "an oily mess rather than a dry material at the end of the process." Trial Tr.

16  (Atwood Direct) 927:23-928:10. Consequently, one skilled in the art would not have expected

17  spray-drying or lyophilization to change the oil of Larsson into an amorphous solid. Accordingly,

18  the person of ordinary skill would not have concluded that the techniques disclosed by Brittain

19  could be used to convert the oil of dexlansoprazole disclosed in Larsson and Von Unge to an

20  amorphous solid. Nor, as mentioned above, have Defendants performed any experiments or

21  pointed to any publications to indicate that these methods could be used successfully to make

22  amorphous dexlansoprazole.

23  **iii.  The Disclosure of Bohlin**

24  368.  As discussed above in connection with the Crystal-Form Patents, Bohlin discloses, among

25  other things, the synthesis of esomeprazole as an amorphous solid. *See* TX 0076-0011 to -0012

26  (Bohlin) at Example 1. Bohlin acknowledges that the prior art already disclosed synthesis of

27  esomeprazole (the neutral, non-salt form) only as "a syrup or oil." *See id.* at TX 0076-0003 to -

28  0004.

90

369.     The synthesis of esomeprazole described in Example 1 of Bohlin is a complicated process. He starts with a sodium salt of esomeprazole. This esomeprazole salt was dissolved in water and then methylene chloride was added. Dr. Atwood explained that methylene chloride is "more dense than water and doesn't mix with water. So one then has on the bottom a methylene chloride layer, an organic phase, and on top the aqueous, the water phase, with the sodium salt of esomeprazole." Acetic acid was then added, which converted the esomeprazole from a salt into a neutral molecule. The neutral molecule was no longer soluble in water, and so it was extracted into the organic phase. The organic phase was then separated and the methylene chloride evaporated under vacuum to obtain a concentrated solution of esomeprazole in methylene chloride. Next, iso-octane was added and the solvent was evaporated again until an almost dry, amorphous solid substance was formed. This procedure was essentially repeated to obtain solid amorphous neutral esomeprazole. *See* TX 0076-0011 to -0012 (Bohlin) at Example 1; Trial Tr. (Rogers Cross) 687:24-689:18; *id.* (Atwood Direct) 931:1-932:22.

370.     One of skill in the art at the time of the '282 Patent would not have reasonably expected that the Bohlin method could be used successfully to make amorphous dexlansoprazole as there was no evidence that methylene chloride, the solvent used in Bohlin, could be used as an effective solvent for dexlansoprazole. Nor was there any evidence presented at trial that Bohlin's complicated process for making amorphous esomeprazole could be used to make amorphous dexlansoprazole. *Id.* (Rogers Cross) 689:19-22; *id.* (Atwood Direct) 933:7-10.

371.     Accordingly, the Court finds that one skilled in the art would not have had a reasonable expectation, in June 1999, that an amorphous compound of dexlansoprazole could be obtained in view of Larsson, Von Unge, or Barberich II in combination with Takechi, Brittain, and/or Bohlin.

          **d.  Handa's and TWi's Contention that Claim 2 of the '282 Patent is Obvious over the Larsson and Von Unge References in Combination with Barberich II, the PDR Entry for Prevacid, and/or Katsuki**

372.     Handa and TWi further contend that asserted claim 2 of the '282 Patent is obvious in view of Larsson or Von Unge in combination with Barberich, the Physicians' Desk Reference ("PDR") entry for Prevacid from 1997, and/or Katsuki.

373.     Trial Exhibit 120x08 is the PDR entry for Prevacid from 1997 (specifically, PDR 2746-48

91

A99

United States District Court
Northern District of California

1 (51st ed. 1997)). This PDR entry describes the use of racemic lansoprazole to treat patients. Handa

2 and TWi do not contend that this reference teaches any relevant methods for isolating

3 dexlansoprazole as an amorphous solid, but only that the R- and S-enantiomers of lansoprazole

4 "can be made into a composition that's a medicine." Trial Tr. (Rogers Cross) 690:1-13.

5 374. Katsuki compares the "pharmacokinetics of the [R(+) and S(-) enantiomers of

6 lansoprazole] in humans." TX 0513-0001. Dr. Rogers testified that Katsuki discloses "superior

7 pharmacokinetics for [] dexlansoprazole, the R-isomer as opposed to the S-isomer," Trial Tr.

8 (Rogers Direct) 597:3-8. In particular, Table 2 in Katsuki shows that "the level of

9 dexlansoprazole in the blood is higher for the R-isomer than the S-isomer." *Id.* (Rogers Direct)

10 597: 14-17. Dr. Rogers conceded, however, that he did not know whether the drug that is bound

11 to plasma proteins and thus measured in blood concentrations (as shown in Table III of Katsuki at

12 TX 0513-0004) is available to exert therapeutic effect by binding to proton pumps in the parietal

13 cells. *Id.* (Rogers Cross) 691:5-693:6. In fact, Katsuki states that this greater protein-binding

14 affinity may *inhibit* the ability of the R-enantiomer to bind to the compartment of interest, namely,

15 the parietal cells of the stomach. *See* TX 0513-0004 ("The binding to human serum proteins was

16 significantly greater for R(+)-enantiomer than for S(-)enantiomer . . . . Distribution of a drug to

17 compartments other than serum is limited by the drug binding to plasma proteins such as albumin

18 and α1 acid glycoprotein. . . . Consequently, the R(+)-enantiomer which is extensively bound to

19 albumin may be poorly distributed and slowly eliminated, resulting in the higher serum

20 concentrations than those of the S(-)enantiomer."). When Dr. Rogers was asked to reconcile these

21 statements in Katsuki with his opinion that a person of skill in the art would read Katsuki as

22 showing that the R-isomer has superior pharmacokinetics over the S-isomer of lansoprazole, Dr.

23 Rogers testified that he was unable to do so because he is not an expert in pharmacokinetics. Trial

24 Tr. (Rogers Cross) 691:5-693: 6. Therefore, the Court finds Dr. Roger's characterization of

25 Katsuki as demonstrating the pharmacokinetic advantages of dexlansoprazole over the S-isomer to

26 be unpersuasive.

27 **e. Motivation to Obtain Dexlansoprazole as an Amorphous Solid**

28 375. As discussed above, Barberich II disclosed the advantages of dexlansoprazole over the

92

United States District Court
Northern District of California

1    racemic lansoprazole for treating GERD and therefore provided a person of skill in the art a

2    motivation to make a pharmaceutical composition of dexlansoprazole and a "pharmaceutically

3    acceptable excipient, carrier or diluent."

4    376.    Similarly, Larsson would have provided a motivation to create a pharmaceutical

5    composition of dexlansoprazole to the extent that it teaches that "[t]he single enantiomers of

6    pharmacologically active compounds have met an increased interest in the last years because of

7    improved pharmacokinetic and biological properties." TX-0301-0002, col. 1, ll. 48-51.

8    377.    At the time of the invention, it was known that crystalline compounds are generally

9    preferable to amorphous compounds for use in pharmaceuticals. *See* Trial Tr. (Genck Direct)

10   771:7-10 ("[I]t is known that crystalline compounds are more stable and, thus, preferred for

11   pharmaceutical formulations."); *id.* (Atwood Direct) 896:16-897:12 (testifying that "[t]he

12   crystalline state is the preferred solid-state" for pharmaceutical compositions, and that all of the

13   brand-name proton pump inhibitors on the market use crystalline API); *id.* (Rogers Cross) 700:9-

14   13 (admitting same).

15   378.    Nonetheless, there are at least two reasons why researchers seeking to develop

16   dexlansoprazole as a pharmaceutical would have been motivated to obtain dexlansoprazole as an

17   amorphous compound.  First, as Takeda concedes, obtaining solid amorphous dexlansoprazole

18   was "a necessary first step in obtaining a crystal form of the compound." *See* Takeda's Post-Trial

19   Findings of Fact and Conclusions of Law, No. 48 (citing TX 1055 ('282 Patent) at col. 7 l. 51 -

20   col. 8, l. 7 Reference Example 1); *id.*, col. 8, ll. 9-29 (Reference Example 2)).  Thus, development

21   of a technique for obtaining the amorphous form would also be valuable in developing

22   pharmaceuticals using the crystal form of dexlansoprazole.  Second, although it was understood

23   that in general the amorphous form of a compound was less desirable than a crystal form for use in

24   pharmaceuticals, the prior art taught that the amorphous form would have advantages over the oil

25   or liquid form and might even have certain advantages over the crystal form. *See* TX0076

26   (Bohlin) at 2:1-4, 8, 14- 16 (teaching that a syrup or oil is "unsuitable for pharmaceutical use

27   because of the difficulty of handling an oil and incorporating it into solid pharmaceutical

28   compositions, especially in a reproducible manner"); TX0387-0003 (Brittain) (teaching that

93

amorphous solids are sometimes preferred over crystalline form for pharmaceuticals because they undergo dissolution at a faster rate).

379.    Accordingly, one of ordinary skill in the art in 1999 would have been motivated to obtain an amorphous solid of dexlansoprazole, as well as a pharmaceutical composition using such a solid.

### 3. Handa's and TWi's Contention that the Claims of the '282 Patent are Invalid for Failure to Satisfy the Written Description Requirement

380.    As noted above, Handa and TWi contend that the asserted claims of the '282 Patent are invalid for failure to satisfy the written description requirement because the specification of the '282 Patent contains no written description of 1) an amorphous (as opposed to crystalline) compound of dexlansoprazole; and 2) a salt of amorphous dexlansoprazole.

381.    As to the first argument, the Court finds that a person of ordinary skill reviewing the '282 Patent specification would understand that the inventors were in possession of an amorphous solid of dexlansoprazole based on Reference Examples 1 and 2, which describe the isolation of amorphous solids of dexlansoprazole.

382.    The Court expressly rejected the second argument at summary judgment, holding that the disclosure of the '282 Patent "shows that the inventors were in possession of the claimed salt of dexlansoprazole." TWi Summary Judgment Order [D.N. 235] at 45. The Court declines to revisit that ruling.

## III.    CONCLUSIONS OF LAW

### A. Constitutional Standing of the Takeda U.S. Entities

383.    Under Article III, § 2 of the U.S. Constitution, the jurisdiction of federal courts is limited to "Cases" or "Controversies." To establish constitutional standing under this provision, a party "must 'show that the conduct of which [it] complains has caused [it] to suffer an "injury in fact" that a favorable judgment will redress.'" *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). In a patent case, injury in fact may be established by demonstrating that a party has been deprived of exclusionary rights created under the Patent Act. *Id.* at 1264-1265. Thus, "a party holding one or

94

United States District Court
Northern District of California

1    more of those exclusionary rights – such as an exclusive licensee – suffers a legally cognizable

2    injury when an unauthorized party encroaches upon those rights and therefore has standing to

3    sue." *Id.* at 1265-1266 (citing *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir.2007);

4    *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333,

5    1346 (Fed. Cir. 2001)); *Ortho Pharma. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed.

6    Cir.1995)).

7    384.    While a transfer of title in the patent confers constitutional standing on the assignee to sue

8    another for patent infringement in its own name, a nonexclusive license does not confer standing

9    on the licensee because it is merely a "bare" license – that is, a promise by the patent owner not to

10   sue the licensee for making, using or selling the patented device where the patent owner reserves

11   the right to grant similar licenses to other entities. *Intellectual Property Development, Inc. v. TCI*

12   *Cablevision of California, Inc.*, 248 F.3d at 1345. In other words, a nonexclusive license does not

13   convey to the licensee any of the exclusionary rights afforded patent owners under the Patent Act.

14   Somewhere between these two extremes is an exclusive license. "An exclusive licensee receives

15   more substantial rights in a patent than a nonexclusive licensee, but receives fewer rights than an

16   assignee of all substantial patent rights." *Id.* For example, a licensee may be granted exclusive

17   rights in a particular field of use. A licensee holding exclusive rights only in a particular field of

18   use under the patent has standing to sue so long as the patent owner is also joined in the action as a

19   co-plaintiff. *See Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278-1279 (Fed.

20   Cir. 2007). This requirement arises from the doctrine of "prudential standing" rather than

21   constitutional standing and is intended to address the potential "risk of multiple suits and multiple

22   liabilities against an alleged infringer" where both an exclusive licensee and a patent owner may

23   assert infringement claims for a single act of infringement. *Id.*

24   385.    A license is "exclusive" if the licensee is "a beneficial owner of some identifiable part of

25   the patentee's bundle of rights to exclude others." *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52

26   F.3d 1026, 1032 (Fed. Cir.1995). "To be an exclusive licensee for standing purposes, a party must

27   have received, not only the right to practice the invention within a given territory, but also the

28   patentee's express or implied promise that others shall be excluded from practicing the invention

United States District Court
Northern District of California

95

within that territory as well." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995)

(citations omitted). The licensee need "only be able to exclude 'others,' not all others." *Abbott*

*Laboratories v. Sandoz, Inc.*, 2010 WL 1948185, *3 (N.D.Ill., May 12, 2010) (quoting *Ropak*

*Corp. v. Plastican, Inc.*, No. 04–C5422, 2005 WL 2420384, at *2–3 (N.D.Ill. Sept.30, 2005)

(citing *Ortho Pharm.*, 52 F.2d at 1032); citing *Hill Phoenix Inc. v. Systematic Refrigeration, Inc.*,

117 F.Supp.2d 508, 512 (E.D.Va. 2000)). To determine whether a license is exclusive, the court

must look beyond labels and examine the terms of the parties' agreement to determine whether

they intended to create an exclusive license. *Textile Productions, Inc. v. Mead Corp.*, 134 F.3d

1481, 1484 (Fed. Cir. 1998).

386. The Court has examined the terms of the License Agreement. As stated in its Findings of

Fact, the Court finds that the License Agreement grants TPNA exclusive rights to the patents

covering dexlansoprazole, including the '282 Patent, so that TPNA may sell TPC's drug products

in the United States *and* exclude others from selling generic dexlansoprazole products, including

those that contain amorphous dexlansoprazole. Because the rights of the other Takeda U.S.

entities, TPA and Takeda LLC, are derivative of TPNA's rights, those entities have the same

rights. As a result, the Takeda U.S. entities can block TWi from obtaining a license from TPC to

practice the '282 Patent in connection with the ANDA products. In other words, the Takeda U.S.

entities hold at least *some* of the rights in the patent owner's bundle of exclusionary rights under

the Patent Act. Further, to the extent the License Agreement is a "field of use" agreement, the

Takeda U.S. entities have prudential standing because TPC is joined in the action, thus meeting

the standing requirements of *Int'l Gamco*. Accordingly, the Court concludes the Takeda U.S.

entities have standing to assert infringement under the '282 Patent.

### B. Declaratory Judgment Jurisdiction

387. Declaratory judgment jurisdiction exists in a patent case if there is an actual controversy,

that is, the "facts alleged, under all the circumstances, show that there is a substantial controversy,

between parties having adverse legal interests, of sufficient immediacy and reality to warrant the

issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127

(2007) (internal quotation marks omitted). The question of whether there is an actual controversy

United States District Court
Northern District of California

A104

1    is evaluated "in the context of the facts as they existed when the complaint was filed."

2    *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed. Cir. 1992).

3    388.    Even where there is an actual controversy, the exercise of a court's jurisdiction over a

4    declaratory judgment action is discretionary. *Minnesota Mining and Mfg. Co. v. Norton Co.*, 929

5    F.2d 670, 672 (Fed. Cir. 1991). In *Minnesota Mining*, the Federal Circuit offered the following

6    guidance as to when the exercise of discretion is appropriate:

7    > The reason for giving this discretion to the district court is to enable
     > the court to make a reasoned judgment whether the investment of
8    > judicial time and resources in a declaratory action will prove
     > worthwhile in resolving a justiciable dispute. Situations justifying
9    > exercise of the court's discretion to issue a declaratory judgment
     > include "(1) when the judgment will serve a useful purpose in
10   > clarifying and settling the legal relations in issue, and (2) when it
     > will terminate and afford relief from the uncertainty, insecurity, and
11   > controversy giving rise to the proceeding." E. Borchard, Declaratory
     > Judgments, 299 (2d ed. 1941).

12   *Id.* at 672-673. Some courts have declined to exercise jurisdiction under the Declaratory

13   Judgment Act over claims asserting future infringement under § 271(a) based on the filing of an

14   ANDA by a generic manufacturer, reasoning that permitting such an action would undermine

15   Congress's intent in creating a safe haven under § 271(e)(1). *See Intermedics, Inc. v. Ventritex,*

16   *Inc.*, 775 F.Supp. 1269, 1290 (N.D.Cal.1991), *aff'd*, 991 F.2d 808 (Fed.Cir.1993) (unpublished

17   disposition); *Abbott Laboratories v. Zenith Labs., Inc.*, 934 F.Supp. 925, 938 (N.D. Ill., 1995).

18   389.    The question of whether a declaratory judgment claim under § 271(a) based on the filing of

19   an ANDA is consistent with the statutory scheme established under the Hatch-Waxman Act is the

20   subject of considerable disagreement among the lower courts and has not been addressed in any

21   precedential opinion by the Federal Circuit. In *Cephalon, Inc. v. Sandoz, Inc.*, for example, Judge

22   Robinson opined, "I do not understand the administrative paradigm of the Hatch-Waxman Act to

23   preclude a patent holder from establishing jurisdiction under 28 U.S.C. § 2201(a)." 2012 WL

24   682045, at *5 (D.Del., Mar. 1, 2012); *see also In re Cyclobenzaprine Hydrochloride Extended-*

25   *Release Capsule Patent Litigation*, 693 F. Supp. 2d 409, 418-419 (D.Del., 2010) ("A claim for

26   declaratory judgment under 35 U.S.C. § 271 "is proper so long as plaintiffs can show the existence

27   of real and immediate controversy. . . . Moreover, "[i]n the context of a § 271(e)(2) infringement

28   action, where the court is engaged in a forward-looking analysis of what defendants will do upon

United States District Court
Northern District of California

97

A105

ANDA approval, defendants' declared intent is sufficient to make the controversy real and

immediate.") (citation omitted). In contrast, in *In re Rosuvastatin Calcium Patent Litig.*, Judge

Stark stated, "to permit the § 271(a) action to proceed seems to me to be inconsistent with

Congressional intent." 2008 WL 5046424, at *13 (D.Del. Nov. 24, 2008). He reasoned:

> Congress evidently believed that a patentee in AstraZeneca's position did not have a cause of action under § 271(a) – indeed, the lack of such an action was a motivating factor in creating the § 271(e)(2) action. Second, the § 271(e)(1) "safe harbor" would be threatened if a patentee could sue ANDA filers under § 271(a) for conduct (such as preparing an ANDA) that is expressly identified in the Act as "not ... an act of infringement."

*Id.*; *see also Eisai Co., Ltd. v. Mutual Pharmaceutical Co., Inc.*, 2007 WL 4556958, at *17

(D.N.J., Dec. 20, 2007) ("[A]ctivities protected by the safe harbor provision [of § 271(e)] cannot

serve as the basis for a declaratory judgment of actual future infringement").

390.    Courts that have addressed whether a § 271(a) claim based on the filing of an ANDA

raises a sufficiently immediate controversy to give rise to jurisdiction under the Declaratory

Judgment Act have considered a variety of factors, including whether the generic manufacturer

intends to market the drug, the likelihood or imminence of FDA approval and whether there is an

automatic stay in place under the Hatch-Waxman Act. *See, e.g., Cephalon, Inc. v. Sandoz, Inc.*,

2012 WL 682045, at *5 (D.Del., Mar. 1, 2012)(finding declaratory judgment jurisdiction on the

basis that there could be "no dispute" that the defendant was "systematically attempting to meet

the applicable regulatory requirements while preparing to manufacture its product"); *Abbott*

*Laboratories*, 934 F. Supp. at 938 (finding that controversy was not sufficiently immediate

because even though FDA approval might be granted within three months of date complaint was

filed, there was "no guarantee that the FDA approval will be forthcoming on any particular date

in the future" and because the defendant might "change its course of actions and decide not to

market the drug"); *In re Rosuvastatin Calcium Patent Litig.* 2008 WL 5046424, at *12 (D.Del.

Nov. 24, 2008) (holding that controversy was not sufficiently immediate because 30 month stay of

FDA approval was in place under Hatch-Waxman Act and was not set to expire until several

months after the date scheduled for trial in that case).

391.    In this case, Takeda has made no showing as to TWi's intent to bring its generic drug to

98

market or the likelihood of FDA approval. Rather, to establish declaratory judgment jurisdiction it relies entirely on the fact that TWi filed an ANDA. Further, the parties appear to disagree as to the likely timing of the FDA's approval in this case. Takeda suggests FDA approval could occur at any time because "no 30-month stay of approval of TWi's ANDA results from Takeda's assertion of the '282 Patent against TWi, in light of the fact that the '282 Patent is not listed in the Orange Book." *See* Takeda's Post-Trial Proposed Findings of Fact and Conclusions of Law, No. 434. In contrast, TWi states that "because TWi was not the first filer for either dosage strength of the ANDA product, FDA is prohibited from finally approving TWi's ANDA until six months after the first filer launches its ANDA product or otherwise loses its statutory exclusivity." Handa, Par, and TWi's Joint Post-Trial Brief Concerning Invalidity at 61. The immediacy of the controversy was not addressed at trial, and though the parties addressed the issue in their pre- and post-trial briefs the parties did not request argument on the question and the Court heard none.

392.     In light of the scant record in this case as to the immediacy of the controversy and the minimal briefing provided by the parties on this issue, the Court is reluctant to exercise Declaratory Judgment jurisdiction over Takeda's § 271(a) claim even assuming that there may be an actual controversy. The Court is particularly concerned about deciding this question on a limited record because Takeda's § 271(a) claim asserted under the Declaratory Judgment Act implicates important and unresolved questions as to the interaction between the Declaratory Judgment Act and the Hatch-Waxman Act. The Court further finds that resolution of Takeda's infringement claim under § 271(a) and the Declaratory Judgment Act will not "serve a useful purpose in clarifying and settling the legal relations in issue" because the Court has already found that it has jurisdiction over Takeda's infringement claims under the Hatch-Waxman Act. Therefore, "the investment of judicial time and resources" required to decide whether the Court may decide Takeda's § 271(a) claim under the Declaratory Judgment Act is unwarranted. The Court declines to exercise its discretion under the Declaratory Judgment Act over Takeda's § 271(a) infringement claim asserted under the Declaratory Judgment Act. Therefore, the Court dismisses Takeda's Count VII against TWi.

99

A107

United States District Court
Northern District of California

## C. Infringement of the '276 Patent

### 1. Legal Standard on Infringement

393.    With the exception of the infringement claim discussed above, Takeda asserts its

infringement claims in this action under 35 U.S.C. § 271(e)(2), which provides that:

> [i]t shall be an act of infringement to submit . . . an [ANDA
> application to the FDA] . . . if the purpose of such submission is to
> obtain approval under such Act to engage in the commercial
> manufacture, use, or sale of a drug, veterinary biological product, or
> biological product claimed in a patent or the use of which is claimed
> in a patent before the expiration of such patent.

35 U.S.C. § 271(e)(2).  "A claim for patent infringement must be proven by a preponderance of

the evidence, which simply requires proving that infringement was more likely than not to have

occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1348 (Fed. Cir. 2005).

An accused product literally infringes the claim if every limitation of the properly construed claim

is found in the accused device. *See, e.g., Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d

968, 971 (Fed. Cir. 1999).  Where infringement is asserted under 35 U.S.C. § 271(e)(2)(A ) based

on the filing of an ANDA, the analysis compares the asserted claims and the product likely to be

sold following FDA approval. *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir.

2002).

### 2. Analysis

394.    Based on the findings of fact recited above, the Court concludes that Takeda has satisfied

its burden of proving by a preponderance of the evidence that Handa's ANDA product contains a

crystalline compound of dexlansoprazole and therefore will infringe claims 2 and 3 of the '276

Patent.

395.    As discussed above, it is undisputed that Handa's ANDA product contains crystalline

material, as reflected in the XRPD peaks at 6.4 and 10.0 degrees two-theta.  These peaks cannot be

attributed to any of the raw excipients used in the manufacture of the active-layered spheres of

Handa's drug product.  Further, the Court has found, for the reasons discussed in its Findings of

Fact, that the crystal peaks at 6.4 and 10.0 degrees two-theta in the active-layered spheres of

Handa's ANDA product are attributable to crystalline dexlansoprazole in Handa's ANDA product.

A108

396.    Because the asserted claims cover any crystalline form of dexlansoprazole, the Court finds that Handa's ANDA product infringes claims 2 and 3 the '276 Patent.

### D. Validity of Asserted Patents

#### 1. Legal Standards

##### a. Presumption of Validity

397.    Issued patents have a presumption of validity in infringement proceedings. 35 U.S.C. § 282. The party asserting the invalidity of a patent bears the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd.*, 131 S. Ct. 2238, 2242 (2011). Clear and convincing evidence is such evidence that produces "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

##### b. Anticipation

398.    Under 35 U.S.C. § 102(a), a patent may be anticipated if the claimed invention was described in a printed publication "before the invention thereof by the applicant for patent." As a general rule, "invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). However, material that is not contained in the single prior art document may be considered where it has been incorporated by reference into that document. *Id.* "Incorporation by reference provides a method for integrating material from various documents into a host document – a patent or printed publication in an anticipation determination – by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Id.*

399.    "Enablement requires that 'the prior art reference must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation.'" *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (*quoting Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002)). The determination

101

United States District Court
Northern District of California

1   of what amount of experimentation is considered "undue" for the purposes of determining whether

2   a prior art reference is enabled is made from the point of view of an experienced person in the

3   field of the invention. *Id.* at 1055. Whether a prior art reference is enabling "is a question of law

4   based upon underlying factual findings." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d at

5   1301.

6   400.   To fulfill the enablement requirement, "[i]t is the specification, not the knowledge of one

7   skilled in the art, that must supply the novel aspects of an invention." *Genentech, Inc. v. Novo*

8   *Nordisk*, 108 F.3d 1361, 1366 (Fed. Cir. 1997).

9   401.   The factors pertinent to enablement under 35 U.S.C. § 112 for patentability are set forth in

10   *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988). In *Wands*, the Federal Circuit identified the

11   following eight factors that may be pertinent to whether the disclosure of the patent would require

12   undue experimentation:

> (1) the quantity of experimentation necessary,
> (2) the amount of direction or guidance presented,
> (3) the presence or absence of working examples,
> (4) the nature of the invention
> (5) the state of the prior art,
> (6) the relative skill of those in the art,
> (7) the predictability or unpredictability of the art, and
> (8) the breadth of the claim.

19   *Id.* at 737. The *Wands* factors are "illustrative, not mandatory" and therefore, the court need

20   consider only the factors that are relevant to the facts of the case. *Amgen, Inc. v. Chugai Pharm.*

21   *Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

22   402.   The *Wands* factors are equally relevant to enablement of prior art. *See Mangosoft, Inc. v.*

23   *Oracle Corp.*, 421 F. Supp. 2d 392, 405 (D.N.H. 2006) ("[T]he Federal Circuit has also considered

24   the *In re Wands* factors in determining whether a prior art reference is enabling."); *see also Elan*

25   *Pharms., Inc. v. Mayo Found. for Med. Educ. & Res.*, 346 F.3d 1051, 1054-56 (Fed. Cir. 2003)

26   (considering the *Wands* factors in analyzing enablement of prior art).

27   403.   On summary judgment, the Court found that the burden on the question of enablement, in

28   the context of a challenge to the validity of a patent based on anticipation, falls on the patentee.

102

*See* Handa Summary Judgment Order at 35. The Court relied on the Federal Circuit's decision in

*In re Antor Media Corp.*, 689 F.3d 1282 (Fed. Cir. 2012). In that case, the Federal Circuit held

that in the context of patent prosecution, the presumption of enablement applies not only to prior

art patents but also to non-patent printed publications. *Id.* at 1288. In its summary judgment

order, the Court found that the reasoning of *In re Antor* also applied to anticipation challenges in

the district court. The Court now reconsiders its previous conclusion and finds that it is in clear

error. *See Willis v. Mullins*, 809 F.Supp.2d 1227, 1232 (E.D. Cal., 2011) (noting that district

court has inherent authority to "reconsider and modify an interlocutory decision for any reason it

deems sufficient, even in the absence of new evidence or an intervening change in or clarification

of controlling law" but that "a court should generally leave a previous decision undisturbed absent

a showing that it either represented clear error or would work a manifest injustice.")

404.    In *In re Antor*, the Federal Circuit explained that the burden of proving enablement is

placed on the patent applicant for reasons of procedural convenience because the applicant "is in a

better position to show, by experiment or argument, why the disclosure in question is not enabling

or operative." 689 F.3d at 1288. That rationale does not apply, however, in the district court. The

court in *Abbot Labs. v. Diamedix Corp.*, 969 F. Supp. 1064, 1067-1068 (N.D. Ill. 1997) offered

the following reasons for distinguishing between patent prosecution and an invalidity challenge in

district court in determining who bears the burden of proving that non-patent prior art is enabling:

> While numerous courts have stated that prior art references are entitled to a presumption of enablement . . ., these courts have each relied incorrectly upon *In re Sasse*, 629 F.2d 675, 681 (C.C.P.A. 1980) for the proposition that the patent holder bears the burden of proving that prior art references are not enabling. In *Sasse*, the court was faced with an appeal from a PTO Board of Appeals decision affirming the rejection of certain patent claims. In such a situation, where the applicant has not yet received a patent, it is clearly up to the applicant to prove to the PTO that he or she is entitled to one. Thus, once the PTO cites a prior art reference that enjoys a presumption of enablement, the burden shifts to the applicant. However, in the present case, unlike *Sasse*, the patents in question themselves have a presumption of validity. Since the burden is always on the challenger to show invalidity by clear and convincing evidence, *Jervis B. Webb Co. v. Southern Sys.*, 742 F.2d 1388, 1392 (Fed. Cir. 1984) ("Regardless of the prior art introduced by the party asserting invalidity, the presumption [of validity] remains intact."); *Oak Indus., Inc. v. Zenith Elec. Corp.*, 726 F. Supp. 1525, 1530 (N.D. Ill. 1989) ("This clear and convincing standard applies even

103

though the prior art introduced in court was not considered by the PTO."), once [the accused infringer] has shown that each and every claim is cited in [a cited prior art] reference, i.e., identity, [the patentee] only has the burden of producing some material evidence which places the enablement of the reference in question. Once it has done so, [the accused infringer] must show by clear and convincing evidence that the [the] reference was, in fact, enabling.

*Id.*; *see also Jacobs Vehicle Equip. Co. v. Pac. Diesel Brake Co.*, 829 F. Supp. 2d 11, 33 (D. Conn. 2011) (finding the reasoning of *Diamedix* persuasive and holding that in the context of an anticipation challenge in district court, the burden is on the alleged infringer to prove by clear and convincing evidence that prior art is enabled)

405.    While *Diamedix* and *Jacobs* were decided before the Federal Circuit issued its decision in *In re Antor*, the Court finds that the reasoning in those cases persuasive and therefore, that the Federal Circuit would not extend the holding of *In re Antor* to challenges based on anticipation that are being litigated in the district court. *See* 1 Donald S. Chisum, *Chisum on Patents* § 3.04(1)(b)(v) (2011) (relying, in part, on *Diamedix* and opining, "It is likely that the Federal Circuit will apply [the following approach] to the issue of the enabling quality of a prior art reference": "If a challenger provides evidence sufficient to establish a prima facie showing on an issue, the burden of production of evidence shifts to the patent owner. If the patent owner provides some contradictory evidence, then the trier of fact must resolve the conflict with the challenger, as noted, bearing the burden of persuasion by clear and convincing evidence").

406.    For the reasons stated above, the Court concludes that the ultimate burden of proving enablement of non-patent prior art that is alleged to anticipate is on the party that is challenging the validity of the patent, who must establish enablement by clear and convincing evidence.

### c. Obviousness

407.    Obviousness under 35 U.S.C. § 103 is a question of law based on factual underpinnings. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). To invalidate a patent claim based on obviousness, a challenger must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Procter & Gamble v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir.

104

United States District Court
Northern District of California

United States District Court
Northern District of California

1    2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

2    408.    Analogous prior art is considered when evaluating obviousness. *See Wang Labs., Inc. v.*

3    *Toshiba Corp.*, 993 F.2d 858, 863-64 (Fed. Cir. 1993). The Federal Circuit in *Wang* explained:

4        Two criteria are relevant in determining whether prior art is
5        analogous: (1) whether the art is from the same field of endeavor,
         regardless of the problem addressed, and (2) if the art is not within
6        the same field of endeavor, whether it is still reasonably pertinent to
         the particular problem to be solved.

7    *Id.* at 864 (internal citation omitted). These are factual issues. *See Finish Eng'g Co. v. Zerpa*

8    *Indus., Inc.*, 806 F. 2d 1041, 1043-44 (Fed. Cir. 1986).

9    409.    Whether the claimed invention is obvious must be evaluated from the perspective of a

10    hypothetical person of ordinary skill in the art. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666 (Fed.

11    Cir. 2000). In determining what constitutes ordinary skill in the art, a court may consider "(1) the

12    types of problems encountered in the art; (2) the prior art solutions to those problems; (3) the

13    rapidity with which innovations are made; (4) the sophistication of the technology; and (5) the

14    educational level of active workers in the field." *Id.* at 666-667. The hypothetical person of

15    ordinary skill in the art is presumed to be aware of all analogous prior art. *In re Gorman*, 933 F.2d

16    982, 986 (Fed. Cir. 1991).

17    410.    The obviousness determination turns on underlying factual inquiries involving: (1) the

18    scope and content of prior art, (2) differences between claims and prior art, (3) the level of

19    ordinary skill in pertinent art, and (4) evidence of secondary factors, such as long-felt need and

20    failure by others, unexpected results, or commercial success. *Graham*, 383 U.S. at 17; *Texas*

21    *Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993).

22    However, the absence of secondary considerations does not prove obviousness. *See Custom*

23    *Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986) ("[T]he absence

24    of objective evidence [of commercial success, longfelt but unresolved need, failure of others, or

25    copying] does not preclude a holding of nonobviousness because such evidence is not a

26    requirement for patentability. . . . [T]he absence of objective evidence is a neutral factor"

27    (quotations omitted)); *see also Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 878 (Fed. Cir.

28    1993) ("[The patent owner] did not show objective indicia of non-obviousness. Such evidence, if

1    present, would weigh in favor of non-obviousness, although the lack of such evidence does not

2    weigh in favor of obviousness.").

3    411.    A factor to be considered in determining obviousness is whether a prior art reference

4    "teaches away" from the claimed invention. *Depuy Spine, Inc. v. Medtronic Sofamor Danek,* Inc.,

5    567 F.3d 1314, 1326 (Fed. Cir. 2009).  "A reference will teach away when it suggests that the

6    developments flowing from its disclosures are unlikely to produce the objective of the applicant's

7    invention." *Syntex (U.S.A.) LLC v. Apotex, Inc.,* 407 F.3d 1371, 1380 (Fed. Cir. 2005) (citation

8    omitted).

9    412.    "The combination of familiar elements according to known methods is likely to be obvious

10   when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398,

11   416 (2007).  However, obviousness is not established "merely by demonstrating that each of [an

12   invention's] elements was . . . known in the prior art," because "it can be important to identify a

13   reason that would have prompted a person of ordinary skill in the relevant field to combine the

14   elements in the way the claimed new invention does." *KSR,* 550 U.S. at 418; *see also Ruiz,* 234

15   F.3d at 665 ("[T]he notion that combination claims can be declared invalid merely upon finding

16   similar elements in separate prior patents would necessarily destroy virtually all patents and

17   cannot be the law under the statute, § 103").

18   413.    The Federal Circuit has explained that:

19               A suggestion, teaching, or motivation to combine the relevant prior
                 art teachings does not have to be found explicitly in the prior art, as
20               the teaching, motivation, or suggestion may be implicit from the
                 prior art as a whole, rather than expressly stated in the references....
21               The test for an implicit showing is what the combined teachings,
                 knowledge of one of ordinary skill in the art, and the nature of the
22               problem to be solved as a whole would have suggested to those of
                 ordinary skill in the art.
23

24   *In re Kahn,* 441 F.3d 977, 987-88 (Fed. Cir. 2006) (quoting *In re Kotzab,* 217 F.3d 1365, 1370

25   (Fed. Cir. 2000)).

26   414.    Claimed subject matter may be obvious when it might have been obvious to try known

27   options within the technical grasp of the ordinarily skilled person, but only when there is "a design

28   need or market pressure to solve a problem and there are a finite number of identified, predictable

United States District Court
Northern District of California

106

1   solutions." *KSR*, 550 U.S. at 421.

2   415.   When relying on a "combination" of references, "the burden falls on the patent challenger

3   to show by clear and convincing evidence that a person of ordinary skill in the art would have had

4   reason to attempt to make the composition or device, or carry out the claimed process, and would

5   have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v.*

6   *ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) (citations omitted).  The purpose of this

7   requirement is to "prevent hindsight bias." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164

8   (Fed. Cir. 2006).  "In making obviousness determinations, the test is 'whether the subject matter of

9   the claimed inventions would have been obvious to one skilled in the art at the time the inventions

10   were made, not what would be obvious to a judge after reading the patents in suit and hearing the

11   testimony.'" *Id.* (quoting *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1092 (Fed. Cir.

12   1985).

13                     **d.  Written Description**

14   416.   35 U.S.C. § 112 states:

15          The specification shall contain a written description of the invention,
           and of the manner and process of making and using it, in such full,
16         clear, concise, and exact terms as to enable any person skilled in the
           art to which it pertains, or with which it is most nearly connected, to
17         make and use the same, and shall set forth the best mode
           contemplated by the inventor or joint inventor of carrying out his
18         invention.

19   417.   Lack of an adequate written description must be established by the challenger by clear and

20   convincing evidence.  *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir.

21   2009). The written description requirement is met where the disclosure reasonably conveys to

22   those of ordinary skill in the art that the inventor had possession of the claimed subject matter as

23   of the filing date.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

24   The written description requirement is distinct from the enablement requirement, although the two

25   "often rise and fall together." *Id.* at 1352.

26   418.   To satisfy the written description requirement, "the applicant does not have to utilize any

27   particular form of disclosure to describe the subject matter claimed, but the description must

28   clearly allow persons of ordinary skill in the art to recognize that he or she invented what is

United States District Court
Northern District of California

United States District Court
Northern District of California

1   claimed." *Carnegie Mellon Univ. v. Hoffman-La Roche, Inc.*, 541 F.3d 1115, 1122 (Fed. Cir.

2   2008). Put differently, "the applicant must convey with reasonable clarity to those skilled in the

3   art that, as of the filing date sought, he or she was in possession of the invention . . . and

4   demonstrate that by disclosure in the specification of the patent." *Id.* at 1122. So long as these

5   requirements are met, "[the applicant] does not have to describe exactly the subject matter

6   claimed." *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1533 (Fed. Cir.

7   1992). "[I]t is unnecessary to spell out every detail of the invention in the specification" to satisfy

8   the written description requirement, *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d

9   1336, 1345 (Fed. Cir. 2005), and the written description requirement does not "require a re-

10  description of what was already known." *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).

11  Instead, "[t]he descriptive text needed to meet [the] requirement varies with the nature and scope

12  of the invention at issue, and with the scientific and technologic knowledge already in existence."

13  *Id.*

### 2. Whether the Crystal Form Patents are Obvious

#### a. Claims 1 and 3 of the '058 Patent[7]

16  419.   Based on the findings of fact recited above, the Court concludes that claims 1 and 3 of the

17  '058 Patent are not obvious over the disclosures of Larsson, Von Unge, or Barberich in view of

18  Kato, Nohara, Kohl, Bohlin, Tietze, Vogel, or Gordon.

19  420.   The Court further concludes that claims 1 and 3 of the '058 Patent are not obvious over the

20  disclosures of Katsuki, Tanaka, Borner and Erlandsson in view of Kato, Nohara, Kohl, Bohlin,

21  Tietze, Vogel, or Gordon.

22  421.   Although the Court has found that a person of ordinary skill in the art would have had a

23  reason to try to crystallize the R enantiomer of lansoprazole, Defendants have not presented clear

24  and convincing evidence that such a person would have had a reasonable expectation of being able

25  successfully to synthesize crystalline dexlansoprazole in light of the prior art cited by Defendants

26

27  [7] Takeda asks the Court to find, as a matter of law, that Barberich II is not prior art to the '058
    Patent. Because the Court reaches the same result as to the validity of the '058 Patent regardless
28  of whether or not Barberich II is prior art, it assumes that Barberich II is prior art to that patent but
    does not decide this issue.

1     for the reasons stated in the Court's Findings of Facts.

2     422.    First, as discussed above, a person of ordinary skill in the art would not have had a

3     reasonable expectation of being able successfully to synthesize crystalline dexlansoprazole in light

4     of the disclosures of Larsson and Von Unge, which disclosed the failure to obtain dexlansoprazole

5     in crystalline form. In particular, Larsson and Von Unge disclosed the production of a very pure

6     sample of dexlansoprazole in oil form, which would have suggested to a person of skill in the art

7     that impurities in the sample were not responsible for the failure of crystallization and that the

8     material might not exist in crystal form at room temperature. In this way, Larsson and Von Unge

9     teach away from dexlansoprazole in crystal form. Likewise, as explained above, because the

10     Barberich reference is devoid of any mention, much less any enabling disclosure, of a crystal of

11     dexlansoprazole, it does not, alone or in combination with other prior art, render crystalline

12     dexlansoprazole obvious. At most, Impax and Handa have merely presented evidence that it

13     would have been obvious to try to make all possible forms of dexlansoprazole and its enantiomers,

14     including crystalline forms. This does not suffice to establish obviousness. As discussed above, in

15     *KSR*, the Supreme Court held that a showing that the prior art rendered a combination obvious to

16     try alone might be sufficient to prove obviousness "[w]hen there is a design need or market

17     pressure to solve a problem and there are a *finite number of identified, predictable solutions*" that

18     leads to an anticipation of success. 550 U.S. at 421 (emphasis added). This is not the case here.

19     Rather than a "finite number of identified, predictable solutions," there were myriad possible

20     solvents, combinations of solvents, and adjustment of conditions (e.g., time and temperature) that

21     could have been used to attempt to crystallize dexlansoprazole.

22     423.    Moreover, as discussed above, crystallization of benzimidazole compounds such as

23     dexlansoprazole is unpredictable, as evidenced by the various methods and solvent combinations

24     disclosed in the prior art references to treat other benzimidazole compounds, and the different

25     forms of matter – amorphous solids, crystalline solids, partially crystalline solids, hydrates,

26     ethanolates, and oils – obtained through such methods. Dr. Genck admitted that even he could not

27     predict *a priori* whether any given solvent or solvent combination would lead to crystallization of

28     dexlansoprazole. Rather, a skilled artisan would have to try each of numerous possibilities in

<div align="center">109</div>

United States District Court
Northern District of California

1 terms of solvents, solvent combinations, and/or conditions until possibly arriving at a successful

2 result. Thus, the record does not contain a finite number of identified, predictable solutions which

3 would support a finding of obviousness. *See Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd.*, 533

4 F.3d 1353, 1359 (Fed. Cir. 2008) ("To the extent an art is unpredictable, as the chemical arts often

5 are, *KSR*'s focus on [ ] 'identified, predictable solutions' may present a difficult hurdle [for patent

6 challengers] because potential solutions are less likely to be genuinely predictable."); *see also In*

7 *re Brimonidine Patent Litig.*, 643 F.3d 1366, 1376 (Fed. Cir. 2011) (rejecting "obvious to try"

8 argument based on district court's finding that prior art suggested "roadblocks" such that the

9 claimed invention would not have been an expected result); *In re Armodafinil Patent Litig.* ('722

10 Patent Litigation), 2013 WL 1332523, at *39 (D. Del. Mar. 30, 2013) ("the Federal Circuit has

11 clarified that 'obvious to try' is also not obvious when a skilled artisan would have to: (1) 'vary all

12 parameters or try each of numerous possible choices until one possibly arrived at a successful

13 result, where the prior art gave . . . no direction as to which of many possible choices is likely to

14 be successful; or (2) explore a new technology or general approach that seemed to be a promising

15 [field] of experimentation, where the prior art gave only general guidance as to the particular form

16 of the claimed invention or how to achieve it.'") (quoting *In re O'Farrell*, 853 F.2d 894, 903 (Fed.

17 Cir. 1988) and citing *In re Kubin*, 561 F.3d 1351, 1359-60 (Fed. Cir. 2009) (reaffirming holdings

18 in *O'Farrell* in view of *KSR* )); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule*

19 *Patent Litig.*, 676 F.3d 1063, 1072-73 (Fed. Cir. 2012) ("Evidence of obviousness, especially

20 when that evidence is proffered in support of an 'obvious-to-try' theory, is insufficient unless it

21 indicates that the possible options skilled artisans would have encountered were 'finite,' 'small,'

22 or 'easily traversed,' and that skilled artisans would have had a reason to select the route that

23 produced the claimed invention.").

24 424. The Court rejects Impax's argument that the anhydrous crystal of claim 1 of the '058

25 Patent and claim 7 of the '971 Patent is obvious because the crystallization techniques used to

26 make it are obvious. The last sentence of the statutory section on obviousness applicable to the

27 patents-in-suit, 35 U.S.C. § 103(a), states that "[p]atentability shall not be negated by the manner

28

110

A118

in which the invention was made."[8] "[E]ven assuming that there would have been a motivation to obtain the 'most stable' form of [a compound], a skilled artisan would have expected to resort to trial and error experimentation, using a large number of conditions, to try to make this form." *Armodafinil*, 2013 WL 1332523 at *34.

425.    Dr. Genck similarly applied an incorrect test for obviousness when he concluded that crystalline dexlansoprazole would be obvious because the methods used to obtain it would be obvious. *See* Trial Tr. (Genck Cross) 802:10-15. The proper question with respect to these claims is whether the patented subject matter itself, not the method by which it was made, is obvious. *See Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1422 (Fed. Cir. 1994) (holding that the patentability of a claim directed to a chemical compound "derives from the structure of the claimed compound in relation to prior compounds"); *In re Certain Crystalline Cefadroxil Monohydrate*, 15 U.S.P.Q.2d 1263, 1270 (U.S.I.T.C. 1990) ("The patentability of a new chemical structure is independent of how it is made") (quoting *Bristol-Myers Co. v. USITC*, 15 U.S.P.Q.2d 1258, 1262 (Fed. Cir. 1989) (unpublished opinion). Thus, in *In re Cofer*, 354 F.2d 664 (C.C.P.A. 1966), the Court of Customs and Patent Appeals held that the Board of Appeals, in finding obvious claims to a crystalline form of a compound previously known to exist in liquid form, erred by failing to consider "whether the prior art suggests the particular structure or form of the compound or composition as well as suitable methods of obtaining that structure or form." *Id.* at 666-668.

426.    Defendants have identified no evidence that disclosed or suggested the structure of the specific anhydrous crystalline form described in claim 1 of the '058 Patent or any crystalline form of dexlansoprazole prior to Takeda's invention. Nor have Defendants pointed to any evidence indicating that one would reasonably expect that specific crystalline compound to result from any prior art. As a result, Dr. Genck's reliance on the fact that the inventors used known methods is misplaced.

427.    *In re Irani*, 427 F.2d 806 (C.C.P.A. 1970) also supports the Court's conclusion. There, the

United States District Court
Northern District of California

---

[8] Prior to its amendment in 2011, the last sentence of § 103 used the word "negative" rather than "negated".

111

Court of Customs and Patent Appeals found a claim for an anhydrous crystal of a compound previously known to exist in amorphous form to be patentable and nonobvious over prior art disclosing the crystallization of some related compounds. *Id.* at 809. The court noted that, "[t]he most definite conclusion that can be reached is that some of these [compounds] can be obtained in crystalline form and some cannot. . . . ," and that the prior art disclosure "would not provide a basis for predicting with reasonable certainty that [the compound] could exist in a crystalline anhydrous form." As in *Irani*, the prior art here discloses some benzimidazole compounds in crystalline form but others in amorphous solid or oil form. As discussed above, Larsson shows the isolation of enantiomers of some benzimidazole compounds in crystal form, others as amorphous solids, and others as oils. As in *Irani*, comparisons to related compounds in the prior art do not demonstrate that one would have an expectation of being able to make crystalline dexlansoprazole prior to the work of the Takeda inventors.

428.    Likewise, the Court rejects Defendants' argument that the relatively short amount of time it took Dr. Kamiyama to invent the claimed dexlansoprazole crystal supports their position that his invention was obvious. This is not a relevant consideration for determining whether an invention is obvious. *See Shiley, Inc. v. Bentley Laboratories, Inc.*, 794 F.2d 1561, 1568 (Fed. Cir. 1986) (obviousness not established by speed with which inventor conceived the successful design because "the patentability of an invention does not depend on how the invention is made").

429.    The Court finds distinguishable the Federal Circuit's opinion in *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007), upon which Defendants rely in support of their argument that an invention may be obvious, even though some experimentation is required, if it uses a known process. In that case, the Federal Circuit held that certain claims covering the besylate salt of a known compound would have been obvious because the prior art included a reference that disclosed a genus of pharmaceutically acceptable anions that could be used to form pharmaceutically acceptable acid addition salts, as well as other publications that disclosed the chemical characteristics of the besylate salt form in general. *Id.* at 1363. Thus, "on the particularized facts" of the case, the Federal Circuit found that "consideration of the 'routine testing' performed by Pfizer [was] appropriate because the prior art provided not only the means

112

A120

United States District Court
Northern District of California

1  of creating acid addition salts but also predicted the results, which Pfizer merely had to verify

2  through routine testing." *Id.* at 1367.

3  430.  The critical distinction is that both the method of making the salt claimed in *Pfizer*, and the

4  structure of that salt, which merely consisted of a pharmaceutically acceptable acid reacted with

5  the neutral compound, were predictable and known at the time of the claimed invention.  Here, the

6  three-dimensional structure that is the critical aspect of the claimed crystalline dexlansoprazole

7  was neither known nor predictable at the time of the invention. *See Armodafinil*, 2013 WL

8  1332523 at *28 (finding that "[u]nlike salts, which for the most part can be prophetically claimed

9  based on an understanding of the chemical structure of the compound and its ionization constants,

10  the existence and identity of . . . polymorphs have defied prediction"). Whereas *Pfizer* involved

11  the selection of which particular salt to make from among a known, predictable and limited

12  universe of salts, here the invention involved the selection from a broad range of available but

13  unpredictable techniques to try to create a previously non-existent crystalline compound whose

14  structure could not be predicted.

15  431.  The Court concludes that Impax's argument that the particular crystal defined in claim 1 of

16  the '058 Patent would have been obvious is based on hindsight analysis.  Only with the teachings

17  of the '058 Patent are the d-spacings, and thus, the physical three-dimensional structure, of that

18  crystal known.  Accordingly, the crystal of claim 1 is not obvious.  For the same reasons,  the

19  pharmaceutical composition of such a crystal, described in claim 3, also is not obvious.

20  **b.  Claims 2 and 3 of the '276 Patent**

21  432.  Based on the findings of fact recited above, the Court concludes that claims 2 and 3 of the

22  '276 Patent also are not obvious in view of the prior art.  As discussed above, Dr. Genck testified

23  that the basis for his opinion that the '276 Patent is not valid is the same as that of his opinion with

24  respect to the '058 Patent.  With the exception of the findings and analysis specifically relating to

25  the uniqueness and unpredictability of the particular anhydrous polymorph defined in claim 1 of

26  the '058 Patent, the preceding findings and analysis apply to the claims of the '276 Patent as well.

27  The fact that potential methods of attempting crystallization were known at the time of the

28  invention does not render the crystals invented by Takeda obvious given the acknowledged

113

1   unpredictability of crystallization techniques, the absence of any teaching that would tell one

2   skilled in the art which particular crystallization technique to try to crystallize dexlansoprazole,

3   and the teaching of Larsson and Von Unge, which indicated that dexlansoprazole in very pure

4   form existed as an non-crystalline oil.

5   433.   Likewise, the references relied on by Dr. Genck relating to HPLC would not teach one of

6   ordinary skill in the art how to make dexlansoprazole for the purposes of crystallization.  As

7   discussed above, these references fail to describe certain steps in the preparation of

8   dexlansoprazole that were done to overcome challenges in synthesizing material appropriate for

9   crystallization in the preparation of the material used for the successful crystallization of

10  dexlansoprazole set forth in the '058 Patent.  Moreover, even if one of ordinary skill in the art

11  would have been motivated to obtain dexlansoprazole using HPLC for the purposes of performing

12  crystallization, such a person would not have had a reasonable expectation of success in obtaining

13  crystals, as discussed above.

14  434.   Just as the specific crystal form of dexlansoprazole claimed in the '058 Patent was

15  unknown and unpredictable before Takeda's invention, no crystalline form of dexlansoprazole

16  was known or predictable prior to the Takeda patents.  Indeed, the prior art taught away from

17  dexlansoprazole crystals, as discussed above. Defendants have identified no evidence that disclosed

18  or suggested the structure of any crystalline form of dexlansoprazole or that any such crystal would or

19  should be made by any prior art process.  Indeed, as discussed above, the prior art showed that

20  crystallization of benzimidazole compounds is unpredictable and taught away from the existence of

21  dexlansoprazole in crystal form. Defendants here, as in *Cofer*, failed to introduce evidence of "whether

22  the prior art suggests the particular structure or form of the compound or composition *as well as*

23  suitable methods of obtaining that structure or form." 354 F.2d at 666-668 (emphasis added). And as in

24  *Armodafinil*, a person of ordinary skill in the art would not have known of the existence of

25  dexlansoprazole in crystal form and could not have reasonably expected to produce it with any

26  particular solvent prior to the teachings of the Takeda patents.

27              **c.  Claims 6 and 7 of the '971 Patent**

28  435.   Based on the findings of fact recited above, and for the same reasons set forth above in

114

United States District Court
Northern District of California

1  connection with claim 3 of the '276 Patent and claim 3 of the '058 Patent, the Court finds that claims 6

2  and 7 of the '971 Patent are not obvious in view of the prior art.

3        **3. Whether Claims 1 and 2 of the '282 Patent are Anticipated**

4           **a. Whether Barberich II Anticipates an Amorphous Compound of**
            **Dexlansoprazole**
5

6  436.   As discussed above, Handa and TWi contend that claims 1 and 2 of the '282 Patent are

7  anticipated by the Barberich II. The Court concludes that Barberich II does not anticipate claims 1

8  and 2 of the '282 Patent, despite its disclosure of solid pharmaceutical compositions of

9  dexlansoprazole, because the person of ordinary skill would not have been able to make the

10 amorphous solid of dexlansoprazole described by Barberich without undue experimentation.

11 437.   Barberich purports to disclose a solid pharmaceutical composition of dexlansoprazole. The

12 parties agree that a skilled person already in possession of the amorphous solid of dexlansoprazole

13 disclosed in the '282 Patent would have understood from prior art such as Larsson how to make a

14 solid dosage form without undue experimentation. *See, e.g.,* Trial Tr. (Rogers Direct) 547:23-

15 548:9 (testifying that Example 1 of Barberich II, TX 0078-0005, would not require undue

16 experimentation because "[e]ssentially this is a recipe"); *id.* (Rogers Direct) 575:12-576:4

17 (testifying that Larsson, which predates Barberich, discloses the "pharmaceutically acceptable

18 excipient, carrier, or diluent limitation of claim 2 of the '282 Patent"). Thus, to the extent it

19 contains anything novel, Barberich's novelty is its disclosure of a solid form of dexlansoprazole.

20 Consequently, to satisfy the enablement requirement, Barberich must disclose a method for

21 synthesizing a solid form of dexlansoprazole . *See Genentech*, 108 F.3d at 1366.

22 438.   Consideration of the evidence relevant to the *Wands* factors persuades the Court that

23 Barberich (including the disclosures of Larsson that are incorporated by reference in Barberich)

24 would not have enabled the person of ordinary skill to make the amorphous solid of

25 dexlansoprazole described by Barberich without undue experimentation.

26 439.   **The Amount of Direction or Guidance Provided by the Specification:** Barberich

27 merely incorporates by reference the synthesis methods disclosed in Larsson and Von Unge. *See*

28 TX 0078 (Barberich II) at [0013]. However, as discussed above, Larsson discloses the synthesis

                                           115

United States District Court
Northern District of California

only of an oily form of dexlansoprazole; it does not describe any process for converting that oil to a solid. Similarly, the Barberich specification provides no direction or guidance as to how to convert the oil in Larsson into a solid.

440. **The Presence or Absence of Working Examples Set Forth in the Specification**: The Barberich specification does not contain any working examples regarding how to synthesize solid dexlansoprazole. Instead, all of the examples in Barberich that describe solid dexlansoprazole are set forth in present tense, indicating that they are "prophetic" and were not carried out. *See Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1376 n. 1 (Fed. Cir. 2003)("Prophetic examples are set forth in the present tense to indicate that they were not carried out") (citing *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1578 (Fed.Cir.1984)). There is no evidence that Barberich ever actually obtained the solid. Similarly, the subject matter of Larsson and Von Unge that is incorporated by reference in Barberich II does not set forth any working example showing how to synthesize solid dexlansoprazole.

441. **Nature of the Invention and the Relative Skill of a Person of Ordinary Skill in the Art**: The invention of Barberich II is a pharmaceutical formulation of dexlansoprazole. Accordingly, the level of skill of the person of ordinary skill in the art of the Barberich invention would be a formulator with a bachelor's degree in pharmacy or a related field, with three to five of experience in pharmaceutical formulations. The person of ordinary skill would also need to understand some organic chemistry because of Barberich's incorporation of the Larsson and Von Unge references, but this person's focus would be formulation.

442. **The State of the Prior Art**: As discussed above, the Larsson and Von Unge references are the closest prior art references and are incorporated into Larsson. Neither Larsson nor Von Unge discloses the synthesis of a solid form of dexlansoprazole.

443. **Predictability or Unpredictability of the Art**: The synthesis of solid dexlansoprazole, which falls within the field of organic chemistry, is unpredictable. *See Boston Scientific v. Johnson & Johnson*, 679 F. Supp.2d 539, 557 (D. Del. 2010) (noting that "the chemical arts have long been acknowledged to be unpredictable"). Organic chemistry is an experimental science, meaning that one cannot predict the outcome of an experiment without actually carrying out the

116

experiment (such as a crystallization or synthesis) in the laboratory. *See* Trial Tr. (Atwood Direct) 903:20-905:5; *Application of Carleton*, 599 F.2d 1021, 1026 (Cust. & Pat. App. 1979) ("Although there is a vast amount of knowledge about general relationships in the chemical arts, chemistry is still largely empirical, and there is often great difficulty in predicting precisely how a given compound will behave"); *Schering Corp. v. Gilbert*, 153 F.2d 428, 433 (2d Cir. 1946) ("Organic chemistry is essentially an experimental science and results are often uncertain, unpredictable and unexpected").

444.    **The Breadth of the Claim**: Barberich states that its pharmaceutical formulations can take either solid or liquid form. The person of ordinary skill could have used the oil of dexlansoprazole disclosed in Larsson to make a liquid formulation of dexlansoprazole that would have fallen within the scope of the Barberich claims. *See* TX 0078-0004 (Barberich II) at [0034] ("Pharmaceutical compositions of the present invention suitable for oral administration may be presented as . . . an oil-in-water emulsion, or a water-in-oil liquid emulsion."); Trial Tr. (Rogers Cross) 618:22-619:6 ("I think if dexlansoprazole was an oil, then you could incorporate that into an emulsion, along with whatever solvent was with it.").

445.    **The Quantity of Experimentation Needed**: The experiments performed at the University of Wisconsin under the direction of Dr. Elder demonstrate that the person of ordinary skill would not have been able to make solid amorphous dexlansoprazole based on the disclosures of Barberich without considerable and undue experimentation.

446.    Dr. Elder attempted to replicate Example 22 two times, and both times he failed to obtain the oil Larsson describes. The first experiment, in which Dr. Elder opted for a "literal interpretation of Larsson," Trial Tr. (Rogers Direct) 513:3-10, resulted in a solid of "nearly racemic" lansoprazole, with only a "slight preference" (6% e.e.) for dexlansoprazole. TX 0733x03-0004-5 and -0008 (UW Report). In the second experiment, Dr. Elder departed from the teachings of Larsson by adding the 1.1 milliliters of oxidant over a 60-minute period instead of in one portion. However, Larsson teaches that good enantioselectivity in the asymmetric oxidation process does not require reduced temperatures but can be conducted at or above room temperature. *See* TX 301-0005, col.8, ll.44-47; *see also* Trial Tr. (Atwood Direct) 911:4-912:19; *id.* (Rogers

117

Cross) 638:14-639:2, 651:3-7 ("[O]ne of [Larsson's] big advances was to be able to do this [oxidation reactions] at room temperature or above"). Larsson itself would have provided the most up-to-date disclosure regarding how to add the oxidant in an asymmetric oxidation reaction for the person of ordinary skill attempting to replicate Example 22 of Larsson in 1998 (the priority date of the Barberich reference) or 1999 (the priority date of the '282 Patent). *See* Trial Tr. (Atwood Direct) 911:4-14; cf. Trial Tr. (Rogers Cross) 635:15-637:6. Because slowing down the rate of oxidant addition is an alternative to simply lowering the temperature of the reaction, the person of ordinary skill would have concluded from this teaching in Larsson that dropwise addition of 1.1 milliliters of oxidant over 60 minutes would not be a way of obtaining improved enantioselectivity. Trial Tr. (Atwood Direct) 911:4-913:7.

447.    Dr. Elder's selection of the solvents used during the workup procedures and the ratios for the flash chromatography gradient also would not have been a matter of routine experimentation for the person of ordinary skill implementing Example 22, but, instead, were informed by the subsequent evolution of the art.

448.    Because of these departures from the teachings of Larsson, Dr. Elder obtained a solid from the workup procedure – in fact, Dr. Elder never obtained an oil of dexlansoprazole. Because Dr. Elder never obtained an oil of dexlansoprazole, in contrast to the explicit teachings of Larsson, UW's experiments fail to establish that the oil obtained by Larsson could have been evaporated to dryness to obtain a solid.

449.    In addition, the chemical purity of the "light, brown solid" obtained by Dr. Elder following the workup procedures is unknown and unreported, as the UW lab failed to assess its chemical purity using achiral HPLC.

450.    For all of these reasons, the experiments performed at UW do not indicate that one skilled in the art could have converted that oil into an amorphous solid. Instead, with the benefit of hindsight knowledge that a solid amorphous dexlansoprazole compound could be obtained, Dr. Elder conducted an experiment different from that described in Larsson and different from how the ordinarily skilled person in 1998 would have attempted to adapt the Larsson reference to obtain a solid.

118

A126

United States District Court
Northern District of California

451. Based on the foregoing analysis of the *Wands* factors, the Court concludes that Barberich would not have enabled the person of ordinary skill at the relevant time to make the amorphous solid of dexlansoprazole described by Barberich without undue experimentation.[9]

### b. Whether Barberich II Anticipates an Amorphous Salt of Dexlansoprazole

452. As discussed above, in its Findings of Fact, the Court finds that Handa and TWi failed to establish by clear and convincing evidence that a person of skill in the art could have obtained an amorphous solid salt of dexlansoprazole from the oil obtained in Larsson and incorporated by reference in Barberich II. Further, for the reasons discussed above, to obtain the solid form of amorphous dexlansoprazole disclosed in Barberich from which a solid salt could be derived would require undue experimentation.

### 4. Whether Claims 1 and 2 of the '282 Patent are Obvious

453. Based on the findings of fact recited above, the Court concludes that it would not have been obvious for one ordinarily skilled in the art in 1999 to evaporate the oil described in Larsson and Von Unge (and incorporated by reference in Barberich) using known techniques to obtain an amorphous solid. In particular, although a person of ordinary skill in the art would have been motivated to obtain an amorphous solid form of dexlansoprazole, such a person would not have had a reasonable expectation of success based on this prior art.

454. Similarly, based on the findings of fact recited above, the Court concludes that claim 1 of the '282 Patent is not obvious in view of Larsson, Von Unge, or Barberich II in combination with Takechi, Brittain, and/or Bohlin because a person of ordinary skill in the art also would not have had a reasonable expectation of success in obtaining an amorphous solid of dexlansoprazole based on this prior art.

455. Finally, Claim 2 of the '282 Patent also is not obvious in view of Larsson or Von Unge in

---

[9] Although the Court has found that it is the burden of Handa and TWi to establish by clear and convincing evidence that Barberich is enabling – and that Handa and TWi have failed to meet that burden – the Court notes that even if the burden fell on Takeda to establish by the preponderance of the evidence that Barberich is *not* enabled, the evidence presented at trial was sufficient to meet that burden.

A127

United States District Court
Northern District of California

1    combination with Barberich, the PDR entry for Prevacid, and/or Katsuki for the same reason.

2    ### 5. Whether Claims 1 and 2 of the '282 Patent Satisfy the Written Description Requirement

456.    Based on the findings of fact recited above, the Court concludes that the person or ordinary skill reviewing Reference Examples 1 and 2 of the '282 Patent would have understood that the inventors were in possession of an amorphous solid of dexlansoprazole.

457.    Defendants contend that claim 1 of the '282 Patent is invalid for failure to satisfy the written description requirement because the specification describes crystalline compounds of dexlansoprazole as its invention. That the specification does not place as much emphasis on the amorphous form of dexlansoprazole as it does on the crystal form is of no import. As the Federal Circuit has recognized, to satisfy the written description requirement, "the applicant does not have to utilize any particular form of disclosure to describe the subject matter claimed, but the description must clearly allow persons of ordinary skill in the art to recognize that he or she invented what is claimed." *Carnegie*, 541 F.3d at 1122. Put differently, "the applicant must convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention . . . and demonstrate that by disclosure in the specification of the patent." *Id.*

458.    These requirements are met here. The description of the isolation of amorphous solid dexlansoprazole in the specification clearly demonstrates that the inventors of the '282 Patent were in possession of that compound, and that a person of ordinary skill in the art could recognize that they were in possession of the subject matter of claim 1.

## IV. CONCLUSION

459.    For all of the foregoing reasons, the Court concludes that: (1) TPC, TPNA, Takeda LLC, and TPA each have sufficient exclusive right to the asserted patents to have standing to assert these patents; (2) Handa infringes the '276 Patent; (3) the asserted claims of the '058, '276, and '971 Patents are valid; and (4) the asserted claims of the '282 Patent are valid. The Court declines to exercise declaratory judgment jurisdiction over TWi's claim under 35 U.S.C. § 271(a) and the Declaratory Judgment Act.

A128

460.    Takeda is ordered to submit a proposed judgment incorporating the rulings contained in this opinion.

IT IS SO ORDERED.

Dated: October 17, 2013

_____

JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

121

A129

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

TAKEDA PHARMACEUTICAL CO., LTD
ET AL et al,

        Plaintiff,

v.

HANDA PHARMACEUTICALS, LLC et al,

        Defendant.

_____/

Case Number: CV11-00840 JCS
CV11-1609 JCS
CV11-1610 JCS

**SEALED CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 17, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Ted G. Dane
Heather Takahashi
Jeffrey I. Weinberger
Munger, Tolles & Olson LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071

Mark T. Jansen M
Pilar Stillwater
Crowell and Moring LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111

James K. Stronski
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022-2524

Donald J Mizerk
Husch Blackwell LLP
120 S. Riverside Plaza
Suite 2200
Chicago, IL 60606

A130

Eric Martin Acker
Morrison Foerster LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130

Parisa Jorjani
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105


Dated: October 17, 2013

*Karen L. Hom*

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk

2

A131

```
                                              FILED

                                              APR X 8 2013

        UNITED STATES DISTRICT COURT          RICHARD W. WIEKING
                                              CLERK, U.S. DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA         NORTHERN DISTRICT OF CALIFORNIA
```

TAKEDA PHARMACEUTICAL CO., LTD.,    Case No. C-11-01609 JCS
et al.,
                                    Related Cases: C-11-0840 JCS,
          Plaintiffs,               C-11-01610 JCS

      v.                            **ORDER RE SUMMARY JUDGMENT**
                                    **MOTIONS [Docket Nos. 160, 175 (redacted**
TWI PHARMACEUTICALS, INC., et al.,  **publicly filed versions); 166, 204 (sealed**
                                    **versions)]**
          Defendant.
                                    **FILED UNDER SEAL**

## I.    INTRODUCTION

Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda

Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc. (hereinafter, referred to

collectively as "Takeda") initiated this action under 35 U.S.C. § 271 and the Declaratory

Judgment Act, 28 U.S.C. §§ 2201, 2202, in response to Defendants' Abbreviated New Drug

Applications ("ANDA") No. 202-666, seeking approval from the Food and Drug Administration

("FDA") to manufacture and sell generic versions of Takeda's drug DEXILANT

(dexlansoprazole).[1] Takeda alleges that TWi's ANDA products infringe two of its patents, U.S.

---

[1] Takeda alleged in its First Amended Complaint ("FAC") that the ANDA was submitted to the
FDA by Defendant Anchen Pharmaceuticals, Inc. ("Anchen") and that ownership of the ANDA
was transferred to TWi Pharmaceuticals, Inc. ("TWi") on May 10, 2011. FAC ¶¶ 33, 38. Anchen
has been dismissed from this action, *see* Docket No. 103, but the parties agree that any references
to Anchen's ANDA products apply with equal force to TWi because they refer to the same
products. Hereinafter, the Court refers to the products in ANDA No. 202-666 as "TWi's ANDA
products."

United States District Court
Northern District of California

1    Patent No. 7,737,282 ("the '282 Patent") and U.S. Patent No. 7,790,755 ("the '755 Patent"). [2]

2    TWi, in turn, asserts counterclaims seeking declaratory judgment that no valid claims of the '755

3    or '282 Patents are infringed.

4         Presently before the Court are the parties' cross-motions for summary judgment.  Takeda

5    has filed a motion seeking summary judgment of infringement of the '282 Patent based on what it

6    contends is undisputed evidence that the 30-mg and 60-mg dexlansoprazole drug products in

7    TWi's ANDA contain the amorphous form of dexlansoprazole and therefore contain every

8    element of claims 1 and 2 of the '282 patent.  *See* Motion for Summary Judgment of Infringement

9    of the '282 Patent ("Takeda SJ Motion (TWi)").  TWi brings a motion seeking summary judgment

10   that: 1) its ANDA products do not infringe the '755 Patent because Takeda cannot establish that

11   the composition of those products "begins to release" the active ingredient at a pH level of no less

12   than 5.0 and no more than 6.0, as is required under the asserted claims; 2) there is no subject

13   matter jurisdiction over claims IV and VII of Takeda's complaint to the extent they are based on

14   alleged infringement of the '282 Patent because the '282 Patent is not listed in the FDA Orange

15   Book and TWi has not filed a Paragraph IV certification with respect to it; 3) claims 1 and 2 of

16   the '282 Patent are invalid because they are anticipated by the Larsson[3] and Barberich[4]

17   references; and 4) claims 1 and 2 of the '282 Patent are invalid as lacking the required written

18   description of the claimed dexlansoprazole salts and compositions containing them.[5]  *See*

19   Defendant TWi Pharmaceuticals, Inc.'s Motion for Summary Judgment ("TWi SJ Motion").

20

21   [2] Originally, Takeda alleged that TWi's ANDA products infringed six of its patents.  Judgment of

22   non-infringement was entered as to four of these patents, *see* Docket No. 146, leaving only the
     '282 and '755 Patents at issue.

23   [3] Larsson" refers to WO 96/02535 ("Larsson I") and U.S. Patent No. 5,948,789 ("Larsson II").
     Local Rule 56-2 Stipulation of Undisputed Facts ("JSUF (TWi Motion)") ¶¶ 90-91. The parties

24   agree that there is no material difference between the disclosures of Larsson I and Larsson II.
     JSUF (TWi Motion) ¶ 92.

25   [4] "Barberich" refers to WO 99/38513 ("Barberich I") and U.S. Patent App. No. 2003/0008903

26   ("Barberich II").  The parties agree that there is no material difference between the disclosures of
     Barberich I and Barberich II.  JSUF ¶¶ 93-94 (TWi Motion).

27   [5] TWi also incorporates and joins in "any invalidity summary judgment motion offered by any

28   defendant in any related case with respect to claims 1 and 2 of the '282 patent."  TWi SJ Motion
     at 15 n. 9.

                                            2

A133

1    Hearings on the motions were held on February 8, 2013 and February 22, 2013. For the

2    reasons set forth below, Takeda's summary judgment motion is GRANTED. TWi's summary

3    judgment motion is GRANTED in part and DENIED in part.[6]

4    ## II.   BACKGROUND

5    ### A.   The Accused Products

6    In its ANDA, TWi seeks approval from the FDA to market dexlansoprazole delayed-release

7    capsules in 30-mg and 60-mg dosage forms. JSUF (Takeda Motion) ¶¶ 5,16. TWi manufactures

8    its ANDA products in Taiwan. *Id.* ¶ 13.

9    ### B.   The Asserted Claims of the '282 Patent

10   Takeda alleges that TWi's ANDA products infringe claims 1 and 2 of the '282 Patent.

11   Claim 1 of the '282 Patent claims an "amorphous compound of (R)-2-[[[3-methyl-4-

12   (2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof." Joint

13   Statement of Undisputed Facts for Takeda's Motion for Summary Judgment of Infringement of

14   the '282 Patent ("JSUF (Takeda Motion)"), ¶ 1. The parties agree that the term "(R)-2-[[[3-

15   methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1 H-benzimidazole" in the '282

16   Patent refers to dexlansoprazole. *Id.* ¶ 4. Claim 2 of the '282 patent, which depends from claim

17   1, requires a "pharmaceutical composition comprising the amorphous compound according to

18   claim 1 and a pharmaceutically acceptable excipient, carrier or diluent." *Id.* ¶ 2. The Court has

19   construed the term "amorphous compound" in claims 1 and 2 of the '282 Patent to mean "a non-

20   crystalline solid that lacks the long-range order characteristic of a crystal." *Id.* ¶ 3; Claim

21   Construction Order at 71.

22   ### C.   The Asserted Claims of the '755 Patent

23   Takeda alleges that TWi's ANDA products infringe claims 2 and 4 of the '755 Patent, each

24   of which depends from claim 1. JSUF (TWi Motion) ¶ 1. Claim 1 describes a capsule

25   comprising two compositions, one of which is "soluble in the pH range of 6.0 to 7.5"

26   ("composition (i)") and another in which the drug is "released in the pH range of no less than 5.0

27

28   [6] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28
U.S.C. § 636(c).

3

United States District Court
Northern District of California

1    to no more than 6.0" ("composition (ii)").   At the claim construction stage of the case, the Court

2    was asked to construe the claim term specifying the range for composition (ii) (hereinafter, the

3    "release term").  The primary dispute focused on whether the specified pH range refers to the

4    threshold level at which release of the active ingredient begins, as Takeda asserted, or rather,

5    represents the *only* pH values at which release or dissolution occurs.  The Court adopted Takeda's

6    proposed construction, construing the claim term "released in the pH range of no less than 5.0 to

7    no more than 6.0" to mean that the dexlansoprazole "begins to be released from the tablet, granule

8    or fine granule at pH values within the range from 5.0 to 6.0."  Claim Construction Order at 70.

9    In response to the argument that the claim term is indefinite because a person skilled in the art

10   would not know what percentage of the drug needs to be released to satisfy the "begins to be

11   released" requirement, the Court noted that "the phrase 'begins to release' is not a claim term but

12   merely a proposed construction intended to convey the idea that the pH values in the term

13   represent a threshold."  *Id.* at 67.  The Court went on to find that the question of what amount of

14   drug release satisfies this requirement does not render the claim term insolubly ambiguous to a

15   person of ordinary skill in the art.  *Id.*

16   **D.    The Parties' Contentions**

17       **1.    Subject Matter Jurisdiction Over '282 Infringement Claim**

18          **a.    TWi's Motion**

19       TWi asserts there is no subject matter jurisdiction over Takeda's '282 Patent infringement

20   claim under 35 U.S.C. § 271(e)(2) because Takeda has not listed the '282 Patent in the "Orange

21   Book" and TWi's ANDA does not include a Paragraph IV certification.  TWi SJ Motion at 14-15

22   (citing *Eisai Co. v. Mutual Pharmaceutical Co., Inc.*, 2007 WL 4556958, at *6 (D.N.J. Dec. 20,

23   2007); *Abbott Labs. v. Zenith Labs., Inc.*, 934 F.Supp. 925, 936 (N.D.Ill.,1995)).  According to

24   TWi, a Paragraph IV certification is a jurisdictional requirement under the Hatch-Waxman Act.[7]

25

26

27   [7] In the Motion, TWi requests dismissal of both Count IV (asserted under the Hatch-Waxman
     Act) and Count VII of Takeda's First Amended Complaint on this basis.  Count VII, however, is

28   asserted under § 271(a) and the Declaratory Judgment Act rather than the Hatch-Waxman Act.
     Therefore, this argument does not apply to Count VII.

4

United States District Court
Northern District of California

### b.    Takeda's Opposition

Takeda rejects TWi's assertion that the Court lacks subject matter jurisdiction under § 271(e)(2) because the '282 Patent is not listed in the Orange Book.  Takeda Opposition at 19-21.  According to Takeda, Supreme Court and Federal Circuit authority establish that it is the submission of an ANDA, not a paragraph IV certification, that establishes jurisdiction in the district courts for an act of infringement under § 271(e)(2).  *Id.* at 19-20 (citing *Caraco Pharmaceutical Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1680 n. 5 (2012); *AstraZeneca Pharms. LP v. Apotex Corp.*, 669 F.3d 1370, 1376-77 (Fed. Cir. 2012);  *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1343-44 (Fed. Cir. 2004);  *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1372-73 (Fed. Cir. 2006)).  Takeda cites district court decisions that it contends have reached the same conclusion.  *Id.* at 12 (citing *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 363 n.49 (D. Del. 2009); *Cephalon, Inc. v. Sandoz, Inc.*, 2012 WL 682045, at *5 (D. Del. Mar. 1, 2012); *Teva Pharms. USA, Inc. v. Abbott Labs.*, 301 F. Supp. 2d 819, 829 (N.D. Ill. 2004); *Bayer Healthcare, LLC v. Norbrook Labs., Ltd.*, 2009 WL 6337911, at *9 (E.D. Wis. Sept. 24, 2009)).

### c.    TWi's Reply

In its Reply brief, TWi asserts that Takeda has not cited any case in which a patentee was able to maintain "an ANDA patent infringement action with respect to a patent that was never listed in the Orange Book."  TWi Reply at 12.  According to TWi, *Eisai* is closely on point and in that case, the court found that a Paragraph IV certification was required for subject matter jurisdiction.  *Id.* (citing 2007 WL 4556958, at *14 (D.N.J. Dec, 20, 2007).   TWi argues that the cases cited by Takeda are "easily distinguished" on the grounds that in those cases: "(1) the asserted patent was shortly thereafter listed in the Orange Book," *id.* at 12 n. 6 (citing *Cephalon, Inc. v. Sandoz, Inc.*, 2012 WL 682045, at *4 (D. Del. Mar. 1. 2012)); "(2) changes in patent certification from 'paragraph IV' to other certifications did not destroy already existing jurisdiction over listed Orange Book patents," *id.* (*citing Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1680 (2012); *Bayer Healthcare LLC v. Norbrook Labs., Ltd.*, No. 08-cv-00953, 2009 WL 6337911, at *9 (E.D. Wis. Sept. 24, 2009)); and "(3) 'old-antibiotic' cases

5

A136

that are expressly excluded from Orange Book listing requirements altogether provided jurisdiction," *id.* (citing *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1344 (Fed. Cir. 2004)).[8]

### 2. Infringement of the '282 Patent

#### a. Takeda's Motion

Takeda asserts in its summary judgment motion that TWi's ANDA products should be found to infringe the '282 claims because TWi's representations to the FDA and its admissions in discovery establish that those products contain the claimed amorphous compound of dexlansoprazole. Takeda SJ Motion (TWi) at 1. Takeda acknowledges that because the drug products are manufactured in Taiwan, the fact that the dexlansoprazole used to manufacture them is the solid amorphous form of dexlansoprazole does not establish infringement; rather, Takeda must establish that the *finished* product that will be imported and sold into the United States will contain amorphous dexlansoprazole in order to establish infringement. *Id.* at 6 (citing JSUF (Takeda Motion) ¶ 6).

In support of its contention that TWi's prior statements establish infringement of the '282 Patent, Takeda points first to the undisputed fact that TWi has informed the FDA that the active pharmaceutical ingredient used in the manufacture of its ANDA products is the amorphous form of dexlansoprazole. *Id.* at 2 (citing JSUF (Takeda Motion) ¶ 6). Takeda next cites the following statement made by TWi to the FDA in the ANDA relating to its layering process[9]:

---

[8] In its reply brief, TWi also cites *Eisai*'s holding that the plaintiff's claim seeking a declaratory judgment based on future infringement failed because the alleged future infringement depended on two contingent future events, namely, FDA approval of the ANDA and the manufacturer's decision to market the generic drug pursuant to the ANDA. *Id.* at 12 (citing 2007 WL 4556958, at *18). This argument goes to the question of whether Takeda can establish standing under the Declaratory Judgment Act, an argument that should have been raised in TWi's opening brief. As TWi raised this issue for the first time in its reply brief, the Court declines to rule on it, as discussed further below.

[9] In its brief, Takeda explains that TWi's drug products, as described in the ANDA, are capsules that contain multilayered "pellets," which control the release of the active ingredient. *Id.* at 3 (citing Declaration of Allan S. Myerson, PhD, in Support of Takeda's Motion for Summary Judgment of Infringement of the '282 Patent ("Myerson Decl."), Ex. 3 (Chen Dep. Ex. 40) at ANC-DEXL0000437 & fig.). During TWi's manufacturing process, the active drug core pellets are created by dissolving amorphous dexlansoprazole with sodium hydroxide, sucrose, the surfactant SDS (also known as sodium dodecyl sulfate or sodium lauryl sulfate), and

6

United States District Court
Northern District of California

[t]wo drug layering processes were investigated, one was suspension and the other one was solution. The suspension based drug layering was investigated because of low water solubility of the drug substance and produced a high solid content suspension in an environmentally friendly vehicle. However, the active substance re-crystallized immediately when it contacted with water and formed big and hard particles. Homeogenizer was used to micronize the particles, but it was difficult to control the particle size distribution of the active substance. Additionally, a great quantity of heat was produced when the suspension passed through the homogenizer and this may cause the stability issue of the active. Therefore, it was concluded that the suspension system approach was not viable. In contrast, dissolving the active completely in a solution was [a] much more uniform way to layer the active.

*Id.* at 4 (citing Myerson Decl., Ex. 8 (Chen Dep. Ex. 51) at ANC-DEXL0000779; JSUF (Takeda Motion) ¶ 11). Takeda contends that this statement to the FDA indicates that TWi's ANDA products do not crystallize during the manufacturing process and therefore this statement is tantamount to an admission that the finished product contains the amorphous form of dexlansoprazole. *Id.*

This conclusion finds further support, Takeda argues, in the deposition testimony of TWi's 30(b)(6) witness, Dr. Shou-Chiung Chen, who is TWi's Vice President for Research and Development, that TWi uses the excipients SDS and hypromellose in the core pellet to prevent crystallization of the amorphous dexlansoprazole. *Id.* at 4 (citing Myerson Decl., Ex. 7 (Jun. 20, 2012 Chen Dep. Tr. 118:1-10, 123:24-124:6-8); JSUF (Takeda Motion) ¶ 10). Takeda also cites other statements made in this litigation that it contends are admissions that TWi's ANDA products contain amorphous dexlansoprazole. First, Takeda points to TWi's interrogatory responses stating that its "ANDA drug products do not contain a crystal or crystalline compound of dexlansoprazole . . . ." *Id.* at 4 (citing Myerson Decl., Ex. 9 (TWi's Responses and Objections to Plaintiffs First Set of Joint Interrogatories, July 28, 2011) at 17; JSUF (Takeda Motion) ¶ 14). Takeda also relies on TWi's paragraph IV letter to Takeda, which states that "the ANDA drug products do not include a crystal or crystalline compound of dexlansoprazole." *Id.* (citing

---

hypromellose K100 premium LVCR (a polymer) and then sprayed onto sugar spheres and dried to form the active drug core pellet. *See* JSUF (Takeda Motion) ¶ 12.

United States District Court
Northern District of California

1   Myerson Decl., Ex. 10 at ANC-DEXL0000258; JSUF (Takeda Motion) ¶ 15). Based on this

2   evidence, Takeda's expert, Dr. Myerson, concluded that TWi's ANDA products contain

3   amorphous dexlansoprazole. *Id.* at 5, 7 (citing Expert Report of Allan S. Myerson, PhD,

4   Regarding Infringement by TWi ("Myerson Report (TWi)" ¶¶ 22, 58-61). Dr. Myerson opines,

5   *inter alia*, that if TWi's drug product is not crystalline, as TWi has admitted in its interrogatory

6   responses and in its ANDA, "it must be the amorphous form of dexlansoprazole." Myerson

7   Report ¶ 60. According to Takeda, because TWi has not offered any expert testimony to rebut the

8   opinion of Dr. Myerson, there is no genuine dispute of material fact and it is entitled to summary

9   judgment of infringement of the '282 Patent. *Id.* at 8.

10              **b.    TWi's Opposition**

11              TWi argues that Takeda is not entitled to summary judgment of non-infringement because

12   it has not pointed to any final product testing that shows that the form of the dexlansoprazole in

13   the ANDA products is amorphous. TWi Opposition at 1. TWi points out that at claim

14   construction, Takeda asked the Court to exclude dexlansoprazole molecules such as those mixed

15   with solvents or air, from its construction of "an amorphous compound" and the Court agreed. *Id.*

16   at 3 (citing Claim Construction Order at 37, 39-40, 47). Thus, TWi contends, for the purposes of

17   this case, dexlansoprazole exists in three forms: 1) a crystalline solid, characterized by a

18   molecular pattern over a long range; 2) an amorphous solid, which has no pattern over a long

19   range; and 3) "where the dexlansoprazole molecules constitute neither a crystalline or an

20   amorphous solid, *i.e.,* other." *Id.* at 3-4. According to TWi, in order to prevail on its summary

21   judgment motion Takeda must offer evidence that establishes, as a matter of law, that the finished

22   product is the amorphous form and not one of the other two forms of dexlansoprazole. *Id.* at 4.

23   TWi contends that Takeda has failed to meet this burden. *Id.*

24              TWi notes that Takeda has acknowledged that it is required to establish that the finished

25   product contains amorphous dexlansoprazole and further points to testimony by Takeda's expert

26   conceding that he has not conducted any testing of TWi's ANDA products. *Id.* at 5-6. TWi

27   further cites statements made by Takeda in this litigation that dexlansoprazole naturally tends to

28   convert to crystalline form. *Id.* at 7-9. In light of these statements and admissions by Takeda,

8

United States District Court
Northern District of California

TWi asserts, summary judgment of infringement of the '282 Patent is not warranted. *Id.* at 9.
TWi further argues that Takeda relies on the use of amorphous dexlansoprazole to manufacture its
ANDA products as evidence that the finished product contains amorphous dexlansoprazole, but
that this evidence does not support Takeda's position because the raw dexlansoprazole is
completely dissolved in a solvent with excipients, then dried. *Id.* at 9-10. Given that the
amorphous solid form of the raw dexlansoprazole is completely lost in the manufacturing process,
TWi argues, the fact that the dexlansoprazole was initially an amorphous solid has no bearing on
the question of what form the dexlansoprazole takes in the finished product. *Id.* at 10-12.

    TWi also contends that it has not made any admissions regarding whether the ANDA
products contain amorphous dexlansoprazole, arguing that in its notice letter to Takeda it only
stated that Takeda would be "unable to carry its burden of proof to show that the proposed
ANDA products contain the claimed 'crystalline compound' or a 'crystal' of dexlansoprazole."
*Id.* at 12. TWi also notes that its statements were made prior to the Court's claim construction
and therefore do not constitute admissions that its ANDA products contain amorphous
dexlansoprazole as that term has been construed by the Court in this action. *Id.* at 12-13.

### c.    Takeda's Reply

    In its Reply brief, Takeda reiterates its position that it has offered significant evidence of
infringement, including TWi's statements to the FDA and in this litigation and expert testimony,
even if it has not conducted its own testing. Takeda Reply at 3. Takeda rejects TWi's suggestion
that the dexlansoprazole in its ANDA products might take the form of "molecules in gases,
solutions, and oils," asserting that there is no factual support for that position. *Id.* Takeda points
out that in its Claim Construction order, the Court acknowledged that "typically amorphous
materials used in oral pharmaceuticals are solids." *Id.* (citing Claim Construction Order at 48).
Takeda further notes that at his deposition, TWi's expert was not able to name any orally-ingested
non-solid amorphous materials used in pharmaceuticals. *Id.* (citing Takahashi Reply Decl., Ex. 2
(Dec. 9, 2011 Rogers Dep. Tr.) at 58:3 - 59:3, 72:6-20). Further, Takeda contends, TWi's
statements to the FDA acknowledge that the dexlansoprazole in its ANDA products is in a solid
form. *Id.* (citing Myerson Decl., Ex. 3 at ANC-DEXL0000438 (indicating that excipients used in

United States District Court
Northern District of California

1  ANDA product fell below "limits for solid, oral dosage forms"); Myerson Decl., Ex. 8 at ANC-

2  DEXL0000769 (same); Takahashi Reply Decl., Ex. 3 (ANC-DEL0000796) (statement in ANDA

3  that a particular test was not performed on the ANDA product because it is "[n]ot applicable for

4  solid oral dosage forms").

5       Takeda also cites the testimony of its own expert, Dr. Myerson, that the process used to

6  create the ANDA products, which involves dissolving the amorphous dexlansoprazole API,

7  spraying the solution on a core pellet, and allowing it to dry, results in a solid. *Id.* at 4 (citing

8  Mizerk Decl., Ex. A (Oct. 25, 2012 Myerson Dep. Tr.) at 116:16- 123:16 ("[W]e're forming a,

9  basically, a solid . . . ."); *id.* ("[E]verything in there when this is done is a solid.").  Dr. Myerson

10  also testified that solids must be either crystalline or amorphous, and Takeda contends that the

11  binary nature of solids is well-supported in the scientific literature. *Id.* (citing Decl. of Allan S.

12  Myerson, Ph.D., in Support of Takeda's Opening Claim Construction Brief ("Myerson Claim

13  Construction Decl.") ¶ 81 ("Solids can be crystalline or amorphous."), ¶ 23 ("Solids that are not

14  crystalline and have no long range order . . . are said to be amorphous."); Myerson Rep. ¶ 22

15  (same); Myerson Claim Construction Decl., Ex. 11 at DEX0014516 ("The terms amorphous and

16  non-crystalline are synonymous . . . and can be used interchangeably."); *id.*, Ex. 12 at

17  DEX0014612 ("[N]ot all solids are crystals. Materials that have short-range rather than long

18  range ordering . . . are non-crystalline solids. A noncrystalline solid is often referred to as an

19  amorphous solid."); *id.*, Ex. 13 at DEX0014769 ("A liquid may solidify in two ways: . . . to a

20  crystalline solid or . . . to an amorphous solid."); *id.*, Ex. 27 at DEX0014491 (defining

21  "[a]morphous [s]olid" as "[a] noncrystalline solid"); Expert Decl. of Robin D. Rogers in Support

22  of Handa Pharmaceuticals, LLC's Opening Markman Brief ("Rogers Claim Construction Decl."),

23  Ex. 3 at DEX0003649 ("Some authors [] sub-divide solids into crystalline and amorphous."); *id.*,

24  Ex. 4 at IPXL-0009902 (defining "amorphous" as "[n]oncrystalline . . ."); *id.*, Ex. 5 at IPXL-

25  0010285 (same);  Takahashi Reply Decl., Ex. 2 (Dec. 9, 2011 Rogers Dep. Tr.) at 19:5-13;

26  Rogers Claim Construction Decl. ¶ 30 ("[T]he term 'amorphous' is an adjective that is

27  synonymous with 'noncrystalline.'"); *id.* ¶¶ 28-29).

28

<div align="center">10</div>

A141

United States District Court
Northern District of California

1    Takeda rejects TWi's contention that the fact that the dexlansoprazole used to

2 manufacture its ANDA products is amorphous has no bearing on the form of the dexlansoprazole

3 in the finished product. *Id.* at 6. Rather, Takeda cites testimony by Dr. Myerson that after the

4 amorphous dexlansoprazole API is dissolved, excipients are added to the solution to prevent

5 crystallization and that as a result, it is likely that the dexlansoprazole in the finished product

6 remains in an amorphous state. *Id.* (citing Myerson Decl., Ex. 3 at ANC-DEXL0000458;

7 Myerson Report ¶ 58; JSUF (Takeda Motion) ¶ 12). Takeda also points to the testimony of Dr.

8 Chen regarding the use of excipients to prevent crystallization. *Id.* (citing Myerson Decl., Ex. 7

9 (Jun. 20, 2012 Chen Dep. Tr.) at 94:19-95:3; 118:1-10, 123:24-124:8).

10    Takeda argues that testing is not required to show infringement, contrary to TWi's

11 assertions, and that in the face of the evidence offered by Takeda, TWi has failed to produce

12 specific evidence demonstrating the existence of a genuine dispute of fact. *Id.* at 7-8 (citing

13 *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009)).

14    **3.  Validity of the '282 Patent**

15       **a.  TWi Motion**

16    TWi contends in its summary judgment motion that claims 1 and 2 of the '282 patent are

17 anticipated by Larsson[10] and Barberich.[11] TWi SJ Motion at 15-17. In the alternative, TWi

18 argues, the asserted claims of the '282 Patent are invalid because they are not supported by

19 sufficient written description in the specification. *Id.* at 17-19.

20       **i.  Anticipation**

21    According to TWi, even if there is a factual dispute about whether Larsson discloses pure

22 dexlansoprazole as an amorphous solid, the undisputed facts establish that the dexlansoprazole

23 "salts" and "compositions" claimed in the '282 patent are anticipated by both the Larsson and

---

24  [10] "Larsson" refers to WO 96/02535 ("Larsson I") and U.S. Patent No. 5,948,789 ("Larsson II").

25  Larsson I and II are attached as Exhibits 4 and 5, respectively, of the Mizerk Declaration. The
parties agree that there is no material difference between the disclosures of Larsson I and II.

26  JSUF (TWi Motion) ¶ 92.

    [11] "Barberich" refers to WO 99/38513 ("Barberich I") and U.S. Patent App. No. 2003/0008903
27  ("Barberich II"). Barberich I and II are attached as Exhibits 6 and 7, respectively, of the Mizerk

28  Declaration. The parties agree that there is no material difference between the disclosures of
Barberich I and II. JSUF (TWi Motion) ¶ 94.

11

United States District Court
Northern District of California

1  Barberich references. *Id.* at 15. TWi points to the following undisputed facts to show that the

2  claimed "amorphous compound" of dexlansoprazole or salt thereof described in claim 1 of the

3  '282 Patent is disclosed in Larsson: 1) Larsson discloses dexlansoprazole, *id.* at 16 (citing JSUF

4  (Twi Motion) ¶ 95); 2) Larsson discloses making salts with dexlansoprazole, *id.* (citing JSUF

5  (TWi Motion) ¶ 96; and 3) pharmaceutical salts of dexlansoprazole prepared by "conventional

6  processes" are claimed in claim 1 of Larsson II, U.S. Patent No. 5, 948,789, *id.* (citing JSUF (TWi

7  Motion) ¶ 82). Further, these disclosures are presumed to be enabled, TWi asserts, because they

8  are disclosed in a U.S. patent. *Id.* at 16 (citing *In re Antor Media Corp.*, 689 F.3d 1282, 1290

9  (Fed. Cir. 2012) ("both claimed and unclaimed materials disclosed in a patent are presumptively

10  enabling."). With respect to the "pharmaceutical composition" limitation of claim 2, TWi points

11  to the disclosure in Larsson of the use of dexlansoprazole "in medicine." *Id.* (citing Mizerk Decl.,

12  Ex. 4 and 5).

13      As to Barberich, TWi cites to the following undisputed facts: 1) Barberich discloses

14  dexlansoprazole; 2) Barberich discloses making pharmaceutical salts with dexlansoprazole; 3)

15  Barberich discloses dexlansoprazole as a "flowable powder"; 4) Barberich discloses specific

16  examples of tablets and capsules, both of which are solid dosage forms, containing

17  dexlansoprazole. *Id.* (citing JSUF (TWi Motion) ¶¶ 97-99, 101). TWi further cites testimony by

18  Takeda's experts, Drs. Myerson and Atwood, in which they "specifically admit that even the oil

19  from Larsson could be used to prepare a salt of dexlansoprazole." *Id.* at 16-17 (citing JSUF (TWi

20  Motion) ¶ 83 (citing Mizerk Decl., Ex. 10 (Oct. 16, 2012 Atwood Dep. Tr.) at 255-56); Mizerk

21  Decl., Ex. 12 (Oct. 25, 2012 Myerson Dep. Tr.) at 131). In fact, TWi asserts, there is no dispute

22  that preparation of the salts described in claim 1 of the '282 Patent is not difficult using methods

23  known in 1999, as inventor Keiji Kamiyama conceded. *Id.* at 17 (citing Mizerk Decl., Ex. 11

24  (July 11, 2012 Kamiyama Dep. Tr.) at 153). Based on these undisputed facts, TWi contends that

25  both Larsson and Barberich anticipate the asserted claims of the '282 Patent.

26      **ii.   Written Description**

27      If Takeda takes the position that Larsson and Barberich do not disclose the salts claimed in

28  claim 1 of the '282 Patent and their use with pharmaceutical excipients (described in claim 2),

<div align="center">12</div>

<div align="center">A143</div>

TWi contends, it must implicitly concede that the '282 Patent does not contain adequate written description of these claimed features. *Id.* at 17-19. According to TWi, Takeda admits that there is no explicit description in the '282 Patent of the salts claimed in claim 1 or their use with any pharmaceutical excipients and that there is no way to know whether such salts, if made, would be amorphous or crystalline. *Id.* at 18 (citing JSUF (TWi Motion) ¶ 84 (citing Mizerk Decl., Ex. 10 (Oct. 16, 2012 Atwood Dep. Tr.) at 347-349)). TWi also cites deposition testimony by the inventor, Keiji Kamiyama, that as far as he knew, no one at Takeda had actually made any salts of dexlansoprazole before 1999 and that "no one at Takeda, including the inventors, even attempted to incorporate amorphous dexlansoprazole in a pharmaceutical formulation." *Id.* (citing JSUF (TWi Motion) ¶87 (citing Mizerk Decl., Ex. 11 (July 11, 2012 Kamiyama Dep. Tr.) at 153-156)). *Id.* According to TWi, this evidence is sufficient to establish, as a matter of law, that the specification of the '282 Patent does not have sufficient written description to show that the inventors were in possession of the claimed invention. *Id.* at 18-19 (citing 35 U.S.C. § 112; *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344, 1351-1352 (Fed. Cir. 2010) (en banc); *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1362-1364 (Fed. Cir. 2011)).

### b. Takeda's Opposition

#### i. Anticipation

Takeda rejects TWi's anticipation theory, arguing that neither Larsson nor Barberich discloses dexlansoprazole as an amorphous solid in salt form.[12] According to Takeda, TWi's position as to Larsson is based on the proposition that Larsson inherently discloses an amorphous salt of dexlansoprazole because it expressly discloses the synthesis of an oil of dexlansoprazole and "[t]he obtained products may thereafter be converted to pharmaceutically acceptable salts thereof by conventional processes." Takeda Opposition at 22 (citing JSUF (TWi Motion) ¶¶ 95-96; Mizerk Decl., Ex. 5 (Larsson II) at col.1, ll.14-17). Takeda does not dispute that at the

---

[12] Takeda does not challenge TWi's assertions that Larsson or Barberich disclose the "pharmaceutical composition" element of claim 2 of the '282 Patent.

13

priority date, a person of ordinary skill in the art would have been aware of conventional methods for making salts. *Id.* Takeda argues that such a person would not, however, have known how to make an amorphous salt of dexlansoprazole that was a solid, as is required under the Court's claim construction. *Id.* (citing Claim Construction Order at 71).

First, Takeda points out that TWi does not cite any expert testimony from Dr. Rogers, TWi's expert on invalidity, that the salt made from the dexlansoprazole oil disclosed in Larsson would be a solid. *Id.* at 23. Takeda also cites the testimony of its own expert, Dr. Atwood, that "[i]f one started with dexlansoprazole as a solid and carried out the reaction, then one should end up with a solid salt [but that] [i]f one started . . . with an oil, one might well end up with an ionic liquid, an oil." *Id.* at 23 (quoting Purles Opposition Decl., Ex. 16 (Oct. 16, 2012 Atwood Dep. Tr.) at 201:4-13). The testimony of Dr. Kamiyama that TWi cites -- that it was easy to prepare an amorphous salt of dexlansoprazole that is solid -- is not relevant, Takeda contends, because Dr. Kamiyama was testifying about the synthesis of amorphous salts conducted in 2000, after the priority date of the '282 Patent; moreover, Takeda argues, the only evidence in the record is that in the experiments Dr. Kamiyama was describing, he used solid forms of dexlansoprazole as starting materials rather than an oil. *Id.* (citing Purles Opposition Decl., Ex. 17 (July 11, 2012 Kamiyama Dep. Tr.) at 151:11-152:14; *id.*, Ex. 18 (Dep. Ex. 700 (U.S. Patent No. 7,271,182, assigned to Drs. Kamiyama and Hashimoto), at Reference Example 1 and Examples 4 and 5 (describing synthesis of amorphous salts from crystalline dexlansoprazole)). Because TWi has not produced any evidence that shows that the salt made from the oil disclosed in Larsson would necessarily be a solid, Takeda argues, TWi has not established by clear and convincing evidence that Larsson inherently anticipates claim 1 of the '282 Patent. *Id.* at 24.

Second, Takeda argues that Barberich also does not anticipate the asserted claims because it does not disclose the synthesis of any solid form of dexlansoprazole, but merely incorporates by reference the synthesis methods disclosed in prior art such as Larsson. Because Larsson also does not disclose the synthesis of a solid form of dexlansoprazole as a salt, Barberich is not enabled, Takeda contends. *Id.* at 23-24 (citing Atwood Report ¶ 70-71, 100-106; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003)).

14

1    Finally, Takeda argues that TWi's "dexlansoprazole salt" theory should not be considered

2    because it was not raised during discovery and therefore is in violation of Patent Local Rule 3-3.

3    *Id.* at 22-23 (citing Patent L.R. 3-3(a), (c);  Purles Opposition Decl., Ex. 15 (Invalidity

4    Contentions) at 66; *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355 (Fed. Cir.

5    2006)).

6    ## ii.   Written Description

7    Takeda argues that claims 1 and 2 of the '282 patent are not invalid for lack of adequate

8    written description.  *Id.* at 24.  Takeda does not dispute that there is no explicit description in the

9    '282 Patent of the amorphous salt of claim 1 or its use in a pharmaceutical composition but

10   contends that the written description requirement is satisfied because the '282 Patent discloses the

11   synthesis of an amorphous solid of dexlansoprazole and describes specific examples of salts of

12   dexlansoprazole.  *Id.* According to Takeda, this disclosure "in combination with conventional

13   processes that TWi admits were in the prior art," would be sufficient to describe an amorphous

14   solid salt of dexlansoprazole to a person of ordinary skill in the art.  *Id.*  (citing '282 Patent, col.1,

15   l. 65 - col. 2, l. 2; col. 2, ll. 3-10; Atwood Report ¶ 121)).

16   Takeda argues that actual reduction to practice is not required to satisfy the written

17   description requirement, so long as one of skill in the art can "visualize or recognize" the claimed

18   invention based on the disclosure in the specification.  *Id.* (citing *Centocor Ortho Biotech, Inc. v.

19   Abbott Labs.*, 636 F.3d 1341, 1353 (Fed. Cir. 2011); *Volterra Semiconductor Corp. v. Primarion,

20   Inc.*, 796 F. Supp. 2d 1025, 1064 (N.D. Cal. 2011)).  Takeda points to the testimony of Drs.

21   Atwood and Kamiyama, which Takeda contends supports the conclusion that the '282 Patent

22   contains adequate written description of a solid salt of dexlansoprazole. *Id.* at 25 (citing Purles

23   Opposition Decl., Ex. 16 (Oct. 16, 2012 Atwood Dep. Tr.) at 201:4-13 (testifying that "[i]f one

24   started with dexlansoprazole as a solid and carried out the reaction, then one should end up with a

25   solid salt."); *id.*, Ex. 17 (July 11, 2012 Kamiyama Dep. Tr.) at 153:5-22 (testifying that it was

26   "not that difficult" to prepare an amorphous solid salt of dexlansoprazole from an amorphous

27   solid compound of dexlansoprazole).  Moreover, Takeda asserts, the person of ordinary skill in

28   the art in 1999 would have understood the inventors of the '282 Patent had possession of a

15

United States District Court
Northern District of California

pharmaceutical composition of an amorphous solid salt of dexlansoprazole in light of the fact that

such a person would have understood from prior art such as Barberich how to make a solid

dosage form of dexlansoprazole. *Id.* (citing Mizerk Decl., Ex. 7 (Barberich II) at 4 (Example 2);

Atwood Report ¶ 122; Purles Opposition Decl., Ex. 19 (Nov. 9, 2012 Rogers Dep. Tr.) at 65:9-16

(admitting that the teachings of Larsson could be used to make a pharmaceutical composition)).

Thus, Takeda asserts, the evidence at a minimum creates a factual dispute as to whether one

skilled in the art would have understood Takeda's invention to encompass salts of the amorphous

solid of dexlansoprazole, precluding summary judgment of invalidity for lack of adequate written

description.

### c.    TWi Reply

### i.    Anticipation

TWi asserts that Takeda has conceded that both Larsson and Barberich disclose

amorphous and crystalline salts of dexlansoprazole, thus supporting entry of summary judgment

of anticipation. TWi Reply at 14. TWi rejects Takeda's reliance on the testimony of its expert,

Dr. Atwood, that a salt of dexlansoprazole made using conventional processes "might or might

not" be a solid, pointing to testimony by Dr. Atwood in which he stated that "typically one would

expect the salt to be a solid." *Id.* (citing JSUF (TWi Motion) ¶ 82). TWi further contends that

whether one starts with a solid or an oil is irrelevant as Takeda admits that the first step of

preparing a salt is dissolving the dexlansoprazole in a solvent. *Id.* (citing JSUF (TWi Motion) ¶¶

87-89). According to TWi, "[g]iven that Dr. Atwood testified that [the] expectation is that the salt

would be a solid, Takeda has not rebutted the presumption that the Larsson and Barberich

references disclose the claimed solid dexlansoprazole salts." *Id.* (citing *In re Antor Media Corp.*,

689 F.3d 1282, 1288 (Fed. Cir. 2012)). Because Takeda has failed to come forward with

evidence that the disclosures of Larsson and Barberich are not enabled, TWi argues, this prior art

anticipates claim 1. *Id.* Further, TWi asserts, Takeda did not address in its Opposition brief

TWi's argument that Larsson and Barberich disclose the "pharmaceutical composition" required

under claim 2 of the '282 Patent. *Id.*

16

### ii. Written Description

TWi argues that Takeda's assertion that dexlansoprazole subjected to conventional processes is sufficient disclosure to meet the written description argument is inconsistent with its position as to anticipation. *Id.* According to TWi, "Takeda cannot have it both ways." *Id.* To the extent Takeda argues that Larsson and Barberich do not disclose the claimed salts, the written description in the '282 Patent is insufficient, TWi asserts. *Id.*

### 4. Infringement of the '755 Patent

#### a. TWi Motion

TWi contends that it is entitled to summary judgment of non-infringement of the '755 Patent because Takeda has not demonstrated a genuine issue of material fact regarding whether "composition (ii)" of TWi's ANDA products "beings to release" the active ingredient at a pH level of 5.0. TWi SJ Motion at 2. In support of this position, TWi makes the following arguments: 1) Takeda has offered evidence based on tests of expired product and therefore, this evidence is inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995); 2) Takeda's expert testimony based on these tests is inadmissible under *Daubert* because the tests were "created solely for this litigation and ignored other testing showing contrary results;" and 3) even if they are considered, the test results upon which Takeda relies show that TWi's ANDA products begins to release active ingredient at pH less than 5.0 and therefore do not infringe under the Court's claim construction. *Id.*

Regarding the use of expired product, TWi relies on undisputed facts, namely, that: 1) the drug samples used in the Advantar tests that were the basis for Dr. Charman's expert report were manufactured on May 21, 2010; 2) the tests were conducted after Advantar received the samples of TWi's ANDA products, on June 29, 2012; and 3) TWi requested a 24-month expiration period in its ANDA. *Id.* at 4 (citing JSUF (TWi), ¶¶ 28-31; Mizerk Decl., Ex. 1 at ¶ 46). TWi contends that under these circumstances, Dr. Charman's conclusions are not sufficiently tied to the facts of the case to satisfy *Daubert* because FDA regulations do not permit the sale of expired product and therefore, the expired product is not the one that will infringe if the ANDA is approved. *Id.* at 5 (citing *Pooshs v. Philip Morris USA, Inc.*, 2012 WL 5199450, at *2 (N.D. Cal. Oct. 22, 2012); *In*

17

A148

United States District Court
Northern District of California

1    re Brimonidine Patent Litig., 643 F.3d 1366, 1377 (Fed. Cir. 2011)). According to TWi, under

2    similar circumstances, courts have found that opinions based on results obtained from testing

3    expired product are not admissible. Id. (citing SmithKline Beecham Corp. v. Apotex Corp., 2002

4    WL 1613724, at *2 (N.D. Ill. 2002); Apotex, Inc. v. Cephalon, Inc., 2012 WL 1080148 (E.D. Pa.

5    Mar. 28, 2012)).

6        TWi also argues that Dr. Charman's opinions should be found unreliable under Daubert

7    because they were based solely on tests conducted for this litigation and ignored results obtained

8    by Advantar in tests that were conducted for Takeda's counsel before Dr. Charman was retained.

9    Id. at 5-10.[13] According to TWi, at the claim construction stage of the case, Dr. Charman could

10   not state what testing methodology should be used to determine whether his definition of the

11   release claim term was met and could not say how much release would be required to find that a

12   drug product begins to be released at the 5.0 pH threshold. Id. (citing Docket No. 59, Ex. 2

13   (Charman Dep.) at 112:8-113:1, 122:21-123:5). It was only after Dr. Charman reviewed the test

14   results in Advantar's June 29, 2012 report, which were obtained using a testing protocol

15   developed by Advantar based on its prior testing and recommended to Dr. Charman by Advantar,

16   that Dr. Charman concluded that the "begins to release" requirement means release of more than

17   10% of the total drug in the product after two hours. Id. at 7. According to TWi, Dr. Charman's

18   reliance on Advantar's testing protocol indicates that the methodology is not scientifically

19   acceptable. Id. at 9.

20       TWi further contends that Dr. Charman's methodology is inconsistent with Takeda's

21   position at the claim construction stage of the case, when Takeda argued that a person of ordinary

22   skill in the art would know how to test to assess whether the release term is met based on the

23   prosecution history. Id. at 9-10. According to TWi, the test referenced by Takeda was not used

24   by Dr. Charman. Id. at 10. TWi further asserts that in Takeda's '755 Patent contentions, Takeda

25   referenced in vitro release profiles to show that its Dexilant product was covered by the '755

26

27

28   [13] The undisputed facts relating to the earlier Advantar testing, including the results of that testing,
     are set forth in JSUF (TWi Motion) ¶¶ 33-62.

18

A149

United States District Court
Northern District of California

1   Patent, referencing tests that differed from those conducted by Dr. Charman. *Id.* (citing JSUF

2   (TWi Motion) ¶¶ 79, 81).

3          TWi also argues that under the "proper claim construction," there is no material dispute

4   that TWi's ANDA products begin to release active ingredient at a pH level below 5.0. *Id.* (citing

5   JUSF (TWi Motion) ¶¶ 43-70. In particular, "even the tests of expired product relied upon by

6   Dr. Charman show that the amount of the active ingredient released by the TWi 30-mg product

7   shoots up 8 or 9% (as a % of the total in the entire capsule) between 120 minutes and 150 minutes

8   in pH of 4.9." *Id.* (citing JSUF (TWi Motion) ¶ 66). According to TWi, Dr. Charman's test

9   results also show that the amount of the active ingredient released by the TWi 60-mg product

10  rises to 4% (as a % of the total in the entire capsule) between 120 minutes and 150 minutes in pH

11  of 4.9, and then to 13% by 180 minutes. *Id.* at 10-1 (citing JSUF (TWi Motion) ¶ 66). TWi

12  asserts that these amounts are particularly significant because only 33% of the total active

13  ingredient in TWi's ANDA products is contained in the granules alleged to constitute the

14  "composition (ii)" granules. *Id.* at 11 (citing JSUF (TWi Motion) ¶ 25).

15         According to TWi, Dr. Charman's "10%/two-hour time point is completely arbitrary, and

16  in the case of TWi, appears to have been selected because significant release begins at the two-

17  hour time point and even greater release occurs before the 2 1/2 hour time point is reached under

18  Dr. Charman's testing." *Id.* (citing JSUF (TWi Motion) ¶¶ 43-70). TWi further contends that the

19  '755 Patent specification indicates that release should be measured over at least 5 hours. *Id.*

20  (citing '755 Patent, col. 10, ll. 13-17) ("The rate of elution of active ingredient from the active

21  ingredient release-controlled tablet, granule or fine granule thus obtained is desirably 10% or less

22  for 5 hours in a solution of pH 6.0, and 5% or less for one hour and 60% or more for 8 hours in a

23  solution of pH 6.8"). In addition, according to TWi, during patent prosecution, the inventor

24  testified that at a pH level of 6.8, the "composition (i)" disclosed in the '755 Patent, which was

25  designed to release at pH 6.75, the granule "begins to release" after about 3.5 hours. *Id.* (citing

26  JSUF (TWi Motion) ¶ 74 (citing testimony of Takashi Kurasawa)). TWi contends that this

27  testimony contradicts Dr. Charman's position that release should be measured at two hours. *Id.*

28  TWi also notes that in its interrogatory responses, Takeda cited testing of its own Dexilant

19

1  product to show that it began to release between pH levels 6.5 and 7.0 even though it took more

2  than two hours to release 10 % of the API. *Id.* (citing JSUF (TWi Motion) ¶ 80).

3      TWi also argues that Takeda's position amounts to a request for a new claim construction

4  which should be rejected as untimely. *Id.* at 12. Further, it asserts, if this new construction of the

5  release term is adopted, the claim is invalid because the question of how much API must be

6  released to meet the "begins to release requirement" is insolubly ambiguous to a person skilled in

7  the art. *Id.* at 12-13.

8      **b.    Takeda Opposition**

9      Takeda does not dispute that the Advantar test results show some measurable release of

10  dexlansoprazole at pH levels below 5.0. It contends, however, that the small amount of

11  dexlansoprazole that is released at pH levels below 5.0 is not sufficient to place the ANDA

12  products outside the scope of the claim and further, that this is a factual issues that can only be

13  resolved at trial. Takeda Opposition at 2. Takeda notes that the Court explicitly declined to

14  specify at the claim construction stage of the case what type of testing would be required to

15  determine whether the release term was satisfied, leaving this question to be addressed at trial

16  through expert testimony. *Id.* at 3-4. This approach is consistent with Federal Circuit precedent,

17  Takeda asserts, pointing to cases holding that courts need not eliminate all ambiguity in

18  construing claim terms but rather, should only define terms to the level of specificity that is

19  warranted by the language of the claim and the evidence. *Id.* at 4 (citing *Acumed LLC v. Strkyer*

20  *Corp.*, 483 F.3d 800 (Fed. Cir. 2007); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351 (Fed.

21  Cir. 1998); *Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341

22  (Fed. Cir. 2001); *Modine Mfg. Co. v. Int'l Trade Comm'n*, 75 F.3d 1545 (Fed. Cir. 1996 )).

23  According to Takeda, "where 'the claim language does not require a particular form of testing,

24  this inquiry is not a claim construction question' but is 'review[ed] . . . as a question of fact.'" *Id.*

25  at 5 (quoting *Union Carbide Chems. and Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366,

26  1377 (Fed. Cir. 2005), overruled on other grounds by *Cardiac Pacemakers, Inc. v. St. Jude Med.,*

27  *Inc.*, 576 F.3d 1348 (Fed. Cir. 2009)).

28

United States District Court
Northern District of California

A151

Takeda argues further that there is a genuine dispute of material fact as to the testing criteria that should be used to decide whether TWi's ANDA products meet the release limitation and that substantial evidence supports Dr. Charman's approach. *Id.* Takeda points to the following evidence in support of Dr. Charman's approach:

- the monograph on dissolution testing in the United States Pharmacopeia ("USP"), which recognizes that for delayed-release dosage forms, a product passes a dissolution test if no individual dosage unit shows more than 10% dissolution in acid medium. *Id.* at 6 (citing Charman Decl., Ex. B.21 (2012 USP section on dissolution ) at 301, Acceptance Table 3; Takahashi Decl., Ex. F (1995 USP section on dissolution) at 1796, Acceptance Table 2 (same)).

- the USP section on delayed release lansoprazole (which is an enantiomer of dexlansoprazole), which "permits dissolution of less than 10% in the acid stage in a two-stage experiment designed to simulate passage through an acidic stomach (in the first stage) followed by simulated intestinal dissolution (in the second stage)." *Id.* (citing Takahashi Decl., Ex. G (2009 USP section on lansoprazole delayed-release capsules) at 2753 (stating as to acid stage "[t]olerances" that "[n]ot more than 10% of the labeled amount of [lansoprazole] is dissolved in 60 minutes")).

- the FDA's Dissolution Methods Database entry for dexlansoprazole, recommending that in testing dexlansoprazole dissolution, sampling for the acid stage should be conducted at 120 minutes. *Id.* at 7 (citing Takahashi Decl., Ex. P (Dissolution Methods)).

- testimony by Impax's expert, Dr. Augsburger, that once the delayed release product reaches its target pH, the release should be "relatively rapid." *Id.* (citing Purles Decl., Ex. 6 (Nov. 6, 2012 Augsburger Dep. Tr.) at 116:6-18).

- the statement in the '755 Patent specification noting that "the usual enteric coat" dissolves "rapidly." *Id.* (citing '755 Patent, col. 6, l. 66 - col. 7, l. 12).

- Dr. Charman's deposition testimony that "any meaningful test for infringement must have an amount limitation to account for small amounts of dissolution that inevitably occur in any in vitro dissolution test of any significant duration," especially in light of

21

manufacturing defects that commonly result in inappropriately coated or uncoated drug in the formulation. *Id.* (citing Purles Decl., Ex. 7 (Nov. 1, 2012 Charman Dep. Tr.) at 58:16-59:8).

Takeda argues that TWi's reliance on the '755 Patent specification and prosecution history is misplaced. *Id.* at 8. As to TWi's reliance on col. 10, ll. 13-17 of the '755 Patent, stating that "[t]he rate of elution of active ingredient from the active ingredient release-controlled tablet, granule or fine granule thus obtained is desirably 10% or less for 5 hours in a solution of pH 6.0, and 5% or less for one hour and 60% or more for 8 hours in a solution of pH 6.8," Takeda contends that the specification makes clear that the threshold pH for this formulation was "6.75 or above." *Id.* (citing '755 Patent, col. 10, l.2). In other words, according to Takeda, "'rapid and significant' release for this particular embodiment would only be expected at a pH of 6.75 or higher." *Id.* Takeda reasons, "[t]hat release was relatively slow and minimal at pH 6.0, a pH level significantly below the target pH of this particular embodiment, is in no way inconsistent with Dr. Charman's opinion that the claimed formulation should show rapid and significant dissolution above its target pH." *Id.* Takeda asserts that it has shown as to TWi's formulation significant and rapid release of dexlansoprazole at target pH levels of 5.9 and 7.4, which falls within the scope of the '755 claims. *Id.*

Takeda also rejects TWi's contention that the dissolution testing of Dr. Kurasawa cited by the applicants during patent prosecution contradicts Dr. Charman's position. *Id.* According to Takeda, Dr. Kurasawa's test was conducted at pH 6.8, a pH level "much lower than the pH 7.5 upper end of the pH range for the high-pH granule described in claim 1." *Id.* Thus, it contends, "[t]hat the granule released drug slowly at pH level of 6.8 does not indicate how rapidly the drug would release within two hours at the higher pH of 7.5, and thus in no way undermines Dr. Charman's opinion." *Id.*

Takeda argues that TWi's reliance on its interrogatory responses regarding statements in its New Drug Application ("NDA") addressing whether Dexilant was covered by the '755 patent -- which described testing of its own product -- is also misplaced. *Id.* at 8-9. Takeda does not dispute that different tests were used but argues that the test described in the interrogatory

22

United States District Court
Northern District of California

1    response was "merely intended to show that the behavior of the Dexilant granules as reflected in

2    the NDA tests was consistent with the limitations of the '755 patent: the low-pH granules in

3    Dexilant dissolved and completely released drug at pH 6.0 within two hours, and the high-pH

4    granules dissolved and completely released drug within 2 hours at pH levels of 7.0, 7.2, and 7.5."

5    *Id.* at 9 (citing Purles Decl., Ex. 9 (NDA Excerpt) at DEX0011277-82; Charman Decl. ¶ 27).

6    According to Takeda, the NDA experiments were designed to show complete release of drug

7    rather than to test for infringement and therefore were not designed to determine the pH level at

8    which release begins. *Id.* (citing Charman Decl. ¶ 27).

9            Takeda also rejects TWi's contention that Dr. Charman's opinions do not satisfy the

10   requirements of Rule 702 of the Federal Rules of Evidence and *Daubert*. *Id.* According to

11   Takeda, there is no "off-the-shelf" dissolution test for determining whether drug release *does not*

12   occur below a given pH; rather, dissolution testing is typically used to establish the amount of

13   dissolution that occurs at a particular pH. *Id.* (citing Charman Decl. ¶ 8). Therefore, it asserts,

14   Advantar was required to design a customized dissolution test. *Id.* The fact that the test was

15   developed for this litigation, however, does not render the test inadmissible, Takeda argues. *Id.* at

16   10-11. Rather, according to Takeda, expert testimony prepared for litigation is admissible if "the

17   experts . . . explain precisely how they went about reaching their conclusions and point to some

18   objective source -- a learned treatise, the policy statement of a professional association, a

19   published article in a reputable scientific journal or the like -- to show that they have followed the

20   scientific evidence method, as it is practiced by (at least) a recognized minority of scientists in

21   their field." *Id.* at 11 (quoting *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir.

22   2003)).

23           Here, Takeda asserts, Dr. Charman has developed a test that is supported by scientific

24   principles and objective sources. *Id.* at 11-12 (citing Charman Report ¶¶ 58-81; Charman Decl.

25   Exs. B.3, B.4 and B.5 (Advantar reports)). Takeda argues that TWi has not identified any specific

26   ways in which Dr. Charman's testing fails to adhere to scientific method or lacks objective

27   support and its assertion that Takeda manipulated the prior test results by modifying the protocol

28   to omit the use of the surfactant sodium dodecyl sulfate ("SDS") or use a two-stage test are

23

United States District Court
Northern District of California

1  unfounded. *Id.* at 12. Takeda contends that Dr. Charman's decision not to use SDS in the tests

2  upon which he based his report, even though SDS had been used in the earlier tests conducted by

3  Advantar, was based on Advantar's conclusion that the SDS was causing the enteric coating of

4  the low pH granules to disintegrate below the target pH level. *Id.* at 12-13 (citing Charman Decl.

5  ¶¶ 19-22; Takahashi Decl., Ex. J (May 9 Report) at DEX1672037). Takeda points out that TWi

6  also conducted dissolution testing of dexlansoprazole granules without using SDS. *Id.* at 13

7  (citing Purles Decl., Ex. 20 (Dep. Ex. 110) at ANC-DEXL0006471 (setting forth a protocol for

8  dissolution testing that does not include SDS); *id.*, Ex. 10 (Nov. 8, 2012 Gray Dep. Tr.) at 31:17-

9  32:3, 57:19-59:20). Furthermore, Takeda asserts, Dr. Charman testified that he never

10  contemplated including the use of SDS in Advantar's testing protocol for dissolution testing of

11  dexlansoprazole. *Id.* (citing Purles Decl. Ex. 7 (Nov. 1, 2012 Charman Dep. Tr.) at 109:22-

12  112:24; *id.* Ex. 1 (Oct. 31, 2012 Charman Dep. Tr.) at 196:2-198:2).

13  Takeda also argues that a February 7, 2012 email from Takeda's counsel asking Advantar

14  if SDS should be used in the dissolution medium and whether a two-stage test should be used

15  does not support TWi's assertion that Takeda acted improperly. *Id.* at 13 (citing Mizerk Decl.,

16  Ex. 1-R at DEX1678010 (Feb. 7, 2012 email). According to Takeda, these questions do not show

17  any improper conduct on its part given that TWi has conducted dissolution tests that do not use

18  SDS and a two-stage approach is provided for in the USP. *Id.* (citing Purles Decl., Ex. 11 (Jun.

19  20, 2012 Chen Dep. Tr.) at 186:9-19 (testimony from TWi's 30(b)(6) witness that "for the R&D

20  experiment, we don't use any SDS in the medium")). Takeda also notes Dr. Charman made

21  several changes to the Advantar testing protocols, further undermining TWi's position. *Id.* (citing

22  Charman Report ¶ 60). According to Takeda, the prior testing by Advantar has no bearing on the

23  admissibility of Dr. Charman's tests and at most goes to the weight of the evidence. *Id.* at 14

24  (citing *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998)). Takeda also cites

25  testimony of the experts of the other Defendants in the related cases that they found Dr.

26  Charman's testing to be "reasonable," even though they believed SDS should be included in the

27  dissolution medium. *Id.* (citing Purles Decl., Ex. 5 (Nov. 14, 2012 Amiji Dep. Tr.) at 110:24-

28  111:19; *id.*, Ex. 6 (Nov. 6, 2012 Augsburger Dep. Tr.) at 49:19-50:19, 51:9-52:4). In addition, to

24

United States District Court
Northern District of California

1   the extent TWi challenges Dr. Charman's interpretation of the test results, Takeda argues, this is a

2   question that goes to the weight of the evidence, not its admissibility. *Id.* at 15 (*Gutierrez v.*

3   *Johnson & Johnson*, 2006 WL 3246605, at *8 (D.N.J. Nov. 6, 2006); *Tristrata Tech., Inc. v. Mary*

4   *Kay, Inc.*, 423 F. Supp. 2d 456, 463–64 (D. Del. 2006); *In re Diet Drugs Prods. Liab. Litig.*, 2000

5   WL 962545, at * 13 (E.D. Pa. June 28, 2000)).

6        Takeda rejects TWi's assertion that Dr. Charman's results are inadmissible because

7   expired product was used by Advantar. *Id.* at 16. According to Takeda, "there is 'no reason to

8   assume that on the date a product is no longer within the FDA-required shelf life for the purposes

9   of commercialization, it also ceases to be structurally representative of the product.'" *Id.* at 16

10  (quoting *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 495 (S.D.N.Y. 2007)). Takeda

11  notes that TWi has not provided any evidence showing that the expired samples were not

12  representative of its ANDA products. *Id.* (citing *Roche Palo Alto LLC v. Ranbaxy Labs., Inc.*,

13  2009 WL 3261252, at *13 n.26 (D.N.J. Sept. 30, 2009)). It further contends that TWi cannot

14  provide any such evidence in light of the admission of its 30(b)(6) witness that TWi intends to

15  seek a 36-month shelf-life from the FDA for its product. *Id.* (citing Purles Decl., Ex. 11 (Jun. 20,

16  2012 Chen Dep. Tr.) at 176:6-8). As the Advantar tests were conducted within this 36 month

17  period, Takeda asserts, TWi cannot now assert that the test results are not relevant to its ANDA

18  products. *Id.* Takeda also notes that TWi's expert, Dr. Gray, had the same batch tested as Dr.

19  Charman. *Id.* (citing Purles Decl., Ex. 10 (Nov. 8, 2012 Gray Dep. Tr.) at 39:17-45:21

20  (representation from TWi's counsel that the samples tested by Boston Analytical are from the

21  same batch as the samples provided by TWi to Takeda); *id.*, Ex. 13 (Gray Rep. Ex. N) at 1

22  (Boston Analytical Report, signed Oct. 18, 2012); Charman Rep. ¶ 82).

23       Finally, Takeda rejects TWi's contention that if Dr. Charman's approach is accepted the

24  claim will be rendered indefinite, an argument that it contends was already rejected by the Court

25  and has no merit. *Id.* at 16-18.

26       Accordingly, Takeda argues that TWi is not entitled to summary judgment of non-

27  infringement of the '755 Patent because there is a genuine issue of material fact that must be

28  resolved at trial.

25

United States District Court
Northern District of California

#### c. TWi Reply

In its Reply brief, TWi reiterates its position that Dr. Charman's approach is not supported by any acceptable scientific methodology, arguing that because the test was developed for litigation, it is presumed to be inappropriate and Takeda bears the burden of showing that the results are reliable -- a burden TWi contends has not been met. TWi Reply at 2 (citing *Cooper v. Brown*, 510 F.3d 870, 944 n. 29 (9th Cir. 2007)). TWi rejects Takeda's explanation that in developing the test, "Takeda and Advantar were guided by the fact that Dexilant is a preferred embodiment of the '755 patent, and thus could be expected to meet the claim limitations." *Id.* at 4 (citing Takeda Opposition at 12). This approach is improper, according to TWi, because "[i]t is legally impermissible to determine infringement by comparing an accused device to the patentee's product." *Id.* (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003)).

TWi also objects to Takeda's reliance on the declaration offered by Dr. Charman in support of Takeda's opposition brief, in which he explains why he made certain choices in designing the Advantar tests. *Id.* at 4-6. TWi contends Dr. Charman merely combined components from various tests in the field, asserting that "Takeda's 'Frankenstein' dissolution test simply was not the product of any acceptable scientific methodology." *Id.* at 5. TWi further asserts that Takeda should be precluded from relying on the declaration because it is untimely. *Id.* at 5 (citing *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358 (Fed. Cir. 2011); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998)). According to TWi, the declaration also should be disregarded because it contradicts Dr. Charman's earlier testimony. *Id.* In particular, TWi points to Dr. Charman's statement in his declaration that "[p]hotographs of the granules taken at the conclusion of experiments, with and without SDS, demonstrate that SDS is interacting with the enteric polymer in the coat of the low-pH granules...." *Id.* (citing Charman Decl. ¶ 22). TWi asserts that Dr. Charman "expressed no such opinion in his report or at his deposition" and further points to the following statements in the March 12, 2012 and May 9, 2012 Advantar reports that TWi contends conflict with this opinion: 1) "The mechanism whereby SDS reduces lag time for

26

A157

1   release is unknown." *Id.* (citing Mizerk Decl., Ex. 17 at DEX1672899 (emphasis added); Mizerk

2   Decl., Ex. 1 at Ex. H at DEX1671969 (same)); 2) "The SDS effect does not appear to relate to

3   elevated solubility limits for DEX. Rather a direct effect on the granule enteric coating or possibly

4   granule contents seems *likely.*" *Id.* (citing Mizerk Decl., Ex. 17 at DEX1672901 (emphasis added

5   in TWi brief)); and 3) "Specifically, additional investigations should include the following: . . .

6   Further study of SDS effects on granule dissolution profiles." *Id.* (citing Mizerk Decl., Ex. 17 at

7   DEX1672902). TWi contends that no further investigation was conducted on the effects of SDS

8   and that because Dr. Charman's opinion in his declaration regarding the effects of the SDS is a

9   new opinion that contradicts his earlier report and deposition testimony, it should not be admitted.

10  *Id.* at 6 (citing *Chime v. PPG Indus., Inc.*, 402 F.3d 1371, 1381 (Fed. Cir. 2005); *Delaware*

11  *Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1382 (Fed. Cir. 2010)).

12      Regarding the use of expired batches of TWi's ANDA products for testing, TWi argues

13  that it is irrelevant that TWi may in the future ask the FDA to extend the expiration date beyond

14  two years. *Id.* at 7. According to TWi, the cases cited in its motion establish that evidence based

15  on expired drug product is not relevant to infringement. *Id.* at 7 (citing *SmithKline Beecham*

16  *Corp. v. Apotex Corp.*, 2002 WL 1613724, at *2 (N.D. Ill. 2002); *Apotex, Inc. v. Cephalon, Inc.*,

17  2012 WL 1080148, *14 (E.D. Pa. Mar. 28, 2012)). Further, Takeda's reliance on *In re*

18  *Omeprazole Patent Litig.*, 490 F. Supp. 2d 381 (S.D.N.Y. 2007) is misplaced, TWi argues,

19  because in that case, the party offering the testing provided additional testing that the expired

20  product continued to meet the approval specifications in the ANDA. *Id.* at 8. In other words, it is

21  Takeda's burden, and not TWi's, to show that the tests were representative of the ANDA

22  products. *Id.*

23      Finally, TWi reiterates its position that Takeda is improperly seeking a new claim

24  construction and that if the Court adopts Takeda's proposed (new) construction, the asserted

25  claims of the '755 Patent will be rendered indefinite. *Id.* at 8-11.

26

27

28

*United States District Court*
*Northern District of California*

27

A158

# III. ANALYSIS

## A. Legal Standards

### 1. Legal Standard Governing Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.

### 2. Legal Standard Governing Infringement

A determination of infringement is a two-step process. *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). The first step is claim construction, which is a question of law to be determined by the court. *Id.* The second step is an analysis of infringement, in which it must be determined whether a particular device infringes a properly construed claim. *Id.* A device literally infringes if each of the limitations of the asserted claim is found in the accused device. *Id.* The patentee always bears the burden of proof on infringement. *Under Sea Industries, Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987). Thus, a patentee is entitled to summary judgment if it can show that it is "more likely than not" that the accused product possesses all of the elements of the asserted claim. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 (Fed. Cir. 2005) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 252). Once the patentee has made a prima facie showing that it is more likely than not that all the claim limitations are met, the accused infringer must come forward with more than

28

United States District Court
Northern District of California

1    a scintilla of evidence to create a genuine issue of material fact as to non-infringement. *Id.*

2    Conversely, an accused infringer is entitled to summary judgment of non-infringement where it

3    shows "that the patentee failed to put forth evidence to support a finding that a limitation of the

4    asserted claim was met by the structure in the accused devices." *Johnston v. IVAC Corp.*,

5    885 F.2d 1574, 1578 (Fed. Cir. 1989).

6        Takeda asserts its infringement claims under 35 U.S.C. § 271(e)(2); it also seeks a

7    declaratory judgment of infringement and injunctive relief under 35 U.S.C. § 271(a) and the

8    Declaratory Judgment Act.   Section 271(e)(2) provides that:

9        [i]t shall be an act of infringement to submit . . . an [ANDA
10       application to the FDA] . . . if the purpose of such submission is to
         obtain approval under such Act to engage in the commercial
11       manufacture, use, or sale of a drug, veterinary biological product, or
         biological product claimed in a patent or the use of which is
12       claimed in a patent before the expiration of such patent.

13   35 U.S.C. § 271(e)(2).  Section 271(a) provides that "whoever without authority makes, uses,

14   offers to sell, or sells any patented invention, within the United States or imports into the United

15   States any patented invention during the term of the patent therefor, infringes the patent." 35

16   U.S.C. § 271(a).

17       **3.  Legal Standards Governing Invalidity**

18       In a patent infringement action, the accused infringer bears the burden of proving

19   invalidity of the asserted patent by clear and convincing evidence. *Central Admixture Pharmacy*

20   *Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1357-58 (Fed. Cir. 2007).

21       **a.   Anticipation**

22       Under 35 U.S.C. § 102(a), a patent may be anticipated if the claimed invention was

23   described in a printed publication "before the invention thereof by the applicant for patent." 35

24   U.S.C. § 102(a).  The claim limitations may be disclosed "either expressly or inherently." *EMI*

25   *Group N. Am., Inc., v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001). "In

26   general, a limitation or the entire invention is inherent and in the public domain if it is the 'natural

27   result flowing from' the explicit disclosure of the prior art." *Schering Corp. v. Geneva Pharms.*,

28   339 F.3d 1373, 1379 (Fed. Cir. 2003) (citing *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955,

                                                    29

970 Fed. Cir. 2001); *In re Kratz*, 592 F.2d 1169, 1174 (CCPA 1979) (suggesting inherent anticipation of a compound even though the compound's existence was not known)). In *Continental Can Co. v. Monsanto Co.*, the Federal Circuit explained that "inherent" disclosure "may not be established by probabilities or possibilities" but must be "necessarily present in the thing described in the reference" as viewed by persons of ordinary skill in the art. 948 F.2d 1264, 1269 (Fed. Cir. 1991).

"[A]nticipation is a question of fact, including whether or not an element is inherent in the prior art." *Eli Lilly and Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). The accused infringer bears the burden of proving invalidity of the asserted patent by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238 U.S. (2011). In *Microsoft*, the Court explained that this heavy burden is based on § 282(a) of the Patent Act, which provides that an issued patent "shall be presumed valid" and that "[t]he burden of establishing invalidity ... rest[s] on the party asserting such invalidity." Nonetheless, in *Amgen Inc. v. Hoechst Marion Roussel, Inc.* 314 F.3d 1313, 1354 (Fed. Cir. 2003) (*Amgen II*), the Federal Circuit announced an exception to this rule, holding that a presumption of enablement applies to both the claimed and unclaimed disclosures of prior art patents. *Amgen II*, 314 F.3d at 1355. Thus, the burden is on the *patentee* defending against an invalidity challenge based on a prior art patent to "present persuasive evidence of non-enablement to overcome this presumption." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1307 (2006) (*Amgen III*).

The Federal Circuit in *Amgen II* reasoned as follows:

> In patent prosecution the examiner is entitled to reject application claims as anticipated by a prior art patent without conducting an inquiry into whether or not that patent is enabled or whether or not it is the claimed material (as opposed to the unclaimed disclosures) in that patent that are at issue. . . . *In re Sasse*, 629 F.2d 675, 681, 207 USPQ 107, 111 (C.C.P.A.1980) ("[W]hen the PTO cited a disclosure which expressly anticipated the present invention ... the burden was shifted to the applicant. He had to rebut the presumption of the operability of [the prior art patent] by a preponderance of the evidence." (citation omitted)). The applicant, however, can then overcome that rejection by proving that the

United States District Court
Northern District of California

30

United States District Court
Northern District of California

relevant disclosures of the prior art patent are not enabled. *Id*. We hold that an accused infringer should be similarly entitled to have the district court presume the enablement of unclaimed (and claimed) material in a prior art patent defendant asserts against a plaintiff. Thus, a court cannot ignore an asserted prior art patent in evaluating a defense of invalidity for anticipation, just because the accused infringer has not proven it enabled. Like the applicant in ex parte prosecution, however, the patentee may argue that the relevant claimed or unclaimed disclosures of a prior art patent are not enabled and therefore are not pertinent prior art. If a patentee presents evidence of nonenablement that a trial court finds persuasive, the trial court must then exclude that particular prior art patent in any anticipation inquiry, for then the presumption has been overcome.

*Amgen II*, 314 F.3d at 1355.

In a footnote, the Federal Circuit in *Amgen II* noted that "by logical extension, our reasoning here might also apply to prior art printed publications as well," *id.* n. 22, and recently, in *In re Antor Media Corp.*, the Federal Circuit squarely held "that a prior art printed publication cited by an examiner is presumptively enabling barring any showing to the contrary by a patent applicant or patentee." *Id.* at 1288. In *Antor*, the Federal Circuit rejected the patentee's argument, based on § 282, that the presumption should not extend to non-patent prior art, explaining that in *Amgen*, the court did not rely only on § 282 as the source of the presumption but also on that fact that it is "procedurally convenient to place the burden on the applicant who is in a better position to show, by experiment or argument, why the disclosure in question is not enabling or operative." *Id.*

Although the Federal Circuit in *Antor* addressed whether the presumption of enablement applied in the context of patent prosecution, the reasoning of that decision persuades the Court that the presumption also applies in the district court, just as the Federal Circuit found in *Amgen II* with respect to patent prior art cited to establish anticipation. Therefore, the Court finds that where a prior art printed publication is asserted in support of an anticipation defense, the prior art is presumed enabled unless the patentee can present "evidence of nonenablement that a trial court finds persuasive." *See Amgen II*, 314 F.3d at 1355. Further, the Court concludes based on the *Amgen II* court's reliance on *In re Sasse* that the amount of evidence required to rebut the

31

A162

United States District Court
Northern District of California

1  presumption is a preponderance of the evidence and that if the patentee meets that burden, the

2  court must then exclude the prior art in its anticipation analysis. *See id*; *see also Amgen III*, 457

3  F.3d at 1307 (noting that on remand, the district court found that the patentee met its "burden of

4  proving by a preponderance of the evidence" that the prior art that was alleged to anticipate was

5  not enabled and affirming the district court's holding).

### b.    Lack of Written Description

7      The Patent Act requires that every patent must contain a written description and be

8  enabled, as stated in 35 U.S.C. § 112 ¶ 1, which provides as follows:

> The specification shall contain a written description of the
> invention, and of the manner and process of making and using it, in
> such full, clear, concise, and exact terms as to enable any person
> skilled in the art to which it pertains, or with which it is most nearly
> connected, to make and use the same, and shall set forth the best
> mode contemplated by the inventor of carrying out his invention.

13  To satisfy the written description requirement, "the description 'must clearly allow persons of

14  ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Ariad*

15  *Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (quoting *In re Gosteli*,

16  872 F.2d 1008, 1012 (Fed. Cir. 1989)). "In other words, the test for sufficiency is whether the

17  disclosure of the application relied upon reasonably conveys to those skilled in the art that the

18  inventor had possession of the claimed subject matter as of the filing date." *Id.* (quoting *Ralston*

19  *Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985)).

20      The Federal Circuit in *Ariad* acknowledged that the term "possession" "has never been

21  very enlightening." *Id.* It explained that "the hallmark of written description is disclosure" and

22  that the "test requires an objective inquiry into the four corners of the specification from the

23  perspective of a person of ordinary skill in the art." *Id.* "For generic claims, [the Federal Circuit

24  has] set forth a number of factors for evaluating the adequacy of the disclosure, including 'the

25  existing knowledge in the particular field, the extent and content of the prior art, the maturity of

26  the science or technology, [and] the predictability of the aspect at issue.'" *Id.* Thus, the inquiry

27  is a question of fact and is context-specific. *Id.* (citing *Ralston Purina*, 772 F.2d at 1575; *Capon*

28

32

A163

*v. Eshhar*, 418 F.3d 1349, 1357–58 (Fed.Cir.2005)). However, certain "broad principles . . . hold true across all cases." *Id.* at 1352. The Federal Circuit described these principles as follows:

> We have made clear that the written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement. *Falko–Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366–67 (Fed. Cir. 2006). Conversely, we have repeatedly stated that actual "possession" or reduction to practice outside of the specification is not enough. Rather, as stated above, it is the specification itself that must demonstrate possession. And while the description requirement does not demand any particular form of disclosure, *Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed.Cir.2008), or that the specification recite the claimed invention in haec verba, a description that merely renders the invention obvious does not satisfy the requirement, *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1571–72 (Fed.Cir.1997).

*Id.* at 1352.

    Finally, to meet the written description requirement, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). Thus, "[a] specification may, within the meaning of 35 U.S.C. § 112 para. 1, contain a written description of a broadly claimed invention without describing all species that [the] claim encompasses." *Id.* (quoting *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir.1988)). Further, "[a] patent need not teach, and preferably omits, what is well known in the art." *Epistar Corp. v. International Trade Commission*, 566 F.3d 1321, 1336 (Fed. Cir. 2009) (quoting *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 2009)).

    In *Ariad*, the Federal Circuit made clear that the written description requirement is distinct from the enablement requirement, although the two "often rise and fall together." 598 F.3d at 1352.

United States District Court<br>Northern District of California

33

A164

### 4. Legal Standards Governing Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.Evid. 702. In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993). The Court declined to set forth a definitive list of factors, but offered some "general observations" about the types of factors that might be considered. *Id.* at 593. These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

If the basis for the expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact. See *id.* at 596 (if "the trial court concludes that the scintilla of [expert] evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to . . . grant summary judgment").

United States District Court
Northern District of California

34

A165

The Ninth Circuit has held that a significant factor to be considered is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Thus, "if the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles." *Id.* at 1317-1318; *see also Clausen v. M/V NEW CARISSA*, 339 F.3d 1049 (9th Cir. 2003) (holding that even where scientific evidence is based on research that was conducted for the purpose of testifying and was not subjected to normal scientific scrutiny through peer review and publication, it may still be admissible if the experts have explained "precisely how they went about reaching their conclusions and point[ed] to some objective source -- a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like -- to show that they have followed the scientific evidence method, as it is practiced by (at least) a recognized minority of scientists in their field." ).

The determination of reliability is left to the discretion of the district court, consistent with its gatekeeping function under Rule 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

**B.    Infringement of the '282 Patent**

**1.    Existence of Subject Matter Jurisdictions**

TWi contends that there is no subject matter jurisdiction over Takeda's '282 Patent infringement claim under 35 U.S.C. §271(e)(2) because Takeda did not list that patent in the Orange Book. The Court disagrees.

The Hatch-Waxman Act gives manufacturers of generic drugs a safe harbor in which to develop their products without threat of patent litigation. See 35 U.S.C. § 271(e)(1). In return, Congress gave patentees the right to challenge a generic drug when the generic manufacturer files an ANDA, deeming the filing of the ANDA "a defined act of infringement sufficient to create case or controversy jurisdiction to enable a court to promptly resolve any dispute concerning

35

A166

United States District Court
Northern District of California

1  infringement and validity." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir.1997).

2  This compromise is embodied in subsections (1) and (2) of 35 U.S.C. § 271(e), which provides, in

3  relevant part as follows:

> (e)(1) It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913) which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques) solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.
>
> (2) It shall be an act of infringement to submit--
>
> (A) an application under section 505(j) of the Federal Food, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent, . . .
>
> if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

19  35 U.S.C. § 271(e) (1) & (2).

20       Further, "the Hatch-Waxman Act . . . establishes a procedure called a 'Paragraph IV

21  certification,' 21 U.S.C. § 355(j)(2)(A)(vii)(IV), by which an entity that seeks to market a generic

22  counterpart of a patented drug product or method of use, before the patent has expired, may

23  challenge the patent before actually marketing the drug." *Cephalon, Inc. v. Watson Pharms., Inc.*,

24  707 F.3d 1330 (Fed. Cir. 2013). As part of this procedure, most patentees and New Drug

25  Applicant ("NDA") holders are required to list patents related to their approved drugs in the

26  FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" publication (the

27  "Orange Book"). 21 U.S.C. § 355(b)(1). A company that manufactures generic drugs, in turn, is

28  required to consult the Orange Book before filing an ANDA and certify that either (I) no patent

<center>36</center>

<center>A167</center>

United States District Court
Northern District of California

1    information is listed in the Orange Book for the proposed generic drug; (II) that the listed patents

2    have expired; (III) that the listed patents will expire before the generic company markets its

3    product; or (IV) that the patents listed are invalid or will not be infringed by the generic drug (a

4    "paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV).

5       Here, Takeda has alleged jurisdiction under 28 U.S.C. § 1338, which provides that "[t]he

6    district courts shall have original jurisdiction of any civil action arising under any Act of Congress

7    relating to patents." Thus, the existence of subject matter jurisdiction over Takeda's § 271(e)(2)

8    claim based on the '282 Patent depends on whether that claim "arises under" the Hatch-Waxman

9    Act even though TWi's ANDA did not include a Paragraph IV certification. Some courts have

10    found that a Paragraph IV certification is a jurisdictional requirement for bringing a claim under

11    the Hatch-Waxman Act. *See, e.g., Eisai Co. v. Mutual Pharmaceutical Co., Inc.,* 2007 WL

12    4556958 (D.N.J. Dec. 20, 2007). In *Eisai,* the court recognized that "[t]he plain text of §

13    271(e)(2) does not require that the alleged infringer file an ANDA with a Paragraph IV

14    certification, or that the drug claims be listed in the Orange Book." *See* 2007 WL 4556958, at *9.

15    Nonetheless, based on extended discussion of the ANDA process in decisions by the Federal

16    Circuit, the *Eisai* court concluded that a Paragraph IV requirement should be "read into" §

17    271(e)(2). *Id.* at * 12.

18       The undersigned does not find the reasoning of *Eisai* persuasive given the clear language

19    of the statute and the fact that none of the Federal Circuit cases addressed in *Eisai* directly

20    addressed the question of whether a Paragraph IV certification was required in order for a

21    patentee to bring an infringement claim under the Hatch-Waxman Act. See *id.* at *11 ("The

22    Federal Circuit has never squarely faced the question before this Court"). The Federal Circuit

23    subsequently resolved any doubt on this issue in *AstraZeneca Pharms. LP v. Apotex Corp.,* 669

24    F.3d 1370 (Fed. Cir. 2012). In *AstraZeneca,* the Federal Circuit held that under the Hatch-

25    Waxman Act, "the requirements for jurisdiction in the district courts are met once a patent owner

26    alleges that another's filing of an ANDA infringes its patent under § 271(e)(2), and this threshold

27    jurisdictional determination does not depend on the ultimate merits of the claims." 669 F.3d at

28    1376-77.

<div align="center">37</div>

<div align="center">

A168

</div>

United States District Court
Northern District of California

Further, in *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670 (2012), the Supreme Court also made clear that a Paragraph IV certification is not a jurisdictional requirement for bringing an action under the Hatch-Waxman Act. In that case, the generic drug manufacturer, *Caraco*, initially included a Paragraph IV certification in its ANDA but later inserted a statement under § 355(j)(2)(A)(viii) ("section viii statement"). 132 S. Ct. at 1679. A section viii statement asserts that the generic manufacturer will market the drug for one or more methods of use not covered by the brand's patents and is an alternative to a Paragraph IV certification for obtaining FDA approval. *Id.* at 1677-1678. Before the FDA had approved the generic on the basis of the section viii statement, however, the patentee, Novo, amended its use codes to cover the uses for which the generic manufacturer sought approval. *Id.* at 1679. In the ensuing Hatch-Waxman infringement action initiated by Novo, the generic manufacturer asserted a counterclaim seeking to compel Novo to amend its use codes such that *Caraco* would be able to obtain FDA approval under section viii rather than under Paragraph IV. The question before the Supreme Court was whether *Caraco* could assert such a counterclaim. In that context, Novo argued that there was no subject matter jurisdiction over the action. 132 S. Ct. 1670, 1680 n.5 (2012). The Court rejected that argument, reasoning as follows:

> On Novo's theory, [a section viii] statement (unlike a paragraph IV certification) does not count as an act of infringement under the patent statute, see 35 U.S.C. § 271(e)(2)(A), and so cannot provide a jurisdictional basis for the suit. But that argument is wrong even assuming (as Novo contends) that Caraco's section viii filing terminated its paragraph IV certification and that a section viii filing is not an act of infringement. The want of an infringing act is a merits problem, not a jurisdictional one. Nothing in the section of the statute defining certain filings as acts of infringement suggests anything to the contrary. And "we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such." *Stern v. Marshall*, 564 U.S. ——, ——, 131 S. Ct. 2594, 2607, 180 L.Ed.2d 475 (2011). In the absence of such a bar, the federal courts have jurisdiction over this suit for a single, simple reason: It "ar[ose] under a[n] Act of Congress relating to patents." 28 U.S.C. § 1338(a).

*Id.*

38

United States District Court
Northern District of California

In light of the *Caraco* decision and the Federal Circuit's recent decision in *Astrazeneca*, this Court joins a number of other district courts in concluding that there is no requirement under the Hatch-Waxman Act that a patent must be listed in the Orange Book in order for a drug manufacturer to bring an infringement action based on that patent against an ANDA applicant. See *Merck Sharp & Dohme Corp. v. Sandoz Inc.*, 2013 WL 591976 (D.N.J. Feb. 14, 2013) (declining to follow *Eisai* on the basis that "more recent precedent of the Federal Circuit controls" and holding that under *AstraZeneca* it is clear that the requirements for jurisdiction in the district courts are met once a patent owner alleges that the filing of an ANDA infringes its patent under § 271(e)(2), regardless of whether the ANDA includes a Paragraph IV certification); *Cephalon, Inc. v. Sandoz, Inc.*, 2012 WL 682045, at *5 (D. Del. Mar. 1, 2012) (rejecting the reasoning and "sweeping conclusion" of *Eisai* that the court lacked jurisdiction under the Hatch-Waxman Act where there was no paragraph IV certification); *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 363 n.49 (D. Del. 2009) (holding that "[t]here is no requirement that infringement actions against ANDA filers must be based on patents listed in the Orange Book"); *Teva Pharms. USA, Inc. v. Abbott Labs.*, 301 F. Supp. 2d 819, 829 (N.D. Ill. 2004) ("The language of § 271(e)(2)(A) does not require that the ANDA contain a [paragraph IV] certification to constitute an act of infringement. It only requires that the [ANDA] application be filed under § 355(j)"); *Bayer Healthcare, LLC v. Norbrook Labs., Ltd.*, 2009 WL 6337911, at *9 (E.D. Wis. Sept. 24, 2009) (holding in a case involving an Abbreviated New Animal Drug Application that "a paragraph IV certification is not required to trigger an infringement action under § 271(e)(2)").

Therefore, the Court concludes that it has subject matter jurisdiction over Takeda's infringement claim under § 271(e)(2) even though the '282 Patent was not listed in the Orange Book.

### 2. Whether Takeda has Established Infringement

Takeda seeks summary judgment of infringement of the '282 Patent based on what it contends is substantial evidence that TWi's ANDA products contain amorphous dexlansoprazole. Takeda relies primarily on TWi's statements, both to the FDA and in this litigation, rather than on its own testing of the ANDA products. For the reasons discussed below, the Court concludes that

39

United States District Court
Northern District of California

1   this evidence is sufficient to find, as a matter of law, that TWi's ANDA products contain

2   amorphous dexlansoprazole and therefore, that Takeda is entitled to summary judgment of

3   infringement of the '282 Patent under the Hatch-Waxman Act (Count IV).  The Court declines to

4   enter summary judgment in Takeda's favor on Count VII, however, because Takeda has not

5   established that it meets the constitutional requirements for bringing claims under the Declaratory

6   Judgment Act.

7           To establish a case or controversy under Article III of the U.S. Constitution, a claim must

8   be "'definite and concrete, touching the legal relations of parties having adverse legal interests';

9   and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive

10  character, as distinguished from an opinion advising what the law would be upon a hypothetical

11  state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)(quotations

12  omitted).  Some courts have permitted claims seeking declaratory judgment of infringement under

13  § 271(a) based on the filing of an ANDA. *See, e.g., Cephalon v. Sandoz,* Inc., 2012 WL 682045 ,

14  at *5 (D. Del.  Mar. 1, 2012); *Bayer Healthcare, LLC v. Norbrook Labs., Ltd.,* 2009 WL

15  6337911, at *13-14  (E.D. Wis. Sept. 24, 2009).  Other courts, however, have held that such

16  claims are not sufficiently real and immediate to satisfy the requirements of *MedImmune. See,*

17  *e.g., Eisai*, 2007 WL 4556958 (D.N.J. Dec. 20, 2007); *see also Abbott Labs. v. Zenith Labs., Inc.*,

18  934 F. Supp. 925, 983 (N.D. Ill. 1995) (questioning whether such a claim is consistent with

19  Congress' intent in providing a safe haven for generic manufacturers under the Hatch-Waxman

20  Act).  Although TWi alluded to this issue in its Reply brief, Takeda did not have an opportunity to

21  respond on this question.  Therefore, the Court does not reach the question of whether Takeda can

22  establish the existence of a "definite and concrete" controversy on its infringement claims under §

23  271(a) and the Declaratory Judgment Act.   The Court now turns to the substantive question of

24  whether Takeda is entitled to summary judgment that TWi's  ANDA products contain amorphous

25  dexlansoprazole.

26          "A patentee may prove infringement by 'any method of analysis that is probative of the

27  fact of infringement' . . . , and circumstantial evidence may be sufficient." *Martek Biosciences*

28  *Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (citing *Forest Labs. v. Abbott*

1   *Labs.*, 239 F.3d 1305, 1312 (Fed. Cir. 2001), *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449

2   F.3d 1209, 1219 (Fed. Cir. 2006)).  Further, "[b]ecause drug manufacturers are bound by strict

3   statutory provisions to sell only those products that comport with the ANDA's description of the

4   drug, an ANDA specification defining a proposed generic drug in a manner that directly addresses

5   the issue of infringement will control the infringement inquiry." *Abbott Labs. v. TorPharm, Inc.*,

6   300 F.3d 1367. 1373 (Fed. Cir. 2002); see also *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*,

7   491 F.3d 1342, 1351 (Fed. Cir. 2007)("[t]here is no prohibition against using the admissions of a

8   party, whether in the form of marketing materials or otherwise, as evidence in an infringement

9   action").  Whether a statement made in a party's legal brief is considered a binding judicial

10  admission is within the discretion of the court. *Gospel Missions of America v. City of Los Angeles*,

11  328 F.3d 548, 557 (9th Cir. 2003).

12      In light of the rule stated in *Abbott*, the Court looks first to TWi's statement to the FDA in

13  its ANDA describing its choice of layering process.  That statement indicates that TWi rejected

14  one layering process in favor of a different process because the former resulted in recrystallization

15  during manufacture.  *See* Myerson Decl., Ex. 8 (Chen Dep. Ex. 51), at ANC-DEXL0000779;

16  JSUF (Takeda Motion) ¶ 11.  Given that it is undisputed that the dexlansoprazole used in the

17  manufacture of the ANDA products is amorphous dexlansoprazole, this statement is sufficient to

18  establish that the finished product also contains amorphous dexlansoprazole.

19      Further, even if the statement to the FDA in the ANDA did not, by itself,  require such a

20  finding, the Court further finds that Takeda is entitled to summary judgment on this question

21  because TWi's statements in this litigation also establish that its ANDA products more likely than

22  not contains amorphous dexlansoprazole.  These statements include: 1)  deposition testimony by

23  Dr. Shou-Chiung Chen, TWi's 30(b)(6) witness, that TWi uses certain excipients in the core

24  pellet to prevent recrystallization, *see* Myerson Decl., Ex. 7 (Jun. 20, 2012 Chen Dep. Tr.  118:1-

25  10, 123:24-124:6-8); 2)  TWi's interrogatory responses stating that its "ANDA drug products do

26  not contain a crystal or crystalline compound of dexlansoprazole . . . .," *see* Myerson Decl., Ex. 9

27  (TWi's Responses and Objections to Plaintiff's First Set of Joint Interrogatories, July 28, 2011) at

28  17; 3) TWi's paragraph IV letter to Takeda, which stated that "the ANDA drug products do not

41

include a crystal or crystalline compound of dexlansoprazole." *See* Myerson Decl., Ex. 10

(ANCDEXL0000238-277), at ANC-DEXL0000258.

In reaching this conclusion, the Court rejects TWi's suggestion it should find that there is a material dispute of fact because the dexlansoprazole in the ANDA products *might* be molecular dexlansoprazole rather than an amorphous solid. The only evidence in the record indicates that the dexlansoprazole in the ANDA products is a solid; indeed, TWi characterized it as such in its ANDA. *See* Myerson Decl., Ex. 3, at ANC-DEXL0000438 (indicating that excipients used in ANDA products fell below "limits for solid, oral dosage forms"); Myerson Decl., Ex. 8, at ANC-DEXL0000769 (same); Takahashi Reply Decl., Ex. 3 (ANC-DEL0000796) (statement in ANDA that a particular test was not performed on the ANDA products because it is "[n]ot applicable for solid oral dosage forms"). Further, there is substantial evidence in the record that a solid form of dexlansoprazole must be either amorphous or crystalline. *See* Myerson Claim Construction Decl. ¶ 81 ("Solids can be crystalline or amorphous."), ¶ 23 ("Solids that are not crystalline and have no long range order . . . are said to be amorphous."); Myerson Rep. ¶ 22 (same); Myerson Claim Construction Decl. Ex. 11 at DEX0014516 ("The terms amorphous and non-crystalline are synonymous . . . and can be used interchangeably."); *id.*, Ex. 12, at DEX0014612 ("[N]ot all solids are crystals. Materials that have short-range rather than long range ordering . . . are non-crystalline solids. A noncrystalline solid is often referred to as an amorphous solid."); *id.*, Ex. 13 at DEX0014769 ("A liquid may solidify in two ways: . . . to a crystalline solid or . . . to an amorphous solid."); *id.*, Ex. 27, at DEX0014491 (defining "[a]morphous [s]olid" as "[a] noncrystalline solid"); Rogers Claim Construction Decl., Ex. 3, at DEX0003649 ("Some authors [] sub-divide solids into crystalline and amorphous."); *id.*, Ex. 4 at IPXL-0009902 (defining "amorphous" as "[n]oncrystalline . . ."); *id.*, Ex. 5 at IPXL-0010285 (same); Takahashi Reply Decl., Ex. 2 (Dec. 9, 2011 Rogers Dep.) at 19:5-13; Rogers Claim Construction Decl. ¶ 30 ("[T]he term 'amorphous' is an adjective that is synonymous with 'noncrystalline.'"); *id.*, ¶¶ 28-29).

Because the Court finds that TWi has not identified specific facts establishing the existence of a genuine issue of material fact as to whether its ANDA products contain the claimed

42

United States District Court
Northern District of California

A173

United States District Court
Northern District of California

1    amorphous dexlansoprazole, the Court concludes that Takeda is entitled to summary judgment of

2    infringement of the '282 Patent by TWi's ANDA products under the Hatch-Waxman Act (Count

3    IV). Further, if Takeda can establish at trial that it has standing under the Declaratory Judgment

4    Act, it will be entitled to judgment in its favor on Count VII as well.

5    **C. Validity of the '282 Patent**

6        **1. Anticipation**

7        TWi argues that the '282 Patent is anticipated by the Larsson and Barberich references.

8    This dispute turns primarily on two questions: 1) whether Larsson inherently discloses an

9    amorphous salt of dexlansoprazole, as is required under claim 1 of the '282 Patent; and 2)

10    whether the disclosure of such a salt is enabled. The Court finds that this feature is not inherently

11    disclosed in Larsson, which therefore does not anticipate the asserted claims of the '282 Patent.

12    The Court further finds that although a solid salt of dexlansoprazole is disclosed in Barberich,

13    there is a fact question as to whether the disclosure is enabled and therefore, summary judgment

14    on the question of whether Barberich anticipates the asserted claims of the '282 Patent is

15    inappropriate.

16        In support of its contention that Larsson inherently discloses making a salt of

17    dexlansoprazole consistent with the Court's claim construction, which requires that the salt must

18    be a solid, TWi cites Dr. Atwood's testimony that "typically" one would expect a salt of

19    dexlansoprazole made through conventional processes to be a solid. This evidence is insufficient

20    to establish inherent disclosure. As stated above, inherent disclosure may not be established by

21    "probabilities or possibilities." *Bettcher Industries, Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 639

22    (Fed. Cir. 2011) (quoting *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)). "The mere fact that a

23    certain thing may result from a given set of circumstances is not sufficient." *Id.* For example, in

24    *GlaxoInc. v. Novapharm Ltd.*, the defendant argued that the asserted patent was anticipated based

25    on inherent disclosure in the prior art, citing evidence that its expert had reproduced the prior art

26    method thirteen times, each time obtaining the claimed crystals. 52 F.3d 1043, 1047 (Fed. Cir.

27    1995). However, the patentee had presented evidence that two of its own experts had used the

28    same method to produce different crystals. *Id.* Because the method described in the prior art did

<center>43</center>

<center>A174</center>

United States District Court
Northern District of California

1   not "always yield" the claimed invention but rather, *could* yield something different, the

2   Federal Circuit affirmed the district court's holding that there was no inherent disclosure and

3   therefore, that the asserted patent was not anticipated. *Id.*

4       Dr. Atwood did not testify that conventional processes for making a salt of

5   dexlansoprazole always result in a solid salt of dexlansoprazole, as is claimed in the '282 Patent.

6   To the contrary, he testified that such processes will not always result in a salt that is a solid.

7   Thus, his testimony does not establish inherent disclosure. Nor does Dr. Atwood's testimony that

8   one would "typically" expect a solid give rise to a "presumption that the Larsson and Barberich

9   references disclose the claimed solid dexlansoprazole salts." *See* TWi Reply at 14. TWi's

10  reliance on *In re Antor Media Corp.*, 689 F.3d 1282, 1288 Fed. Cir. 2012) in support of this

11  assertion is misplaced. That case addressed the presumption of *enablement* that the Federal

12  Circuit found applies to a printed prior art publication during patent prosecution. It did not

13  address the question of inherent disclosure of an allegedly anticipating reference. In the absence

14  of disclosure of the claimed *solid* salt of dexlansoprazole, the Court does not reach the question of

15  enablement as to Larsson.

16      On the other hand, it is undisputed that a solid amorphous compound of dexlansoprazole *is*

17  disclosed in Barberich. Further, Takeda does not dispute that a person skilled in the art at the

18  priority date would have known how to obtain "a salt thereof" and that a salt obtained from a

19  solid amorphous compound would also be a solid. Therefore, the Court finds that the "salt

20  thereof" of claim 1 is disclosed in Barberich. The question of whether Barberich anticipates the

21  '282 Patent, then, turns on enablement, that is, whether a person of ordinary skill in the art could

22  create a salt of an amorphous compound of dexlansoprazole (which must be solid under the

23  Court's claim construction) based on the disclosure in Barberich. As it is undisputed that a

24  person of ordinary skill knew how to obtain a salt and that a salt made from a solid amorphous

25  compound of dexlansoprazole would also be solid, the only remaining question is whether a

26  person of ordinary skill in the art would have been enabled as to creating the claimed amorphous

27  compound of dexlansoprazole, which must be a solid under the Court's claim construction.

28  Barberich does not offer any guidance on how to create such a compound, instead incorporating

                                              44

Larsson. The only guidance in Larsson, however, is set forth in Example 22. For the reasons set forth in the Court's Order in related case C-11-0840, the Court finds that there is a fact question as to whether the disclosure in Larsson would be sufficient to create the claimed amorphous compound without undue experimentation.[14] Therefore, there is also a fact question as to whether the claimed amorphous solid salt of dexlansoprazole disclosed in Barberich is enabled. Accordingly, summary judgment on this question is not appropriate.

### 2. Lack of Written Description

TWi contends that Takeda's anticipation argument, if credited, leads to the conclusion that the '282 Patent lacks sufficient written description because it does not describe how the solid salt of dexlansoprazole is created. TWi's position fails because it is undisputed that a person of skill in the art would know how to derive a salt of amorphous dexlansoprazole. Because the '282 Patent also describes the synthesis of an amorphous compound of dexlansoprazole that is solid, this disclosure shows that the inventors were in possession of the claimed salt of dexlansoprazole, which was a solid rather than an oil. Therefore, TWi is not entitled to summary judgment of invalidity on this basis.

### D. Infringement of the '755 Patent

#### 1. Whether Dr. Charman's Opinions Should be Excluded Under *Daubert*

TWi argues that Dr. Charman's opinions are not supported by any scientifically acceptable methodology and are based on what it colorfully describes as a "Frankenstein" dissolution test. In support of its position, TWi relies primarily on the fact that the test methodology was developed for litigation. It dismisses the explanation offered by Dr. Charman in his opposition declaration, in which he sets forth his reasons for adopting the protocol that was used by Advantar, as an untimely attempt to survive TWi's *Daubert* motion by articulating new opinions that conflict with Dr. Charman's earlier report. The Court finds TWi's arguments unpersuasive.

As a preliminary matter, the Court addresses whether the declaration of Dr. Charman in supported of Takeda's opposition should be excluded. TWi appears to seek exclusion of this

---

[14] In its Motion, TWi expressly joined in the invalidity arguments set forth in Handa's summary judgment motion. *See* TWi SJ Motion at 15 n. 9.

45

United States District Court
Northern District of California

1    declaration as a discovery sanction, pursuant to Rule 37 of the Federal Rules of Civil Procedure.[15]

2    The Federal Circuit has noted that "Rule 37(c)(1) 'gives teeth' to the written report requirement of

3    Rule 26(a)(2)(B) by forbidding a party's use of improperly disclosed information at a trial, at a

4    hearing, or on a motion, unless the party's failure to disclose is substantially justified or

5    harmless." *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1365 (Fed. Cir. 2011) (citing

6    *Yeti By Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). TWi

7    contends that Dr. Charman's declaration contains new opinions that conflict with his expert report

8    or at least were not disclosed in them. TWi points to only one concrete example of a new opinion

9    however, namely, Dr. Charman's statement that "[p]hotographs of the granules taken at the

10   conclusion of experiments, with and without SDS, demonstrate that SDS is interacting with the

11   enteric polymer in the coat of the low-pH granules...." *Id.* (citing Charman Decl. ¶ 22). This

12   opinion is new and contradictory, according to TWi, because it was not expressed in Dr.

13   Charman's report, and the Advantar documents upon which Dr. Charman relied stated only that it

14   was "likely" that the effect of the SDS in the earlier tests resulted from its "effect on the granule

15   enteric coating or possibly granule contents." *See* Mizerk Decl., Ex. 17 at DEX1672901. The

16   Court finds that this variation in the degree of certainty as to reason for the SDS effect in the

17   earlier Advantar tests is insignificant and does not represent the sort of new and undisclosed

18   opinion that would warrant exclusion under Rule 37. The Court further notes that TWi's counsel

19   had the opportunity to depose Dr. Charman after Dr. Charman had reviewed the earlier test

20   protocols. Therefore, the Court does not find that the Charman opposition declaration should be

21   excluded.

22        The Court also rejects TWi's contention that Dr. Charman's tests are not supported by any

23   acceptable scientific methodology. TWi's position is largely based on unsupported accusations

24   and innuendo. It makes much of the fact that at his November 11, 2011 deposition, Dr. Charman

25   testified, when asked what experiments he would conduct to determine whether a product met his

26   proposed claim construction, that he had not "considered the experiments that one may undertake

27

28

---

[15] The Court notes that to the extent TWi seeks exclusion of the Charman opposition declaration
as a discovery sanction, it has failed to adhere to the Local Rules of this district, which require
that a request for sanctions must be set forth in a separately filed motion. *See* Civ. L. R. 7-2.

46

United States District Court
Northern District of California

1    in order to meet the proposed claim construction" because this was outside the scope of what he

2    had been asked to address in the context of claim construction. *See* Purles Decl., Ex. 12 at 112.

3    TWi suggests that when Dr. Charman did eventually develop a test protocol, it was created only

4    to ensure that the results would support Takeda's position and not for any scientifically valid

5    reasons; it is for this reason, according to TWi, that Dr. Charman chose to conduct the Advantar

6    tests upon which he relied without SDS.

7         Dr. Charman's report, however, as well as the Advantar report cited therein, provides

8    scientific reasons for choosing to conduct the Advantar tests without SDS. *See* Charman Decl.,

9    Ex. B (Charman Report Regarding Infringement by TWi) ¶ 71 & Ex. 3 (Advantar Aug. 23, 2012

10   Report) at DEX1668807. In particular, in his report, Dr. Charman states as follows:

> Due to lansoprazole's low solubility in water, compendial (USP)
> monograph methods for release from lansoprazole capsules include
> surfactant (sodium dodecyl sulfate or "SDS") in the dissolution
> medium to enhance dissolution. The quantities of granules used in
> Advantar's experiments, however, were such that dexlansoprazole's
> solubility was not exceeded. Therefore, SDS, which is not found in
> the GI environment into which the drug is ingested, was neither
> required nor included in the dissolution medium.

16   Charman Report (TWi) ¶ 71 (citing Advantar Aug. 23, 2012 Report at 2). TWi does not point to

17   any expert testimony that addresses these reasons or explains why they are not scientifically valid.

18   Under these circumstances, the Court concludes that Dr. Charman's opinions based on the

19   Advantar tests are admissible, even though those tests were conducted within the context of

20   litigation and have not been subjected to peer review, because Dr. Charman has provided

21   scientific reasons in support of his protocol and TWi has not cited expert testimony establishing

22   (or even opining) that those reasons are not based on scientifically valid principles. *See Daubert*

23   *v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

24        The Court rejects TWi's *Daubert* challenges.

25        **2.   Whether Test Results Establish Non-Infringement**

26        TWi contends that even if the Court finds that Dr. Charman's opinions based on the

27   Advantar tests are admissible, the results of those tests establish, as a matter of law, that TWi's

28   ANDA products do not infringe the asserted claims of the '755 Patent. Because the Court finds

A178

United States District Court
Northern District of California

1   that Takeda's position on this issue amounts to a request for a revised construction of the release

2   term, the Court first addresses whether such a revision is appropriate.[16] Having carefully

3   considered the supplemental claim construction briefs and supporting materials filed by the

4   parties in this action and the related actions, the Court declines to revise its previous construction.

5   Further, the Court finds that under that construction, the undisputed facts establish, as a matter of

6   law, that TWi's ANDA products do not infringe the asserted claims of the '755 Patent.

7       As noted above, at the claim construction stage of the case, the Court construed the phrase

8   "released in the pH range of no less than 5.0 to no more than 6.0" to mean "begins to be released

9   from the tablet, granule or fine granule at pH values within the range from 5.0 to 6.0." The

10  Court's construction makes clear that the range set forth in the release term is a threshold at which

11  release begins. The Court acknowledged in its claim construction order that the parties disagree

12  about what testing should be conducted to determine infringement but found that this

13  disagreement goes to infringement rather than indefiniteness, rejecting the defendants' argument

14  that a person skilled in the art would not know how to determine when release "begins." Now,

15  however, Takeda argues that there is a fact question on infringement -- even though the

16  undisputed evidence (Takeda's own testing) shows measurable dissolution of the API of TWi's

17  ANDA product at pH levels below 5.0 -- because the release is not significant and rapid;

18  according to Takeda's expert, such release does not occur unless at least 10% of the drug is

19  released in a 2-hour period. Takeda is essentially asking the Court to adopt a broader construction

20  of the release term than it adopted in its claim construction order. In light of the intrinsic

21  evidence, the Court concludes that Takeda's position is incorrect.

22      First, the Court looks to the claim language. "Absent an express intent to impart a novel

23  meaning, claim terms take on their ordinary meaning." *Elekta Instrument S.A. v. O.U.R. Scientific*

24  *International, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (citation omitted). The plain language

25  of the release term of claim 1 sets forth a specific range of pH values in which release of the API

26  must begin. This range captures the idea set forth in the specification that composition (ii)

27

28  [16] The general legal standards governing claim construction are set forth in the Court's claim
    construction order. *See* Docket No. 81. Therefore, the Court does not repeat them here.

dissolves at a pH of "about 5.5." *See* '755 Patent, col. 2, ll. 48-53 (stating in the "Disclosure of Invention" section that the invention provides a "capsule . . . which comprises a tablet, granule or fine granule having an enteric coat that releases an active ingredient at the pH of about 5.5"). In other words, the claim language *already* allows for some dissolution to occur below the 5.5 target pH level for composition (ii) while remaining within the scope of the claim. Were the Court to insert further qualifying language in its construction that allowed release *below* the lower end of the range claimed by the inventors, it would not only be ignoring the ordinary meaning of the claim term but would also be rendering the lower end of the range in the claim superfluous to the extent that release would be permitted both below 5.0 *and* above 5.0. *See Elekta*, 214 F.3d at 1307 (reversing district court's construction of the term "only within a zone extending between latitudes 30° - 45°" as meaning "beginning at the edge of the helmet (0°) and extending to a point between 30° - 45°" on the basis that it was inconsistent with ordinary meaning of claim language and rendered lower end of the range superfluous); *U.S. Philips Corp. v. Isasaki Elec. Co.*, 505 F.3d 1371, 1376 (Fed. Cir. 2007) (affirming district court's construction of term "between $10^{-6}$ and $10^{-4}$ <<mu>>mol/mm $^{3}$" as meaning "between $1 \times 10^{-6}$ and $1 \times 10^{-44}$ <<mu>>mol/mm $^{3}$" and noting that district court was correct that "the overall phrase - 'a quantity between -- and --' - is a construction that 'implies a specific range . . . it does not imply a range between two values which are themselves ranges"). Thus, the unambiguous language of the claim supports a construction that does not permit release of the API outside of the claimed range.

Further, nothing in the prosecution history or the specification of the '755 Patent persuades the Court that it is appropriate to read into the release term a requirement that release must be significant and rapid (or to state it somewhat differently, that the claim covers embodiments in which there is no *significant* release below the lower end of the range, pH 5.0). The parties hotly dispute the significance of: 1) the applicants' reliance on the Kurasawa testing during patent prosecution; and 2) the disclosure in columns 9 and 10 of the '755 Patent. Beyond the fact that both describe testing that was conducted over a longer period of time than Takeda asserts is appropriate for determining whether the release limitation is satisfied, suggesting that the two-hour limitation proposed by Takeda is incorrect, the Court finds that neither the prosecution

49

United States District Court
Northern District of California

1    history nor the passage in the specification offers significant guidance as to the construction of the

2    release term.

3        On one hand, the Kurasawa testing revealed a dissolution rate of less than 5% dissolution

4    after 2 hours and thus, the embodiment of the invention tested by Kurasawa would not have

5    satisfied the "significant and rapid" requirement that Takeda asks the Court to read into the

6    release term.[17]  On the other hand, the single example describing testing in the specification,

7    found in columns 9 and 10, arguably supports Takeda's position that claim 1 allows some release

8    below the claimed pH ranges.  That passage states as follows:

9        It is desirable that the coating material is used alone or, if necessary,
     in combination so that the polymer is dissolved, preferably at a pH

10       of 6.0 or above, more preferably at a pH of 6.5 or above, and further
     more preferably at a pH of 6.75 or above. . . . The rate of elution of

11       active ingredient from the active-ingredient release-controlled
     tablet, granule or fine granule thus obtained is desirably 10% or less

12       for 5 hours in a solution of pH 6.0, and 5% or less for one hour and

13       60% or more for 8 hours in a solution of pH 6.8.

14   '755 Patent, col. 9, l. 65 - col. 10, l. 17.  Neither of the examples, however, addresses whether (or

15   when) the release described in them falls within the range set forth in the release term.  Moreover,

16   even if Takeda is correct that the passage in the specification describes an embodiment that is

17   excluded under the Court's current construction of the release term, this does not justify

18   modifying the construction because "the unambiguous language of the . . . claim controls over

19   any contradictory language in the written description." *Elekta*, 214 F.3d at 1308.  Finally, to the

20   extent that the Court finds that the claims themselves are unambiguous, reliance on extrinsic

21   evidence, such as the USP, is not a proper basis for varying the meaning of the term.  *See*

22   *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In most situations,

23   an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In

24   such circumstances, it is improper to rely on extrinsic evidence.").

25

26

27   [17]The Court notes that the Kurasawa testing involved the high pH granule rather than the low pH
     granule that is the subject of the release term.  Nonetheless, at claim construction Takeda argued

28   that the Kurasawa testing would have offered guidance to a person of ordinary skill in the art as to
     how to measure whether the release term was satisfied.

A181

United States District Court
Northern District of California

1    For these reasons, the Court concludes that it is not appropriate to revise its construction

2  of the release term to insert qualifying language requiring that release must be rapid and

3  significant. Rather, the Court finds that a product falls outside of the ambit of claim 1 if there is

4  any measurable release of the API from the low pH granule below the range specified in the

5  release term.  Because Takeda's own testing shows measurable release of the low pH capsule of

6  TWi's ANDA products below a level of pH 5.0, the Court finds as a matter of law that those

7  products do not infringe the asserted claims of the '755 Patent.[18]

## IV.   CONCLUSION

9    For the reasons stated above, Takeda's Motion for Summary Judgment is GRANTED.

10  TWi's Motion is GRANTED in part and DENIED in part.

11    IT IS SO ORDERED.

13  Dated: April 8, 2013

Joseph C. Spero
United States Magistrate Judge

---

[18] Because the Court finds that TWi is entitled to summary judgment of non-infringement as to the '755 Patent, it need not reach TWi's argument that the Advantar test results are not relevant because they were run after the ANDA product batch had already expired.

51

A182

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

TAKEDA PHARMACEUTICAL CO. et al,

        Plaintiff,

    v.

ANCHEN PHARMACEUTICALS et al,

        Defendant.
_____/

Case Number: CV11-01609 JCS

**SEALED CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 8, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Donald J Mizerk
Husch Blackwell LLP
120 S. Riverside Plaza
Suite 2200
Chicago, IL 60606

Heather E. Takahashi
Munger, Tolles and Olson LLP
355 S Grand Ave 35th Fl
Los Angeles, CA 90071

Jeffrey I. Weinberger
Munger Tolles & Olson LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560

Ryan Neil Hagglund
Munger, Tolles and Olson LLP
355 S. Grand Ave., 35th FL
Los Angeles, CA 90071

Ted G. Dane
Munger, Tolles & Olson LLP
355 South Grand Ave., #3500
Los Angeles, CA 90071

A183

Dated: April 8, 2013

*Karen L. Hom*

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk

A184

1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   TAKEDA PHARMACEUTICAL CO., LTD.,        Case No. C-11-00840 JCS
    ET AL.,
8                                            Related Case Nos. C-11-1609 JCS and
                                             C-11-1610 JCS
9                  Plaintiffs,

10         v.
                                             **CLAIM CONSTRUCTION ORDER**
11   HANDA PHARMACEUTICALS, LLC,

12                 Defendant.
                                        /
13

14   RELATED CASES

15   TAKEDA PHARMACEUTICAL CO., LTD.,
     ET AL.,
16
                   Plaintiffs,
17

18         v.

19   ANCHEN PHARMACEUTICALS, INC.,
     AND TWI PHARMACEUTICALS, INC.,
20
                   Defendants.
21
                                        /
22
     TAKEDA PHARMACEUTICAL CO., LTD.,
23   ET AL.,

24                 Plaintiffs,

25         v.

26   IMPAX LABORATORIES, INC.,

27                 Defendant.
                                        /
28

United States District Court

For the Northern District of California

A185

## I. INTRODUCTION

Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc. (hereinafter, referred to collectively as "Takeda") initiated these three related patent infringement actions ("the Actions") under 35 U.S.C. § 271(e)(2), a provision of the Hatch-Waxman Act, in response to Abbreviated New Drug Applications ("ANDA") submitted to the U.S. Food and Drug Administration ("FDA") by Handa Pharmaceuticals, Inc. ("Handa"), Anchen Pharmaceuticals, Inc. ("Anchen"), TWi Pharmaceuticals, Inc. ("TWi"), and Impax Laboratories, Inc. ("Impax").[1]  In their ANDAs, Defendants seek FDA approval to manufacture and sell generic versions of Takeda's drug DEXILANT (dexlansoprazole), a prescription drug used to treat acid reflux disease.  Takeda owns several patents related to dexlansoprazole.

The following Takeda patents are at issue in the Actions: 1) U.S. Patent No. 6,462,058 ("the '058 Patent"); 2) U.S. Patent No. 6,664,276 ("the '276 Patent"); 3) U.S. Patent No. 6,939,971 ("the '971 Patent"); 4) U.S. Patent No. 7,737,282 ("the '282 Patent"); 5) U.S. Patent No. 7,285,668 ("the '668 Patent") and 6) U.S. Patent No. 7,790,755 ("the '755 Patent").

The parties conducted a tutorial on February 2, 2012.  A claim construction hearing was held on February 16, 2012.  The Court's final constructions are set forth below.[2]

## II. BACKGROUND RELATING TO THE CLAIMED TECHNOLOGY

### A. Crystals

Crystals are solids in which the atoms (or molecules) are arranged in a periodic repeating pattern that extends in three dimensions.  Declaration of Allan S. Myerson, Ph.D., in Support of Takeda's Opening Claim Construction Brief ("Myerson Decl.") ¶ 21; Declaration of Wayne J. Genck, Ph.D. ("Genck Decl.") ¶ 16.  The smallest repeating unit in a crystal is the "unit

---

[1] Anchen and TWi are codefendants in Case No. C-11-01609 JCS.  Hereinafter, the Court refers to them collectively as "TWi."

[2] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

A186

**United States District Court**
For the Northern District of California

1   cell," which is "essentially a box with a specific size and shape that contains a particular number of

2   atoms and molecules in a well-defined arrangement." Genck Decl. ¶ 22. The unit cell, as well as

3   the arrangement of atoms and molecules within it, is the defining characteristic of a given crystalline

4   form. *Id.* The unit cells are packed together in the crystal in a lattice structure, which is made up of

5   a repeating pattern of individual unit cells. *Id.* ¶ 23. The lattice can be characterized in terms of

6   three spatial dimensions – a, b, and c – and three angles – alpha, beta and gamma. Myerson Decl. ¶

7   26. These lengths and angles are known as "lattice parameters." *Id.* The shape of the unit cell,

8   including the axes that form the borders of the unit cell and the angles between those axes, defines a

9   series of "lattice planes" in the crystal. Genck Decl. ¶ 29 (citing Myerson Decl., Ex. 19

10  (Bhattacharya Article) at DEX0014478).

11         **B.     X-ray Crystallography**

12         X-ray diffraction is a technique used to identify crystals and to determine crystal structure.

13  Myerson Decl. ¶ 28; Genck Decl. ¶ 25. Crystal structure can be analyzed using single crystal x-ray

14  diffraction or x-ray powder diffraction ("XRPD"). Myerson Decl. ¶ 29; Genck Decl. ¶ 25. In

15  XRPD, crystalline material is ground into a fine power and irradiated with x-rays of a certain

16  wavelength (referred to as "λ"), at a range of different angles (referred to as "2θ" or "two-theta"

17  angles). Genck Decl. ¶ 28 (citing Myerson Decl., Ex. 12 (Myerson Article) at DEX0014616). A

18  diffractometer measures the intensity of the X-rays that diffract from the sample across a range of

19  diffraction angles. Myerson Decl. ¶ 31; Genck Decl. ¶ 32. The instrument then produces a plot of

20  the two-theta values versus the intensity of the diffracted x-rays, called a "diffractogram." Myerson

21  Decl. ¶ 31; Genck Decl. ¶ 28. For a crystalline material, the diffractogram has a number of peaks of

22  various heights, with each peak appearing at a particular two-theta angle value. Genck Decl. ¶ 28.

23  This pattern of peaks acts as a signature or fingerprint for the substance. Myerson Decl. ¶ 32; Genck

24  Decl. ¶ 32.

25         When X-rays of a particular wavelength reflect off parallel planes in the crystal, the

26  diffractometer registers an increase in intensity when the reflected X-rays are "in phase" with each

27  other, which occurs only when two parallel planes are separated by a particular distance, referred to

28

A187

United States District Court

For the Northern District of California

as "d."  Myerson Decl. ¶30;  Genck Decl. ¶ 30.  The distances "d", or "d-spacings,"  are

mathematically related to both the wavelength (λ) and angle (two-theta) of the incoming X-rays

according to an equation known as Bragg's Law.  Myerson Decl. ¶30; Genck Decl. ¶ 31.  Under

Bragg's Law,  nλ  = 2d sin θ, where n is an integer (usually 1), λ is the wavelength, d is the

d-spacing, and θ (theta) is the angle of incidence of the X-rays relative to the crystal.  Myerson Decl.

¶ 30;  Genck Decl. ¶ 31.

**C.      Enantiomers**

Enantiomers are pairs of compounds that contain chemical formulas and atomic sequences

that are identical to one another except that they are non-superimposable mirror images of one

another, just as a person's left and right hands are non-superimposable images of each other.

Meyerson Decl. ¶ 39; Genck Decl. ¶ 42.  Enantiomers, which also are known as chiral molecules,

are designated as right (R+) and left (S-), or (+) and (-).  Myerson Decl. ¶ 39.  The patents-in-suit

relate to dexlansoprazole, which is an enantiomer of lansoprazole..  Genck Decl. ¶ 77.

**D.      Thermal Analysis**

One way to characterize crystals is through the use of "thermal analysis," which explores the

way a sample behaves over a range of temperatures.  Genck Decl. ¶ 33.  Thermal analysis can be

used to analyze a crystal sample for various phase transitions, that is, transitions between states of

matter, such as solid phase to liquid phase or liquid phase to gas phase.  *Id.* ¶¶ 33-34.  A parameter

that is often used to characterize a crystal form using thermal analysis is the crystal's melting

properties.  *Id.* ¶ 35.  The melting properties of a particular sample of a crystalline material are

directly related to the purity of the sample.  *Id.*  In particular, a pure crystal form melts at a

well-defined, characteristic temperature whereas a sample that includes impurities generally melts

over a broader temperature range.  *Id.*

A variety of methods can be used to analyze a crystal's melting properties.  *Id.*  One such

method is differential scanning calorimetry ("DSC").  *Id.* ¶ 37; Myerson Decl. ¶ 41.  DSC is a

technique in which the difference in the amount of heat required to increase the temperature of a

sample and a reference is measured as a function of temperature.  Myerson Decl. ¶ 41.  The DSC

instrument creates a plot of the amount of energy required to maintain the sample crystal at a given

4

**United States District Court**
For the Northern District of California

1    temperature over the time of the experiment.  Genck Decl. ¶ 39.  At or near a crystal's melting point,

2    there is a peak in the DSC curve.  Myerson Decl. ¶ 43.  In the case of a pure crystalline solid, the

3    peak will be sharp, corresponding to melting only at or near its melting point.  Genck Decl. ¶ 40.  On

4    the other hand, where impurities are present, the DSC curve is more gradual because heat flow may

5    be detected before the actual melting of the sample, resulting in a gradual departure of the curve

6    from the baseline. Genck Decl. ¶ 40.

7         Other techniques for assessing the melting point of a crystal are the capillary method and hot

8    stage microscopy.  Genck Decl. ¶¶ 36, 41.  The capillary method uses a capillary tube containing a

9    small amount of the test compound, which is immersed in an oil bath that is heated slowly.  *Id*. ¶ 36.

10   The transition from solid to liquid is observed visually through a magnifier on the instrument, or is

11   detected optically by the instrument itself.  *Id*.  Hot stage microscopy involves slowly heating a solid

12   sample on the viewing stage of a microscope across a range of temperatures and visualizing the

13   sample transitions as a function of temperature.  *Id*. ¶ 41.

14        **E.    The Patents-in-Suit**

15        The patents-in-suit relate to compositions of, or methods of treatment using,

16   dexlansoprazole, a drug classified as a proton pump inhibitor ("PPI") that is used to treat acid reflux

17   and gastroesophageal reflux disease ("GERD") by reducing the amount of gastric acid produced in

18   the stomach.  *See* Myerson Decl. ¶ 44; Declaration of George Triadafilopoulos ("Triadafilopoulos

19   Decl.") ¶ 23.  The asserted claims from the '058, '276, '668 and '971 patents relate to crystal forms

20   of dexlansoprazole, while the '282 patent relates to an amorphous (that is, non-crystalline)

21   compound of  dexlansoprazole.  The '755 patent relates to controlled-release compositions for

22   imidazoles, a class of compounds of which dexlansoprazole is a member. The asserted claims of the

23   '755 patent are specifically directed at a composition that uses a dual-delayed release mechanism

24   with two different types of enteric coatings.

25        The '668 patent claims dexlansoprazole crystals different from, and developed later than,

26   those claimed in the '058 and '971 patents.  In the specification of the '668 patent, the inventors

27   explain that the relatively high "melting start temperature" of the crystal form of dexlansoprazole

28   disclosed in the '668 patent distinguishes it from the dexlansoprazole crystal forms disclosed in

1  the earlier patents. '668 patent, col.12, ll. 35-41. According to the inventors, because of this higher

2  melting start temperature, the disclosed crystal form has "superior preservation stability and can be

3  used advantageously as a pharmaceutical product" as compared to the crystal forms in the prior art

4  with lower melting start temperatures. *Id*.

5  **III.  LEGAL STANDARDS**

6       **A.   Claim Construction Standards**

7       "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

8  which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

9  (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

10  1111, 1115 (Fed. Cir. 2004)). Generally, claim terms are given the ordinary and customary meaning

11  that would be ascribed to them by a person of ordinary skill in the field of the invention. *Id*. at 1312-

12  1313; *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)("[U]nless

13  compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as

14  understood by an artisan of ordinary skill").

15      The most "significant source of the legally operative meaning of disputed claim language" is

16  the intrinsic evidence of record, that is, the claims, the specification and the prosecution history.

17  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). This is because "the

18  person of ordinary skill in the art is deemed to read the claim term not only in the context of the

19  particular claim in which the disputed term appears, but in the context of the entire patent, including

20  the specification." *Phillips*, 415 F.3d at 1313. In some cases, the specification may reveal a "special

21  definition" given by the inventor that differs from the meaning the term might otherwise possess. *Id*.

22  at 1316. In such instances, "the inventor's lexicography governs." *Id*. Similarly, a specification

23  may reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*.

24      A person of ordinary skill in the art also looks to the prosecution history of a patent to

25  understand how the patent applicant and the Patent Office understood the claim terms. *Id*. at 1313,

26  1317. Arguments and amendments made during patent prosecution limit the interpretation of claim

27  terms to exclude interpretations that were disclaimed to obtain allowance of a claim. *Southwall*

28  *Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

**United States District Court**
For the Northern District of California

A190

1   While claims are to be construed in light of the specification, courts must be careful not to

2   read limitations from the specification into the claim. *Phillips*, 415 F.3d at 1323. Thus, for

3   example, if a patent specification describes only a single embodiment of a claimed invention, that

4   does not mean the claims of the patent necessarily must be construed as limited to that embodiment.

5   *Id.* Rather, it is understood that the purpose of the specification "is to teach and enable those of skill

6   in the art to make and use the invention" and that sometimes, the best way to do that is to provide an

7   example. *Id.*

8   Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as

9   such evidence is not used to "vary or contradict the terms of the claims." *Markman v Westview*

10  *Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995). As the court explained in *Markman*,

11  "[extrinsic] evidence may be helpful to explain scientific principles, the meaning of technical terms,

12  and terms of art that appear in the patent and prosecution history." 52 F.3d at 980. The Federal

13  Circuit has warned, however, that such evidence is generally "less reliable than the patent and its

14  prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318. Thus,

15  courts are free to consult dictionaries and technical treatises so long as they are careful not to elevate

16  them "to such prominence . . that it focuses the inquiry on the abstract meaning of the words rather

17  than on the meaning of claim terms within the context of the patent." *Id.* at 1321-22.

18  **B.    Indefiniteness Standards**

19  The requirement that claims be sufficiently "definite" is set forth in 35 U.S.C. § 112, ¶ 2,

20  which provides that, "[t]he specification shall conclude with one or more claims particularly

21  pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

22  "The definiteness inquiry focuses on whether those skilled in the art would understand the scope of

23  the claim when the claim is read in light of the rest of the specification." *Union Pacific Resources*

24  *Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001). In order to "accord respect to

25  the statutory presumption of patent validity," a claim should be found indefinite "only if reasonable

26  efforts at claim construction prove futile." *Exxon Research and Eng'g Co. v. United States*, 265

27  F.3d 1371, 1375 (Fed. Cir. 2001). A claim is not indefinite simply because its meaning is not

28  ascertainable from the face of the claims. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d

1311, 1342 (Fed. Cir. 2003). Nor is a claim indefinite simply because it covers "some embodiments

that may be inoperable." *Exxon Research and Engineering Co.,* 265 F.3d at 1382. A claim is

indefinite, however, if it is "insolubly ambiguous, and no narrowing construction can properly be

adopted." *Amgen*, 314 F.3d at 1342 (citations omitted). To establish that a claim is indefinite an

alleged infringer must "demonstrate by clear and convincing evidence that one of ordinary skill in

the relevant art could not discern the boundaries of the claim based on the claim language, the

specification, the prosecution history, and the knowledge in the relevant art." *Haemonetics Corp. v.

Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

## IV.     CONSTRUCTION OF CLAIM TERMS

    The parties submitted ten claim terms for construction, consistent with Patent Local Rule 4-3

and the Court's Case Management and Pretrial Order [Docket No. 51]. The Court addresses these

claim terms below.

### A.     "a crystal of" ('058 patent, claims 1-4/ '668 patent, claims 9-10), "a crystalline compound of" ('276 patent, claims 2 and 3/ '971 patent, claims 6-8)

#### 1.     Contentions of the Parties

| Proposed Construction of Takeda, Impax and Handa | Proposed Construction of TWi |
|---|---|
| regularly repeating pattern of molecules with long range order extending in three dimensions | plain meaning |

    Claims 2 and 3 of the '276 patent and claims 6-8 of the '971 patent are directed to a

"crystalline compound" of dexlansoprazole; claims 1-4 of the '058 patent and claims 9 and 10 of the

'668 patent are directed to a "crystal of" dexlansoprazole. The parties agree that these claim terms

are used interchangeably and therefore may be considered together. Takeda, Impax and Handa have

proposed a construction of these claim terms based on what they assert is their plain and ordinary

meaning, while TWi contends that the terms do not require construction.

    According to Takeda, Impax and Handa, the proposed construction of these claim terms is

consistent with the plain and ordinary meaning of the terms as they have long been understood by

United States District Court

For the Northern District of California

8

A192

United States District Court
For the Northern District of California

1    those skilled in the art.[3]  Takeda notes that the definition for a crystal set forth in the extrinsic

2    evidence offered by TWi in connection with its claim construction position is consistent with the

3    construction offered by Takeda, Impax and Handa.  *See* Myerson Decl. ¶ 58 & Ex. 15 at 510 (IPXL -

4    0009909) (*McGraw-Hill Concise Encyclopedia of Science and Technology*, Sybil P. Parker ed., 3d

5    ed. 1994 (defining a "crystal" as a "solid throughout [in] which the atoms and molecules are

6    arranged in a regularly repeating pattern")).

7         Takeda further contends that it will be helpful to the Court to construe these claim terms to

8    "elucidate[ ] the structural characteristics that define a crystal" and to "clarify the link between the

9    'crystal' claim requirement and the empirical determination of whether the accused products contain

10   crystals, as the regularly repeating three-dimensional molecular order that characterizes a crystalline

11   solid can be confirmed or refuted through methods such as the x-ray powder diffraction analysis

12   technique referred to in several of the claims."  Takeda's Opening Claim Construction Brief at 10.

13        TWi does not dispute that the proposed definition of "crystal" and "crystalline compound"

14   offered by Takeda, Impax and Handa "recites a 'characteristic' of a crystal."  Defendants' Claim

15   Construction Brief at 7 (citing Declaration of Parisa Jorjani in Support of Defendants' Claim

16   Construction Brief ("Jorjani Decl."), Ex. 1 (Myerson Dep.) at 215-216).  It argues, however, that the

17

18   _____

19        [3]Takeda cites to the following extrinsic evidence in support of its proposed construction of these
     claim terms: Myerson Decl.  ¶ 56 ("It is my opinion . . . that a person of ordinary skill in the art, reading
20   the crystal-form patents in 1999, would have understood the disputed term "a crystal of" and "a
     crystalline compound of" to be "a regularly repeating pattern of molecules with long range order
21   extending in three dimensions"), ¶57 (citing the following "literature references that are accepted
     authorities in the field of crystallography" in support of proposed construction: Ex. 9, at DEX0014501
22   (C.W. Bunn, Chemical Crystallography (2d ed. 1961)) ("crystalline" means that "the atoms or molecules
     of which [a solid substance is] composed are packed together in a regular manner, forming a
23   three-dimensional pattern"); Ex. 10, at DEX0014581 (Bruno C. Hancock and George Zografi,
     Characteristics and Significance of the Amorphous State in Pharmaceutical Systems, 86 J. Pharm. Sci.
24   1-12, 1 (1986) (hereinafter, "Hancock and Zografi")) ("crystalline material" normally possesses
     "three-dimensional long-range order"); Ex. 11, at DEX0014512 (S.R. Elliott, Physics of Amorphous
25   Materials 1-6 (2d ed. 1990)) ("A perfect crystal is that in which the atoms (or groups of atoms or
     'motifs') are arranged in a pattern that repeats periodically in three dimensions to an infinite extent");
26   Ex. 12, at DEX0014612 (Allan S. Myerson and Rajiv Ginde, Crystals, Crystal Growth, and Nucleation,
     in Handbook of Industrial Crystallization 33 (2d ed. 2002)) ("Crystals are solids in which the atoms are
27   arranged in a periodic repeating pattern that extends in three dimensions"); Ex. 13, at DEX0014770
     (Richard Zallen, The Physics of Amorphous Solids 1-5 (2004)) (stating that, "in crystals, "[t]he atomic
28   positions exhibit long-range order"); Ex. 14, at DEX0014719 (Hsien-Hsin Tung et al., Crystallization
     of Organic Compounds: An Industrial Perspective 25 (2009)) ("crystalline materials are solids in which
     molecules are arranged in a periodical three-dimensional pattern")).

9

A193

1  Court should not construe these terms because they are well understood and have an established

2  meaning. *Id.* According to TWi, construction of these claim terms not only is not required but also

3  "makes no sense in many respects and creates ambiguity where none previously existed." *Id.* In

4  particular, TWi asserts that "if one substitutes the proposed definition for the word 'crystal' as it

5  appears in the patent specification, it would not be consistent with how the term was actually used

6  throughout the specification." *Id.* In support of this contention, TWi cites deposition testimony of

7  Takeda's expert, Dr. Myerson, offered in connection with the '058 and '668 patents. *Id.* (citing

8  Jorjani Decl., Ex. 1 (Myerson Dep.) at 197, 214).

9      First, as to the '058 patent, TWi cites Dr. Myerson's testimony that if the phrase "a crystal"

10  were replaced with Takeda's proposed definition of this term in Example 1 of the '058 patent

11  (described in column 10), the resulting statement is "very wordy." *See* Jorjani Decl., Ex. 1

12  (Myerson Dep.) at 214. Second, as to the '668 patent, TWi cites Dr. Myerson's opinion that in

13  connection with claim 9 of the '668 patent, directed to "a crystal" of dexlansoprazole having a

14  melting start temperature of not lower than 131 degrees Celsius, multiple crystals of dexlansoprazole

15  would be required to determine the melting start temperature using the DSC method because "you

16  normally would not find a single crystal to do a DSC on." *Id.* at 197. Therefore, in that context "a

17  crystal" of dexlansoprazole meant "crystalline dexlansoprazole," according to Dr. Myerson. *Id.*

18      Finally, TWi contends that if the Court were to adopt the construction proposed by Takeda,

19  Impax and Handa, there would likely be a "new round of disputes regarding the meaning of the

20  words used in the construction, such as 'regularly,' 'repeating,' and 'long-range order.'"

21  Defendants' Claim Construction Brief at 8.

22      In its Reply Claim Construction Brief, Takeda dismisses TWi's assertion that the proposed

23  construction will create ambiguity, arguing that TWi has failed to identify any such ambiguity.

24  Takeda's Reply Claim Construction Brief at 1. According to Takeda, the proposed construction of

25  these terms is "similar to that adopted by other courts." *Id.* (citing *Pfizer Inc. v. Dr. Reddy's*

26  *Laboratories Ltd.*, 2011 WL 767849, at *1 n.2 (D. Del. Feb. 28, 2011) (construing "crystalline" as

27  "a solid form having a long range periodic ordered structure extending in three dimensions").

28

10

A194

United States District Court

For the Northern District of California

### 2.    Analysis

"[T]he Federal Circuit has held that if commonly understood words are used, then the 'ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'" *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007) (quoting *Phillips*, 415 F.3d at 1314). Thus, in *Board of Trustees of Leland Stanford Junior University*, the Court held that the claim terms "therapeutically effective" and "therapeutically ineffective" required no construction because "they are neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history." *Id*. (citing *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997)).

On the other hand, even if a claim term has a plain and ordinary meaning, the court should construe the term if construction is required to resolve a dispute about the scope of the asserted claims, which is a question of law to be decided by the Court. *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In *O2*, for example, the Federal Circuit held that the district court had erred in declining to construe the claim term "only if," because although the phrase had a "common meaning," the parties disagreed as to its scope. *Id*. at 1362. In other words, the court explained, the district court "failed to resolve the parties' dispute because the parties disputed not the meaning of the words themselves, but the scope that should be encompassed by this claim language." *Id*. at 1362.

Here, the parties seeking construction of these claim terms have identified no dispute or ambiguity that requires that the Court construe the terms. Nonetheless, the Court finds that construction of the term "a crystal" and "crystalline compound" is appropriate because these terms, unlike the claim terms at issue in cases where courts have found that no construction is necessary, such as *Board of Trustees of Leland Stanford Junior University*, are not so familiar that their meaning would be readily understood by a jury (or the Court) without construction.

Having found that construction of these claim terms is appropriate, the Court next addresses

11

1   whether the construction proposed by Takeda, Impax and Handa should be adopted in light of the

2   concerns expressed by TWi.  The Court concludes that it should.

3          First, while TWi contends that the proposed construction will simply result in a "new round"

4   of disputes arising out ambiguities in the proposed construction, no actual dispute has been

5   identified in this respect.  Therefore, the Court rejects this argument.

6          Second, the Court finds unpersuasive TWi's assertion that "if one substitutes the proposed

7   definition for the word 'crystal' as it appears in the patent specification, it would not be consistent

8   with how the term was actually used throughout the specification."  In support of this position, TWi

9   relies on the testimony of Dr. Myerson that substitution of the word "a crystal" with the words of the

10  proposed construction would make an example in the '058 patent specification "very wordy."  Dr.

11  Myerson went on to say, however, that the description would mean the same thing either way.  *See*

12  Jorjani Decl., Ex. 1 (Myerson Dep.) at 214.

13         The Court also rejects TWi's suggestion that the proposed construction of these claim terms

14  may be inadequate because it merely describes "a characteristic" of "a crystal" or a "crystalline

15  compound" rather than defining those terms.  Again, TWi relies on Dr. Myerson's deposition

16  testimony in support of its position.  Dr. Myerson's testimony, however, supports the opposite

17  conclusion.  In particular, the following exchange occurred at Dr. Myerson's deposition:

18  Q:   Well, lets turn to your definition of "amorphous compound."  You say that an amorphous
     compound as used in the '282 patent, it means "a noncrystalline solid that lacks the long-
19   range order characteristic of a crystal."

20  A:   That's correct.

21  Q:   So isn't it fair to say that this long-range order that you're talking about is a characteristic of
     a crystal?

22

23        . . .

24  A:   It's the definition of a crystal.  If you don't have the long-range order, it's not a crystal.

     Q:   . . .then why did you choose the word "characteristic" when you . . . offered a definition for
25   "amorphous compound," why did you call the long-range order a "characteristic of a
     crystal"?
26

27        . . .

28  A:   Well, it is a characteristic of a crystal because it is the definition of a crystal.

                                              12

**United States District Court**
For the Northern District of California

Jorjani Decl., Ex. 1 (Myerson Dep.) at 215-216.  Therefore, the Court rejects TWi's contention that the proposed construction falls short because it merely describes "a characteristic"of "a crystal" or "crystalline compound."

For the reasons stated above, the Court adopts the construction proposed by Takeda, Impax and Handa for the claim terms "a crystal" and "crystalline compound."

**B.     "characteristic peaks at interplanar spacings (d)" ('058 patent, claims 1 and 2/ '971 patent, claims 7 and 8)**

**1.     Contentions of the Parties**

| Takeda's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Peaks in the X-ray powder diffractogram of a crystal that uniquely identify that crystal, denoted by distances between lattice planes in a crystal as measured by a diffraction experiment and defined by Bragg's law, within normal experimental error of X-ray powder diffraction[4] | Peaks in the X-ray powder diffractogram of a crystal that uniquely identify that crystal, denoted by distances between lattice planes in a crystal as measured by a diffraction experiment and defined by Bragg's law |

The term "characteristic peaks at interplanar spacings (d)" appears in claims 1 and 2 of the '058 patent and in claims 7 and 8 of the '971 patent.  In each of these claims, the recitation of this term is followed by a list of eleven  numbers, corresponding to the d-spacings of the particular crystal forms.

The parties agree that this claim limitation refers to measurements obtained through the x-ray powder diffraction method.  *See* Myerson Decl. ¶ 62.  The only dispute between Takeda and Defendants is whether or not the term should be construed so as to incorporate the experimental

---

[4]In Takeda's Opening Claim Construction Brief, it proposed that the term be construed as "a series of peaks that are characteristic of a particular crystal form within normal experimental error of x-ray powder diffraction."  Takeda's Opening Claim Construction Brief at 8.  In its reply brief, however, Takeda agreed to Defendants' more specific proposed construction, so long as the Court also included in its construction the phrase "within normal experimental error of X-ray powder diffraction."  Takeda Reply Brief on Claim Construction at 2.

13

A197

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

1    error that is associated with the measurement of the diffraction peaks and corresponding d-spacings.

3         In its Opening Claim Construction Brief, Takeda argues that at the time of the inventions of

4    the '058 and '971 patents, both of which have a priority date of June 17, 1999, it was "universally

5    recognized . . . that x-ray powder diffraction techniques involve some degree of experimental

6    error." Opening Claim Construction Brief at 11 (citing Myerson Decl. ¶ 63) (stating that "[a] person

7    of ordinary skill in 1999 would have understood any description of 'characteristic peaks of

8    interplanar spacings (d)' to be within the context of the normal experimental error inherent to XRPD

9    measurements because of limitations in the measuring equipment or techniques"). In support of this

10   contention, Takeda points to the United States Pharmacopeia ("USP"), which establishes standards

11   for medicines that are used by regulatory agencies and manufacturers. *Id.* The 1995 edition of the

12   USP states that when using XRPD to compare a  known material (the "reference") with an unknown

13   material (the "sample"):

14        [a]greement between sample and reference should be within the calibrated precision of the
          diffractometer for diffraction angle ($2\theta$ values should typically be reproducible to $\pm 0.10$ or
15        0.20 degrees), while relative intensities between sample and reference may vary up to 20
          percent.

17    *Id.* (citing Myerson Decl., Ex. 16 at DEX0014738 ("X-Ray Diffraction," The United States

18   Pharmacopeia, 1844 (23rd rev. 1995)). Takeda notes that the 2002 edition of the USP provided for

19   the same range of error as to the diffraction angle values as the 1995 edition, while the 2005 USP

20   narrowed the range of error to $\pm 0.10$ degrees (rather than $\pm 0.10$ or $0.20$ degrees) for those values,

21   reflecting improvements in XRPD technology. *Id.* (citing Myerson Decl., Ex. 17 (2002 USP

22   excerpt), Ex. 18 (2005 USP excerpt)).[5]

23        Takeda also points to other references that its asserts reflect the understanding of a person

24   skilled in the art that the measurement of the peaks of interplanar spacings (d) allowed for a range of

27    [5]The later versions of the USP do not set forth a specific range of error as to relative intensities,
28   instead acknowledging that they may "vary considerably." *Id.*

A198

United States District Court

For the Northern District of California

1 error. First, Takeda cites to Sisir Bhattacharya et al., Thermoanalytical and Crystallographic

2 Methods, in Polymorphism in Pharmaceutical Solids, 318-46 (2d ed. 2009), which states as follows:

3     The United States Pharmacopeia contains a general chapter on XRD . . . , which sets the
criterion that identity is established if the scattering angles in the powder patterns of the

4     sample and reference standard agree to within the calibrated precision of the diffractometer.
It is noted that it is generally sufficient that the scattering angles of the ten strongest

5     reflections obtained for an analyte agree to within either $\pm 0.10$ or $0.20°$ $2\theta$, whichever is
more appropriate for the diffractometer used. Older versions of the general test contained an

6     additional criterion for relative intensities of the scattering peaks, but it has been noted that
relative intensities may vary considerably from that of the reference standard, making it

7     impossible to enforce a criterion based on the relative intensities of corresponding scattering
peaks.

8

9 *Id.* at 11-12 (citing Myerson Decl., Ex. 19, at DEX0014482).

10     Second, Takeda cites to Harry G. Brittain, "Methods for the Characterization of Polymorphs

11 and Solvates," in Polymorphism in Pharmaceutical Solids, 227, 236 (1st ed. 1999) – a reference that

12 was cited by Defendants in the Joint Claim Construction and Prehearing Statement – in which the

13 author quotes with approval the USP standard. *Id.* at 12 (citing Myerson Decl., Ex. 20 at IPXL -

14 0009873). In particular, Brittain states that the "USP general chapter on x-ray diffraction states that

15 identity is established if the scattering angles of the ten strongest reflections obtained for an analyte

16 agree to within $\pm 0.20$ degrees with that of the reference material, and if the relative intensities of

17 these reflections do not vary by more than 20 percent." *Id.*

18     Defendants respond that Takeda's proposed construction improperly imports the notion of

19 "experimental error" from extrinsic evidence. Defendants' Claim Construction Brief at 9 (citing

20 *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005)). The intrinsic evidence,

21 Defendants contend, does not support Takeda's proposed construction. *Id.* Defendants point out

22 that Takeda's expert, Dr. Myerson, admitted that nothing in the claims or specification of the '058 or

23 the '971 patents addressed experimental error and that he did not recall any mention of this issue in

24 the file history. *Id.* (citing Jorjani Decl., Ex. 1 (Myerson Dep.) at 29:24-33:5; 43:8- 20).

25     Looking to the claim language, Defendants assert that the precise d-spacing values in the

26 claims and the absence of any modifiers such as "approximately" or "about," indicate that a person

27 skilled in the art would have viewed the recited d-spacing values to be very precise limitations,

28 contrary to Takeda's proposed construction. *Id.* (citing Genck Decl. ¶70).

United States District Court

For the Northern District of California

1    Defendants argue that the specification of the '058 patent also supports their position, citing

2    Reference Example 4 and Example 2. *Id.* at 9 (citing '058 patent, col. 10, ll. 14-17 (Reference

3    Example 4) and col. 11, l. 55 - col. 12, l. 9 (Example 2)). These examples describe two crystal

4    forms that were made using different methods and were analyzed separately; nonetheless,

5    Defendants point out, "the d-spacings reported for the two crystals are exactly the same, to the

6    hundredth decimal place, with no reported experimental error or other deviation whatsoever." *Id.*

7    According to Defendants, because the inventors provided exact values that were reproducible over

8    multiple experiments, a person skilled in the art would have understood that the claimed d-spacings

9    were meant to be exact values. *Id.* at 10.

10    Finally, Defendants cite to the claims and specification of the '668 patent in support of their

11    position. *Id.* The '668 patent describes and claims various crystal forms of the enantiomers of

12    lansoprazole and offers multiple experimental examples in which crystal forms of dexlansoprazole

13    are made using various methods. *Id.* (citing Genck Decl. ¶¶ 77-78.). Although these crystals are

14    reported to have different melting properties, the d-spacings that are listed in the examples are

15    exactly the same as the values reported in the '058 patent. *Id.* (citing '668 patent, col. 16, l. 45 - col.

16    24, l. 5 and comparing '668 patent at col. 18, ll. 44-47, col. 20, ll. 34-38, col.20, ll. 57-61, col. 21, ll.

17    33-37, col. 21, ll. 60-65, col. 23, ll. 58-62 with '058 patent at col. 10, ll. 14-17, col. 11, l. 55 - col.

18    12, l. 9). According to Defendants, the precision in these values is particularly striking in light of

19    the fact that different diffraction instruments were used to generate the data in the two patents. *Id.*

20    (comparing '668 patent at col. 16, ll. 14-15 (disclosing a "Rigaku RINT Ultima+" diffractometer)

21    with '058 patent at col. 7, ll. 15-17 (disclosing a "Rigaku RINT2500" diffractometer)). This

22    precision further supports a construction of this claim term that does not incorporate the concept of

23    error, Defendants contend. *Id.*

24    In response, Takeda points out that Defendants' expert, Dr. Genck, does not dispute that a

25    person skilled in the art at the time of the invention would have understood that the measurement of

26    diffraction peaks using XRPD would have involved a certain amount of experimental error. Takeda

27    Reply Brief on Claim Construction at 2. In particular, in his declaration, Dr. Genck states, "I do not

28    disagree with Dr. Myerson regarding the +/- 0.1 or +/- 0.2 error generally associated with the

A200

United States District Court

For the Northern District of California

1  two-theta values in normal X-ray powder experiments . . . ." *Id.* (quoting Genck Decl. ¶ 76).

2  Similarly, in his deposition, Dr. Genck testified that there is always some variability in the

3  measurement of diffraction angles. *Id.* (citing Declaration of Erin J. Cox in Support of Takeda's

4  Reply Brief on Claim Construction ("Cox Decl."), Ex. 1 (Genck Dep.) at 98:23-99:8 (testifying that

5  d-spacings measured in any two experiments will be different, "based upon experimental error for

6  the machine") & 105:13-106:22, 108:6-19 (agreeing that as of 1999, a ± 0.1 or a ± 0.2 error

7  rate in the two-theta values was to be expected in a normal X-ray powder experiment)).

8      Takeda rejects Defendants' reliance on the absence of any reference to experimental error in

9  the claims or specifications of the '058 and '971 patents, arguing that none is necessary because

10  patents are meant to be "a concise statement for persons in the field" and are not drafted for lawyers

11  or judges. *Id.* (citing *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002); *In re*

12  *Nelson*, 280 F.2d 172, 181 (C.C.P.A. 1960)).

13      Takeda argues that the identical d-spacings reported in the '058 and '971 patents, cited by

14  Defendants in support of their position that the claims do not incorporate experimental error,

15  "ignores what anyone skilled in the art would know: that measurements made on *different* equipment

16  by *different* operators using *different* samples sizes or sample preparation techniques will necessarily

17  be subject to normal experimental error." *Id.* at 3.

18      Finally, Takeda challenges Defendants' reliance on the '668 patent in support of their

19  proposed construction, asserting that because the '668 patent has different inventors, a different

20  specification and a different prosecution history than the '058 and '971 patents, it is not intrinsic or

21  relevant extrinsic evidence in determining the meaning of claim terms in the earlier '058 and '971

22  patents. *Id.* at 2 n. 2.

23          **2.      Analysis**

24      As discussed above, the most "significant source of the legally operative meaning of

25  disputed claim language" is the intrinsic evidence of record, that is, the claims, the specification and

26  the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

27  On the other hand, "[w]hile reference to intrinsic evidence is primary in interpreting claims, the

28  criterion is the meaning of words as they would be understood by persons in the field of the

17

A201

invention." *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002). In *Verve*, the Federal Circuit explained:

> Patent documents are written for persons familiar with the relevant field; the patentee is not required to include in the specification information readily understood by practitioners, lest every patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of a concise statement for persons in the field. Thus resolution of any ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention.

*Id.*

The extrinsic evidence here establishes that at the time of the invention, a person skilled in the art would have understood that the values listed in the claims of the '058 and '971 patents, as well as those contained in the examples of the '058 patent, must have allowed for experimental error. All of the cited editions of the USP acknowledge the experimental error associated with XRPD measurements; indeed, *all* of the references cited by the parties in connection with this claim term recognize the experimental error associated with XRPD measurements. Consistent with these references, Defendants' expert conceded in his declaration that there is a " +/- 0.1 or +/- 0.2 error generally associated with the two-theta values in normal X-ray powder experiments." Genck Decl. ¶ 76. Similarly, in his deposition Dr. Genck testified that there is always some experimental error in XRPD diffraction results:

> Q:   Is there some probability that if you were to perform X-ray powder diffraction on the same sample ten times, that the d-spacings measured in two of those runs would be identical out to two decimal places?
>
> A:   Some probability? I don't know. So – I know that they'd be different, based upon experimental error from the machine . . .
>
> . . .
>
> Q:   Do you think there's always some variation in the d-spacings from run to run?
>
> A:   By definition there is, yes.

Cox Decl., Ex. 1 (Genck Dep.) at 98-100. In light of this evidence, the Court concludes that a person skilled in the art would not have required any discussion of the experimental error associated with XRPD diffraction, either in the specification or in the claims, to understand that the references to "characteristic peaks at interplanar spacings (d)" allowed for such experimental error.

18

A202

United States District Court
For the Northern District of California

<div style="text-align:center; font-weight:bold;">United States District Court</div>
<div style="text-align:center;">For the Northern District of California</div>

1  Nor does the case cited by Defendants, *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361,

2  1368 (Fed. Cir. 2005), support a contrary result.  That case merely stands for the proposition that the

3  court may not import limitations from the specification to restrict the claims to coverage of a single

4  embodiment.  That is not the situation here, where the Court looks to extrinsic evidence to

5  understand a term that would have been readily understood by a person skilled in the art.  Therefore,

6  the Court adopts Takeda's proposed construction.

7      **C.**    **"effective amount" ('971 patent, claim 5)**

8          **1.**    **Contentions of the Parties**

| Takeda's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| an amount sufficient to help ameliorate or cure reflux esophagitis | the term is indefinite |

12  Claim 5 of the '971 patent claims "a method of treating reflux esophagitis in a mammal in

13  need thereof which comprises administering an effective amount of a crystalline compound of

14  [dexlansoprazole] or a salt thereof, and a pharmaceutically acceptable excipient, carrier or

15  diluent."  Although Takeda does not assert claim 5, it asserts dependent claims 6-8, which

16  incorporate the limitations of claim 5.  Takeda proposes that the term "effective amount" be

17  construed to mean "an amount sufficient to help ameliorate or cure reflux esophagitis."  Defendants

18  assert that this term is indefinite.

19  Takeda argues in its Opening Claim Construction Brief that the term "effective amount"

20  would be understood by a person skilled in the art to pertain to treatment based on the language of

21  claim 5 (claiming a "method of *treating* reflux esophagitis") and the patent specification (stating that

22  "the crystal of the present invention is useful in mammals . . . for the *treatment* and prevention" of

23  various ailments, including "reflux esophagitis").  Takeda's Opening Claim Construction Brief at 13

24  (citing '971 patent, col. 3, ll. 54-59) (emphasis added).

25  Further, Takeda asserts, the term "effective amount" has been found to have a well-

26  established meaning when used in the context of pharmaceuticals:  "'[E]ffective amount' is a

27  common and generally acceptable term for pharmaceutical claims and is not ambiguous or

28

<div style="text-align:center;">19</div>

<div style="text-align:center; border:1px solid black; display:inline-block; padding:4px;">A203</div>

United States District Court

For the Northern District of California

1   indefinite, provided that a person of ordinary skill in the art could determine the specific amounts

2   without undue experimentation." *Id*. (quoting *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349

3   F.3d 1373, 1383-84 (Fed. Cir. 2003)). According to Takeda, the guidance provided in the '971

4   specification is sufficient to meet this standard because it sets forth a dosage range for treatment of

5   mammals generally, as well as a narrower range for treatment of an adult human. *Id*. (citing '971

6   patent, col. 4, ll. 19-25). Specifically, the specification states as follows:

> Varying depending on the subject of administration, route of administration, target disease etc., its dose is normally about 0.5 to 1,500 mg/day, preferably about 5 to 150 mg/day, based on the active ingredient, for example, when it is orally administered as an antiulcer agent to an adult human (60 kg). The crystal of the present invention may be administered once daily or in 2 to 3 divided portions per day.

10   '971 patent, col. 4, ll. 18-24. Takeda contends that a person skilled in the art would understand the

11   meaning of the term "effective amount," as used in claim 5, based on this disclosure. Takeda's

12   Opening Claim Construction Brief at 13 (citing *Schering Corp. v. Mylan Pharms., Inc.*, 2011 WL

13   3736503 (D.N.J. Aug. 22, 2011) (finding phrase "effective amount" sufficiently definite based on

14   specification's disclosure of dosages); Declaration of Heather Takahashi in Support of Takeda's

15   Opening Claim Construction Brief ("Takahashi Decl."), Ex. B (United States Reissued Patent

16   RE42,461, asserted in *Schering Corp*.) at col. 20, ll. 49-51; col. 20, ll. 64-66 (reflecting dosage range

17   from 1 mg to 1,000 mg/day)).

18      Takeda also cites to numerous cases in which it asserts the term "effective amount" has been

19   given a construction similar to the one it proposes in this case. *Id*. at 13-14 (citing *Abbott*

20   *Laboratories v. Baxter Pharmaceutical Products, Inc.*, 334 F.3d 1274 (Fed. Cir. 2003), *Cytomedix,*

21   *Inc. v. Little Rock Foot Clinic, P.A.*, 2004 WL 1921070, at *4 (N.D. Ill. Aug. 4, 2004); *Teva Pharms.*

22   *USA, Inc. v. Amgen, Inc.*, 2010 WL 3620203, at *12-13 (E.D. Pa. Sept. 10, 2010); *Medicis Pharm.*

23   *Corp. v. Acella Pharms. Inc.*, 2011 WL 810044, at *8 (D. Ariz. Mar. 2, 2011); *Biogen Idec, Inc. v.*

24   *GlaxoSmithKline LLC*, 2011 WL 4949042, at *11 (S.D. Cal. Oct. 18, 2011)). Takeda notes that

25   some courts have even concluded that the term needs no construction. *Id*. at 14 (citing *Pfizer Inc. v.*

26   *Teva Pharms. USA, Inc.*, 803 F. Supp. 2d 397, 408 (E.D. Va. Mar. 17, 2011)).

27      Defendants do not disagree with Takeda that the "effective amount" term refers to the

28   amount necessary to treat reflux esophagitis in a mammal. Defendants' Claim Construction Brief at

A204

1  16.  They contend, however, that the term is indefinite because a person of ordinary skill in the art

2  would not know from the disclosures of the '971 patent how to determine the "effective amount" to

3  treat "any mammal," as they contend is required by the words of claim 5.  *Id.* at 16-18.

4  First, Defendants argue that the only experimental example disclosed in the '971 patent

5  involves the use of dexlansoprazole to prevent injury of rats' stomachs.  *Id.* at 16-17 (citing '971

6  patent, col. 13, ll. 15-54).  According to Defendants' expert, Dr. Triadafilopoulos, this experiment

7  would not have allowed a person skilled in the art to determine the effective amount to treat any

8  mammal because: 1) the experiment involved *prevention* of injury rather than *treatment*; and 2) the

9  experiment focused on injury to the rat's *stomach* and not on injury to or inflammation of the rat's

10  *esophagus*, which would have been the relevant inquiry for treating reflux esophagitis.  *Id.* (citing

11  Triadafilopoulos Decl. ¶¶ 33-35).

12  Second, Defendants assert that the dosage ranges disclosed in the '971 specification at

13  column 4, lines 18-24 also do not provide a sufficient basis for determining the amount necessary to

14  treat any mammal for reflux esophagitis.  *Id.* at 17.  Defendants point out that the invention of the

15  '971 patent is described as being "useful" for treating a long list of  conditions, only one of which is

16  reflux esophagitis.  *Id.* (citing '971 patent, col. 3, l. 54 - col. 4, l. 4).  Yet, they contend, the dosage

17  ranges in the specification are specific to the use of dexlansoprazole as an "antiulcer agent" and

18  therefore do not offer guidance as to the proper dose to treat reflux esophagitis.  *Id.* (citing

19  Triadafilopoulos Decl. ¶ 37).  Further, these dosages are insufficient, Defendants assert, because

20  they relate only to the treatment of an adult human, whereas the claim is directed to the treatment of

21  a mammal and the specification lists a wide variety of mammals that can be treated with the claimed

22  invention, including "humans, monkeys, sheep, bovines, horses, dogs, cats, rabbits, rats, mice, etc."

23  *Id.* at 17-18 (citing '971 patent, col. 3, ll. 54-56).  Given the differences in the physiology of the

24  gastrointestinal tracts of these different mammals, Defendants contend, the dosages provided for

25  treating gastric ulcers in humans would not provide a person skilled in the art a sufficient basis to

26  determine the appropriate dosages for treating *other* mammals for a different condition, namely,

27  reflux esophagitis.  *Id.* at 18 (citing Triadafilopoulos Decl. ¶¶ 30-31, 38-40).

28

**United States District Court**
For the Northern District of California

21

United States District Court

For the Northern District of California

1    Finally, Defendants assert that the cases cited by Takeda do not stand for a contrary result

2    because in all of them, it would have been possible for a person skilled in the art to determine the

3    dosage that would constitute an "effective amount."  *Id.* (citing *Geneva Pharms., Inc. v.*

4    *GlaxoSmithKline, PLC*, 349 F.3d 1373 (Fed. Cir. 2003)).  In particular, Defendants contend that in

5    *Schering Corp. v. Mylan Pharm., Inc.*, *Abbott Labs. v. Baxter Pharm. Prods. Inc.*, and *Biogen Idec,*

6    *Inc. v. GlaxoSmithKline LLC*, the specification contained "extensive explanations . . . that would

7    allow a skilled artisan to determine the effective amount of the compound at issue."  *Id.*   Defendants

8    further contend that *Pfizer, Inc. v. Teva Pharms. USA, Inc.* is distinguishable because the court was

9    construing "claims that were aimed at a very specific host and a single disease."  *Id.*

10    In its Reply Brief on Claim Construction, Takeda asserts that Defendants have applied the

11    wrong test: the disclosure is not required to "precisely define the amount of dexlansoprazole

12    sufficient to treat reflux esophagitis" but rather, need only disclose enough information so that a

13    person skilled in the art would be able to determine the amounts required for treatment *without*

14    *undue experimentation.*  Reply Brief on Claim Construction at 3 (citing *Geneva Pharms., Inc. v.*

15    *GlaxoSmithKline, PLC*, 349 F.3d 1373 (Fed. Cir. 2003)).  Defendants, Takeda argues, have not

16    shown by clear and convincing evidence – as is required to establish indefiniteness – that a person

17    skilled in the art would be unable to determine the effective amounts for treatment without undue

18    experimentation.  *Id.* (citing *King Pharms., Inc. v. Purdue Pharma L.P.*, 718 F. Supp. 2d 703, 718

19    (W.D. Va. 2010); *Ortho–McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365-66 (Fed.

20    Cir. 2008)).  Indeed, in another lawsuit, Takeda asserts, Defendant Impax argued that clinical trials

21    did not amount to undue experimentation because the methodology for conducting such trials would

22    have been known to a person skilled in the art.  *Id.* at 4 (citing Brief of Plaintiff-Appellant Impax

23    Laboratories, Inc., *Impax Labs., Inc. v. Aventis Pharms. Inc.,* 2005 WL 2598148, at *39-40 (Fed.

24    Cir. filed June 10, 2005)).

25    Finally, Takeda asserts that the broader of the two dosage ranges provided in the

26    specification – "normally about 0.5 to 1,500 mg/day," depending on the subject of administration

27    and target disease – is sufficient to set out the metes and bounds of the claim and that the inventors

28    were not required to undertake an "impossible task" of specifying exact dosages.  *Id.* (citing '971

A206

1   patent, col. 4, ll. 18-22 & *King Pharms., Inc. v. Purdue Pharma L.P.*, 718 F. Supp. 2d at 718).

2   **2.   Analysis**

3   Takeda asks the Court to construe the term "effective amount" as "an amount sufficient to

4   ameliorate or cure reflux esophagitis." Courts have routinely construed the claim term "effective

5   amount" in a manner similar to Takeda's proposed construction. *See, e.g.*, *Cytomedix, Inc. v. Little*

6   *Rock Foot Clinic, P.A.*, 2004 WL 1921070, at *4 (N.D. Ill. Aug. 4, 2004)(construing "effective

7   amount" as "a sufficient amount of treating composition to facilitate healing"); *Teva Pharms. USA,*

8   *Inc. v. Amgen, Inc.*, 2010 WL 3620203, at *12-13 (E.D. Pa. Sept. 10, 2010) (construing

9   "administering an effective amount of" as "administering an amount adequate and suitable for

10  therapeutic use"); *Medicis Pharm. Corp. v. Acella Pharms. Inc.*, 2011 WL 810044, at *8 (D. Ariz.

11  Mar. 2, 2011) (construing "effective amount" as "adequate therapeutic dose"); *Biogen Idec, Inc. v.*

12  *GlaxoSmithKline LLC*, 2011 WL 4949042, at *11 (S.D. Cal. Oct. 18, 2011) (construing "effective

13  to treat the chronic lymphocytic leukemia" as "providing a positive clinical benefit to the chronic

14  lymphocytic leukemia patient"). Thus, the Court finds that Takeda's proposed construction

15  adequately captures the meaning of the words "effective amount" as they are used in claim 5.

16  A more difficult question is whether the term "effective amount" is, nonetheless, indefinite,

17  as Defendants contend. The Federal Circuit has explained that "'effective amount' is a common and

18  generally acceptable term for pharmaceutical claims and is not ambiguous or indefinite, *provided*

19  *that* a person of ordinary skill in the art could determine the specific amounts without undue

20  experimentation." *Geneva Pharms., Inc. v. GlaxoSmithKline, PLC*, 349 F.3d at 1383-1384

21  (emphasis added). Due to the largely factual nature of this inquiry, the Court concludes that this

22  question is more suitable for determination on summary judgment than at the claim construction

23  phase of the case. *See CSB-System Int'l, Inc. v. SAP America, Inc.,* 2011 WL 3240838, at *17-18

24  (E.D. Pa., July 28, 2011) (discussing reasons for deferring indefiniteness inquiry to summary

25  judgment). Accordingly, the Court adopts Takeda's proposed construction without prejudice to

26  Defendants' bringing a motion for summary judgment on the question of whether the standard set

27  forth in *Geneva Pharmaceuticals* is met as to the claim term "effective amount."

28

**United States District Court**

For the Northern District of California

A207

United States District Court

For the Northern District of California

D.    **"melting start temperature"** **('668 patent, claims 9 and 10)**

1.    **Contentions of the Parties**

| Takeda's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| the temperature at which crystals start to melt, represented by the onset temperature of melting as measured by differential scanning calorimetry | the term is indefinite |

Claim 9 of the '668 patent claims a crystal "having a melting start temperature of not lower than about 131° C." Claim 10 is dependent on claim 9, claiming "[t]he crystal from claim 9, wherein the melting start temperature is about 135° C." Takeda proposes that the term "melting start temperature" should be construed to mean "the temperature at which crystals start to melt, represented by the onset temperature of melting as measured by differential scanning calorimetry." Defendants argue that the term is indefinite.

In its Opening Claim Construction Brief, Takeda argues that the term "melting start temperature" is defined in the specification of the '668 patent, which states that "[a]s used herein, the 'melting start temperature' refers to the temperature at which crystals start to melt when heated under, for example, the DSC measurement conditions to be mentioned below." Takeda Opening Claim Construction Brief at 15 (citing '668 patent, col. 12, ll. 4-7). Further, Takeda points out, the specification sets out the specific DSC conditions under which "melting start temperature" can be measured in the specification, stating as follows:

The melting start temperature was measured using DSC (differential scanning calorimeter SEIKO DSC220C) under the following measurement conditions.

DSC Measurement Conditions;

temperature range: room temperature to 220° C.

temperature rise rate: 0.5° C./min.

sample container: aluminum pan (without cover)

atmosphere: nitrogen gas (100 mL/min)

*Id*. (quoting '668 patent, col. 16, ll. 15-22).

A208

United States District Court

For the Northern District of California

1    The extrinsic evidence also shows that a person skilled in the art at the time of the invention[6]

2    would have been familiar with the concept of the "melting start temperature," Takeda asserts. *Id.* at

3    16.  In particular, Takeda cites the 1995 and 2005 editions of the United States Pharmacopeia. *Id.*

4    The 1995 version provided that, for thermal analysis measurements performed by heating a

5    substance in a glass tube, "[t]he temperature at which the column of the substance under test is

6    observed to collapse definitely against the side of the tube at any point is defined as the beginning of

7    melting."  Myerson Decl. ¶ 73 & Ex. 22 ("Melting Range or Temperature," The United States

8    Pharmacopeia, 1805-06 (25th rev. 1995) at DEX0014733).  The 2005 edition additionally provided

9    that, when a heat phase test is performed using an apparatus having a detector signal to monitor the

10   melting process, the "beginning of melting" is defined as "the temperature at which the detector

11   signal first leaves its initial value."  Myerson Decl., Ex. 23, at DEX0014750 ("Melting Range or

12   Temperature," The United States Pharmacopeia, 2433-34 (28th rev. 2005)).  The 2005 edition

13   elsewhere notes that "'onset'. . . temperature can be determined objectively and reproducibly, often

14   to within a few tenths of a degree."  Myerson Decl. ¶ 73 & Ex. 24, at DEX0014754 ("Thermal

15   Analysis," The United States Pharmacopeia, 2501-03 (28th rev. 2005)).

16   Defendants assert that the term "melting start temperature" did not have a generally

17   understood meaning to persons skilled in the art at the time of the invention, rejecting both the

18   extrinsic and intrinsic evidence cited by Takeda.  Defendants' Claim Construction Brief at 11.  With

19   respect to the extrinsic evidence, Defendants argue that the references cited by Takeda provided

20   disparate definitions of various melting terms, both generally and in the context of measurements

21   using the DSC method. *Id.*  Defendants point out that the 1995 United States Pharmacopeia defines

22   the "beginning of melting" when using the capillary method as "[t]he temperature at which the

23   column of substance under test is observed to collapse definitely against the side of the tube at any

24   point," and  the "end of melting" (which it equates with the "melting point") as "the temperature at

25   which the test substance becomes liquid throughout." *Id.* (citing Myerson Decl., Ex. 22  ("Melting

26

27   ────────────

[6]Takeda contends that the relevant date in this respect is December 1, 2000, the date of filing of
28   the Japanese Patent application upon which the '668 patent was based. Defendants do not challenge this
     assertion.

United States District Court
For the Northern District of California

1 Range or Temperature," The United States Pharmacopeia, 1805-06 (25th rev. 1995)) at

2 DEX0014733;  Jorjani Decl., Ex. 1 (Myerson Dep.) at 49).  Further, Defendants point out, these two

3 temperatures are said to fall within the "melting range." *Id.* (citing Myerson Decl., Ex. 22 at

4 DEX0014733; Jorjani Decl., Ex. 1 (Myerson Dep.) at 52:16-21 ("All melting points are reported as a

5 range")).

6      In contrast, in the context of the DSC method, Defendants point out, extrinsic evidence cited

7 by Takeda in its joint claim construction chart defines the "melting point" as the point at which the

8 DSC curve leaves the baseline, without providing any range of temperatures. *Id.* at 11-12 (citing

9 Genck Decl. ¶ 84 & Ex. 4 (Brown, M.E., "Determination of Purity by Differential Scanning

10 Calorimetry," *J. Chem. Ed.* 1979, 310-313) at DEX00144954).  According to Defendants, another

11 article cited by Takeda in support of its proposed construction equates the "melting point" with the

12 "onset temperature," while yet another defines the "onset temperature" as the intersection of the

13 slope of the DSC baseline and the slope of the relevant peak in the DSC curve.  *Id.* at 12 (citing

14 Genck Decl., Ex. 5 (D'Amelia, R. *et al*., "Introduction of Differential Scanning Calorimetry in a

15 General Chemistry Laboratory Course: Determination of Thermal Properties of Organic

16 Hydrocarbons," *J. Chem. Ed.*, 2007, 84(3), 453-455) at DEX0014506); Myerson Decl., Ex. 10

17 (Hancock and Zografi) at DEX0014587; Genck Decl. ¶ 85 & ¶ 94 n.9).

18      Defendants also cite to the deposition testimony of Dr. Myerson, in which Dr. Myerson

19 allegedly confirmed that there was no uniform definition for "melting start temperature." *Id.* at 12

20 (citing Jorjani Decl., Ex. 1 (Myerson Dep.) at 49:10-55:7, 58-61, 75-78, 82-85)(conceding that

21 references cited by Takeda in support of proposed construction do not use exact term "melting start

22 temperature").

23      Regarding the intrinsic evidence, Defendants contend that the definition in the specification

24 cited by Takeda (defining the melting start temperature as the "temperature at which crystals start to

25 melt") would not have offered any guidance because it is circular.  *Id.* at 12.  Further, Defendants

26 assert, the definition of "melting start temperature" offered in the specification is not limited to any

27 particular method of measuring, as is clear from the fact that the DSC method is offered only as an

28 "example."  *Id.* at 13 (citing Jorjani Decl., Ex. 1 (Myerson Dep.) at 63-65).

26

A210

United States District Court

For the Northern District of California

1    Defendants also cite to the prosecution history in support of their position that this claim

2  term is indefinite.  *Id*. at 13.  Specifically, Defendants cite to a declaration submitted during

3  prosecution stating that the crystals of '058 Examples 1 and 2 have a "melting start temperature" of

4  128.3º C and 129.1º C, respectively, using the DSC method.  *Id*. (citing Myerson Decl., Ex. 21

5  (Declaration of Tadashi Urai)).  Defendants note that the '058 patent reports a melting range of

6  144.0º C to 144.5º C and 147.0º C to 148.0º C, respectively, for the same crystals, using a "Micro

7  Melting Point Apparatus." *Id*. (citing '058 patent, col. 10, l. 44, col. 11, l. 44, col. 6, ll. 61-63).

8  Thus, Defendants assert, despite the fact that the lower ends of the melting ranges are reported in the

9  '058 patent as 144.0º C (Example1) and 147.0º C (Example 2), the inventors told the patent office

10  that the "melting start temperatures" for the same crystal were actually 128.3 º C and 129.1º C.

11  According to Defendants, this disparity suggests that either the same crystals can have widely

12  varying "melting" characteristics based on the analytical method used, or the '668 inventors used the

13  term "melting start temperature" to mean something entirely different than what, according to

14  Takeda's expert, the "start of melting" meant to a skilled artisan.  *Id*. (citing Genck Decl. ¶¶ 88-89).

15  Further, Defendants argue, Dr. Myerson had "no credible explanation for this huge temperature

16  difference" when questioned about it at his deposition.  *Id*. (citing Jorjani Decl., Ex. 1 (Myerson

17  Dep.) at  94:17-101:20).

18    In its Reply Claim Construction Brief, Takeda argues that Defendants have attempted to

19  obfuscate the issue by focusing on definitions of terms that are irrelevant to the claim term in

20  question, such as "end of melting," "melting point" and "melting range," and by referring to

21  methods of measuring melting temperature that are not mentioned in the '668 patent.  Takeda's

22  Reply Brief on Claim Construction at 5.  The specification of the '668 patent provides both a method

23  for measuring melting start temperature and a clear definition of the term, Takeda asserts.  *Id*.  In

24  particular, Takeda cites to the following excerpt of the specification:

25    The crystal obtained by the above-mentioned production method (step (1) alone, or step (2)
      after step (1)) *has the following melting start temperature by DSC measurement (temperature
26    rise rate 0.5° C./min). . . . The crystal has the melting start temperature of not less than about
      131° C.*, preferably about 131° C. to about 137° C., more preferably about 132° C. to about
27    135° C., most preferably about 133° C. to about 135° C., particularly preferably about 135°
      C.

28

United States District Court

For the Northern District of California

1    *Id.* (quoting '668 patent, col. 12, ll. 1-12 (emphasis added by Takeda)).  Thus, Takeda contends, a

2    person skilled in the art would understand that "melting start temperature," as used in claims 9 and

3    10, was to be measured using differential scanning calorimetry ("DSC"), and not using the other

4    techniques discussed by Defendants in their brief.  *Id.*

5           Takeda further points out, as it did in its Opening Claim Construction Brief, that the '668

6    specification defines "melting start  temperature" as "the temperature at which crystals start to melt

7    when heated under, for example, the DSC measurement conditions to be mentioned below."  *Id.*

8    (citing '668 patent, col. 12, ll. 5-7).  According to Takeda, a person skilled in the art would have

9    understood this definition because, at the time of the invention, such a person would have

10   understood how to use DSC to measure "the temperature at which crystals start to melt." *Id.* at 5.  In

11   particular, Takeda contends, a person skilled in the art knew that in DSC analysis, the melting of a

12   pure crystalline solid produces a peak on the DSC heat flow plot, that the entire peak represents the

13   heat of melting, and that the point where the heat flow curve departs from the baseline is the start of

14   melting.  *Id.* at 5-6 (citing Genck Decl. ¶ 40 & fig., Ex. 7, at 2390 & fig.1 (example of a heat flow

15   curve); Myerson Decl. ¶ 43 & fig.1; Cox Decl., Ex. 1 (Genck. Dep.) at 43:25-44:11, 45:4-23

16   (admitting that the point where the heat flow curve departs from the baseline is sometimes called the

17   onset of melting), Ex. 3 (Myerson Dep.) at 70:4-74:19 & Ex. 4 (Genck Dep. Ex. 21) at 82-83 &

18   fig.5.2 (excerpt of book entitled "Differential Scanning Calorimetry," published in 1996, describing

19   the point where the curve of measured values begins to deviate from the baseline as the "initial peak

20   temperature")).

21          Takeda also points to extrinsic evidence in support of its position.  In addition to the 2005

22   edition of the United States Pharmacopeia, cited in its Opening Claim Construction Brief, Takeda

23   cites to two references that were offered as exhibits during Dr. Genck's deposition.  *Id.* at 6.  The

24   first is a European Patent Application in which the term "melting start temperature" is defined as "a

25   temperature at which the DSC leaves the line obtained by extending a base line to the high

26   temperature side").  *Id.* (citing Cox Decl., Ex. 5 (Genck Dep. Ex. 23), European Patent Application

27   No. EP 0990513 ("the '513 application"), published on April 5, 2000, at [0041]).  The second is a

28   European Patent defining "melting start temperature" as "the temperature at the intersection of the

A212

United States District Court

For the Northern District of California

1    differential thermal curve and the extended line of the base line on the high temperature side from

2    the maximum peak to the low temperature side." *Id*. (citing Cox Decl., Ex. 6 (Genck Dep. Ex. 24)

3    (European Patent No. EP 1223474 (the "'474 patent"), granted on February 20, 2008, at [0042])).

4       In light of this intrinsic and extrinsic evidence, Takeda asserts, a skilled artisan would have

5    understood the meaning of "melting start temperature" as the term was used in claims 9 and 10 of

6    the '668 patent. *Id*. Further, Takeda argues, such a person would have understood that "melting

7    start temperature" would be measured using DSC and would have known how to obtain those

8    melting start temperatures. *Id*. Therefore, Takeda argues, the term is not indefinite. *Id*. (citing

9    *Marley Mouldings Ltd. v. Mikron Indus., Inc.*, 417 F.3d 1356, 1360-61 (Fed. Cir. 2005) ("§ 112 ¶ 2

10    is satisfied when the relevant values can be 'calculated or measured.'")).

11       Impax has filed a surreply responding to three references that were offered by Takeda in

12    support of its proposed construction for the first time in its Reply Claim Construction Brief. Impax

13    Claim Construction Surreply at 2 (citing Cox Declaration, Exhibits 4, 5 and 6). Impax argues that

14    these documents, rather than supporting Takeda's position, show that the term "melting start

15    temperature" is indefinite.[7] *Id*. As to the '513 application and the '474 patent, Impax argues that

16    "[t]he fact that each of these patent documents specifically defines 'melting start temperature'

17    demonstrates that this term had no well-understood meaning to persons of skill in the art at the time

18    the '668 patent was filed." *Id*. at 3. Further, Impax asserts, to the extent Takeda relies on these

19    references, it is attempting to improperly import a definition of the term "melting start point" from

20    unrelated patents. *Id*. (citing *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir.

21    2005)). According to Impax, Takeda admits that this is improper in footnote 2 of its reply brief,

22    where it challenges Defendants' reference to the '668 patent in relation to the construction of the

23    "characteristic peaks" claim term. *Id*. (citing Takeda Reply Brief on Claim Construction at 2, n.2).

24       Impax also rejects Takeda's reliance on the 1996 book entitled "Differential Scanning

25    Calorimetry." *Id*. at 4 (citing Cox Decl., Ex. 4). According to Impax, this publication further

26    illustrates that the term "melting start temperature" had no well-understood meaning in the art at the

27

28     [7]Although Impax contends that Takeda should have disclosed these references in its opening brief, it does not ask the Court to exclude the documents.

29

A213

United States District Court

For the Northern District of California

1  time of the '668 invention. In particular, the passage cited by Takeda defines the point where the

2  curve of measured values begins to deviate from the baseline as the "initial peak temperature." *Id*.

3  (citing Takeda Reply Brief at 5-6). Thus, Impax asserts, this document "assigns yet a different name

4  to the point at which the DSC curve leaves the baseline: it does not refer to it as the 'onset,' contrary

5  to Takeda's claim construction, and it does not refer to it as the 'melting start temperature,' contrary

6  to Takeda's insistence that the '668 patent must have meant the same thing by its use of this term."

7  *Id*. According to Impax, because "the '668 patent used a term coined by its own inventors, 'melting

8  start temperature,' that is not used in any reference book or generally understood to have any

9  particular meaning," the claim term is indefinite. *Id*.

10             **2.     Analysis**

11             Defendants contend that a person skilled in the art would not have discerned the boundaries

12  of claim 9 of the '668 patent because the term "melting start temperature" was not a term that had a

13  set meaning at the time of the invention and could have had a number of different meanings,

14  depending upon the thermal measurement techniques used. Even if it would have been understood

15  that the term referred to DSC, Defendants assert, it is not clear what point on the DSC peak the term

16  referred to. The Court rejects both contentions.

17             First, the extrinsic evidence supports the conclusion that the concept of a "melting start

18  temperature" would have been understood by a person skilled in the art at the time of the invention.

19  Both the 1995 and the 2005 versions of the United States Pharmacopeia discuss the "beginning of

20  melting," and the 2005 Pharmacopeia states that in the context of DSC, "an 'onset' . . . temperature

21  can be determined objectively and reproducibly, often to within a few tenths of a degree." Myerson

22  Decl., Ex. 22 (1995 version of United States Pharmacopeia at 1805), Ex. 23 (2005 version of United

23  States Pharmacopeia at 2433-2434), Ex. 24 (2005 Version of United States Pharmacopeia at 2502).

24  Further, Takeda's expert has testified that in this context, "beginning" and "onset" are synonymous

25  with "start." *See* Jorjani Decl., Ex. 1 (Myerson Dep.) at 51, 52, 55, 85.

26             Second, a person skilled in the art would have understood from the '668 specification that the

27  "melting start temperature" in claim 9 of the '668 patent referred to the melting start temperature

28

1   that would be obtained using DSC measurement.  Most significantly, the '668 specification states as

2   follows:

>   The crystal obtained by the above-mentioned method . . . has the following melting start
3   temperature by DSC measurement . . . As used herein, the "melting starting temperature"
    refers to the temperature at which crystals start to melt when heated under, for example, the
4   DSC measurement conditions to be mentioned below.

5

6   '668 patent, col. 12, ll. 1-7.  The most natural reading of this portion of the specification is that

7   "melting start temperature" is determined using DSC measurement; the words "for example" refer to

8   the specific DSC measurement conditions described later in the specification as an example of the

9   DSC measurement that is referred to generally in the previous sentence.  This interpretation is

10  consistent with the fact that the '668 specification refers *only* to DSC as a method for measuring the

11  melting starting point.  Thus, Dr. Myerson opined that "if one was attempting to reproduce the

12  teachings of the ['668] patent, . . . one of ordinary skill would be led to the use of DSC for such a

13  measurement."  Cox Decl., Ex. 3 (Myerson Decl.) at 64-65.  Accordingly, the Court rejects

14  Defendants' assertion that the term "melting start temperature," as used in claim 9, would have been

15  insolubly ambiguous to a person skilled in the art.  Rather, it would have been apparent that the term

16  referred to the beginning – or onset – of melting as measured by DSC.

17          The Court next turns to the question of whether the term "melting start temperature" is

18  indefinite because a person skilled in the art at the time of the invention would not have known

19  *where* on the DSC curve the onset of melting occurred.   While the '668 patent specification does not

20  offer significant guidance on this question, the extrinsic evidence supports the conclusion that a

21  person skilled in the art would have understood that the melting start point using DSC is the point

22  where the heat flow curve departs from the baseline.  This definition is consistent with the definition

23  of a very similar term, "the beginning of melting," that is provided in the 2005 edition of the United

24  States Pharmacopeia, stating that "[t]he temperature at which the detector signal first leaves its

25  initial value is defined as the beginning of melting."  Myerson Decl., Ex. 23 (United States

26  Pharmacopeia, 28th rev. (2005)) at DEX0014750.  Similarly, figure 5.2 of the book Differential

27  Scanning Calorimetry refers to this point as the "*initial* peak temperature."  *See* Cox Decl., Ex. 4 at

28  82.  Further, the '513 application and the '474 patent explicitly define "melting start temperature"

United States District Court

For the Northern District of California

31

United States District Court
For the Northern District of California

1    with reference to this point.

2         The Court is not persuaded by Defendants' assertion that there are "multiple points on a

3    DSC curve at which melting could be said to begin" and that the use of the word "onset" in Takeda's

4    proposed construction is arbitrary.  *See* Genck Decl. ¶ 94.  In support of this point, Defendants cite

5    Dr. Genck's opinion that the word "onset" refers to "the point of intersection of the tangent drawn at

6    the point of greatest slope on the leading edge of the peak . . . with the extrapolated baseline."

7    Genck Decl. ¶ 94 & n. 9 (citing Genck Decl., Ex. 7 (IUPAC Article) at 2390; Genck Decl., Ex. 8

8    (IUPAC website) at 4).  The point referenced by Dr. Genck, however, is used in all of the cited

9    references with the modifier "extrapolated."  In particular, the IUPAC references cited by Dr. Genck

10    reflect that the definition he provides is for the term "extrapolated onset."  *Id*.  Similarly, fig. 5.2 of

11    Differential Scanning Calorimetry refers to this point as Te, or "*extrapolated* peak onset

12    temperature."  Cox Decl., Ex. 4 at 82 (emphasis added).  The '668 patent, however, contains nothing

13    suggesting that the inventors intended that the melting start temperature referred to this *extrapolated*

14    onset temperature.  Nor does Takeda's proposed construction incorporate this term.

15         The Court also rejects Impax's contention that the inclusion of definitions of "melting start

16    temperature" in  the '513 application and the '474 patent shows that the term did not have an

17    established meaning at the time of the invention.  The fact that other inventors chose to provide an

18    explicit definition of the same term in unrelated patent applications gives rise to, at best, only a weak

19    inference that the term "melting start temperature" might not have had an established meaning at the

20    time of the invention.  That inference is insufficient to establish that the term is indefinite,

21    particularly in light of the extrinsic evidence cited above.

22         Based on the intrinsic and extrinsic evidence cited by Takeda, the Court finds that the claim

23    term "melting start point" is not indefinite and adopts Takeda's proposed construction of that term.

24

25

26

27

28

A216

United States District Court
For the Northern District of California

E.     "about" ('668 patent, claims 9 and 10)

1.     Contentions of the Parties

| Takeda's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, ie., approximately | With a variation of no more than 0.5°C<br><br>Accordingly, "about 131° C" includes temperatures between 130.5° C and 131.5° C, and "about 135° C" includes temperatures between 134.5° C and 135.5° C |

Claims 9 and 10 of the '668 patent cover a crystalline compound whose melting start temperature is "not lower than about 131° C," and "about 135° C," respectively.  Takeda argues that the term "about" should be given its plain and ordinary meaning of "approximately."  Defendants contend that the term should be construed to mean "with a variation of no more than 0.5° C.  Under that construction, "about 131° C" would include temperatures between 130.5° C and 131.5° C, and "about 135° C" would include temperatures between 134.5° C and 135.5° C.

In its Opening Claim Construction Brief, Takeda argues that because neither the specification nor the prosecution history of the '668 patent indicates the range of values the word "about" is intended to encompass, the term should simply be given its plain and ordinary meaning, that is, "approximately."  Takeda's Opening Claim Construction Brief at 17 (citing *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995); Myerson Decl. ¶¶ 76-78).  Takeda contends that this approach is consistent with Federal Circuit precedent, which explains that where a claim is drafted "using terminology that is not as precise or specific as it might be," the court should construe the claim with "whatever specificity is warranted by the language of the claim and the evidence bearing on the proper construction" but should not go further, under the rubric of claim construction, by providing *additional* specificity in order to facilitate a comparison of the claim and the accused product.  *Id.* (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998)).  Takeda also cites district court cases in which courts have declined to specify a particular range in connection with the claim term "about" and instead have construed the term to mean  "approximately."  *Id.* at 18 (citing *Biopolymer Eng'g Inc. v. Immunocorp.*, 2007 WL 4562592, at *10 (D. Minn. Dec. 21, 2007) ("[w]ithout evidence that would provide a basis to specify

33

A217

United States District Court
For the Northern District of California

1  the permissible deviation from one percent, the Court gives the term 'about' its ordinary meaning of

2  'approximately'"); *Unigene Labs., Inc. v. Apotex Inc*., 2008 WL 3992294, at *4, *9 (S.D.N.Y. Aug.

3  28, 2008) (where term "about" was "used in all the claims to indicate an approximate measurement

4  of a substance," and "nothing in the patent specification contradict[ed] this ordinary and customary

5  meaning," court construed the word "about" in phrase "about 20 mM citric acid" to mean

6  "approximately" and "construe[d] the claim term no further")).

7       Defendants argue that the term "about" should be construed more specifically to identify the

8  degree of variation the term permits in the claimed melting start temperature.  Defendants' Claim

9  Construction Brief at 15.  In support of their position, Defendants cite Dr. Myerson's deposition

10  testimony, in which he stated that "about 135° C" in claim 10 of the '668 patent" would allow for a

11  variation of ".2, .3 degrees C maximum," in light of his conclusion that the claimed "melting start

12  temperature" would be measured with DSC and based on how a person of ordinary skill in the art

13  would understand DSC works.  *Id*. (citing Jorjani Decl., Ex. 1 (Myerson Dep.) at 106).

14       Defendants further contend that the '668 claims and specification support their position.  *Id*.

15  As to the claims, Defendants point to the opinion of their expert, Dr. Genck, that because no error

16  bars or standard deviations are provided following the temperatures recited in the claims, a person of

17  ordinary skill in the art would understand that the recited figures result from rounding the

18  experimental results up or down using "normal arithmetic conventions."  *Id*. at 16 (citing Genck

19  Decl. ¶ 99).  As to the specification, Defendants argue that a variation of half a degree is consistent

20  with the experimental examples for dexlansoprazole, in which every "melting start temperature"

21  disclosed for dexlansoprazole is reported to an accuracy of no more than half of a degree.  *Id*. (citing

22  '668 patent at col. 18, l. 54, col. 20, l. 44, col. 20, l. 67; '058 patent at col. 21, l. 47, col. 22, ll. 4, 15,

23  29, 41, 56, col. 23, ll. 4, 19, 33, col. 24, l. 5; Genck Decl. ¶ 100).

24       Finally, Defendants argue that the extrinsic evidence cited by Takeda is consistent with their

25  proposed construction to the extent that these references allow for a variation of between a few

26  tenths of a degree Celsius up to half a degree.  *Id*.  In particular, Defendants' expert, Dr. Genck,

27  notes that the 2005 United States Pharmacopeia states that melting temperatures as measured by

28  DSC "can be determined objectively and reproducibly, often to within a few tenths of a degree" and

A218

United States District Court

For the Northern District of California

1    further states that  "[m]elting-point determinations by scanning calorimetry have a reproducibility

2    with a standard deviation of about 0.2º C." Genck Decl. ¶ 102 (citing Myerson Decl., Ex. 24  at

3    DEX0014754- 14755).  Defendants also cite to another reference stating that measurements of these

4    temperatures have "[d]eviations as small as 0.02º C to 0.1º C" and should be reported "to the nearest

5    0.1º C (or at least 0.5º C) for routine melting point ranges." *Id.* at 16 (citing Genck Decl., Ex.

6    6)(Stanford Research Systems, "Melting Point Determination") (cited by Takeda in Docket No. 52

7    (Joint Claim Construction and Prehearing Statement), Appendix B in support of proposed

8    construction of "melting start temperature") at DEX0014703, DEX0014711).

9           In its Reply Claim Construction Brief, Takeda argues that if the Court is inclined to specify a

10   particular degree of variation associated with the term "about," it should specify a narrower range of

11   no more than 0.2 °C to 0.3 °C on the low end in light of the fact that the difference between melting

12   start points of the prior art crystals and the crystal of the '668 patent is less than 2° C.  Reply Claim

13   Construction Brief at 6-7 (citing Myerson Decl., Ex. 21 (Declaration of Tadashi Urai, Sept. 6, 2005)

14   at DEX0003569)).[8]  Takeda also cites to the 2005 version of the United States Pharmacopeia, which

15   states that DSC measurements have a standard deviation of  0.2  °C .  *Id.* (*citing* Myerson Decl., Ex.

16   24 at DEX0014755).

17          **2.      Analysis**

18          "[T]he word 'about' does not have a universal meaning in patent claims, and . . .  the

19   meaning depends on the technological facts of the particular case." *Pall Corp. v. Micron*

20   *Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995) (citation omitted).  In *Pall Corp.*, the Federal

21   Circuit offered the following guidance for construing this claim term:

22          The use of the word "about," avoids a strict numerical boundary to the specified parameter.
             Its range must be interpreted in its technologic and stylistic context. We thus consider how
23          the term . . . was used in the patent specification, the prosecution history, and other claims. It
             is appropriate to consider the effects of varying that parameter, for the inventor's intended
24          meaning is relevant. Extrinsic evidence of meaning and usage in the art may be helpful in
             determining the criticality of the parameter, and may be received from the inventor and
25          others skilled in the field of the invention.

26   ──────────────

27          [8] This declaration was submitted to the patent office by one of the '668 inventors, Tadashi Urai,
     in support of the '668 application.  In it, he provides the melting start temperatures for three prior art
28   crystals, described as examples in U.S. Patent No. 6462058, which he obtained using DSC.  The three
     temperatures are as follows:  128.7 °C (Example 4), 128.3 °C (Example 1) and 129.1 °C (Example 2).

1  *Id.*  Where courts have found that the intrinsic evidence does not offer sufficient guidance to

2  determine a specific range, the word "about" has been given its plain and ordinary meaning, that is,

3  "approximately."  *See, e.g., Biopolymer Engineering, Inc. v. Immunocorp*, 2007 WL 4562592, at *10

4  (D. Minn. Dec. 21, 2007); *Unigene Labs., Inc. v. Apotex Inc.*, 2008 WL 3992294, at *4, *9

5  (S.D.N.Y. Aug. 28, 2008).

6       The Court finds that the intrinsic evidence cited by the parties in this case offers insufficient

7  guidance to construe the term "about" with reference to a specific temperature range.  The intrinsic

8  evidence does not allow the Court to determine a specific range because while the specification

9  indicates that a person skilled in the art would have understood that the claimed temperatures were

10  measured using DSC – which was capable of determination to within "a few tenths of a degree" –

11  the temperatures in the asserted claims are stated without any error bars or standard deviations,

12  suggesting that "about" might permit a broader range of temperatures.  As a result, any inference

13  based on the specification that "about" indicates a specific range associated with the accuracy of

14  DSC measurements is undercut by the claims themselves.  Under these circumstances, it is

15  inappropriate to assign a specific range to the term "about."

16       Accordingly, the Court finds that the term "about" means "approximately."

17  **F.**    **"amorphous compound" ('282 patent, claims 1 and 2)**

18      **1.**    **Contentions of the Parties**

| Takeda's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A non-crystalline solid that lacks the long-range order characteristic of a crystal | Plain meaning |

22       Claims 1 and 2 of the '282 patent recite the term "amorphous compound" of

23  dexlansoprazole.  Defendants assert that this term should be given its plain and ordinary meaning,

24  that is, a compound that is amorphous, or non-crystalline in form.  Takeda proposes that the term be

25  construed as "a non-crystalline solid that lacks the long-range order characteristic of a crystal."  The

26  primary dispute between the parties is whether the term is limited to solids or rather, includes liquids

27  or oils that are amorphous.

28

A220

United States District Court

For the Northern District of California

1   In support of its proposed construction, Takeda cites numerous references that distinguish

2   between amorphous and crystalline compounds. Takeda Opening Claim Construction Brief at 19

3   (citing Myerson Decl. ¶¶ 80-81). Some of these references are cited only to show that an

4   "amorphous compound" lacks long range order. *See* Myerson Decl., Ex. 10, at DEX0014581

5   (Hancock and Zografi); *id.*, Ex. 11, at DEX0014516 (S.R. Elliott, Physics of Amorphous Materials,

6   6 (2d ed. 1990)) ("amorphous materials do not possess the long-range translational order

7   (periodicity) characteristic of a crystal"). Others offer definitions of amorphous *solids*, but do not

8   directly address whether an "amorphous compound" must be a solid. *See id.*, Ex. 26, at

9   DEX0014494 (Theodore L. Brown et al., Chemistry, The Central Science, G-1 (8th ed. 2000))

10  (defining "amorphous solid" to mean "a solid whose molecular-arrangement lacks a regular

11  long-range pattern"); *id.*, Ex. 13, at DEX0014770 (Richard Zallen, The Physics of Amorphous

12  Solids 1-5 (2004)) ("in amorphous solids, long-range order is absent; the array of equilibrium atomic

13  positions is strongly disordered"); *id.*, Ex. 27, at DEX0014491 (James E. Brady and Fred Senese,

14  Chemistry: Matter and Its Changes, G-1 (4th ed. 2004)) (defining "amorphous solid" as "a

15  noncrystalline solid"). Finally, two of the references cited in Takeda's opening brief suggest that an

16  "amorphous compound" would have been understood by a person of skill in the art to mean a solid.

17  *See id.*, Ex. 12, at DEX0014612 (Allan S. Myerson and Rajiv Ginde, Crystals, Crystal Growth, and

18  Nucleation, in Handbook of Industrial Crystallization 33 (2d ed. 2002)) ("Materials that have

19  short-range order rather than long-range ordering, like glass, are non-crystalline solids. A

20  noncrystalline solid is often referred to as an amorphous solid"); *id.*, Ex. 14, at DEX0014719

21  (Hsien-Hsin Tung et al., Crystallization of Organic Compounds: An Industrial Perspective 25

22  (2009)) (hereinafter, "Hsien-Hsin Tung") ("amorphous materials are solids in which molecules do

23  not have a periodical three-dimensional pattern").

24  Takeda further asserts that the term "amorphous compound" refers to a *solid* based on the

25  two examples in the '282 patent specification that use the term "amorphous substance," Reference

26  Examples 1 and 2. *Id.* at 19-20 (citing Myerson Decl. ¶¶ 83-84). Takeda's expert explains as

27  follows:

28

United States District Court

For the Northern District of California

A221

United States District Court
For the Northern District of California

1   Reference Examples 1 and 2 describe the isolation of optically pure dexlansoprazole from a
2   starting material consisting of racemic lansoprazole (containing both the right and left
    enantiomers). The specification states that the isolated dexlansoprazole was "evaporated to
3   dryness to yield R(+)-lansoprazole . . . as an amorphous substance." '282 patent, col. 8, ll.
    3-6; '282 col. 8, ll. 25-29.  This reference to drying the amorphous substance indicates that
    the amorphous substance was in a solid form.

4

5   Myerson Decl. ¶ 83.[9]

6       Takeda further asserts that the comparison in Reference Example 2 of the stability of the

7   amorphous form of dexlansoprazole to the crystal form supports the conclusion that "amorphous

8   compound" means "amorphous solid," citing the following description in the '282 specification:

9           The crystals of R(+)-lansoprazole as obtained in Example 2 (about 5 mg) and
10      amorphous R(+)-lansoprazole as obtained in Reference Example 1 (about 5 mg) were each
        taken in a colorless glass bottle, and their stability during storage at 60° C. (stopper removed)
11      was examined. A 25 ml solution (concentration: about 0.2 mg/ml) of the sample after
        completion of storage in the mobile phase, along with a standard solution prepared using the
12      initial lot, was analyzed under the HPLC conditions shown below, and the R(+)-lansoprazole
        content (residual percentage) was calculated from the peak area obtained. . . .

13          When the sample was stored at 60° C. (exposed), the crystal of Example 2 retained a
        content exceeding 90% for up to 4 weeks, whereas the amorphous form of Reference
14      Example 1 showed reduction in content to 70.8% after 1 week and 57.5% after 2 weeks. This
        finding demonstrates that the crystal of R(+)- lansoprazole is more stable and more
15      preferable for use as a pharmaceutical etc. than the amorphous form.

16  Takeda Claim Construction Brief at 20 (citing col. 14, ll. 4-14, 41- 47).  According to Takeda,

17  because crystals are solid substances, a person skilled in the art would understand that a stability test

18  comparing an amorphous compound to a crystalline compound would involve a comparison of like

19  to like, that is, a solid to a solid.  *Id.* (citing Myerson Decl. ¶ 84).

20      Finally, Takeda contends that construction of the term "amorphous compound," like

21  "crystal" and "crystalline compound," will be helpful to the Court because it "elucidates in an

22  empirically verifiable way the differences in molecular structure that distinguish an amorphous

23  compound, on the one hand, from a crystalline compound, on the other."  *Id.*

24      Defendants argue that no construction of the claim term "amorphous compound" is necessary

25  and further, that Takeda is seeking to improperly import a limitation into the claims by limiting the

26  _____

27      [9]At his deposition, Dr. Myerson expanded on his opinion that the reference to evaporation
    indicated a solid, explaining that "if somebody produces an oil in an example, they say an oil.  If they
28  produce an amorphous solid, they would normally say an . . .amorphous substance." Jorjani Decl., Ex.
    1 (Myerson Dep.) at 164.

A222

1   term to a solid without a clear indication that the patentees intended to restrict the meaning of the

2   claim term in this manner. Defendants' Claim Construction Brief at 19 (citing *Callicrate v.*

3   *Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005); *Epistar Corp. v. ITC*, 566 F.3d 1321,

4   1334-1335 (Fed. Cir. 2009) & *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F. 3d 1313, 1327-1328

5   (Fed. Cir. 2002)).

6        According to Defendants, when the '282 patent application was originally filed, in 1999, a

7   person of ordinary skill in the art understood that "amorphous" meant "non-crystalline," that a

8   "compound" included both solids and nonsolids, and that an "amorphous compound" could exist in

9   different physical forms such as solids, liquids and oils. *Id.* (citing Expert Declaration of Robin D.

10   Rogers in Support of Handa Pharmaceuticals, LLC's Opening *Markman* Brief ("Rogers Decl.") ¶¶

11   27-32). Dr. Rogers cites three references in support of this conclusion. First, he cites a dictionary

12   that defines "amorphous substance" as "a substance in which its constituent basic particles (ions,

13   atoms, molecules) are not regularly distributed" and states further that "[p]lasmas, gases and liquids

14   are always in an amorphous state." Rogers Decl. ¶ 27 & Ex. 3 (Comprehensive Dictionary of

15   Physical Chemistry L. (Ulicky & T.J. Kemp ed., Ellis Horwood) (1992) (hereinafter, "Ulicky") at

16   page 21 (DEX0003649)).

17        Second, he cites a dictionary that defines "amorphous" as follows:

18      noncrystalline, having no molecular lattice structure which is characteristic of the solid state.
19      All liquids are amorphous. Some materials that are apparently solid, such as glasses, or
        semisolid, such as some high polymers, rubber and sulfur allotropes, also lack a definite
20      crystal structure and a well-defined melting point. They are considered high viscosity
        liquids.

21

22   Rogers Decl. ¶ 28 & Ex. 4 (Hawley's Condensed Chemical Dictionary, 15th Ed., (Richard J. Lewis

23   ed., John Wiley & Sons, Inc. (2007), at page 75 (IPXL-000902)).

24        Third, he cites an encyclopedia of science and technology that defines "amorphous solid" as

    follows:

25

26      A rigid material whose structure lacks crystalline periodicity; that is, the pattern of its
        constituent atoms or molecules does not repeat periodically in three dimensions. In the
27      present terminology amorphous and noncrystalline are synonymous. A solid is distinguished
        from its other amorphous counterparts (liquids and gases) by its viscosity.

28

United States District Court

For the Northern District of California

A223

United States District Court
For the Northern District of California

1   Rogers Decl. ¶ 29 (citing Myerson Decl., Ex. 15 (McGraw-Hill Concise Encyclopedia of Science
2   and Technology, 3rd Ed., (Sybil P. Parker, ed. McGraw-Hill Book Company) (1994) at pages 84-85
3   (IPXL-0009907-08))).

4          Further, Defendants contend, the '282 patent does not contain an express disavowal of
5   non-solid amorphous compounds or any express definition limiting "amorphous compound" to
6   "non-crystalline solids." *Id*. at 19-20 (citing Rogers Decl. ¶¶ 33-45).  Defendants note that at his
7   deposition, Dr. Myerson agreed that the '282 patent does not define the term "amorphous
8   compound" or expressly disavow nonsolid amorphous compounds and further, that a person skilled
9   in the art would understand the term to encompass solid and nonsolid compounds if it were
10  interpreted "without reference to the specification at all . . . in a vacuum." *Id*. at 20 (citing Jorjani
11  Decl., Ex. 1 (Myerson Dep.) at 132:23-133:3; 133:16-134:4; 136:12-24; 137:13-23; 144:4-13;
12  146:16-21)).

13         Addressing the references cited by Dr. Myerson in support of Takeda's proposed
14  construction, Defendants contend that only two of the references existed at the time of the invention,
15  in 1999, namely, the Hancock and Zografi reference and the Elliot reference.  *Id*. at 20 (citing
16  Myerson Decl. ¶ 81 & Exs. 10, 11).  These references, Defendants assert, do not support Takeda's
17  position because they define "amorphous solid" rather than "amorphous compound."  *Id*. (citing
18  Jorjani Decl., Ex. 1 (Myerson Dep.) at 139-140 (conceding that references in Exhibits 10 and 11
19  "support the understanding of what an amorphous solid is")).  Further, Defendants contend, "none of
20  Dr. Myerson's cited references dispute[s] the plain meaning of 'amorphous compound.'"  *Id*.

21         With respect to the intrinsic evidence, Defendants, like Takeda, point to the use of the term
22  "amorphous substance" in Reference Examples 1 and 2 of the '282 specification.  *Id*.  That term,
23  Defendants assert, like the term "amorphous compound," would have been understood by a person
24  skilled in the art to include solids and non-solids, such as oils and liquids.  *Id*. (citing Rogers Decl., ¶
25  28; Jorjani Decl., Ex. 1 (Myerson Dep.) at 137).

26         Defendants reject Takeda's assertion that Reference Examples 1 and 2 indicates that the term
27  "amorphous compound" must refer to a solid.  *Id*.  Defendants point out that these reference
28  examples do not specify the physical state of the amorphous substances described in them.  *Id*. at 20-

United States District Court

For the Northern District of California

1    21.  Defendants further assert that the words "evaporat[ing] to dryness" in these reference examples

2    do not support Takeda's position because it was understood in the art that evaporating or drying a

3    substance did not necessarily result in a solid compound, especially in the case of dexlansaprozole.

4    *Id.* at 20-21.  In support of this contention, Defendants offer three references that they contend

5    illustrate that drying or evaporating can give rise not only to a solid but also to a liquid or oil.  *Id.*

6    (citing Jorjani Decl., Ex. 4 (U.S. Pat. No. 4,191,830 ("the '830 patent") at Example 49, col. 46, ll.

7    33-51 ("The ether solution is evaporated in vacuo to afford 52.85 grams of a colorless liquid"); *id.*,

8    Ex. 5 (U.S. Pat. No. 5,128,356 ("the '356 patent") at Reference Example 25, col. 25, ll. 12-32) ("The

9    solvent was evaporated to dryness to give an oily residue"); *Id.*, Ex. 6 (WO 97/02261 ("Von Unge")

10    at Example 12, col. 16, ll. 1-10 ("[e]vaporation of the filtrate afforded an oil with enhanced optical

11    purity"))).  As to Von Unge, Defendants point out that in prosecuting the '276 patent (a parent patent

12    to the '282 patent), Takeda relied on Example 12 to show that obtaining a *crystal* form of

13    dexlansoprazole was "not a trivial matter."  *Id.* at 21 (citing Rogers Decl., Ex. 6 at DEX0001948).

14    Defendants note that in Von Unge, as in Reference Examples 1 and 2 of the '282 patent, the process

15    described involves evaporating solvent from a filtrate.  *Id.* at 21.

16          Defendants also reject Dr. Myerson's additional reason for concluding that the words

17    "amorphous substance" in Reference Examples 1 and 2 must refer to a solid, namely, that Reference

18    Example 2 compares a solid crystalline form with an "amorphous substance" and a person skilled in

19    the art would have understood that the comparison was of "like to like."  *Id.* (citing Myerson Decl. ¶

20    84).  Defendants again point to the prosecution history of the '276 patent, in which the patentees

21    argued that Reference Example 2 afforded "surprising results" because when a crystalline

22    enantiomer was compared with "its corresponding amorphous form," the former was significantly

23    more stable.  *Id.* at 21 (citing Rogers Decl., Ex. 6 at DEX0001948-0001949).  The patentees went on

24    to cite a prior art reference in which the author compared the stability of the solid form of the

25    compound with the same compound dissolved in a solution.  *See* Rogers Decl., Ex. 6 at

26    DEX0001948-0001949 (citing Sukenik, et al., J. Am. Chem. Soc. (1975) vol. 97, no. 18, pp. 5290-

27    5291 (hereinafter, "Sukenik")).  In particular, the patentees stated that Sukenik "provides an example

28    wherein a benzenesulfonate is indefinitely stable in solution (amorphous form), but is much less

A225

United States District Court

For the Northern District of California

1    stable as a solid." Defendants argue that the patentees' comparison of the stability of a crystalline

2    material to that of an amorphous material that was clearly in liquid form (to the extent the compound

3    was dissolved in a solution) shows that Dr. Myerson is incorrect in his assertion that a person skilled

4    in the art would not compare a solid to a non-solid for the purpose of evaluating stability. *Id*

5            In its Reply Claim Construction Brief, Takeda argues that "while it is true that liquids and

6    gases are 'amorphous,' when used as a modifier, the term 'amorphous' typically describes non-

7    crystalline *solids*." Takeda Reply Claim Construction Brief at 7 (emphasis in original). In support

8    of this point, Takeda cites to two references that it also cited in its Opening Claim Construction

9    Brief, the Hancock and Zografi and the Hsien-Hsin Tung references. *Id*. (citing Myerson Decl., Exs.

10   10, 14). As to the latter reference, Takeda concedes that it was published in 2009, after the 1999

11   priority date, but notes that Defendants' expert, Dr. Rogers, testified at his deposition that the terms

12   "amorphous compound" and "amorphous substance" have not changed between 1999 and the

13   present. *Id*. n. 7 (citing Cox Decl., Ex. 10 (Rogers Dep.) at 16-17).

14           In addition, Takeda cites several references that it did not cite in its Opening Claim

15   Construction Brief. *Id*. First, it cites a 1999 science and technology encyclopedia that contains the

16   following definition of the term "amorphous substance":

17           Non-crystalline solid; its atoms or molecules have no regular order. Supercooled liquids
18           such as glass, rubber, and some plastics are amorphous. Many powders appear amorphous
             but are microcrystalline in structure.

19   *Id*. (citing Cox Decl., Ex. 7 (Rogers Dep. Ex. 35, Science and Technology Encyclopedia (University

20   of Chicago Press) (1999) at 17). Second, it cites a 1993 chemistry dictionary that defines

21   "amorphous" as follows:

22           a term applied to solids in which the constituent particles (atoms, ions or molecules) do not
             display periodic long-range order. . . . [Amorphous] substances correspond in their structure
23           to liquids, but differ from them because the particles are not mobile. They are sometimes
             called *supercooled liquids* in which the friction between particles is very great. . . Glasses are
24           among the most important [amorphous]. Occasionally gases and liquids are called
             [amorphous] due to their lack of long-range order.

25

26   *Id*. (citing Cox Decl., Ex. 8 (Rogers Dep. Ex. 36, Concise Encyclopedia: Chemistry (Hans-Dieter

27   Jakubke, Hans Jeschkeit, eds., Walter de Gruyter & Co.)(1993)) (emphasis in original)). Third,

28   Takeda cites a 1990 article in which the authors distinguish between the "amorphous state" and the

A226

United States District Court

For the Northern District of California

1   "highly viscous oily state." *Id*. (citing Cox Decl., Ex. 9 (Rogers Dep. Ex. 27, E.A. Prodan, "State of

2   matter and its reactivity," Reactivity and Solids (1990) vol. 8 at 309)).

3          Finally, Takeda points to the '668 patent, which it contends is important because it is a

4   pharmaceutical patent, even if it is not in the same patent family as the '282 patent. *Id*. at 7-8.

5   According to Takeda, in the '668 patent the word "amorphous" is used to refer to solids, and *not* to

6   oils. *Id*. (citing '668 patent, col. 5, ll. 1-4) ("The (R)-lansoprazole or (S)-lansoprazole produced by

7   the above-mentioned method may be a solid (crystal, amorphous) or an oily substance").

8          Takeda argues that in determining the meaning of "amorphous compound," as that term is

9   used in the claims of the '282 patent, the context in which the term is used is particularly important.

10  *Id*. at 8. Takeda points out that Dr. Rogers conceded in his deposition that skilled artisans

11  sometimes use the terms "amorphous state," "amorphous substance" and "amorphous compound" to

12  refer specifically to solids and that "people can use the term differently under different contexts."

13  *Id*. (citing Cox Decl., Ex. 10 (Rogers Dep.) at 31-33, 38, 51-52, 59-62). Takeda argues that because

14  the term "amorphous compound" is used in the context of a pharmaceutical patent, references from

15  that field are more relevant to the meaning of the claim term than references from the general field

16  of chemistry. *Id*. (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir.

17  1998)). Takeda further asserts that Defendants' position should be rejected because Defendants

18  have cited references from the field of chemistry generally, whereas Takeda has cited references

19  from the pharmaceutical field. *Id*. at 8.

20         In addition, Takeda argues, a person skilled in the art would have understood that

21  "amorphous compound" referred to a solid in the context of the '282 patent because the specification

22  of that patent contains extensive discussion of crystalline compositions of dexlansoprazole. *Id*.

23  (citing Cox Decl., Ex. 10 (Rogers Dep.) at 12, 15 ("[t]he '282 patent is directed to the synthesis, the

24  stereo resolution, and the crystallization of a pharmaceutical")). Because a crystal is known to be a

25  solid, Takeda contends, a person skilled in the art would understand that "the amorphous counterpart

26  to a crystalline solid pharmaceutical composition would itself be a solid." *Id*.

27         Takeda also points to an FDA guidance entitled "Pharmaceutical Solid Polymorphism" in

28  support of its proposed construction. *Id*. at 8 (citing Cox Decl., Ex. 11 (Rogers Dep. Ex. 33)

1   (hereinafter "FDA Guidance")).  That reference states that drugs can come in various "polymorphic

2   forms," which are defined as crystalline forms, amorphous forms, and solvates.  *Id.*  At his

3   deposition, Dr. Rogers testified that in the context of this article, he understood the term "amorphous

4   form" to refer to a solid.  *Id.* (citing Cox Dec., Ex. 10 (Rogers Dep.) at 64-65).  According to

5   Takeda, Dr. Rogers' testimony supports its position that in the pharmaceutical context, an

6   "amorphous compound" is understood to be a solid.  *Id.*  Takeda also cites to another reference that

7   comes from the pharmaceutical literature that it contends supports its proposed construction.  *Id.*

8   (citing Cox Decl., Ex. 12 (Rogers Dep. Ex. 31) (Stephen Byrn, et al., "Pharmaceutical Solids: A

9   Strategic Approach to Regulatory Considerations," Pharmaceutical Research, Vol. 12, no. 7 (1995)

10  (hereinafter "Byrn") at 952 (stating that "there are cases where the amorphous forms is [sic] the only

11  solid form that has adequate bioavailability")).  *Id.*  Takeda notes that at his deposition, Dr. Rogers

12  was unable to name any orally ingested pharmaceutical product that used an oil or a gas, even

13  though these forms fall within Defendants' proposed definition of "amorphous compound."  *Id.*

14  (citing Cox Decl., Ex. 10 (Rogers Dep.) at 58-59, 72).

15      Takeda rejects Defendants' reliance on the statements made during prosecution of the '276

16  patent regarding Reference Examples 1 and 2.  *Id.* at 9 n. 8.  Takeda argues that these statements

17  "were made with regard to the term 'amorphous compound,' a term which does not appear in the

18  '276 patent."  *Id.*  Further, Takeda argues, these statements have nothing to do with the "amorphous

19  substance" described in the '282 patent because they were "part of a broader explanation of why the

20  prior art Larsson reference, which explicitly discloses isolating dexlansoprazole in liquid form as an

21  oil, did not render the crystals of the '276 patent obvious."  *Id.* (citing Rogers Decl., Ex. 6 (excerpt

22  of '276 patent prosecution history) at DEX0001946-49).

23      Takeda also argues that Defendants' proposed construction should be rejected because it

24  would ensnare prior art that was before the PTO when it considered the application that resulted in

25  the issued '282 patent, namely Von Unge and Larsson.[10]  *Id.* at 9 (citing *Apple Comp., Inc. v.*

26

27      [10]In its brief, Takeda mistakenly referred to WO 97/2261 as "Larsson."  Reply at 9.  At oral

28  argument, Takeda made clear that it advances this argument as to both Larsson (WO 96/02535) and Von
    Unge (WO 97/02261).

United States District Court

For the Northern District of California

1  *Articulate Sys., Inc.*, 234 F.3d 14, 24 (Fed. Cir. 2002)); *see also* '282 patent (listing both Von Unge

2  and Larsson under the heading "References Cited")).  Takeda points out that in the Reasons for

3  Allowance issued by the PTO in connection with the '058 patent (a parent patent of the '282 patent),

4  the examiner expressly recognized that Larsson and Von Unge taught the oily R stereoisomer.  *Id.*

5  (citing Cox Decl., Ex. 13).  Indeed, at oral argument, Takeda offered a page from the patent

6  prosecution history of the '058 patent with a handwritten note in connection with the Larsson

7  reference stating "oil obtained not solid at all."  Claim Construction Hearing, February 16, 2012,

8  Takeda Slide 83.

9          **2.**    **Analysis**

10        The term "amorphous compound" is used in the claims of the '282 patent but is not used in

11  the specification, much less defined.  Therefore, the Court begins its analysis by looking to the

12  extrinsic evidence for guidance on the generally accepted meaning of the term "amorphous

13  compound" in the field of the invention.

14        As a preliminary matter, the Court addresses the relevant field of the invention, and in

15  particular, Takeda's assertion in its Reply brief that references from the "broader field of chemistry"

16  (as opposed to the narrower field of pharmaceutical science) are of "marginal relevance to

17  understanding the meaning of the claim term [amorphous compound]."  *See* Takeda's Reply Brief on

18  Claim Construction at 8.  It is undisputed that the '282 patent is directed at a pharmaceutical.  *See*

19  Cox Decl., Ex. 10 (Rogers Dep.) at 12, 15 ("[t]he '282 patent is directed to the synthesis, the stereo

20  resolution, and the crystallization of a pharmaceutical"); Myerson Decl. ¶ 50 (listing qualifications

21  of a person skilled in the art, including experience in the pharmaceutical industry related to, *inter*

22  *alia*, crystallization or detection and/or evaluation of solid state forms").  This does not mean,

23  however, that references from the general field of chemistry may not be helpful for developing an

24  understanding of how this term is used in the '282 patent.  Indeed, Takeda relied on a number of

25  references taken from the general field of chemistry in support of its proposed construction.  *See,*

26  *e.g.,* Cox Decl., Ex. 7 (definition of "amorphous substance" taken an encyclopedia of science and

27  technology), Ex. 8 (definition of "amorphous" from a chemistry encyclopedia).  Therefore, while the

28  Court finds the references from the pharmaceutical field to be particularly helpful, as discussed

**United States District Court**
For the Northern District of California

A229

1   further below, it does not limit its consideration of the extrinsic evidence to references that are

2   specifically related to pharmaceuticals.

3       Looking to the various definitions offered by the parties, the Court concludes that there is

4   more than one possible meaning of the word "amorphous" as used by a person skilled in the art in

5   the field of chemistry.  In particular, while some definitions of "amorphous" or terms that use the

6   word "amorphous" appear to include liquids and gases, *see, e.g.,* Rogers Decl., Ex. 4 (Hawley's

7   Condensed Chemical Dictionary) at 75 ("all liquids are amorphous");  Myerson Decl., Ex. 15

8   (McGraw-Hill Concise Encyclopedia of Science and Technology) at  84-85 ("A solid is

9   distinguished from its other amorphous counterparts (liquids and gases) by its viscosity"), others

10  limit the definition of these terms to a solid.  *See, e.g.,* Cox Decl., Ex. 7 ( Science and Technology

11  Encyclopedia at 17, defining "amorphous substance" as "[n]on-crystalline solid").  These alternate

12  meanings are expressly recognized in some of the definitions offered by the parties.  For example, in

13  an 1993 encyclopedia of chemistry, it is stated that "amorphous" is "a term applied to solids" but

14  that "[o]ccasionally gases and liquids are called [amorphous] due to their lack of long-range order."

15  Cox Decl., Ex. 8 (Concise Encyclopedia: Chemistry) at 67).  Similarly, the "Ulicky" reference cited

16  by Defendants and also listed among the references before the PTO on the '668 patent recognizes

17  that there is "ambiguity" as to the definition of "amorphous substance."

18      In light of these alternate meanings, the Court rejects Defendants' assertion that Takeda is

19  required to show that it clearly disavowed a construction of "amorphous compound" that includes

20  gases and liquids.  That rule applies only when an inventor "deviate[s] from the ordinary and

21  accustomed meaning of a claim term."  *Epistar*, 566 F.3d at 1334.  Here, there appear to be two

22  possible meanings of the term, *both* of which might be characterized as the "ordinary and

23  accustomed meaning" of the claim term.  Thus, the general standard set forth in *Phillips* and

24  *Vitronics*, discussed above, applies.

25      With this standard in mind, the Court looks to the intrinsic evidence to determine which of

26  these possible definitions is consistent with the use of the claim term "amorphous compound" in the

27  '282 patent.  First, the Court addresses the significance of Reference Examples 1 and 2 of the '282

28  patent.  The parties vigorously dispute the significance of these examples.  Takeda argues that a

46

**United States District Court**
For the Northern District of California

A230

United States District Court

For the Northern District of California

1    person of ordinary skill in the art would have understood that the "amorphous substance" that is

2    described in them is a solid, and *not* a liquid or gas, while Defendants contend the term encompasses

3    all three forms.  Although a close call, the Court finds Takeda's position to be more persuasive.

4           In Reference Examples 1 and 2, the patentees expressly state that the amorphous substance is

5    obtained using a process that involves "evaporat[ing] to dryness" isolated dexlansoprazole.  '282

6    patent, col. 8, ll. 3-6, 25-29.  Dr. Myerson has opined that this language would have indicated to a

7    person skilled in the art that the amorphous substance was a solid.  Myerson Decl. ¶ 83.  In support

8    of this opinion, Dr. Myerson explained at his deposition that "if somebody produces an oil in an

9    example, they say an oil.  If they produce an amorphous solid, they would normally say an . . .

10   amorphous substance."  Jorjani Decl., Ex. 1 (Myerson Dep.) at 164.  Dr. Myerson further testified

11   that "amorphous substance" and "amorphous compound" would be understood to mean the

12   "identical thing."  *Id.* at 142.  The references cited by Defendants to show that evaporation can yield

13   an oil are, in fact, consistent with Dr. Myerson's opinion.  In particular, all of them call out the fact

14   that the processes that are being described give rise to a liquid or oil.  *See* Jorjani Decl., Ex. 4 ('830

15   patent) at Example 49, col. 46, ll. 33-51 ("The ether solution is evaporated . . .to afford . . . a

16   colorless liquid"); *id.*, Ex. 5 ( '356 patent) at Reference Example 25, col. 25, ll. 12-32) ("The solvent

17   was evaporated to dryness to give an oily residue"); *Id.*, Ex. 6 (Von Unge) at Example 12, col. 16, ll.

18   1-10 ("[e]vaporation of the filtrate afforded an oil ")).  The failure of the patentees to state that the

19   amorphous substance obtained in Reference Examples 1 and 2 by way of evaporation was a liquid or

20   oil supports the conclusion that these examples referred to *solids* when they used the term

21   "amorphous substance."

22          The arguments made by the patentees in connection with the '276 patent application do not

23   support a contrary conclusion, although they do suggest that Takeda's alternative argument – that a

24   person skilled in the art would understand that in Reference Example 2, the amorphous substance

25   must be a solid because it is being compared to a crystalline material – is incorrect.  In the

26   prosecution history, the patentees offered Sukenik to support the thesis that "a crystalline material

27   will be more stable than its corresponding amorphous form."  Rogers Decl., Ex. 6 at DEX0001949.

28   Sukenik, in turn, addressed the stability of a benzenesulfonate "in solution (amorphous form)" as

A231

United States District Court

For the Northern District of California

1   compared to the stability of benzenesulfonate in solid form.  *Id.*  The comparison of the stability of a

2   liquid to a solid to show that "a crystalline material will be more stable than its corresponding

3   amorphous form" directly contradicts Dr. Myerson's contention that a person skilled in the art would

4   have understood that Reference Example 2 described the comparison of like to like, that is, a solid to

5   a solid.[11]  The usage of the word "amorphous" in the patentee's submission to the PTO, however, is

6   entirely consistent with Dr. Myerson's opinion that when an amorphous substance is something

7   *other* than a solid, that is, a liquid or gas, it is expressly identified as such.  In particular, the

8   patentees make clear that the amorphous form at issue in Sukenik is a liquid.

9        Takeda's assertion that in the context of the pharmaceutical field, reference to an

10  "amorphous substance" or "amorphous compound" means a solid unless otherwise stated appears to

11  be consistent with the pharmaceutical references offered by the parties.  In particular, the vast

12  majority of the pharmaceutical references offered, including the '668 patent, the FDA Guidance,

13  Hancock and Zografi, Hsien-Hsin Tung, and Byrn, involved amorphous compounds that are solids.

14  These references indicate that typically, at least, amorphous materials used in oral pharmaceuticals

15  are solids.  It was for this reason, perhaps, that Dr. Rogers was hard-put at his deposition to name

16  any orally ingested non-solid amorphous material used in pharmaceuticals, though he testified that

17  they exist.

18       Finally, the Court turns to Takeda's argument that the term "amorphous compound" should

19  be construed so as to avoid ensnaring prior art, namely, Larrson and Von Unge.  As Defendants

20  pointed out at oral argument, the rule that claims should be construed to preserve their validity is a

21  principle that has not been applied broadly.  Rather, the Federal Circuit has cautioned against

22  "judicial rewriting of claims to preserve validity."  *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d

23  898, 911 (Fed. Cir. 2004)( quoting *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed.Cir.1999)).  In

24  *Liebel-Flarsheim*, the court held that "unless the court concludes, after applying all the available

25  tools of claim construction, that the claim is still ambiguous, the axiom regarding the construction to

26  _____

27       [11]For the same reason, the Court finds unpersuasive Takeda's more general argument that
    because the '282 patent addresses crystalline materials, a person skilled in the art would understand that
28  the claimed "amorphous compound" must be the counterpart to the crystalline material and therefore
    also a solid.

1  preserve the validity of the claim does not apply."  It is not clear to the Court that this is such a case,

2  given that there is both intrinsic and extrinsic evidence to suggest that the patentees used the term

3  "amorphous compound" to refer to a solid, as appears to have been the more common usage in the

4  pharmaceutical literature.  Assuming the term remains ambiguous, however, this rule also supports

5  Takeda's position.

6          The prior art at issue – Von Unge and Larsson – was before the PTO when it considered the

7  application that led to the issuance of the '282 patent.  Further, the prosecution history of the '058

8  patent, which is a parent patent, indicates that the examiner was aware that Von Unge and Larsson

9  related to oils.  *See* Cox Decl., Ex. 13 (Reasons for Allowance).  Similarly, the arguments made by

10  the patentee's in support of the '276 patent application that were cited by Defendants state that Von

11  Unge involved the isolation of an oil rather than a solid.  *See* Rogers Decl., Ex. 6 at DEX0001948.

12  Under these circumstances, Defendants' proposed construction would run counter to the rule that the

13  Patent Office is presumed to have properly done its job.  *See Tokai Corp. v. Easton Enterprises, Inc.*,

14  632 F.3d 1358, 1367 (Fed. Cir. 2011).  Thus, to the extent the claim term "amorphous compound" is

15  ambiguous, the term should not be construed to encompass liquids and gases.

16          The Court adopts Takeda's proposed construction of the term "amorphous compound."

17

18          **G.**     **"released in the pH range of no less than 5.0 to no more than 6.0" ('755 patent,**
             **claim 1)/"soluble in the pH range of 6.0 to 7.5" ('755 patent, claim 1)/ "soluble in**
19          **the pH range of no less than 6.5 to no more than 7.0" ('755 patent, claim 7)**

20

| Claim Term | Proposed Constructions |
|---|---|
| "released in the pH range of no less than 5.0 to no more than 6.0"<br><br>[hereinafter, the "release limitation"] | **Takeda**:  "begins to be released from the tablet, granule, or fine granule into the body at pH values within the range from 5.0 to 6.0"<br><br>**TWi**: Phrase is indefinite<br><br>**Impax and Handa**: Plain meaning |

26

27

28

A233

| "soluble in the pH range of 6.0 to 7.5" | **Takeda**: "begins to dissolve in the gastrointestinal tract at pH values within the range from 6.0 to 7.5"<br><br>**TWi**: Phrase is indefinite<br><br>**Impax and Handa**: Plain meaning |
|---|---|
| "soluble in the pH range of no less than 6.5 to no more than 7.0"<br><br>[hereinafter, this term and the preceding term are referred to together as "the solubility limitations"] | **Takeda**: "begins to dissolve in the gastrointestinal tract at pH values within the range from 6.0 to 7.5."<br><br>**TWi**: Phrase is indefinite<br><br>**Impax and Handa**: Plain meaning |

The '755 patent is directed to controlled-release formulations containing, *inter alia*, dexlansoprazole. The claims-in-suit are specifically directed to a composition that employs a dual-delayed release mechanism that uses two different types of enteric coatings.[12] In particular, Independent claim 1, and dependent claim 7, read as follows:

    1.     A capsule comprising:

        composition (i) comprising a tablet, granule or fine granule in which a release of an active ingredient is controlled; said tablet, granule or fine granule comprising a core particle containing an imidazole compound. . . and

        a pH-dependently soluble release-controlled coating-layer which comprises one kind of polymeric substance or a mixture of two or more kinds of polymeric substances having different release properties selected from [generic categories of polymeric substances]; **said polymeric substance is soluble in the pH range of 6.0 to 7.5, and**

---

[12]Takeda's expert, Dr. Charman, offers the following background information relating to enteric coatings:

An enteric coating protects the drug core from disintegration in the acidic environment of the stomach. Polymers such as hydroxypropylmethyl cellulose phthalate, cellulose acetate phthalate, and polyvinyl acetate phthalate are commonly used as enteric coatings in pharmaceutical products. These enteric coating materials are designed to dissolve (and hence release drug) once the pH of the local environment exceeds a particular pH value. Typically, they will not dissolve within the acidic environment of the stomach but they will then rapidly dissolve in a pH-dependent manner at the pH values encountered within the small and large intestine.

Declaration of William M. Charman, Ph.D., in Support of Takeda's Opening Claim Construction Brief ("Charman Decl.") ¶ 38.

A234

United States District Court

For the Northern District of California

composition (ii) comprising a tablet, granule or fine granule comprising a core particle containing the active ingredient and enteric coat such that **the active ingredient is released in the pH range of no less than 5.0 to no more than 6.0**.

7.      The capsule according to claim 1, wherein the pH-dependently soluble release-controlled coating-layer of the tablet, granule or fine granule in which the release of the active ingredient is controlled is a layer **soluble in the pH range of no less than 6.5 to no more than 7.0**.

'755 patent, claims 1, 7 (disputed claim terms in bold).   The primary disputes relate to: 1)  whether the pH ranges specified in these claim terms refer to when release of the active ingredient, or dissolution of the enteric coating, begins, as Takeda contends, or rather, represent the *only* pH values at which release or dissolution occurs; and 2) whether the dissolution and release referred to in the claims occurs in the body.

Takeda argues that its proposed constructions are consistent with, and supported by, the surrounding language of the claims and the patent specification. Takeda Opening Claim Construction Brief at 21-22 (citing Charman Decl. ¶¶ 58-86).  It points to the limitation that precedes the claim terms at issue, describing the coating layer for the granule of composition (i) as a "pH dependently soluble release-controlled layer which comprises one kind of polymeric substance or a mixture of two or more kinds of polymeric substances having different release properties." *Id*. According to Takeda, this limitation supports the conclusion that the ranges set forth in claims 1 and 7 reflect the pH values at which the coating layer *begins* to dissolve.  *Id*. at 21-22.  Takeda points out that Impax and Handa's proposed construction of this claim limitation is consistent with its position. *Id*. at 22 (citing Joint Claim Construction and Prehearing Statement [Docket No. 52], App'x B, at 28 (stating that this limitation should be construed to mean "a coating layer that delays or extends the release of active ingredient by dissolving or releasing drug, and/or allowing diffusion of drug, said coating layer comprising one kind of polymeric substance or a mixture of two or more kinds of polymeric substances, each of which begins to dissolve at a different pH value")).

Takeda argues further that its proposed constructions are supported by the '755 specification, which repeatedly defines the phrase "pH dependently soluble" to mean "releasing an active ingredient under the circumstances of more than a certain pH value." *Id*. at 22 (citing '755 patent, col. 142, ll. 62 - 64; col. 143, ll. 27 - 29; col. 145, ll. 16 - 18; col. 145, ll. 50 - 52; col. 147, ll. 2 - 4;

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    col. 147, ll. 34 - 36; col. 152, ll. 27 - 28; col. 152, ll. 62 - 63; col. 154, ll. 2 - 4; col. 154, ll. 33 - 35;

2    col. 156, ll. 33 - 34; col. 159, ll. 60 - 61).  Takeda also points to the statement in the specification

3    that "'pH-dependently' means that the coating material is dissolved/eluted under the circumstances

4    of more than a certain pH value to release an active ingredient." *Id*. (quoting '755 patent, col.9,

5    ll.32-35).  According to Takeda, this language supports the conclusion that the polymeric enteric

6    coatings referred to in the specification have a threshold pH at and above which they will dissolve

7    and release the active ingredient.  *Id*.  Another statement in the specification that Takeda asserts

8    supports this conclusion is the following:

9        It is desirable that the coating material is used alone or, if necessary, in combination so that

10      the polymer is dissolved preferably at a pH of 6.0 or above, more preferably at a pH of 6.5 or
above, and further more preferably at a pH of 6.75 or above. Further, more desirably, a
polymer soluble at a pH of 6.0 or above and a polymer soluble at a pH of 7.0 or above are

11      used in combination, and furthermore desirably, a polymer soluble at a pH of 6.0 or above
and a polymer soluble at a pH of 7.0 or above are used in combination at a ratio of 1:0.5 to

12      1:5.

13    *Id*. (citing '755 patent, col.9, l.65 to col.10, l.7).  Thus, the specification makes clear, Takeda

14    contends, that when the claims refer to dissolution or release occurring "in the pH range of no less

15    than 5.0 to no more than 6.0," "in the pH range of 6.0 to 7.5," or "in the pH range of no less than 6.5

16    to no more than 7.0," it is providing a range of pH values within which dissolution or release begins,

17    rather than a range imposing both a lower and an upper limit on when dissolution or release occurs.

18    *Id*. at 22-23 (citing Charman Decl. ¶¶ 65-66).

19        Takeda further cites to the knowledge of a person skilled in the art about the commercially

20    available polymers that can be used to achieve the dissolution and release properties set forth in

21    the claims.  *Id*. at 23.  As an example, Takeda points to the methacrylic acid polymers listed in claim

22    1, and to the specific examples of such polymers in the '755 specification, including: Eudragit

23    L30D-55 (methacrylic acid-ethyl acrylate copolymer), Eudragit L100 (methyl methacrylate-

24    methacrylic acid copolymer), and Eudragit S100 (also a methyl methacrylate-methacrylic acid

25    copolymer).  *Id*. (citing '755 patent, col.9, ll.46-55).  According to Takeda, the Eudragit polymers

26

27

28

1   are manufactured by Evonik Industries.[13]  *Id.*  Evonik Industries, in turn, states in its marketing

2   materials that the enteric coatings referenced in the '755 specification exhibit dissolution "above pH

3   5.5" for Eudragit L30D-55, "above pH 6.0" for Eudragit L100, and "above pH 7.0" for Eudragit

4   S100.  *Id.* (citing Charman Decl., Ex. 6 at DEX0014573, Ex. 7 at DEX0014559).

5          Similarly, Takeda points to the polymer hydroxypropylmethyl cellulose phthalate in claim 1,

6   and the examples of suitable brands of such a polymer set forth in the specification, including HP-50

7   and HP-55, manufactured by Shin-Etsu Chemical Co., Ltd.  *Id.* at 24 (citing '755 patent, col. 9, ll. 42

8   - 45).  Shin-Etsu Chemical Co., Ltd., in turn, states in its brochure that these polymers are soluble at

9   pH values greater than or equal to 5.0 or 5.5, respectively.  *Id.* (citing Charman Decl., Ex. 8

10  (ShinEtsu Chemical Co., HPMCP: Enteric Coating Material (Sept. 2009)) at DEX0014692).

11  According to Takeda, each of the polymers listed in the specification as suitable for use as the

12  pH-dependent release-control layer will begin to dissolve at a particular threshold pH, but also

13  dissolve at higher pHs. *Id.* (citing Charman Decl. ¶¶ 60-63, 75-77, 82-84).  Further, Takeda

14  contends, none of the exemplary polymers listed in the specification is soluble only in the pH range

15  of pH 5.0 to 6.0, or in the pH range of pH 6.5 to 7.0.  *Id.*

16         Finally, Takeda argues that it is clear that the dissolution and release referred to in the claims

17  occurs in the gastrointestinal tract.  *Id.* (citing Charman Decl. ¶¶ 67-72, 78, 85).  According to

18  Takeda, this is because the specification discusses the inventive formulation's behavior within the

19  gastrointestinal tract.  *Id.*  In particular, the specification notes that "a composition containing a

20  benzimidazole compound having a proton pump inhibitor action is needed to disintegrate rapidly *in*

21  *the small intestine.*" *Id* (citing '755 patent, col. 1, ll. 45 - 50 (emphasis added by Takeda)).  Takeda

22  also points to the statement that "the coating material of the present invention is preferably a

23  substance which is dissolved at a higher pH, . . . and controls more favorably the release of drug *in*

24  *the stomach.*"  *Id.* (citing '755 patent, col. 9, ll. 36-41 (emphasis added by Takeda)).  In addition,

25  Takeda notes that a basic goal of the dual enteric-coating method described and claimed in the patent

26

27          [13]The '755 specification states that these polymers are manufactured by Rohm Co. '755 patent,
28  col. 9, l. 50. Dr. Charman explains that Rohm Co. is now known as Evonik Industries.  Charman Decl.,
    ¶ 62 n. 3.

United States District Court

For the Northern District of California

1    is to provide for two separate releases of drug occurring at different parts of the gastrointestinal tract,

2    and thus at different times. *Id*. (citing '755 patent, col. 6, ll. 43 - 45 (noting that "the persistence of

3    blood levels after oral administration is remarkably prolonged by these combinations [of coatings]");

4    Charman Decl. ¶ 68).

5      Takeda contends that its position finds further support in the product literature of the

6    companies that manufacture these polymers, such as Evonik, which describe their products in terms

7    of how they are released within the human body. *Id*. at 24-25. For example, Evonik describes the

8    polymers referenced in the '755 specification as providing "drug delivery in the duodenum"

9    (Eudragit L30 D-55), "drug delivery in jejunum" (Eudragit L100) and "colon delivery" (Eudragit S

10   100). *Id*. at 25 (citing Charman Decl., Ex. 7 at DEX0014568-69). Takeda also points to a diagram

11   of the digestive system showing where in the gastrointestinal tract the methacrylic acid polymers in

12   claim 1 of the '755 patent are dissolved. *Id*. (citing Charman Decl, Ex. 7 at DEX0014571). Finally,

13   Takeda points to Evonik product literature stating that "the different grades can be combined with

14   each other, making it possible to adjust the dissolution pH, and thus to achieve the required GI

15   targeting for the drug"). *Id*. (citing Charman Decl., Ex. 6 at DEX0014573).

16      Defendants Handa and Impax argue that the disputed pH range terms should be given their

17   plain and ordinary meaning. As to the term "soluble in the pH range of 6.0 to 7.5," Handa and

18   Impax assert this term simply means that solubility must exist within the specified pH ranges but

19   that the term does not restrict solubility outside of that range. Defendants' Claim Construction Brief

20   at 23. On the other hand, Handa and Impax assert, the terms "released in the pH range of no less

21   than 5.0 to no more than 6.0" and "soluble in the pH range of no less than 6.5 to no more than 7.0,"

22   should be construed to mean that release/solubility occurs at "no less than" the claimed lower pH

23   value and "no more than" the claimed upper pH value, such that release and solubility do *not* occur

24   outside the specified ranges. *Id*.

25      According to Handa and Impax, Takeda's proposed constructions is incorrect for several

26   reasons. First, they contend, Takeda ignores the plain meaning of the claim language by eliminating

27   the "no less than/no more than" claim language as to the claim terms that include those words. *Id*. at

28   23-24. Handa and Impax argue that in doing so, Takeda has failed to adhere to the rule that all the

A238

1  words of a claim should be given meaning. *Id.* (citing *Pause Tech. LLC v. Tivo, Inc.*, 419 F.3d 1326,

2  1334 (Fed. Cir. 2005) (a claim construction that gives meaning to all of the words of the claim is

3  preferred over one that does not)).

4  Second, Handa and Impax assert that Takeda's proposed constructions should be rejected

5  because Takeda has given the claim term that does not include the "no less/no more" language the

6  same meaning as the terms that do include this language. *Id.* In doing so, they argue, Takeda fails

7  to adhere to the rule that different words in the claims are presumed to have different meanings. *Id.*

8  (citing *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006)

9  ("[T]he use of . . . different terms in the claims connotes different meanings")).

10  Handa and Impax also reject Takeda's reliance on the brochures and marketing materials for

11  the commercially available polymers referenced in the '755 specification, arguing that Takeda is

12  attempting to redraft claims to sustain their validity. *Id.* (citing *Chef America, Inc. v. Lamb-Weston,*

13  *Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)).

14  Handa and Impax further contend that Takeda's proposed constructions are incorrect because

15  Takeda is attempting to import a limitation – specifically, "begins to be released" and "begins to be

16  dissolved" – from the specification. *Id.* at 24- 25. According to Handa and Impax, the written

17  description cannot be used to substitute for or redraft the claim language. *Id.* at 25 (citing *Resonate*

18  *Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364 (Fed. Cir. 2003)).

19  Handa and Impax reject Takeda's reliance on the phrase in claim 1 claiming a "pH-

20  dependently soluble release-controlled coating-layer which comprises one kind of polymeric

21  substance or a mixture of two or more kinds of polymeric substances having different release

22  properties." *Id.* According to Handa and Impax, "[t]his phrase . . .does not share the same

23  distinctive language found in the pH range limitations and is thus not instructive for construing

24  them." *Id.* Furthermore, they argue, the phrase relates only to composition (i) of claim 1 and not to

25  composition (ii), which includes the "no more/no less" language. *Id.* Therefore, it is improper to

26  consider this claim language to construe claim terms used to claim composition (ii). *Id.* As to the

27  pH range term appearing in claim 7, Handa and Impax argue that while the term relates to the

28  "pH-dependently soluble release-controlled coating layer" of composition (i), it  includes the "no

55

A239

United States District Court

For the Northern District of California

1 less than/no more than" language used in the pH range term of composition (ii), and thus mirrors

2 that term. Therefore, they contend, the pH range terms of claim 7 and composition (ii) should be

3 construed consistently. *Id*.

4      Handa and Impax also argue that in relying on the specification, Takeda has ignored

5 language that conflicts with its argument. *Id*. at 26. In particular, Handa and Impax quote language

6 in the specification describing "a core particle containing an active ingredient and enteric coat which

7 is dissolved, thereby an active ingredient being released in the pH range of no less than 5.0, nor

8 more than 6.0." *Id*. (citing '755 patent, col. 5, l. 66 - col. 6, l. 2). According to Handa and Impax,

9 this disclosure supports their plain meaning constructions because it indicates that the process of

10 releasing the active ingredient must be *completed* within the stated range. *Id*.

11      Handa and Impax also challenge Takeda's assertion that these terms should be construed to

12 include the limitations "in the body" and "in the gastrointestinal tract." *Id*. Handa and Impax point

13 to the statement in the specification stating as follows:

14      [T]he pH mentioned here means a pH of the McIlvaine solution or Clark-Lubs solution.
     Hereinafter, the pH of a pH-dependently soluble layer means the pH of these solutions.

15

16 *Id*. (citing '755 patent, col. 7, ll. 2-5). According to Handa and Impax, neither McIlvaine nor

17 Clark-Lubs solutions exists in the body, and there is no example or mention of any in-body pH

18 testing in the '755 patent. *Id*. (citing Jorjani Decl., Ex. 2 (Charman Dep.) at 69:15-70:7 (testifying

19 that McIlvaine solution is used as a "surrogate for what occurs in the gastrointestinal tract")). Handa

20 and Impax also point to the prosecution of the '755 patent, noting that Takeda submitted a

21 declaration in support of the application describing dissolution testing of the '755 claimed subject

22 matter. *Id*. at 26 (citing Jorjani Decl., Ex. 3 ('755 patent file history excerpt at DEX7123-24,

23 7130-33)). That testing, they contend, was not conducted in the body, but rather occurred in a

24 phosphate buffer outside the body. *Id*.

25      TWi argues that all of the pH range claim terms are indefinite. *Id*. at 27. First, addressing

26 the term "active ingredient is released in the pH range of no less than 5.0 to no more than 6.0," TWi

27 argues that "a skilled artisan could not cull from the claims, specification and prosecution history

28 any objective standard (i.e. test conditions) to determine whether the active ingredient is released

56

A240

United States District Court

For the Northern District of California

1  within the specified pH range." *Id*. In particular, TWi asserts that although the range is described to

2  the one-tenth of a pH value, and although the parties appear to agree that the pH range would be

3  determined using "some kind of dissolution," key information is missing regarding how to make this

4  determination. *Id*. at 27-28 (citing Jorjani Decl., Ex. 2 (Charman Dep.) at 124:18-127:16 (testifying

5  that pH would be measured at least to one decimal point); '755 patent at col. 7, ll. 2-5 (referring to

6  pH of the McIlvaine solution or Clark-Lubs solution);  Jorjani Decl., Ex. 2 (Charman Dep.) at 70:

7  1-18, 111: 5-13, 237: 10-20 (testifying that a variety of tests could be used to determine pH); Expert

8  Declaration of Thomas L. Reiland, Ph.D. In Support of Defendants Anchen Pharmaceuticals, Inc.'s

9  and TWi Pharmaceuticals, Inc.'s Opening Claim Construction Brief ("Reiland Decl."), ¶¶ 20-22

10  (stating that claim term is indefinite because although it refers to dissolution testing, no basis is

11  provided for determining dissolution test criteria)).

12  According to TWi, Takeda's expert admitted that "[d]issolution studies are typically defined

13  by a certain volume, a temperature, and different components," and that there are "a whole range of

14  different materials – solvents, salts, pHs – that can be used for dissolution studies." *Id*. (citing

15  Jorjani Decl., Ex. 2 (Charman Dep.) at 77:3-11). Thus, a skilled artisan would not know what

16  dissolution test to use to determine whether the claim element is met and is left to guess as to the

17  terms' metes and bounds. *Id*. (citing Reiland Decl., ¶¶ 23-27, 32). Even Takeda's expert could not

18  state what test should be used to determine whether the claim term was met, TWi asserts. *Id*. (citing

19  Jorjani Decl., Ex. 2 (Charman Dep.) at 112:8-113:1). Because the skilled artisan would not be able

20  to determine whether the metric listed in the claim is met, the term is indefinite, TWi contends. *Id*.

21  (citing *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003)).

22  According to TWi, Takeda's proposed definition of the claim term "further exacerbates the

23  indefiniteness problem" to the extent Takeda seeks to substitute "is released" with "begins to

24  release." *Id*. at 29. TWi points to the testimony of Takeda's expert that it is "impossible" to

25  determine the amount or percentage that would constitute what "begins to release" means and notes

26  that Takeda's counsel objected that the phrase was "vague, ambiguous, incomprehensible,

27  unintelligible and incomplete." *Id.* (citing Jorjani Decl., Ex. 2 (Charman Dep.) at 111:14 - 112:5).

28

A241

United States District Court

For the Northern District of California

1    TWi also asserts that Takeda's expert used "released" throughout his declaration to mean "the

2    release of the drug" and not "begins to release.  *Id.* (citing Charman Decl., ¶¶ 24, 35, 37).

3            Further, TWi argues, Takeda's proposed construction is inconsistent with the claim language

4    and the specification.  TWi states that when the "specification meant to say begin, it said so."  *Id.* at

5    29.  Further, TWi argues, when the specification and prosecution history referred to "is released,"

6    "they meant that the active ingredient was (past tense) released."  *Id.* (citing '755 patent, col. 1, ll.

7    34-35 ("a pH-dependent release control of compound and a time-dependent release control wherein

8    the compound is released after a certain lag time"), col. 7, ll. 28-31 ("the release of active ingredient

9    is controlled in the meanwhile, the active ingredient is released continuously or in a pulsatile manner

10   from the tablet"), col. 44, ll. 45-48 ("2 kinds of granules, such as granules wherein the active

11   ingredient is released comparatively quickly and granules wherein the active ingredient is released

12   with prolonged time"); Jorjani Decl., Ex. 3 ('755 patent file history) at DEX0006159 (application

13   claim 41, which corresponds to claim 1 of the issued patent); DEX0006164 ("[b]y having

14   composition (ii) dissolving at pH 5.0-6.0 and (i) that includes the polymeric substance for controlled

15   release at higher pH 6.0-7.5, the capsule formulation of claim 41 releases the active ingredient

16   rapidly from composition (ii) at the pH of the small intestine . . . .  Then, the active ingredient that is

17   released from composition (i) later at higher pH 6.0-7.5 maintains the blood level and the efficacy");

18   DEX0007124 ("[a]t predetermined time periods, an aliquot was withdrawn and the percentage of

19   released Compound A was spectophotometrically determined at 286 nm."); DEX 0007131 ("the

20   plasma level of the active ingredient of claim 41, ie., lansoprazole, released in beagle dogs is

21   maintained in a therapeutically effective level . . . composition (ii) of claim 41 releases the active

22   ingredient in a relatively short period of time"); DEX0007261 (stating in Reasons for Allowance

23   "[t]he instantly claimed compounds are novel and non-obvious over the prior art because of the

24   combination of the two components of the composition, one comprising a compound of formula I'

25   and soluble at pH range 6.0 to 7.5, and the other such that it is released in the pH range of no less

26   than 5.0 to no more than 6.0").

27           Next, TWi addresses the claim term "said polymeric substance is soluble in the pH range of

28   6.0 to 7.5" and "a layer soluble in the pH range of no less than 6.5 to no more than 7.0."  *Id.* at 29-

A242

United States District Court

For the Northern District of California

30. According to TWi, these terms are indefinite not only because a person skilled in the art would not know what testing methods should be used to determine if the pH range limitations are met, but also because the word "soluble," as used in these claim terms, would not be understood by a person skilled in the art. *Id.* According to TWi, the patentees' use of the term "soluble" in claims 1 and 7 is not consistent with any understood definition of the term soluble because the '755 patent "fails to provide any rubric or method for a skilled artisan to determine whether the polymer or mixtures of polymers listed in the claim 1 Markush group are soluble at a specified pH as contemplated by the claim." *Id.* (citing Jorjani Decl., Ex. 2 (Charman Dep.) at 104:14-107:17)).

Further, TWi contends, the specification uses "soluble" in a manner inconsistent with its accepted meaning. *Id.* at 30. In particular, TWI argues that the '755 specification and Takeda equate "soluble" in the claims to some form of "release." *Id.* An example of such a use, according to TWi, is the statement in the specification that "[h]erein, 'pH-dependently' means that the coating material is dissolved/eluted under the circumstances of more than a certain pH value to release an active ingredient." *Id.* (citing '755 patent at col. 9, ll. 32 - 35). TWi also points to the following statements of the applicants during prosecution relating to application claim 41:

Composition (i) releases the active ingredient at pH 6.0-7.5, and composition (ii) releases it at pH 5.0-6.0. The two-composition formulation that releases the active ingredient at two different pH is supported by the specification at page 15, line 16 – page 16, line 3.

. . .

Then, the active ingredient that is released from composition (i) later at higher pH 6.0-7.5 maintains the blood level and efficacy.

*Id.* (citing Jorjani Decl., Ex. 3 ('755 patent file history excerpt) at DEX 0006162, 0006164). According to TWi, "the applicants explained their claims in this manner to address patentability rejections [and] rel[ied] on drug release data to demonstrate that their Dexilant product meets the 'soluble' limitations of claims 1 and 7 of the '755 patent." *Id.* (citing Jorjani Decl., Ex.7 (Plaintiffs' Resp. to TWi Interrog.) at 7; Jorjani Decl., Ex. 2 (Charman Dep.) at 69 -70, 79 - 80).

Finally, TWi asserts that the claim term referencing "a layer" is indefinite, as used in claim 7, because that claim references "a layer" being soluble in a narrower pH range, but the layer of composition (i) is not limited to only soluble materials and may contain insoluble components. *Id.*

59

A243

1    Consequently, according to TWi, parts of the "layer" may never become soluble in the restricted pH

2    range. *Id.* (citing Reiland Decl. ¶ 51).

3           In its Reply brief, Takeda contends that Handa and Impax's plain meaning constructions,

4    under which release and solubility do not occur outside the specified ranges, should be rejected

5    because they would render the claims inoperable and "make[ ] no sense as a matter of basic

6    chemistry." Takeda Reply Brief on Claim Construction at 10. Specifically, Takeda asserts, one

7    skilled in the art would understand that the pH ranges in these claim terms refer to the threshold pH

8    at which an enteric coating will begin to dissolve/release drug because it is well-known that

9    pH-sensitive enteric coatings do not dissolve or release drug only within a particular pH range. *Id.*

10   This is recognized in the specification, Takeda argues, which makes clear that enteric coatings

11   dissolve and release drug at and above particular pH levels. *Id.* (citing '755 patent, col. 9, ll. 32 - 35

12   ("'pH-dependently' means that the coating material is dissolved/eluted under the circumstances of

13   more than a certain pH value . . . "). According to Takeda, the specification, in discussing the

14   granule that dissolves at the higher of the two pH ranges specified in the claims, repeatedly

15   emphasizes that the pH values are threshold values at and above which dissolution occurs. *Id.*

16   (citing '755 patent, col. 9, l. 65 - col. 10, l. 7).

17          Takeda further contends that the applicants and the Examiner clearly understood that the

18   claimed ranges referred to threshold values. *Id.* (citing Reiland Decl., Ex. I, at DEX0007130

19   (noting that composition (ii), the granule in which the active ingredient was "released in the pH

20   range of no less than 5.0 to no more than 6.0," released drug rapidly at pH 6.8)). Indeed, Takeda

21   notes, Dr. Reiland acknowledged that all enteric coatings of which he was aware that are soluble at

22   a pH of 5.5 (the "usual enteric coatings" of the inventive composition) also dissolved at a pH

23   above 6.0, such as 6.5. *Id.* at 11 (citing Cox Decl. Ex. 14 (Reiland Dep.) at 95:23 - 96:10). Takeda

24   further points out that Dr. Reiland, when asked about the polymers listed in claim 1 as suitable for

25   the "layer soluble in the pH range of no less than 6.5 to no more than 7.0" in claim 7, similarly

26   acknowledged that all of those with which he was familiar dissolved at pHs above 7, such as 8.0,

27   and further, that he could not identify any that would not dissolve at a pH higher than 7. *Id.* (citing

28   Cox Decl., Ex. 14 (Reiland Dep.) at 28-29, 31-32, 112-118). Thus, Takeda asserts, under Handa

United States District Court
For the Northern District of California

60

A244

United States District Court

For the Northern District of California

1   and Impax's reading, no enteric coating would ever satisfy the pH limitations, rendering the claims

2   completely inoperable – a result that should be viewed with "extreme skepticism." *Id.* (citing

3   *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002), vacated and

4   remanded on other grounds, 537 U.S. 802 (2002); *AstraZeneca LP v. Apotex, Inc*., 633 F.3d 1042,

5   1053 n.1 (Fed. Cir. 2010)).

6        Takeda rejects Handa and Impax's reliance on *Applied Med. Res. Corp. v. U.S. Surgical*

7   *Corp.*, 448 F.3d 1324 (Fed. Cir. 2006) for the proposition that the phrases "no less than 5.0 to no

8   more than 6.0" and "no less than 6.5 to no more than 7.0," must be construed differently than "in the

9   pH range of 6.0 to 7.5," arguing that they ignored the prefatory caveat to the statement they cite:

10   "'*[i]n the absence of any evidence to the contrary*, we must presume that the use of . . . different

11   terms in the claims connotes different meanings.'" *Id.* (citing *Applied Med. Res. Corp.*, 448 F.3d at

12   1333 n.3) (emphasis added by Takeda). According to Takeda, there is "evidence to the contrary"

13   here, namely, the evidence from the specification and the common knowledge of those skilled in the

14   art about the properties of enteric coatings, which support the conclusion that all three claim terms

15   should be construed to state threshold pH levels, notwithstanding the different words used in these

16   claim terms. *Id.* (citing *Baran v. Medical Device Techs., Inc*., 616 F.3d 1309, 1316 (Fed. Cir.2010)

17   (any "implication [that different terms have different meanings] is overcome where . . . the evidence

18   indicates that the patentee used the two terms interchangeably"). Takeda argues further that its

19   proposed constructions *do* provide for different meanings for the different claim terms because each

20   of the claim terms recites a different threshold level. *Id.* at 12.

21        Takeda also reiterates its position that the claim terms should be construed as being directed

22   to dissolution "in the body," pointing to the evidence in the product literature and the specification

23   linking pH ranges with the location in the gastrointestinal tract at which the enteric coating first

24   dissolves. *Id.* at 12 (citing Charman Decl., Ex. 7[14] at DEX0014571; '755 patent, col. 6, l. 66 - col.7,

25   l. 2 (describing the enteric coating of "composition (ii)" as a "usual enteric coat and layer which is

26   dissolved at a pH of about 5.5" and "rapidly dissolved in the intestinal juice. . . .")). In addition,

27   _____

28        [14]Although Takeda cites to Exhibit 8 rather than to Exhibit 7 in its brief, it is clear from the Bates number cited that this was a clerical error.

United States District Court

For the Northern District of California

1    Takeda points to the prosecution history, arguing that the applicants stressed the release

2    characteristics of the inventive compositions in the body when they stated: "By having composition

3    (ii) dissolving at pH 5.0 - 6.0 . . . , the capsule formulation of claim 41 releases the active ingredient

4    rapidly from composition (ii) at the pH of the small intestine." *Id.* (citing Cox Decl., Ex. 15 at

5    DEX0006164 (emphasis added)). Takeda argues that "in the pharmaceutical field, pH-dependent

6    enteric coatings commonly are understood to target release at a particular region of the body." *Id.*

7    (citing Cox Decl., Ex. 16 (polymers identified in '755 patent); *id.*, Ex. 14 (Reiland Dep.) at 66 - 67,

8    69 - 70, 71 - 72 (describing those polymers as dissolving in intestines); *id.*, Ex. 17 (product insert for

9    extended-release erythromycin product that Defendants' expert helped develop); *id.*, Ex. 14 (Reiland

10   Dep.) at 73:17 - 74:10 (describing that product as having a pH-dependent coating to optimize

11   intestinal release)).

12       Takeda also rejects TWi's argument that these claim terms are indefinite. *Id.* at 12. First,

13   Takeda points to the testimony of Dr. Reiland that he understood that the term "soluble" within a

14   particular pH range referred to the property of a solid substance disappearing or dissolving

15   into a liquid within the specified pH range, indicating that he did not find this term to be indefinite.

16   *Id.* at 13 (Cox. Decl., Ex. 14 (Reiland Dep.) at 19:9 - 21:11). According to Takeda, the fact that Dr.

17   Reiland disagrees with its proposed construction to the extent Takeda contends that the term refers

18   to the *beginning* of dissolution in the body, is not sufficient to render these terms indefinite. *Id.* at 13

19   (citing *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) ("A

20   claim is not indefinite merely because parties disagree concerning its construction")).

21       Takeda also rejects TWi's assertion that the claim term that uses the word "layer" is

22   indefinite because an enteric coating layer may contain insoluble material in addition

23   to soluble polymers. *Id.* According to Takeda, Dr. Reiland "did not opine that the presence of even

24   as much as 25% of insoluble excipients in a coating layer would affect the pH level at which the

25   enteric polymer would dissolve;" in any event, it contends, even if other excipients might affect the

26   pH at which the layer dissolved, one skilled in the art could determine that through testing. *Id.*

27   (citing Cox Decl., Ex. 14 (Reiland Dep.) at 58 - 59, 108 - 110).

28

1    Addressing the claim term "released in the pH range of no less than 5.0 to no more than 6.0,"

2    Takeda rejects TWi's reliance on the following statement in the specification that TWi contends

3    equates release of the active ingredient with dissolution of the enteric coating: "the coating material

4    is dissolved/eluted under the circumstances of more than a certain pH value *to release an active*

5    *ingredient*." *Id*. (citing '755 patent, col. 9, ll. 32 - 35 (emphasis added by Takeda)). Takeda argues

6    that during prosecution, the applicants also used the "soluble" and "release" terms similarly. *Id*. In

7    particular, Takeda points to the fact that even though the claim term relating to composition (i) refers

8    to the polymeric substance as "*soluble* in the pH range of 6.0 to 7.5," the applicants described both

9    compositions (i) and (ii) in terms of *release* of active ingredient, stating as follows: "[c]omposition

10   (i) releases the active ingredient at pH 6.0 - 7.5, and composition (ii) releases it at pH 5.0-6.0. The

11   two-composition formulation . . . releases the active ingredient at two different pH . . . ." *Id*. (quoting

12   Reiland Decl., Ex. I at DEX0006162). Takeda also cites to the following statement in the

13   prosecution history to illustrate this point: "By having composition (ii) dissolving at pH 5.0-6.0, . . .

14   the capsule formulation of claim 41 releases the active ingredient rapidly from composition (ii) at

15   the pH of the small intestine." *Id*. (quoting Reiland Decl., Ex. I at DEX0006164). According to

16   Takeda, "[r]ather than suggesting indefiniteness . . . these statements merely recognize that, where

17   the enteric coating is the delayed-release mechanism, 'release' occurs when that coating dissolves."

18   *Id* at 13-14.

19   Takeda also rejects TWi's argument that the release limitation is indefinite because the

20   patent does not specify the conditions of in vitro tests by which release of the active ingredient

21   can be measured. *Id*. at 14. Takeda argues that the testimony TWi cites from Dr. Charman's

22   deposition regarding in vitro dissolution tests does not relate to the actual claim language but rather,

23   to a passage in the specification describing preferred rates of release for composition (i). *Id*. (citing

24   Jorjani Decl., Ex. 2 (Charman Dep.) at 90; '755 patent, col. 10, ll. 13 - 17 ("The rate of elution of

25   active ingredient from the active ingredient release-controlled tablet, granule or fine granule thus

26   obtained is desirably 10% or less for 5 hours in a solution of pH 6.0, and 5% or less for one hour and

27   60% or more for 8 hours in a solution of pH 6.8")). This testimony, therefore, does not support

28   TWi's position, Takeda contends, because the claims are not limited to such a specific release

A247

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1 profile. Similarly, Takeda argues that other testimony by Dr. Charman that TWi cites relates to a

2 specific in vitro release test described in a literature reference rather than to the actual claims of the

3 patent. *Id*. (citing Jorjani Decl., Ex. 2 (Charman Dep.) at 77)).

4 Takeda further asserts that TWi "offers no evidence of the criticality of testing methodology

5 under Takeda's actual construction of the 'release' term, i.e., 'begins to be released from the tablet,

6 granule, or fine granule into the body at pH values within the range from 5.0 to 6.0.'" *Id*. Instead,

7 Takeda argues, TWi challenges the term under a construction that ties the meaning of the claim to in

8 vitro release using dissolution testing – a construction that is not offered by any party. *Id*. (citing

9 Reiland Decl., ¶ 20 (stating that claim term "clearly refers to dissolution testing")). According to

10 Takeda, in concluding that the release limitation refers to in vitro pH levels on the basis that "testing

11 for release in the body at a given pH is not something that can be or is typically done in the art, " Dr.

12 Reiland confuses indefiniteness with infringement analysis. *Id*. (citing Reiland Decl. ¶ 34;

13 *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1346 (Fed. Cir. 2010) ("The difficulty or

14 complexity of the infringement analysis does not necessarily speak to whether a claim is definite or

15 not"); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1354 (Fed. Cir. 2005)

16 ("indefiniteness does not depend on the difficulty experienced by a particular person in comparing . .

17 . the claims with allegedly infringing products or acts"); *SmithKline Beecham Corp. v. Apotex Corp*.,

18 403 F.3d 1331, 1340-41 (Fed. Cir. 2005)).

19 Even if the release limitation were construed to refer to in vitro release, Takeda argues, it

20 would not be indefinite. *Id*. at 15. Takeda notes that during prosecution, the applicants in fact

21 submitted dissolution data to the Patent Office in which they contrasted the in vitro dissolution

22 characteristics of the inventive composition to those of a prior art composition. *Id*. (citing Reiland

23 Decl., Ex. 1 at DEX0007123-24). According to Takeda, the data was obtained using a test similar to

24 the standard "buffer stage" test provided in the United States Pharmacopeia for delayed-release

25 products, in which the applicants placed the two compositions in a buffer medium of pH 6.8 and

26 tracked release over time. *Id*. Takeda argues that because the results reflected that the active

27 ingredient from the inventive composition was fully released within 6 hours, in contrast to the prior

28 art composition, a person of ordinary skill in the art would have known how to replicate tests set

1   forth in the patent specification to determine if a product met the in vitro profile of the inventive

2   composition. *Id.* (citing Cox Decl., Ex. 14 (Reiland Dep.) at 135 -136 (testifying that a person

3   skilled in the art would be familiar with, and could perform, the delayed-release dissolution tests

4   included in the United States Pharmacopeia)).

5       Finally, Takeda argues that the facts here are distinguishable from those in *Honeywell Int'l.,*

6   *Inc. v. Int'l Trade Comm'n*, 341 F.3d 1340 (Fed. Cir. 2003), cited by TWi. *Id.*

7       **2.      Analysis**

8           **a.      Whether the Claim Terms Are Indefinite**

9               **i.      "active ingredient is released in the pH range of no less**

10                      **than 5.0 to no more than 6.0"**

11      As noted above, "[b]ecause a claim is presumed valid, a claim is indefinite only if the claim

12  is insolubly ambiguous, and no narrowing construction can properly be adopted." *Honeywell*, 341

13  F.3d at 1338 (citations omitted).  TWi contends that the release limitation meets this standard for

14  two reasons: 1)  because a person skilled in the art would not know what methodology to use to

15  determine whether this claim limitation is met; and 2) to the extent the word "release" is construed

16  to mean "begins to release," a person skilled in the art would not know how much of the layer would

17  have to dissolve to meet this limitation.  The Court rejects both arguments.

18      First, the Court concludes that because this claim limitation does not specify a particular

19  method for testing whether the range stated in it is met, the question of what testing methodology

20  should be used is one of infringement and not indefiniteness.  The Court's conclusion is based on the

21  well-established rule that "[t]he test for indefiniteness does not depend on a potential infringer's

22  ability to ascertain the nature of its own accused product to determine infringement, but instead on

23  whether the claim delineates to a skilled artisan the bounds of the invention." *SmithKline Beecham*

24  *Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005).  In *SmithKline*, the asserted claim

25  "recited in clear terms a discernible chemical structure" for the claimed compound but the district

26  court limited the claim to "commercially significant amounts" of the compound on the basis that if

27  the term were construed more broadly to include "any amount, however small or insignificant,"

28  potential infringers would not be able to determine whether their products infringed the claim and

United States District Court

For the Northern District of California

65

A249

the claim would be indefinite. *Id*. at 1335. The Federal Circuit rejected the district court's

reasoning, stating as follows:

> In this case, the problem for Apotex is that it cannot accurately ascertain the nature of its own product. The scope of this claim is clear; the infringement of the Apotex product is not. Even if a claim is broad enough to embrace undetectable trace amounts of the claimed invention, "[b]readth is not indefiniteness." *In re Gardner*, 57 C.C.P.A. 1207, 427 F.2d 786, 788 (CCPA 1970).

*Id*. at 1341.

In *SmithKline*, the Federal Circuit distinguished *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5

F.3d 1464 (Fed. Cir.1993), which was cited by the defendant for the proposition that a claim is

indefinite if it is "'not sufficiently precise to permit a potential competitor to determine whether or

not he is infringing.'" *Id.* at 1340 (quoting *Morton*, 5 F.3d at 1470). The court explained:

> The *Morton* case . . .does not hold that the inability to detect the claimed compound in the infringing device renders a compound claim indefinite. Rather, *Morton* stands for the unremarkable proposition that a compound claim, to be definite, must apprise a skilled artisan of the bounds of the claim. The record in *Morton* contained "considerable evidence showing that those skilled in the art could not make the claimed compounds using the procedures of the specification, and no evidence that such compounds even exist."

*Id*. (quoting *Morton*, 5 F.3d at 1469-70). Here, as in *SmithKline*, the claim term at issue is clear,

even if the parties may disagree on the question of what testing should be conducted to determine

whether Defendants are infringing.

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n* does not stand for a contrary result. In that case,

the claims were directed to a method of manufacturing spun yarn which, at certain steps of the

method, required the yarn to have a "melting point elevation" temperature ("MPE") within a

specified range. 341 F.3d at 1339. At the time of the invention, there were at least four different

methods of measuring the MPE, each of which could yield a different MPE value. *Id*. Three

possible constructions were proposed – an "any one method" construction (under which the claim

would be satisfied if the MPE was within the specified range using any of the four methods), an "all

methods" construction (under which the claim would be satisfied only if the MPE was found to be

within the specified range using *all* of the tests) and the "ball method" construction (under which the

claim would be satisfied only if the MPE was within the range specified when measured using a

method called the "ball method" that was argued to be the most appropriate one in light of the patent

A250

1   claims and specification). *Id.* The court concluded that none of these constructions was appropriate

2   because "the claims, the written description, and the prosecution history failed to give [the court], as

3   the interpreter of the claim term, any guidance as to what one of ordinary skill in the art would

4   interpret the claim to require." *Id.* at 1340. The court further noted that although there was extrinsic

5   evidence derived from proprietary documents of the plaintiff showing that the "ball method" was

6   more practical than the others, it would be improper to import limitations from these publications to

7   the extent that they were outside the bounds of the intrinsic evidence and even of any written

8   publication. *Id.* at 1341. Because the sample preparation method was critical to practicing the

9   invention, the court in *Honeywell* concluded that a skilled artisan would not know the bounds of the

10  claim, rendering it indefinite. *Id.*

11      The Court finds the facts here to be distinguishable from those in *Honeywell* because in that

12  case, different yarns would be created depending on which sample preparation method was used. *Id.*

13  As a result, without guidance as to which method should be used, a skilled artisan would be unable

14  to read the claim and make the claimed invention. This case does not involve a production process

15  and the testing method is *not* critical to the claim limitation. Therefore, the holding in *Honeywell* is

16  not applicable here. *See Alza Corp. v. Mylan Laboratories, Inc.*, 349 F. Supp. 2d 1014 (N.D.W.Va.

17  2004) (distinguishing *Honeywell* and holding that claim for sustained release drug was not indefinite

18  even though it set forth ranges of time in which drug released because method for testing was not

19  crucial part of the claim).

20      Second, the Court rejects TWi's assertion that the term is indefinite because the intrinsic

21  evidence does not offer guidance as to the percentage release necessary to meet the "begins to

22  release" requirement. The Court notes that the phrase "begins to release" is not a claim term but

23  merely a proposed construction intended to convey the idea that the pH values in the term represent

24  a threshold. Further, while TWi has cited deposition testimony by Takeda's expert stating that it

25  would be impossible to state the percentage that would constitute what "begins to release" means, it

26  has not cited to any expert testimony suggesting that this concept would have been insolubly

27  ambiguous to a person skilled in the art. Therefore, the Court rejects this argument.

28

A251

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

          **ii.**     **"said polymeric substance is soluble in the pH range of 6.0 to 7.5" and "a layer soluble in the pH range of no less than 6.5 to no more than 7.0"**

TWi argues that these claim terms are indefinite for the same reasons the release limitation is indefinite and for the additional reasons that: 1) the inventors use the word "soluble" in these claim terms in a manner that is not consistent with its common usage in the art, using it to mean "some form of release;" and 2) the word "layer" renders these terms ambiguous. As to the indefiniteness arguments that duplicate the ones asserted in connection with the release limitation, the Court rejects those arguments for the reasons stated above. The Court also rejects TWi's arguments based on the word "soluble" and "layer."

TWi's expert opines that the inventors used the term "soluble" in the '755 patent in a manner that is inconsistent with its generally accepted meaning in the art, namely, to refer to "when the active ingredient is released." Reiland Decl. ¶ 47. Takeda does not disagree. *See* Reply Claim Construction Brief at 13. To the contrary, Takeda notes that in the claims and specification, as well as during the prosecution history, the words "soluble" and "release" were used similarly to reflect the idea that where the enteric coating is the delayed-release mechanism, "release occurs when the coating dissolves." As patentees can create their own lexicon, the mere fact that the word "soluble" is used in a manner that differs from its ordinary and customary meaning in the '755 patent does not render these claims indefinite. Thus, TWi's argument boils down to whether the claims are indefinite because a person skilled in the art would not know what testing methodology to use to determine the point at which the layer becomes soluble, that is to say, when the active ingredient is released. For the reasons discussed above, the Court concludes that this argument fails because the claims do not require that any particular test be used.

The Court also finds unpersuasive TWi's contention that the use of the word "layer" in these claim terms renders them indefinite because the layer could contain excipient materials that are not soluble. Although Dr. Reiland stated in his declaration that insoluble excipients are often used in coatings and that these never dissolve or become soluble, *see* Reiland Decl. ¶ 51, he does *not* state that the coating would not dissolve sufficiently to release the active ingredient because of these excipients. Further, when asked at his deposition whether a coating that included up to 25% non-

68

**United States District Court**
For the Northern District of California

1   soluble excipients would dissolve sufficiently to release the active ingredient, Dr. Reiland testified

2   that he could not say. *See* Cox Decl., Ex. 14 (Reiland Dep.) at 108-110.  Therefore, the Court rejects

3   TWi's assertion that the word "layer" renders this claim term indefinite.

4

5           **b.**     **Whether Claim Terms Should be Construed Based on Plain Language or Rather as Stating Threshold Values**

6         Handa and Impax argue that these claim terms should be construed according to their plain

7   meaning, rejecting Takeda's assertion that the values represent threshold values at which release

8   begins.  Because this position flies in the face of the intrinsic evidence and the knowledge of a

9   person of ordinary skill in the art, the Court rejects Handa and Impax's position and instead finds

10  that Takeda's proposed constructions are correct to the extent that they make clear that the ranges

11  represent threshold values.

12        First, the '755 claims themselves support Takeda's position.  In particular, claim 1 includes a

13  list of polymers suitable for the "layer soluble in the pH range of no less than 6.5 to no more than

14  7.0."  As Defendants' expert, Dr. Reiland, conceded, although all of these polymers begin to

15  dissolve at threshold pH levels of between 6.5 and 7.0, all of them also are soluble at pHs above 7.

16  *See* Reiland Dep. at  28 - 29, 31 - 32, 112 - 118.  Thus, claim 1 would make no sense if Defendants'

17  position were adopted.  *See Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376

18  (Fed. Cir. 2002), vacated and remanded on other grounds, 537 U.S. 802 (2002).

19        Second, the specification supports Takeda's position because it makes clear that enteric

20  coatings dissolve and release drug at and above particular pH levels.  *See* '755 patent, col. 9, ll. 32 -

21  35 ("'pH-dependently' means that the coating material is dissolved/eluted under the circumstances

22  of more than a certain pH value . . . ").  Similarly, the prosecution history reflects the understanding

23  that the claimed ranges referred to threshold values.  *See* Reiland Decl., Ex. I at DEX0007130

24  (noting that "composition (ii), which is soluble at lower pH than 6.8 such as pH 5.0-6.0 . . . releases

25  the active ingredient rapidly at pH 6.8").

26        Third, the marketing materials describing the products referenced in the specification also

27  support the conclusion that a person skilled in the art would understand that these claim terms

28  recited threshold values.  For example, the literature describing the Eudragit and Shin-Etsu polymers

1  describes these coatings with reference to the pHs above which each dissolves. *See* Charman Decl.,

2  Exs. 6-8. Indeed, the evidence presented by Takeda, which appears to be undisputed, reflects that

3  *none* of the exemplary polymers listed in the specification is soluble only in the pH range of pH 5.0

4  to 6.0, or in the pH range of pH 6.5 to 7.0. *Id.*

5      Finally, the Court is not persuaded by Defendants' contention that the claim terms that use

6  "no more/no less" must have a different meaning than the term that does not. The overwhelming

7  intrinsic and extrinsic evidence supports the conclusion that all of these terms recite threshold value

8  ranges. Therefore, the presumption that different words carry different meanings is rebutted.

9
10          c.      **Whether the Court Should Include "in the body" and "in the gastrointestinal tract" in its Construction**

11      The parties dispute whether these claim terms should be construed to include the words "in

12  the body" or "in the gastrointestinal tract." Defendants rely on the references in the specification to

13  McIlvaine or Clark-Lubs solutions, whereas Takeda cites to evidence that these solutions were

14  merely used as surrogates for the pH in the gastrointestinal tract. While the Court agrees with

15  Takeda that the invention is directed to release of active ingredient at certain points in the body, or

16  gastrointestinal tract, it is not clear why these limitations should be included in the construction of

17  these claim terms, given that these ranges could be met using these "surrogate" solutions outside the

18  body. Therefore, the Court declines to include these proposed limitations in its claim construction.

19  **V.    CONCLUSION**

20      For the reasons stated above, the Court adopts the following constructions:

| | |
|---|---|
| **"a crystal of" ('058 patent, claims 1-4/ '668 patent, claims 9-10), "a crystalline compound of" ('276 patent, claims 2 and 3/ '971 patent, claims 6-8)** | regularly repeating pattern of molecules with long range order extending in three dimensions |
| **"characteristic peaks at interplanar spacings (d)" ('058 patent, claims 1 and 2/ '971 patent, claims 7 and 8)** | peaks in the X-ray powder diffractogram of a crystal that uniquely identify that crystal, denoted by distances between lattice planes in a crystal as measured by a diffraction experiment and defined by Bragg's law, within normal experimental error of X-ray powder diffraction. |

*United States District Court*
For the Northern District of California

70

A254

| | |
|---|---|
| **"effective amount" ('971 patent, claim 5)** | an amount sufficient to help ameliorate or cure reflux esophagitis |
| **"about" ('668 patent, claims 9 and 10)** | approximately |
| **"amorphous compound" ('282 patent, claims 1 and 2)** | a non-crystalline solid that lacks the long-range order characteristic of a crystal |
| **"released in the pH range of no less than 5.0 to no more than 6.0"** | begins to be released from the tablet, granule, or fine granule at pH values within the range from 5.0 to 6.0 |
| **"soluble in the pH range of 6.0 to 7.5"** | begins to dissolve at pH values within the range from 6.0 to 7.5 |
| **"soluble in the pH range of no less than 6.5 to no more than 7.0"** | begins to dissolve in the gastrointestinal tract at pH values within the range from 6.0 to 7.5 |

IT IS SO ORDERED.

Dated: April 11, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge



US007737282B2

(12) **United States Patent**
Fujishima et al.

(10) Patent No.: **US 7,737,282 B2**
(45) Date of Patent: **Jun. 15, 2010**

(54) **BENZIMIDAZOLE COMPOUND CRYSTAL**

(75) Inventors: **Akira Fujishima**, Hyogo (JP); **Isao Aoki**, Hyogo (JP); **Keiji Kamiyama**, Osaka (JP)

(73) Assignee: **Takeda Pharmaceutical Company Limited**, Osaka (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/393,409**

(22) Filed: **Feb. 26, 2009**

(65) **Prior Publication Data**
US 2009/0163553 A1 Jun. 25, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 12/006,845, filed on Jan. 7, 2008, now Pat. No. 7,569,697, which is a continuation of application No. 11/149,903, filed on Jun. 10, 2005, now Pat. No. 7,339,064, which is a continuation of application No. 10/655,114, filed on Sep. 4, 2003, now Pat. No. 6,939,971, which is a continuation of application No. 10/243,329, filed on Sep. 13, 2002, now Pat. No. 6,664,276, which is a continuation of application No. 09/674,624, filed as application No. PCT/JP00/03881 on Jun. 15, 2000, now Pat. No. 6,462,058.

(30) **Foreign Application Priority Data**
Jun. 17, 1999 (JP) .............................. 11-171509

(51) Int. Cl.
C07D 215/38 (2006.01)

(52) U.S. Cl. .............................. 546/273.4; 546/273.7

(58) Field of Classification Search .............. 546/273.4, 546/273.7
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,628,098 | A | 12/1986 | Nohara et al. |
| 5,840,737 | A | 11/1998 | Phillips |
| 6,462,058 | B1 | 10/2002 | Fujishima et al. |
| 6,664,276 | B2 | 12/2003 | Fujishima et al. |
| 6,939,971 | B2 | 9/2005 | Fujishima et al. |
| 7,339,064 | B2 | 3/2008 | Fujishima et al. |

FOREIGN PATENT DOCUMENTS

| DE | 40 35 455 | 5/1992 |
| EP | 0 174 726 | 3/1986 |
| EP | 0 302 720 | 2/1989 |
| WO | 92/08716 | 5/1992 |
| WO | 96/02535 | 2/1996 |
| WO | 96/17077 | 6/1996 |
| WO | 97/02261 | 1/1997 |
| WO | 98/21201 | 5/1998 |
| WO | 98/22118 | 5/1998 |
| WO | 98/28294 | 7/1998 |

| WO | 99/38512 | 8/1999 |
| WO | 99/38513 | 8/1999 |
| WO | 99/56698 | 11/1999 |

OTHER PUBLICATIONS

Robinson, Malcolm, Annals of Internal Medicine, vol. 124, vol. 10, pp. 859-867, 1996.*
U.S. Pharmacopia, #23, National Formulary #18 (1995), pp. 1843-1844.
Concise Encyclopedia Chemistry, Translated and revised by Mary Eagleson (1994), Walter de Gruyter: New York, pp. 872-873.
Rouhi, A. Maureen, "the Rigt Stuff", Journal C&E News (Feb. 24, 2003), pp. 32-35.
Katsuki, H. et al., "Determination of R(+)- and S(−)- Lansoprazole using Chiral Stationary-Phase Liquid Chromatography and Their Enantioselective Pharmacokinetics in Humans", Pharmaceutical Research, (1996), vol. 13, No. 4, pp. 611-615.
Curin, A. et al., "Study of Crystal Modifications of Lansoprazole using FT-IR Spectroscopy, Solid-State NMR Spectroscopy and FT-Raman Spectroscopy", Farm vesta (1997), vol. 48, pp. 290-291.
Vrecer, F. et al., "Study of Influence of Temperature and Grinding on the CrystallineState of Lansoprazole", Farm vesta, (1997), vol. 48, pp. 242-243.
Nagaya, H. et al., "Effects of the Enantiomers of Lansoprazole (AG-1979) on (H+ + K +)−ATPase Activity in Canine Gastric Microsomes and Acid Formation in Isolated Canine Parietal Cells", Biochemical Pharmacology, (1991), vol. 42, No. 10, pp. 1875-1878.
Hirschowitz, B. et al., "Long-Term Treatment with Lansoprazole for Patients with Zollinger-Ellison Syndrome", Aliment Pharmacol Ther (1996), vol. 10, pp. 507-522.
Figura, et al., "In-vitro activity of lansoprazole against Helicobacter pylori", Journal of Antimicrobial Chemotherapy, vol. 39, 1997, pp. 585-590.
Langtry, et al., "Lansoprazole", Drugs, vol. 54, No. 3, 1997, pp. 473-500.
Castell, et al., "Efficacy and Safety of Lansoprazole in the treatment of erosive reflux esophagitis", The American Journal of Gastroenterology, vol. 91, No. 9, 1996, pp. 1749-1757.
Zimmermann, et al., "Lansoprazole: a comprehensive review", Pharmacotherapy, vol. 17, No. 2, 1997, pp. 308-326.
Katsuya, et al., "Lansoprazole reduces preoperative gastric fluid acidity and volume in children", Can J Anaesth., 1995, vol. 42, No. 6, pp. 467-472.
Borner, et al., "Separation of Lansoprazole Enantiomers in Human Serum by HPLC", Chromatographia, vol. 47, No. 3/4, Feb. 1998, pp. 171-175.
Arimori, et al., "Pharmacokinetic Differences Between Lansoprazole Enantiomers in Rats", J. Pharm. Pharmacol., 1998, vol. 50, pp. 1241-1245.
Landes, et al., "Clinical Pharmacokinetics of Lansoprazole", Clin. Pharmacokinet., 1995, vol. 28, No. 6, pp. 458-470.

(Continued)

Primary Examiner—D. Margaret Seaman
(74) Attorney, Agent, or Firm—Hamre, Schumann, Mueller & Larson, P.C.

(57) **ABSTRACT**

A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof of the present invention is useful for an excellent antiulcer agent.

4 Claims, No Drawings



DEPOSITION EXHIBIT
4
Kamiyama

US 7,737,282 B2

Page 2

OTHER PUBLICATIONS

"Experimental Organic Chemistry-Principle and Practice", Blackwell Scientific Publication 1989, pp. 127-132.
"Vogel's Textbook of Practical Organic Chemistry", Longman Scientific & Technical; Fifth Edition; 1989, pp. 141-142.
Byrn, "Solid State Chemistry of Drugs", Academic Press, 1982, pp. 10-13.

Opponent's Statement of Case filed in the matter of: Patent Application No. IL 145,996; *Teva Pharmaceutical Industries Ltd.* vs. *Takeda Pharmaceutical Company Limited*, Notice of Opposition filed Oct. 6, 2008, Opponent's Statement of Case filed Feb. 6, 2009—14 pages.

* cited by examiner

TX 1055-0002

A257

US 7,737,282 B2

1

**BENZIMIDAZOLE COMPOUND CRYSTAL**

This application is a continuation of application of Ser. No. 12/006,845, filed Jan. 7, 2008, which is a continuation of Ser. No. 11/149,903, filed Jun. 10, 2005, which is a continuation of Ser. No. 10/655,114, filed Sep. 4, 2003, which is a continuation of application Ser. No. 10/243,329, filed Sep. 13, 2002, which is a continuation of application Ser. No. 09/674, 624, filed Nov. 3, 2000, which application is incorporated herein by reference.

TECHNICAL FIELD

The present invention relates to a crystal of a benzimidazole compound showing antiulcer action.

BACKGROUND ART

2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof having an antiulcer action is reported in JP-A-61-50978, etc.

There is a demand for a more stable and excellently absorbable antiulcer agent.

DISCLOSURE OF INVENTION

Having chiral sulfur in the molecular structure thereof, 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole occurs in two kinds of optical isomers. After extensive exploration, the present inventors succeeded in optically resolving and crystallizing the (R)-isomer of 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole, for the first time found that this crystal serves satisfactorily as a pharmaceutical, made further investigation based on this finding, and developed the present invention.

Accordingly, the present invention relates to:

[1] a crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof;

[2] a crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole;

[3] a crystal according to the above [2] wherein the X-ray powder diffraction analysis pattern has characteristic peaks at interplanar spacings (d) of 11.68, 6.77, 5.84, 5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41 and 3.11 Angstrom;

[4] a pharmaceutical composition which comprises the crystal according to the above [1];

[5] a pharmaceutical composition according to the above [4], which is for treating or preventing digestive ulcer;

[6] a method for treating or preventing digestive ulcer in a mammal in need thereof which comprises administering to said mammal an effective amount of the crystal according to the above [1] with a pharmaceutically acceptable excipient, carrier or diluent;

[7] use of the crystal according to the above [1] for manufacturing a pharmaceutical composition for treating or preventing digestive ulcer, and so forth.

The "salt" of "(R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof" includes, for example, metal salts, salts with

2

organic bases, salts with basic amino acids, and so forth. Preferred are physiologically acceptable salts.

Metal salts include, for example, alkali metal salts such as sodium salt and potassium salt; and alkaline earth metal salts such as calcium salt, magnesium salt and barium salt. Salts with organic bases include, for example, salts with trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, triethanolamine, dicyclohexylamine, N,N-dibenzylethylenediamine, etc. Salts with basic amino acids include, for example, salts with arginine, lysine, etc.

The crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof may be a hydrate or not.

Said "hydrate" includes 0.5 hydrate to 5.0 hydrate. Among others, 0.5 hydrate, 1.0 hydrate, 1.5 hydrate, 2.0 hydrate and 2.5 hydrate are preferred. More preferred is 1.5 hydrate.

The crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof can be produced by subjecting 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof to an optical resolution or subjecting 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]thio]-1H-benzimidazole to an asymmetrical oxidization to obtain the (R)-isomer, followed by crystallizing the resultant isomer.

Methods of optical resolution includes per se known methods, for example, a fractional recrystallization method, a chiral column method, a diastereomer method, and so forth. Asymmetric oxidation includes per se known method.

The "fractional recrystallization method" includes a method in which a salt is formed between a racemate and an optically active compound [e.g., (+)-mandelic acid, (−)-mandelic acid, (+)-tartaric acid, (−)-tartaric acid, (+)-1-phenethylamine, (−)-1-phenethylamine, cinchonine, (−)-cinchonidine, brucine, etc.], which salt is separated by fractional recrystallization etc., and, if desired, subjected to a neutralization process, to give a free optical isomer.

The "chiral column method" includes a method in which a racemate or a salt thereof is applied to a column for optical isomer separation (chiral column). In the case of liquid chromatography, for example, optical isomers are separated by adding a racemate to a chiral column such as ENANTIO-OVM (produced by Tosoh Corporation) or the DAICEL CHIRAL series (produced by Daicel Corporation), and developing the racemate in water, a buffer (e.g., phosphate buffer), an organic solvent (e.g., hexane, ethanol, methanol, isopropanol, acetonitrile, trifluoroacetic acid, diethylamine, triethylamine, etc.), or a solvent mixture thereof. In the case of gas chromatography, for example, a chiral column such as CP-Chirasil-DeX CB (produced by GL Science) is used to separate optical isomers.

The "diastereomer method" includes a method in which a racemate and an optically active reagent are reacted (preferably, an optically active reagent is reacted to the 1-position of the benzimidazole group) to give a diastereomer mixture, which is then subjected to ordinary separation means (e.g., fractional recrystallization, chromatography, etc.) to obtain either diastereomer, which is subjected to a chemical reaction (e.g., acid hydrolysis, base hydrolysis, hydrogenolysis, etc.) to cut off the optically active reagent moiety, whereby the desired optical isomer is obtained. Said "optically active reagent" includes, for example, an optically active organic acids such as MTPA [α-methoxy-α-(trifluoromethyl)phenylacetic acid] and (−)-menthoxyacetic acid; and an optically active alkoxymethyl halides such as (1R-endo)-2-(chloromethoxy)-1,3,3-trimethylbicyclo[2.2.1]heptane, etc.

TX 1055-0003

A258

US 7,737,282 B2

3

2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]me-thyl]sulfinyl]-1H-benzimidazole or a salt thereof is produced by the methods described in JP-A-61-50978, U.S. Pat. No. 4,628,098 etc. or analogous methods thereto.

Methods of crystallization includes per se known methods, for example, a crystallization from solution, a crystallization from vapor, and a crystallization from molten form.

Methods of the "crystallization from solution" include, for example, a concentration method, a slow cooling method, a reaction method (diffusion method, electrolysis method), a hydrothermal growth method, a fusing agent method, and so forth. Solvents to be used include, for example, aromatic hydrocarbons (e.g., benzene, toluene, xylene, etc.), haloge-nated hydrocarbons (e.g., dichloromethane, chloroform, etc.), saturated hydrocarbons (e.g., hexane, heptane, cyclo-hexane, etc.), ethers (e.g., diethyl ether, diisopropyl ether, tetrahydrofuran, dioxane, etc.), nitriles (e.g., acetonitrile, etc.), ketones (e.g., acetone, etc.), sulfoxides (e.g., dimethyl-sulfoxide, etc.), acid amides (e.g., N,N-dimethylformamide, etc.), esters (e.g., ethyl acetate, etc.), alcohols (e.g., methanol, ethanol, isopropyl alcohol, etc.), water, and so forth. These solvents may be used singly or in mixture of two or more kinds in appropriate ratios (e.g., 1:1 to 1:100).

Methods of the "crystallization from vapor" include, for example, a gasification method (sealed tube method, gas stream method), a gas phase reaction method, a chemical transportation method, and so forth.

Methods of the "crystallization from molten form" include, for example, a normal freezing method (pulling-up method, temperature gradient method, Bridgman method), a zone melting method (zone leveling method, float zone method), a special growth method (VLS method, liquid phase epitaxis method), and so forth.

For analyzing the crystal obtained, X-ray diffraction crys-tallographic analysis is commonly used. In addition, crystal orientation can also be determined by a mechanical method, an optical method, etc.

Thus obtained crystal of (R)-2-[[[3-methyl-4-(2,2,2-trif-luoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimida-zole or a salt thereof (hereinafter also referred to as "crystal of the present invention") is useful as a pharmaceutical because it shows excellent antiulcer action, gastric acid secretion-inhibiting action, mucosa-protecting action, anti-Helico-bacter pylori action, etc., and because it is of low toxicity. Furthermore, by crystallizing the (R)-isomer, not only its stability is improved but also its handling is facilitated so that it can be prepared as a solid pharmaceutical composition with good reproducibility. In addition, when orally administered, the crystal of the present invention is more absorbable and more rapidly shows its action than the racemate. In addition, when administered, the crystal of the present invention shows a higher Cmax (maximum blood concentration) and a greater AUC (area under the concentration-time curve) than the race-mate, and becomes more unlikely to be metabolized partly because of the increased protein-binding rate, thus showing an extended duration of action. The crystal of the present invention is therefore useful as a pharmaceutical of low doses and low prevalence of adverse reactions.

The crystal of the present invention is useful in mammals (e.g., humans, monkeys, sheep, bovines, horses, dogs, cats, rabbits, rats, mice, etc.) for the treatment and prevention of digestive ulcer (e.g., gastric ulcer, duodenal ulcer, stomal ulcer, Zollinger-Ellison syndrome, etc.), gastritis, reflux esophagitis, NUD (non-ulcer dyspepsia), gastric cancer and gastric MALT lymphoma; Helicobacter pylori eradication; suppression of upper gastrointestinal hemorrhage due to digestive ulcer, acute stress ulcer and hemorrhagic gastritis;

4

suppression of upper gastrointestinal hemorrhage due to inva-sive stress (stress from major surgery necessitating intensive management after surgery, and from cerebral vascular disor-der, head trauma, multiple organ failure and extensive burn necessitating intensive treatment); treatment and prevention of ulcer caused by a nonsteroidal anti-inflammatory agent; treatment and prevention of hyperacidity and ulcer due to postoperative stress; pre-anesthetic administration etc.

The crystal of the present invention is of low toxicity and can be safely administered orally or non-orally (e.g., topical, rectal and intravenous administration, etc.), as such or in the form of pharmaceutical compositions formulated with a phar-macologically acceptable carrier, e.g., tablets (including sugar-coated tablets and film-coated tablets), powders, gran-ules, capsules (including soft capsules), orally disintegrating tablets, liquids, injectable preparations, suppositories, sus-tained-release preparations and patches, in accordance with a commonly known method.

The content of the crystal of the present invention in the pharmaceutical composition of the present invention is about 0.01 to 100% by weight relative to the entire composition. Varying depending on subject of administration, route of administration, target disease etc., its dose is normally about 0.5 to 1,500 mg/day, preferably about 5 to 150 mg/day, based on the active ingredient, for example, when it is orally admin-istered as an antiulcer agent to an adult human (60 kg). The crystal of the present invention may be administered once daily or in 2 to 3 divided portions per day.

Pharmacologically acceptable carriers that may be used to produce the pharmaceutical composition of the present inven-tion include various organic or inorganic carrier substances in common use as pharmaceutical materials, including excipi-ents, lubricants, binders, disintegrants, water-soluble poly-mers and basic inorganic salts for solid preparations; and solvents, dissolution aids, suspending agents, isotonizing agents, buffers and soothing agents for liquid preparations. Other ordinary pharmaceutical additives such as preserva-tives, antioxidants, coloring agents, sweetening agents, sour-ing agents, bubbling agents and flavorings may also be used as necessary.

Such "excipients" include, for example, lactose, sucrose, D-mannitol, starch, cornstarch, crystalline cellulose, light silicic anhydride and titanium oxide.

Such "lubricants" include, for example, magnesium stear-ate, sucrose fatty acid esters, polyethylene glycol, talc and stearic acid.

Such "binders" include, for example, hydroxypropyl cel-lulose, hydroxypropylmethyl cellulose, crystalline cellulose, α-starch, polyvinylpyrrolidone, gum arabic powder, gelatin, pullulan and low-substitutional hydroxypropyl cellulose.

Such "disintegrants" include (1) crosslinked povidone, (2) what is called super-disintegrants such as crosslinked carmel-lose sodium (FMC-Asahi Chemical) and carmellose calcium (Gotoku Yakuhin), (3) carboxymethyl starch sodium (e.g., product of Matsutani Chemical), (4) low-substituted hydrox-ypropyl cellulose (e.g., product of Shin-Etsu Chemical), (5) cornstarch, and so forth. Said "crosslinked povidone" may be any crosslinked polymer having the chemical name 1-ethe-nyl-2-pyrrolidinone homopolymer, including polyvinylpyr-rolidone (PVPP) and 1-vinyl-2-pyrrolidinone homopolymer, and is exemplified by Colidon CL (produced by BASF), Polyplasdon XL (produced by ISP), Polyplasdon XL-10 (produced by ISP) and Polyplasdon INF-10 (produced by ISP).

Such "water-soluble polymers" include, for example, etha-nol-soluble water-soluble polymers (e.g., cellulose deriva-tives such as hydroxypropyl cellulose (hereinafter also

TX 1055-0004

US 7,737,282 B2

5

referred to as HPC), polyvinylpyrrolidone] and ethanol-in-soluble water-soluble polymers [e.g., cellulose derivatives such as hydroxypropylmethyl cellulose (hereinafter also referred to as HPMC), methyl cellulose and carboxymethyl cellulose sodium, sodium polyacrylate, polyvinyl alcohol, sodium alginate, guar gum].

Such "basic inorganic salts" include, for example, basic inorganic salts of sodium, potassium, magnesium and/or calcium. Preferred are basic inorganic salts of magnesium and/or calcium. More preferred are basic inorganic salts of magnesium. Such basic inorganic salts of sodium include, for example, sodium carbonate, sodium hydrogen carbonate, disodium hydrogenphosphate, etc. Such basic inorganic salts of potassium include, for example, potassium carbonate, potassium hydrogen carbonate, etc. Such basic inorganic salts of magnesium include, for example, heavy magnesium carbonate, magnesium carbonate, magnesium oxide, magnesium hydroxide, magnesium metasilicate aluminate, magnesium silicate, magnesium aluminate, synthetic hydrotalcite [Mg$_6$Al$_2$(OH)$_{16}$·CO$_3$·4H$_2$O], alumina hydroxide magnesium, and so forth. Among others, preferred is heavy magnesium carbonate, magnesium carbonate, magnesium oxide, magnesium hydroxide, etc. Such basic inorganic salts of calcium include, for example, precipitated calcium carbonate, calcium hydroxide, etc.

Such "solvents" include, for example, water for injection, alcohol, propylene glycol, macrogol, sesame oil, corn oil and olive oil.

Such "dissolution aids" include, for example, polyethylene glycol, propylene glycol, D-mannitol, benzyl benzoate, ethanol, trisaminomethane, cholesterol, triethanolamine, sodium carbonate and sodium citrate.

Such "suspending agents" include, for example, surfactants such as stearyltriethanolamine, sodium lauryl sulfate, laurylaminopropionic acid, lecithin, benzalkonium chloride, benzethonium chloride and monostearic glycerol; and hydrophilic polymers such as polyvinyl alcohol, polyvinylpyrrolidone, carboxymethyl cellulose sodium, methyl cellulose, hydroxymethyl cellulose, hydroxyethyl cellulose and hydroxypropyl cellulose.

Such "isotonizing agents" include, for example, glucose, D-sorbitol, sodium chloride, glycerol and D-mannitol.

Such "buffers" include, for example, buffer solutions of phosphates, acetates, carbonates, citrates etc.

Such "soothing agents" include, for example, benzyl alcohol.

Such "preservatives" include, for example, p-oxybenzoic acid esters, chlorobutanol, benzyl alcohol, phenethyl alcohol, dehydroacetic acid and sorbic acid.

Such "antioxidants" include, for example, sulfites, ascorbic acid and α-tocopherol.

Such "coloring agents" include, for example, food colors such as Food Color Yellow No. 5, Food Color Red No. 2 and Food Color Blue No. 2; and food lake colors and red oxide.

Such "sweetening agents" include, for example, saccharin sodium, dipotassium glycyrrhetinate, aspartame, stevia and thaumatin.

Such "souring agents" include, for example, citric acid (citric anhydride), tartaric acid and malic acid.

Such "bubbling agents" include, for example, sodium bicarbonate.

Such "flavorings" may be synthetic substances or naturally occurring substances, and include, for example, lemon, lime, orange, menthol and strawberry.

The crystal of the present invention may be prepared as a preparation for oral administration in accordance with a commonly known method, by, for example, compression-shaping

6

it in the presence of an excipient, a disintegrant, a binder, a lubricant, or the like, and subsequently coating it as necessary by a commonly known method for the purpose of taste masking, enteric dissolution or sustained release. For an enteric preparation, an intermediate layer may be provided by a commonly known method between the enteric layer and the drug-containing layer for the purpose of separation of the two layers.

For preparing the crystal of the present invention as an orally disintegrating tablet, available methods include, for example, a method in which a core containing crystalline cellulose and lactose is coated with the crystal of the present invention and a basic inorganic salt, and is further coated with a coating layer containing a water-soluble polymer, to give a composition, which is coated with an enteric coating layer containing polyethylene glycol, further coated with an enteric coating layer containing triethyl citrate, still further coated with an enteric coating layer containing polyethylene glycol, and still yet further coated with mannitol, to give fine granules, which are mixed with additives and shaped. The above-mentioned "enteric coating layer" includes, for example, aqueous enteric polymer substrates such as cellulose acetate phthalate (CAP), hydroxypropylmethyl cellulose phthalate, hydroxymethyl cellulose acetate succinate, methacrylic acid copolymers [e.g., Eudragit L30D-55 (trade name; produced by Rohm), Colicoat MAE30DP (trade name; produced by BASF), Polykid PA30 (trade name; produced by San-yo Chemical)], carboxymethylethyl cellulose and shellac; sustained-release substrates such as methacrylic acid polymers [e.g., Eudragit NE30D (trade name), Eudragit RL30D (trade name), Eudragit RS30D (trade name), etc.]; water-soluble polymers; plasticizers such as triethyl citrate, polyethylene glycol, acetylated monoglycerides, triacetine and castor oil; and mixtures thereof. The above-mentioned "additive" includes, for example, water-soluble sugar alcohols (e.g., sorbitol, mannitol, multitol, reduced starch saccharides, xylitol, reduced paratinose, erythritol, etc.), crystalline cellulose [e.g., Ceolas KG 801, Avicel PH 101, Avicel PH 102, Avicel PH 301, Avicel PH 302, Avicel RC-591 (crystalline cellulose carmellose sodium)], low-substituted hydroxypropyl cellulose [e.g., LH-22, LH-32, LH-23, LH-33 (Shin-Etsu Chemical) and mixtures thereof]; binders, souring agents, bubbling agents, sweetening agents, flavorings, lubricants, coloring agents, stabilizers, excipients, disintegrants etc. are also used.

The crystal of the present invention may be used in combination with 1 to 3 other active ingredients.

Such "other active ingredients" include, for example, anti-Helicobacter pylori activity substances, imidazole compounds, bismuth salts, quinolone compounds, and so forth. Of these substances, preferred are anti-Helicobacter pylori action substances, imidazole compounds etc. Such "anti-Helicobacter pylori action substances" include, for example, antibiotic penicillins (e.g., amoxicillin, benzylpenicillin, piperacillin, mecillinam, etc.), antibiotic cefems (e.g., cefixime, cefaclor, etc.), antibiotic macrolides (e.g., erythromycin, clarithromycin, etc.), antibiotic tetracyclines (e.g., tetracycline, minocycline, streptomycin, etc.), antibiotic aminoglycosides (e.g., gentamicin, amikacin, etc.), imipenem. and so forth. Of these substances, preferred are antibiotic penicillins, antibiotic macrolides etc. Such "imidazole compounds" include, for example, metronidazole, miconazole, etc. Such "bismuth salts" include, for example, bismuth acetate, bismuth citrate, etc. Such "quinolone compounds" include, for example, ofloxacin, ciploxacin, etc.

Such "other active ingredients" and the crystal of the present invention may also be used in combination as a mixture prepared as a single pharmaceutical composition [e.g.,

TX 1055-0005

US 7,737,282 B2

7

tablets, powders, granules, capsules (including soft capsules), liquids, injectable preparations, suppositories, sustained-release preparations, etc.], in accordance with a commonly known method, and may also be prepared as separate preparations and administered to the same subject simultaneously or at a time interval.

## BEST MODE FOR CARRYING OUT THE INVENTION

The present invention is hereinafter described in more detail by means of, but is not limited to, the following reference examples, examples and experimental examples.

In the following reference examples and examples, the term "room temperature" indicates about 15 to 30° C.

Melting points were measured using the Micro Melting Point Apparatus (produced by Yanagimoto Seisakusho), and uncorrected values are shown.

$^1$H-NMR spectra were determined with CDCl$_3$ as the solvent using Varian Gemini-200; data are shown in chemical shift δ (ppm) from the internal standard tetramethylsilane.

IR was determined using SHIMADZU FTIR-8200.

UV was determined using the HITACHI U-3200 spectrophotometer.

Optical rotation [α]$_D$ was determined at 20° C. using the DIP-370 digital polarimeter (produced by JASCO).

Optical purity was determined by HPLC (column: CHIRALCEL OD 4.6 mm dia.×250 mm, temperature: about 20° C., mobile phase: hexane/2-propanol=80/20 or hexane/2-propanol=85/15, flow rate: 1.0 ml/min, detection wavelength: 285 nm) using a chiral column.

Crystal X-ray diffraction data for determining the absolute structure of sulfoxide were obtained by means of a 4-circle diffractometer (RIGAKU AFC5R) using the Cu-Kx$_α$ ray. After the initial phase was determined by the direct method, the fine structure was analyzed using SHELXL-93. X-ray powder diffraction was determined using the X-ray Powder Diffraction meter Rigaku RINT2500 (ultraX18) No. PX-3.

The other solutions used herein have the following definitions:

s: singlet
d: doublet
t: triplet
q: quartet
m: multiplet
bs: broad singlet
J: binding constant

## EXAMPLES

### Reference Example 1

Isolation of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole)

2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (lansoprazole) (racemate) (3.98 g) was dissolved in the following mobile phase (330 ml) and acetonitrile (37 ml) and fractionated by HPLC (column: CHIRALCEL OD 20 mm dia.×250 mm, temperature: 30° C., mobile phase: hexane/2-propanol/ethanol=255/35/10, flow rate: 16 ml/min, detection wavelength: 285 nm, 1 shot: 20-25 mg). Fractions of optical isomers of shorter retention time were combined and concentrated; the individual lots were combined and dissolved in ethanol and filtered through a 0.45 μm filter; after hexane was added, the filtrate was again evapo-

8

rated to dryness to yield R(+)-lansoprazole (1.6 g, optical purity >97.6% ee) as an amorphous substance.

The amorphous substance obtained was subjected to fractionation and isolation in the same manner as above to yield R(+)-lansoprazole (1.37 g, optical purity >99.9% ee) as an amorphous substance.

[α]$_D$=+174.3° (c=0.994%, CHCl$_3$)

### Reference Example 2

Isolation of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole)

Lansoprazole (racemate) (34.2 g) was dissolved in 2-propanol (1,710 ml) and hexane (1,140 ml) containing triethylamine (0.2%) and fractionated by HPLC (column: CHIRALCEL OD 50 mm dia.×500 mm, temperature: room temperature, mobile phase: hexane/2-propanol=85/15, flow rate: 60 ml/min, detection wavelength: 285 nm, 1 shot: about 300 mg) to isolate the individual optical isomers. Fractions of an optical isomer of shorter retention time were combined and concentrated; the individual lots were combined and dissolved in ethanol (250 ml); after triethylamine (3 ml) was added, the solution was filtered through a 0.45 μm filter. After the filtrate was concentrated, hexane was added, and the filtrate was again evaporated to dryness to yield R(+)-lansoprazole (9.31 g, optical purity 98.3% ee) as an amorphous substance.

### Reference Example 3

Production of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole)

In a nitrogen atmosphere, 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridyl]methyl]thio]benzimidazole (20.0 g, 0.057 mol), toluene (100 ml), water (55 mg, 0.0031 mol as based on total water content) and diethyl(+)-tartrate (2.12 ml, 0.012 mol) were mixed and stirred at 50 to 55° C. for 30 minutes. After titanium (IV) isopropoxide (1.66 ml, 0.0057 mol) was added to the mixture in a nitrogen atmosphere, the mixture was stirred at 50 to 55° C. for 1 hour. After diisopropylethylamine (3.25 ml, 0.019 mol) was added to the resulting mixed liquor under cooling in a nitrogen atmosphere, cumene hydroperoxide (30.6 ml, content 82%, 0.17 mol) was added at 0 to 5° C., followed by 3.5 hours of stirring at 0 to 5° C., to cause the reaction.

Analysis of the reaction liquor by HPLC (column: CHIRALCEL OD (Daicel Chemical Industries, Ltd.), mobile phase: hexane/ethanol=90/10, flow rate: 1.0 ml/min, detection wavelength: 285 nm) detected a sulfide at 1.32% and a sulfone at 1.81% as related substances in the reaction liquor, with no other related substances detected. The enantiomer excess rate of the title compound in said reaction liquor was 96.4% ee.

### Reference Example 4

Crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole)

(1) In a nitrogen stream, 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridyl]methyl]thio]benzimidazole (4.5 kg, 12.7 mol, containing 1.89 g of water), toluene (22 l), water (25 g,

TX 1055-0006

A261

US 7,737,282 B2

9

1.39 mol, or 1.49 mol if based on total water content) and diethyl(+)-tartrate (0.958 l, 5.60 mol) were mixed. In a nitrogen stream, titanium (IV) isopropoxide (0.747 l, 2.53 mol) was added to this mixture at 50 to 60° C., and the mixture was stirred at the same temperature for 30 minutes. After diisopropylethylamine (0.733 l, 4.44 mol) was added to the resulting mixed liquor at room temperature in a nitrogen stream, cumene hydroperoxide (6.88 l, content 82%, 37.5 mol) was added at −5 to 5° C., followed by 1.5 hours of stirring at −5 to 5° C., to yield a reaction liquor.

Analysis of the reaction liquor by HPLC (column: Capcell Pak (Shiseido, Co. Ltd.), mobile phase: solvent mixture (acetonitrile/water/triethylamine=50/50/1); adjusted to pH 7.0 with phosphoric acid, flow rate: 1.0 ml/min, detection wavelength: 285 nm) detected a sulfide at 1.87% and a sulfone at 1.59% as related substances in the reaction liquor, with no other related substances detected.

(2) To the reaction liquor obtained in (1) above, a 30% aqueous solution of sodium thiosulfate (17 l) was added, in a nitrogen stream, to decompose the residual cumene hydroperoxide. To the organic layer obtained by liquid separation, water (4.5 l), heptane (13.5 l), t-butyl methyl ether (18 l) and heptane (27 l) were added sequentially in this order, and this mixture was stirred to cause crystallization. The resulting crystal was separated and washed with t-butyl methyl ether-toluene (t-butyl methyl ether:toluene=4:1) (4 l) to yield a wet crystal of (R)-lansoprazole having the following powder X-ray diffraction interplanar spacings (d).

The results of powder X-ray diffraction analysis of this wet crystal are shown below.

The wet crystal yielded a powder X-ray diffraction pattern with characteristic peaks appearing at powder X-ray diffraction interplanar spacings (d) of 5.85, 4.70, 4.35, 3.66 and 3.48 Angstrom.

Analysis of this crystal by HPLC (column: CHIRALCEL OD (Daicel Chemical Industries, Ltd.), mobile phase: hexane/ethanol=90/10, flow rate: 1.0 ml/min, detection wavelength: 285 nm) detected a sulfone at 0.90% as a related substance in the crystal, with no sulfide or any other related substance detected. The (R)-lansoprazole enantiomer excess rate in this crystal was 100% ee.

(3) With stirring, a suspension in acetone (20 l) of the wet crystal obtained in (2) above was added drop by drop into a mixed liquor of acetone (7 l) and water (34 l), then water (47 l) was added. The precipitated crystal was separated and washed with acetone-water (acetone:water=1:3) (4 l) and water (12 l) to yield a wet crystal of (R)-lansoprazole having the following powder X-ray diffraction interplanar spacings (d).

The results of powder X-ray diffraction analysis of this wet crystal are shown below.

The wet crystal yielded a powder X-ray diffraction pattern with characteristic peaks appearing at powder X-ray diffraction interplanar spacings (d) of 8.33, 6.63, 5.86 and 4.82 Angstrom.

Analysis of this crystal by HPLC (column: CHIRALCEL OD (Daicel Chemical Industries, Ltd.), mobile phase: hexane/ethanol=90/10, flow rate: 1.0 ml/min, detection wavelength: 285 nm) detected no sulfone, sulfide or any other related substance in the crystal. The (R)-lansoprazole enantiomer excess rate in this crystal was 100% ee.

(4) After the wet crystal obtained in (3) above was dissolved in ethyl acetate (45 l) and water (3 l), this solution was

10

divided into liquid layers. The trace amount of insoluble matter in the organic layer was filtered off, then triethylamine (0.2 l) was added, after which the filtrate was concentrated under reduced pressure to a liquid volume of about 7 l. To this concentrate, methanol (2.3 l), about 12.5% aqueous ammonia at about 50° C. (23 l) and t-butyl methyl ether at about 50° C. (22 l) were added, and this liquid was divided into layers. To the organic layer, about 12.5% aqueous ammonia (11 l) was added, and this liquid was divided into layers (this operation was repeated once again). The water layers were combined, and ethyl acetate (22 l) was added, and then acetic acid was added drop by drop to reach a pH of about 8 under cooling. The liquid was divided into layers, and the water layer was extracted with ethyl acetate (11 l). The organic layers were combined and washed with about 20% saline (11 l). After triethylamine (0.2 l) was added, the organic layer was concentrated under reduced pressure. Acetone (5 l) was added to the concentrate, and this mixture was concentrated under reduced pressure. The concentrate was dissolved in acetone (9 l), and this solution was added drop by drop into a mixed liquor of acetone (4.5 l) and water (22.5 l), and then water (18 l) was added drop by drop to the mixed liquor obtained. The precipitated crystal was separated and washed sequentially with cold acetone-water (acetone:water=1:3) (3 l) and water (12 l) to yield a wet crystal of (R)-lansoprazole having the following powder X-ray diffraction interplanar spacings (d).

The results of powder X-ray diffraction analysis of this wet crystal are shown below.

The wet crystal yielded a powder X-ray diffraction pattern with characteristic peaks appearing at powder X-ray diffraction interplanar spacings (d) of 8.33, 6.63, 5.86 and 4.82 Angstrom.

Analysis of this crystal by HPLC (column: CHIRALCEL OD (Daicel Chemical Industries, Ltd.), mobile phase: hexane/ethanol=90/10, flow rate: 1.0 ml/min, detection wavelength: 285 nm) detected no sulfone, sulfide or any other related substance in the crystal. The (R)-lansoprazole enantiomer excess rate in this crystal was 100% ee.

(5) The wet crystal obtained in (4) above was dissolved in ethyl acetate (32 l). The water layer was separated by a liquid separation procedure, and the organic layer obtained was concentrated under reduced pressure to a liquid volume of about 14 l. To the residual liquid, ethyl acetate (36 l) and activated charcoal (270 g) were added, after stirring, the activated charcoal was removed by filtration. The filtrate was concentrated under reduced pressure to a liquid volume of about 14 l. At about 40° C., heptane (90 l) was added drop by drop to the residual liquid. After stirring at the above temperature for about 30 minutes, the resulting crystal was separated, washed with about 40° C. ethyl acetate-heptane (ethyl acetate:heptane=1:8) (6 l), and dried to yield 3.4 kg of the title compound.

The results of powder X-ray diffraction analysis of this crystal are shown below.

The crystal yielded a powder X-ray diffraction pattern with characteristic peaks appearing at powder X-ray diffraction interplanar spacings (d) of 11.68, 6.77, 5.84, 5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41 and 3.11 Angstrom.

Analysis of this crystal by HPLC (column: CHIRALCEL OD (Daicel Chemical Industries, Ltd.), mobile phase: hexane/ethanol=90/10, flow rate: 1.0 ml/min, detection wavelength: 285 nm) detected no sulfone, sulfide or any other

US 7,737,282 B2

11 12

related substance in the crystal. The (R)-lansoprazole enantiomer excess rate in this crystal was 100% ee.

## Example 1

### Crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole)

Amorphous R(+)-lansoprazole as obtained in Reference Example 1 (100 mg) was dissolved in acetonitrile (1 ml), which was gradually evaporated at room temperature in a nitrogen stream. After a crystal began to form, diethyl ether (1.5 ml) was added and the container was stoppered and kept standing at room temperature.

The crystal thus formed was subjected to X-ray structural analysis, and the absolute configuration of sulfoxide was found to be the R-configuration by a method using a Flack parameter. The remaining portion of the crystal was collected by filtration, twice washed with diethyl ether (1 ml), and dried under reduced pressure, to yield crystals of R(+)-lansoprazole (38 mg).

m.p.: 144.0-144.5° C. (dec.)

Elemental Analysis

Calculated: C, 52.03; H, 3.82; N, 11.38; S, 8.68; F, 15.43; O, 8.66.

Found: C, 52.08; H, 3.76; N, 11.58; S, 8.75; F, 15.42.

$^1$H-NMR: 2.25 (3H, s), 4.40 (2H, q, J=7.8 Hz), 4.68 (1H, d, J=13.8 Hz), 4.85 (1H, d, J=13.8 Hz), 6.69 (1H, d, J=6.0 Hz), 7.29-7.39 (2H, m), 7.52 (1H, m), 7.81 (1H, m), 8.37 (1H, d, J=6.0 Hz), 11.00 (1H, bs).

IR (ν cm$^{-1}$): 3081, 3042, 2984, 1586, 1478, 1441, 1306, 1267, 1163.

UVmax (CHCl$_3$): 283.7 nm

$[\alpha]_D$=+199.2° (c=0.202%, CHCl$_3$)

### TABLE 1

| Crystal Data and Structure Refinement Parameters | |
|---|---|
| Molecular formula | C$_{16}$H$_{14}$N$_3$O$_2$F$_3$S |
| Molecular weight | 369.36 |
| Crystal color, habit | Colorless, tabular |
| Crystal Dimension | 0.40 × 0.30 × 0.04 (mm) |
| Crystal system | Monoclinic |
| Lattice constants | a = 8.549(1) (Å) |
| | b = 23.550(1) (Å) |
| | c = 8.720(2) (Å) |
| | β = 103.90(1) (°) |
| | V = 1,689.8(4) (Å) |
| Space group | P2$_1$ |
| Z | 4 |
| Density (calculated) | 1.452 (g/cm$^3$) |
| Effective reflection number/parameter number | 9.12 |
| R (I ≥ 2σ(I)) | 0.056 |
| Flack parameter | −0.02(2) |

## Example 2

### Crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole)

Amorphous (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole as obtained in Reference Example 2 (9.17 g) was dissolved in acetone (20 ml), and made with gentle heating. After the solution was kept standing at room temperature overnight,

water (20 ml) was added, followed by ultrasonication. After being collected by filtration, the solid was washed with water (30 ml, 20 ml), then washed with diisopropyl ether (20 ml), and dried under reduced pressure, to yield a solid (9.10 g).

The solid obtained (9.00 g) was dissolved in acetone (30 ml), and after the solution was filtered, diisopropyl ether (50 ml) was added to the filtrate. A crystal seed was placed, and the mixture was kept standing at room temperature overnight. Precipitated crystals were collected by filtration, washed 3 times with diisopropyl ether (10 ml), and dried under reduced pressure, to yield crystals (7.85 g). The crystals obtained (7.80 g) were dissolved under heating in acetone (22.5 ml) and water (30 ml), and this solution was kept standing at room temperature for 1 hour. A precipitated solid was collected by filtration, washed with acetone-water (1:4) (15 ml), and dried under reduced pressure, to yield a solid (3.88 g). The solid obtained (3.88 g) was dissolved under heating in acetone (4 ml) and diisopropyl ether (14 ml) was added. This solution was kept standing at room temperature for 30 minutes. Precipitated crystals were collected by filtration, twice washed with diisopropyl ether (6 ml), and dried under reduced pressure, to yield crystals of R(+)-lansoprazole (3.40 g, optical purity 99.8% ee).

m.p.: 147.0-148.0° C. (dec.)

Elemental Analysis

Calculated: C, 52.03; H, 3.82; N, 11.38; S, 8.68; F, 15.43; O, 8.66.

Found: C, 51.85; H, 3.92; N, 11.26; S, 8.82; F, 15.22.

$^1$H-NMR: 2.24 (3H, s), 4.38 (2H, q, J=7.8 Hz), 4.74 (1H, d, J=13.6 Hz), 4.87 (1H, d, J=13.6 Hz), 6.68 (1H, d, J=5.8 Hz), 7.26-7.36 (2H, m), 7.45 (1H, m), 7.78 (1H, m), 8.35 (1H, d, J=5.8 Hz).

IR (ν cm$^{-1}$): 3083, 3034, 2975, 1586, 1478, 1441, 1306, 1267, 1163

UVmax (CHCl$_3$): 283.6 nm

$[\alpha]_D$=+180.3° (c=1.004%, CHCl$_3$)

### TABLE 2

| | X-ray Powder Diffraction Data | | |
|---|---|---|---|
| 2θ (°) | Half-value width | d-value (Å) | Relative intensity (%) |
| 7.560 | 0.141 | 11.6841 | 100 |
| 13.060 | 0.165 | 6.7733 | 44 |
| 15.160 | 0.141 | 5.8394 | 55 |
| 15.440 | 0.141 | 5.7342 | 84 |
| 20.040 | 0.165 | 4.4271 | 23 |
| 21.720 | 0.165 | 4.0833 | 89 |
| 22.560 | 0.141 | 3.9380 | 24 |
| 22.820 | 0.141 | 3.8937 | 24 |
| 24.080 | 0.165 | 3.6927 | 37 |
| 26.120 | 0.118 | 3.4088 | 32 |
| 28.680 | 0.165 | 3.1100 | 20 |

## Example 3

### Crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole (R(+)-lansoprazole) 1.5 Hydrate

Amorphous (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole as obtained in Reference Example 1 (100 mg) was dissolved in ethanol (0.15 ml), and water (0.15 ml) was added. After a seed was placed, the solution was kept standing at room temperature for 1 hour. Precipitated crystals were collected by filtration, twice washed with water (2 ml), and dried under reduced pressure, to yield crystals of (R)-2-[[[3-methyl-4-(2,2,2-trif-

US 7,737,282 B2

13

luoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimida-
zole (R(+)-lansoprazole) 1.5 hydrate (96 mg).
m.p.: 76.0-80.0° C.

Elemental Analysis
Calculated: C, 48.48; H, 4.32; N, 10.60; S, 8.09; F, 14.38;
O, 14.13.
Found: C, 48.52; H, 4.44; N, 10.49.

TABLE 3

X-ray Powder Diffraction Data

| 2θ (°) | Half-value width | d-value (Å) | Relative intensity (%) |
|---|---|---|---|
| 6.680 | 0.165 | 13.2212 | 9 |
| 9.200 | 0.165 | 9.6046 | 21 |
| 9.960 | 0.141 | 8.8734 | 25 |
| 10.980 | 0.165 | 8.0513 | 42 |
| 13.380 | 0.141 | 6.6120 | 22 |
| 14.960 | 0.141 | 5.9170 | 63 |
| 15.680 | 0.165 | 5.6469 | 100 |
| 17.640 | 0.212 | 5.0237 | 34 |
| 19.760 | 0.212 | 4.4892 | 33 |
| 25.420 | 0.188 | 3.5010 | 23 |
| 29.800 | 0.188 | 2.9957 | 20 |

Experimental Example 1

Suppressive Action on Gastric Mucosal Injury Due
to Stress of Water Immersion Restraint in Rat

Male SD rats (7 weeks of age, weighing 230 to 250 g) were
fasted for 24 hours, after which they were stressed by being
housed in restraint cages and immersed to below the xiphoid
process in a standing position in a 23° C. constant-tempera-
ture water chamber. After 5 hours, the rats were removed from
the cages and sacrificed using gaseous carbon dioxide, and
their stomachs excised. After the lower portion of the esopha-
gus was clipped, a 1% formalin solution (10 ml) was injected
into the stomach via the duodenum, which was then occluded,
and the stomach was immersed in the same solution. After 10
minutes, an incision was made along the greater curvature,
and the length (mm) of each mucosal injury was measured
under a stereomicroscope. The overall sum of the injury
lengths in each stomach was taken as the gastric mucosal
injury index.

The crystals of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroeth-
hoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole
(R(+)-lansoprazole) as obtained in Example 2 were sus-
pended in 0.5% methyl cellulose (pH 9.5) containing 0.05 M
NaHCO₃ and orally administered at 30 minutes before stress-
ing (dosing volume 2 ml/kg). Each treatment group com-
prised 9 animals. The control group (solvent administration
group) and the drug administration group were compared by
Steel's test.

The results are shown in Table 4.

TABLE 4

| Sample | Dose (mg/kg) | Gastric mucosal injury index (μm) | Suppression rate (%) |
|---|---|---|---|
| Control | — | 10.9 ± 1.9 | — |
| (R)-lansoprazole crystal | 3 | 0.2 ± 0.2* | 98.0 |

Each figure of gastric mucosal injury index is the mean ± standard error for the 9 animals in
each group.
*p < 0.01 (versus control group, Steel's test)

14

Experimental Example 2

The crystals of R(+)-lansoprazole as obtained in Example
2 (about 5 mg) and amorphous R(+)-lansoprazole as obtained
in Reference Example 1 (about 5 mg) were each taken in a
colorless glass bottle, and their stability during storage at 60°
C. (stopper removed) was examined. A 25 ml solution (con-
centration: about 0.2 mg/ml) of the sample after completion
of storage in the mobile phase, along with a standard solution
prepared using the initial lot, was analyzed under the HPLC
conditions shown below, and the R(+)-lansoprazole content
(residual percentage) was calculated from the peak area
obtained. The results are shown in Table 5.

HPLC analytical conditions

| Detection wavelength | UV 275 nm |
|---|---|
| Column | YMC Pro C18, 4.6 × 150 mm |
| Mobile phase | Fluid prepared by adding phosphoric acid to water/acetonitrile/triethyl amine (63:37:1) to reach pH 7. |
| Flow rate | 1.0 ml/min |
| Column temperature | 40° C. |
| Sample injection volume | 10 μl |

TABLE 5

Stability of R(+)-Lansoprazole Crystal and Amorphous

| Sample | Duration of storage | Description | Content (Residual %) |
|---|---|---|---|
| Crystal | 1 week | Light brown | 97.0 |
| | 2 weeks | Brown | 93.8 |
| | 4 weeks | Brown | 91.7 |
| Amorphous | 1 week | Brown | 70.8 |
| | 2 weeks | Blackish brown | 57.5 |

When the sample was stored at 60° C. (exposed), the crys-
tal of Example 2 retained a content exceeding 90% for up to
4 weeks, whereas the amorphous form of Reference Example
1 showed reduction in content to 70.8% after 1 week and
57.5% after 2 weeks. This finding demonstrates that the crys-
tal of R(+)-lansoprazole is more stable and more preferable
for use as a pharmaceutical etc. than the amorphous form.

INDUSTRIAL APPLICABILITY

The crystal of the present invention is useful as a pharma-
ceutical because it shows excellent antiulcer action, gastric
acid secretion-inhibit action, mucosa-protecting action, anti-
Helicobacter pylori action etc., and because it is of low tox-
icity. Furthermore, by crystallizing the (R)-isomer, not only
its stability is improved but also its handling is facilitated so
that it can be prepared as a solid pharmaceutical composition
with good reproducibility. In addition, when orally adminis-
tered, the crystal of the present invention is more absorbable
and more rapidly shows its action than the racemate. In addi-
tion, when administered, the crystal of the present invention
shows a higher Cmax and a greater AUC than the racemate,
and becomes more unlikely to be metabolized partly because
of the increased protein-binding rate, thus showing an
extended duration of action. The crystal of the present inven-
tion is therefore useful as a pharmaceutical of low doses and
low prevalence of adverse reactions.

US 7,737,282 B2

15

The invention claimed is:

1. An amorphous compound of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof.

2. A pharmaceutical composition comprising the amorphous compound according to claim 1 and a pharmaceutically acceptable excipient, carrier or diluent.

16

3. A pharmaceutical composition according to claim 2, wherein the pharmaceutical composition includes an effective amount of the amorphous compound to treat or prevent digestive ulcer.

4. A method for treating or preventing digestive ulcer, which comprises administering to a mammal in need thereof an effective amount of the amorphous compound of claim 1.

* * * * *

TX 1055-0010

A265

# United States Court of Appeals
## for the Federal Circuit

*Takeda Pharmaceutical Co. v. TWi Pharmaceuticals, Inc.,* 2014-1074, -1074

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by HUSCH BLACKWELL LLP, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **April 21, 2014** counsel for Appellant has authorized me to electronically file the foregoing **Brief for the Defendant-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

    Jeffrey I. Weinberger
    Edward G. Dane
    Ryan Hagglund
    Heather E. Takahashi
    Munger, Tolles & Olson LLP
    355 South Grand Avenue, 35th Floor
    Los Angeles, CA 90071-5160
    213-683-9100
    jeffrey.weinberger@mto.com
    ted.dane@mto.com
    ryan.hagglund@mto.com
    heather.takahashi@mto.com

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies

will be filed with the Court, via Federal Express, within the time provided in the

Court's rules.

April 21, 2014                                         /s/ Robyn Cocho
                                                       Counsel Press

## CERTIFICATE OF COMPLIANCE

*Undersigned counsel certifies that:*

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,161 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using **Microsoft® Word® 2010** in **14 point** type size with **Time New Roman** font.

Date:   April 21, 2014            /s/ Don J. Mizerk_____
                                  Don J. Mizerk
                                  Attorney for Defendant-Appellant
                                  TWi Pharmaceuticals, Inc.